UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

JAMIE S. FLANAGAN,

v.

THE LINCOLN NATIONAL LIFE
INSURANCE COMPANY,

Civil Action No.: 3:17-CV-05060-MDH

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND
SUGGESTIONS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.

By: /s/  AnnRene S. Braun
AnnRene S. Braun      MO #67962
4520 Main Street, Suite 400
Kansas City, MO 64111
816-410-2249
816-471-1303 (*Facsimile*)
annrene.braun@ogletree.com

and

Steven J. Silver (*pro hac vice*)
PIERCE ATWOOD, LLP
254 Commercial Street
Portland, Maine 04101
207-791-1145
207-791-1350 (*Facsimile*)
ssilver@pierceatwood.com

**ATTORNEYS FOR DEFENDANT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

I.         INTRODUCTION ....................................................................................1

II.       STATEMENT OF UNDISPUTED MATERIAL FACTS ................................2

        A.     The Group Policy. ..............................................................................2

        B.     Flanagan Undergoes Lumbar Fusion and Continues Working For Two Years. ........................................................................................5

        C.     Flanagan Stops Working and Files LTD Claim. ...................................8

        D.     Flanagan Appeals And Lincoln Approves Her LTD Claim During the Own Occupation Period. .......................................................................10

        E.     At the Change in Definition Lincoln Correctly Determines That Flanagan Failed to Prove Total Disability From Any Occupation. ................15

        F.     Flanagan Appeals and Lincoln Obtains Advice From a Second Independent Board Certified Physician Who Concludes That Evidence of Impairment From Sedentary Functioning in Any Occupation is Lacking. ...................................................................20

        G.     Flanagan Submits Second Appeal But Still Fails To Meet Her Burden of Proving Total Disability From Any Occupation. ........................................23

III.      ARGUMENT ..........................................................................................29

        I.     The Administrative Record Shows That Lincoln's Determination Was Correct and Would Withstand Any Standard of Review. ......................................29

        II.    Flanagan Bore The Burden Of Proof At All Times. .............................................30

        III.   Lincoln's Decision Was Correct. .......................................................................31

             A.     Plaintiff's medical evidence failed to satisfy her burden of proving total disability from any occupation. The medical evidence is clear that she has at least sedentary capacity. ...................32

             B.     Plaintiff's vocational evidence could not possibly meet her burden of proving disability from any occupation. Mr. Eldred's "vocational review" improperly reached medical conclusions and provided no basis upon which to disagree with the two TSA's that identified occupations Plaintiff can perform consistent with her undisputed sedentary capacity. ...........41

**CONCLUSION** ..........................................................................................................................47

ii

# TABLE OF AUTHORITIES

Pages

**Cases**

*Acord v. Metro. Life Ins. Co.*,
2006 WL 2433432 (W.D. Mo. Aug. 21, 2006) ................................................................. 35

*Aetna Health Inc. v. Davila*,
542 U.S. 200 (2004) .......................................................................................................... 29

*Bailey v. Provident Life & Accident Ins. Co.*,
2000 WL 33980014 (N.D. Fla. June 13, 2000) ................................................................ 32

*Black & Decker Disability Plan v. Nord*,
538 U.S. 822 (2003) ................................................................................................... 33, 46

*Bumpas v. Unum Life Ins. Co.*,
2005 WL 2428537 (M.D. Fla. Sept. 30, 2005) ................................................................ 35

*Coker v. Metro. Life Ins. Co.*,
281 F.3d 793 (8th Cir. 2002) ............................................................................................ 40

*Coleman v. Berryhill*,
2017 WL 326284 (D.S.C. July 31, 2017) ........................................................................ 42

*Conkright v. Frommert*,
130 S. Ct. 1640 (2010) ..................................................................................................... 29

*Davis v. Unum Life Ins. Co.*,
444 F.3d 569 (7th Cir. 2006) ............................................................................................ 40

*Dramse v. Delta Family-Care Disability & Survivorship Plan*,
269 F. App'x 470 (5th Cir. 2008) ..................................................................................... 35

*Ellis v. Liberty Life Assur. Co. of Boston*,
394 F.3d 262 (5th Cir. 2004) ............................................................................................ 33

*Farfalla v. Mutual of Omaha Ins. Co.*,
324 F.3d 971 (8th Cir. 2003) ............................................................................................ 46

*Farley v. Benefit Trust Life Ins. Co.*,
979 F.2d 653 (8th Cir. 1992) ............................................................................................ 31

*Ferrari v. Teachers Ins. & Annuity Ass'n*,
278 F.3d 801 (8th Cir. 2002) ............................................................................................ 46

Case 3:17-cv-05060-MDH    Document 33    Filed 05/15/18    Page 4 of 55

*Fisher v. Barnhart*,
181 Fed. App'x 359 (4th Cir. 2006) .................................................................... 42

*Glover v. Jefferson Pilot Fin. Ins. Co.*,
2007 WL 552114 (E.D. Ark. Feb. 21, 2007) ...................................................... 31

*Hilbert v. Lincoln National Life Ins. Co.*,
2017 WL 2633503 (M.D. Pa. June 19, 2017) ..................................................... 35

*Hobbs v. Hartford Life & Acc. Ins. Co.*,
751 F. Supp. 2d 1111 (W.D. Mo. 2010) ............................................................. 33

*Hobson v. Metro. Life Ins. Co.*,
574 F.3d 75 (2d Cir. 2009) .................................................................................. 40

*In re Vorpahl*,
695 F.2d 318 (8th Cir. 1982) .............................................................................. 29

*Jackson v. Prudential Ins. Co. of Am.*,
530 F.3d 696 (8th Cir. 2009) .............................................................................. 35

*Jobe v. Medical Life Ins. Co.*,
598 F.3d 478 (8th Cir. 2010) .............................................................................. 30

*Johnson v. G&K Servs., Inc. Long Term Disability Plan*,
2017 WL 9274764 (D. Minn. Sept. 27, 2017) .................................................... 30

*Johnson v. United of Omaha Life Ins. Co.*,
775 F.3d 983 (8th Cir. 2014) .............................................................................. 30

*King v. Hartford Life & Accident Ins. Co.*,
414 F.3d 994 (8th Cir. 2005) .............................................................................. 29

*Leahy v. Raytheon Co.*,
315 F.3d 11 (1st Cir. 2002) ................................................................................. 29

*Louis v. Genworth Life & Health Ins. Co.*,
2008 WL 4450264 (D. Mass. Sept. 30, 2008) .................................................... 35

*MacNally v. Life Ins. Co. of N. Am.*,
2009 WL 1458275 (D. Minn. May 26, 2009) ..................................................... 31

*Maniatty v. UnumProvident*,
218 F. Supp. 2d 500 (S.D.N.Y. 2002), *aff'd*, 62 F. App'x 413 (2d Cir. 2003) ................. 34

*Menz v. Procter & Gamble Health Care Plan*,
520 F.3d 865 (8th Cir. 2008) .............................................................................. 29

Case 3:17-cv-05060-MDH    Document 33    Filed 05/15/18    Page 5 of 55

*Mote v. Aetna Life Ins. Co.*,
  502 F.3d 601 (7th Cir. 2007) ................................................................................... 34

*Owens v. Colvin*,
  727 F.3d 850 (8th Cir. 2013) ............................................................................. 42, 43

*Pearson v. Metro. Life Ins. Co.*,
  2009 WL 35339 (N.D. Iowa Jan. 6, 2009).............................................................. 29

*Pilot Life Ins. Co. v. Dedeaux*,
  481 U.S. 41 (1987)................................................................................................... 29

*Price v. Disability RMS*,
  2008 WL 763255 (D. Mass. March 21, 2008)......................................................... 35

*Riedle v. General Am. Life Ins. Co.*,
  248 F.3d 753 (8th Cir. 2001) .................................................................................. 46

*Rush Prudential HMO, Inc. v. Moran*,
  536 U.S. 355 (2002)................................................................................................. 29

*Sahulka v. Lucent Technologies, Inc.*,
  206 F.3d 763 (8th Cir. 2000) .................................................................................. 30

*Sahulka v. Lucent Techs., Inc.*,
  206 F.3d 763 (8th Cir. 2000) .................................................................................. 46

*Schmitz v. Sun Life Assurance Company of Canada*,
  57 F. Supp. 3d 1095 (D. Minn. 2014), *aff'd*, 840 F.3d 956 (8th Cir. 2016) ..................... 33

*Torres v. Unum Life Ins. Co. of Am.*,
  405 F.3d 670 (8th Cir. 2005) .................................................................................. 40

*Torres v. UNUM Life Ins. Co. of America*,
  405 F.3d 670 (8th Cir. 2005) .................................................................................. 31

*Waldoch v. Medtronic, Inc.*,
  953 F. Supp. 2d 979 (D. Minn. 2013)...................................................................... 34

*Young v. Am. Int'l Life Assur. Co. of N.Y.*,
  357 F. App'x 464 (3d Cir. 2009) ............................................................................. 35

**Statutes**

Section 502(a)(1)(B) of the Employee Retirement Income Security Act....................................... 1

## Other Authorities

Occupational Employment Statistics
https://catalog.data.gov/dataset/occupational-employment-statistics-employment-
and-wages ....................................................................................................................... 19

## Rules

Fed. R. Civ. P. 56.................................................................................................................... 1

Fed. R. Civ. P. 56.1................................................................................................................. 1

## Regulations

20 C.F.R. § 404.1567 ............................................................................................................ 43

Case 3:17-cv-05060-MDH    Document 33    Filed 05/15/18    Page 7 of 55

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Civil Rules for the United States District Court for the Western District of Missouri, Defendant The Lincoln National Life Insurance Company ("Lincoln") submits the following statement of undisputed material facts. Lincoln's statement and supporting suggestions cite exclusively to the Administrative Record ("AR"), attached as Exhibit A hereto, and replaced bates stamp prefix "LIN" with prefix "AR."

## I. INTRODUCTION

This case seeks judicial review of a claim for benefits pursuant to a group long-term disability ("LTD") policy Lincoln issued to Plaintiff Jamie Flanagan's former employer. Flanagan brings a claim for LTD benefits allegedly due pursuant to Section 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA").

Flanagan had complained of low back pain since 2010 and underwent a lumbar fusion in April of 2011. Following that operation, Flanagan continued to work fulltime as a nurse practitioner until August of 2013.

Lincoln paid Flanagan LTD benefits during the 24-month "own occupation" period as she met her burden of proving that she was disabled from her light duty position. However, under the Group Policy and ERISA, Flanagan bore the burden of proving that she was "totally disabled" from "any occupation" beyond November 24, 2015, including sedentary positions. Simply put, Flanagan failed to meet her burden.

What Flanagan did provide was essentially her own subjective belief that she could not do any work. She also provided some early lukewarm support from one of her several doctors, Dr. Hopewell, who filled out a form that largely agreed she could do sedentary work but for an unexplained lifting restriction of zero which was, literally, contrary to all of the evidence in the

1

file.  Dr. Hopewell admitted that the only basis for his restriction was what Flanagan told him.  After completing this form, Dr. Hopewell never provided any further information supporting the claim in any way.  And all the evidence gathered thereafter clearly established at the very least sedentary work capacity.

Although Flanagan failed to prove that she was totally disabled from any occupation, Lincoln reviewed the claim fully and fairly.  It provided two independent appellate reviews conducted by different personnel.  Lincoln obtained medical advice from two independent, board certified physicians, as well as a registered nurse.  These experts reviewed Flanagan's entire medical file and unanimously concluded that although Flanagan has legitimate restrictions and limitations based on pain, they are not so severe as to preclude sedentary work — the least physically taxing occupational classification.  Further, two independent vocational rehabilitation counselors completed transferable skills analyses that identified several sedentary occupations Flanagan could perform based on her training, education, experience, and physical capacity.

As explained below in detail, over the course of a thorough and extensive claims process including two independent appeals, Lincoln gave Flanagan every opportunity to meet her burden.  She did not do so.  Lincoln reached the only decision supported by the evidence. In sum, Lincoln's determination was correct and would withstand any standard of review.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. The Group Policy.

1. Plaintiff Jamie Flanagan ("Flanagan"), born in April 1980, worked as a nurse practitioner at the Lester E. Cox Medical Center ("Cox Medical").  (AR at 977, 982.)

2. Cox Medical established and maintained an employee welfare benefit plan (the "Plan"), including long-term disability ("LTD") coverage.  (AR at 113-201.)

2

3. Cox Medical funded its Plan, in part, by a Group Long-Term Disability Insurance Policy, policy number 000010157326 (AR at 113-159; the "LTD Policy") that Lincoln issued to Cox Medical.[1]

4. Some full-time Cox Medical employees scheduled to work at least 24 hours per week were eligible for coverage under the LTD Policy. (AR at 117.) Flanagan was a "Class 3" employee eligible for LTD coverage so long as she worked at least 36 hours per week. (AR at 118).

5. The LTD Policy states that Lincoln "will pay a Total Disability Monthly Benefit to an Insured Employee, after the Completion of the Elimination Period, if he or she: (1) is Totally Disabled; (2) becomes Disabled while insured for this benefit; (3) is under the Regular Care of a Physician; and (4) at his or her own expense, submits proof of continued Total Disability and Physician's care to the Company upon request." (AR at 140.)

6. The Elimination Period "means the number of days of Disability during which no benefit is payable. The Elimination Period is shown in the Schedule of Benefits." (AR at 124.) The Schedule of Benefits states that the Elimination Period is "90 calendar days of Disability caused by the same or a related Sickness or Injury, which must be accumulated within a 180 calendar day period." (*Id.* at 118.)

7. "Totally Disabled" means "During the Elimination Period and Own Occupation Period, . . . that due to an Injury or Sickness the Insured Employee is unable to perform all of the Main Duties of his or her Own Occupation." (AR at 128.) "After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform all of the

---

[1] The Complaint only seeks LTD benefits and, as such, Lincoln focuses on the relevant LTD Policy provisions.

3

Main Duties of any occupation for which his or her training, education, experience or physical or mental capacity will reasonably allow." (*Id.*)

8. The "Own Occupation Period" means "a period beginning at the end of the Elimination Period and ending 24 months later for Insured Employees." (AR at 118.)

9. Under the LTD Policy, "Own Occupation" means "the occupation, trade or profession . . . in which the Insured Employee was employed with the Employer prior to the Disability . . . . It means a collective description of related jobs, as defined by the U.S. Department of Labor Dictionary of Occupational Titles." (AR at 126.)

10. Under the LTD Policy, the burden of proving the claim is squarely on the claimant. Proof of Claim "must be provided at the Insured Employee's own expense. It must show the date the Disability began, its cause and degree." (AR at 131.)

11. Under the LTD Policy, an employee's Effective Date is "the first day of the Insurance Month coinciding with or next following the date the Employee becomes eligible for coverage . . . ." (AR at 134.)

12. LTD benefits terminate on the earliest of "the date the Insured ceases to be Totally Disabled" or "the date the Maximum Benefit Period ends." (AR at 140.)

13. Additionally, "[c]easing Active Work results in termination of the Insured Employee's eligibility for insurance" unless extended due to disability. (AR at 136.) This provision precludes recovery for subsequent disabilities as coverage terminated once Flanagan was no longer actively working and no longer disabled.

14. The LTD Certificate of Coverage that Lincoln issued to Cox Medical for distribution to employees states that: "[Lincoln] has the sole discretionary authority to determine

4

eligibility and to administer claims in accord with its interpretation of policy provisions, on the Plan Administrator's behalf." (AR at 200.)

**B.** **Flanagan Undergoes Lumbar Fusion and Continues Working For Two Years.**

15. Flanagan underwent a lumbar fusion at L5-S1 on April 1, 2011. (AR at 923.)

16. Following that operation, Flanagan continued to work as a nurse practitioner fulltime for more than two years. (AR at 982.)

17. On August 2, 2011, Flanagan presented to neurologist Donald Hopewell, M.D. complaining of variable low back pain traveling into her right leg. (AR at 968.) She said the pain worsened later in the day after being on her feet all day. (*Id.*)

18. Flanagan returned to Dr. Hopewell on November 2, 2011 for a routine follow up and he stated that Flanagan had a "good response to muscle relaxers". Her neurological examination was normal. (AR at 967.)

19. Flanagan next saw Dr. Hopewell on February 1, 2012 with continued complaints of low back pain. (AR at 966.) Dr. Hopewell proposed a spinal cord stimulator due to post-laminectomy syndrome. (*Id.*)

20. When Flanagan returned to Dr. Hopewell on May 9, 2012, she did not mention back pain, but instead complained of neck and right shoulder pain. (AR at 964.) Dr. Hopewell diagnosed her with arthralgia and recommended that she take over the counter anti-inflammatories as her examination was normal. (*Id.*)

21. Flanagan had a cervical spine MRI on July 10, 2012. (AR at 944-945.) The MRI revealed mild C5-6 and C6-7 disc bulging but "no cord violation or nerve root entrapment." (*Id.*) John Bartow, M.D. remarked that the findings "are so common" that "while we report their presence they must be interpreted with cautioned." (sic) (*Id.*)

5

22.     On July 31, 2012, Dr. Hopewell confirmed that Flanagan's cervical spine MRI showed no significant pathology. (AR at 963.)

23.     On September 19, 2012, Flanagan presented to Charles Mace, M.D. at the Springfield Neurological & Spine Institute complaining of low back, bilateral leg, neck, and left shoulder pain. (AR at 926.)  Her physical examination was normal showing normal range of motion, normal strength, and normal stability. (*Id.* at 926-927.)  Likewise, her mental status exam was also normal. (*Id.* at 927.)  Dr. Mace also reviewed a September 12, 2012 lumbar spine CT scan (AR at 942-943) and indicated that Flanagan's pre-existing surgical cage and screws "look fine."  (*Id.* at 928).

24.     Flanagan returned to Dr. Hopewell on October 29, 2012 with "highly variable" pain of "multiple etiologies."  (AR at 962.)  Flanagan told Dr. Hopewell that she had seen a rheumatologist and had blood work, but it was negative for autoimmune disease. (*Id.*)  Dr. Hopewell marked that her examination was normal. (*Id.*)

25.     On November 2, 2012, Flanagan had a lumbar myelogram that showed "stable" spondylolisthesis unchanged since October of 2011. (AR at 940.)

26.     Also on November 2, 2012, Flanagan had a cervical spine X-ray that was completely normal. (AR at 939.)  A lumbar spine X-ray the same day indicated "stable appearing changes of posterior lumbar interbody fusion" with "no evidence of segmental instability."  (*Id.* at 938)

27.     A cervical spine CT scan also on November 2, 2012 showed mild degenerative changes with no cord compression, no neural foraminal narrowing, and no nerve root compression. (AR at 936.)  The CT scan also revealed that Flanagan's C5-6 disc bulge had actually decreased in size since July of 2012.  (*Id.*)

6

28. A thoracic spine MRI on December 28, 2012 was completely normal. (AR at 933.)

29. A lumbar spine MRI also on December 28, 2012 indicated postoperative fibrosis involving the S1 nerve root. (AR at 931-32.)

30. Similarly, a lumbar spine X-ray on January 9, 2013 indicated some postsurgical changes of the posterior lumbar interbody fusion at L5-S1, but "no interval change and no evidence of instability." (AR at 930.)

31. Flanagan returned to Dr. Hopewell on January 24, 2013 for a "routine med f/u." Dr. Hopewell noted that Flanagan had plans "to do cord stimulator trial." (*Id.*) He also indicated that she had "no significant neck pathology." (*Id.*) He again marked a normal examination. (*Id.*)

32. Flanagan next saw Dr. Hopewell on April 25, 2013 to discuss mediation options. Dr. Hopewell stated that Flanagan was having hypersomnolence from her morphine. (AR at 960.) Dr. Hopewell suggested methadone, but Flanagan did not want to take it. (*Id.*). He concluded that she should continue her current medication regimen and "explore more options with drug reps." (*Id.*)

33. Flanagan returned to Dr. Hopewell on July 23, 2013 complaining of low back pain traveling down her legs. (AR at 959.) She said her pain paralleled her activity as it worsened as the week went on. (*Id.*) Dr. Hopewell noted that Flanagan was going to have a spinal cord stimulator trial the following month. (*Id.*)

34. Flanagan then presented to Wayne Wallender, D.O. of Ozarks Pain Specialists on August 15, 2013 for an evaluation of a spinal cord stimulator. (AR at 955-958.) Dr. Wallender noted that Flanagan had previously received lumbar injections from Diane Cornellson, D.O. (*Id.* at 955.) But Flanagan never provided any of Dr. Cornellson's records to Lincoln. Flanagan told

7

Dr. Wallender that in addition to her back pain she also suffered from depression. (*Id.* at 957.) Dr. Wallender diagnosed Flanagan with post-laminectomy syndrome, chronic pain syndrome, and spondylolisthesis. (*Id.*) He recommended that she try the spinal cord stimulator, but she never did. (*Id.* at 958.)

### C. Flanagan Stops Working and Files LTD Claim.

35. Flanagan stopped working shortly thereafter on August 25, 2013. (AR at 923.) There are no medical records in the administrative record that provide any background or explanation for why she chose to stop working at that time.

36. Flanagan returned to Dr. Hopewell on September 19, 2013 complaining of bilateral leg weakness. (AR at 954.) Dr. Hopewell noted that Flanagan had "no true motor deficits" despite her subjective complaints of bilateral leg weakness. (*Id.*) He stated that "this is a sensation, not a motor phenomena." (*Id.*) Dr. Hopewell also stated that Flanagan's health insurer denied coverage for the spinal cord stimulator and she planned to appeal. (*Id.*) Dr. Hopewell indicated that Flanagan's examination was "normal." (*Id.*)

37. Flanagan returned to Dr. Hopewell on October 31, 2013 and had another normal neurological examination. (AR at 953.)

38. On or around November 18, 2013, Flanagan filed a LTD claim under the LTD Policy. (AR at 915-925.) Flanagan stated that her low back pain was "severe enough that I cannot perform the duties required of me." (*Id.* at 915.)

39. On that same day, Flanagan also provided a Physician's Statement dated November 17, 2013 from Dr. Hopewell. (AR at 923-925.) Dr. Hopewell diagnosed Flanagan with postlaminectomy syndrome and spinal stenosis. (*Id.* at 923). He stated that her symptoms had been constant since August of 2010. (*Id.*) Dr. Hopewell stated that he believed Flanagan

8

was first unable to work in January of 2013 even though she continued working fulltime for nearly eight months after January, 2013. (*Id.*)  Dr. Hopewell also indicated that Flanagan's physical restrictions and limitations were "unquantifiable" and declined to complete that portion of the Physician's Statement form.  (*Id.* at 924.)  He also wrote that she could not work, but did not explain why.  (*Id.* at 924.)  In addition, Dr. Hopewell noted that Flanagan did not suffer from any cognitive impairment.  (*Id.*)  Finally, Dr. Hopewell stated under "Objective Findings" that Flanagan had "normal physical exam, X-rays, CT myelogram & MRI." (*Id.* at 923.)

40.　　Lincoln assigned Flanagan's claim to Senior LTD Benefit Specialist Loreena Lobdell.  (AR at 847.)

41.　　To provide a full and fair review of Flanagan's claim, Lincoln gathered and reviewed Flanagan's medical records and diagnostic studies, as summarized above.  Lincoln also obtained a medical review by Kathy Freygang, RN on November 26, 2013. (AR at 93-94.) Nurse Freygang concluded that:

> Physical findings report relatively good range of motion with hardware intact and no instability noted. Neurological and motor exam was normal. There is no substantiation that the claimant is unable to stand, ambulate, and use upper/lower extremities in a functional manner. Pain is subjective that cannot be objectively quantified although reasonable to assume that some degree of discomfort in the back is present. Based on the cognitive side effects of the pain medications she is receiving, cognitive functioning was appropriate but safety issue to be considered if involvement with plan of patient care. Based on the medical evidence, claimant is not totally impaired from returning to work in a light occupation from current and beyond. It may be beneficial for the claimant to briefly change positions with posture/position as needed for comfort.

(*Id.* at 94.)

42.　　On December 4, 2013, Ms. Lobdell sent Flanagan's file for a "full manager review" prior to making a determination on her claim. (AR at 110.)

43. On December 14, 2013, Ms. Lobdell informed Flanagan via letter that she had not met her burden of proving entitled to LTD benefits. (AR at 841-847.) Ms. Lobdell explained that

> Based on the medical documentation provided, you have had ongoing complaints of low back pain since at least 10/22/2010. You had an L5-S1 fusion 4/1/2011. You have continued to complain of ongoing symptoms since this date. However, you have continued to work with this condition. There was no significant event prior to the 8/25/2013 date last worked that would substantiate any significant decline in your medical condition that would support you now being unable to perform your occupation as you had been performing previously. Your physical findings report relatively good range of motion with hardware intact and no instability noted. Neurological and motor exam is normal. There is no substantiation that you are unable to stand, ambulate, and use your upper and lower extremities in a functional manner. Pain is subjective and cannot be objectively quantified, although it is reasonable to assume that some degree of discomfort in your back is present. Restrictions of the ability to change positions as needed would be understandable - and in your occupation this would not be a disabling restriction.

(*Id.* at 846). Ms. Lobdell also explained that Flanagan had 180 days to appeal that determination. (*Id.*)

### D. Flanagan Appeals And Lincoln Approves Her LTD Claim During the Own Occupation Period.

44. On January 2, 2014, Flanagan's counsel notified Lincoln of his representation and requested a copy of the claims file. (AR at 828.)

45. Ms. Lobdell sent Flanagan's counsel all relevant documents and materials on January 9, 2014. (AR at 820.)

46. Meanwhile, though Flanagan retained counsel and expressed an intent to appeal Lincoln's decision, she actually sought no treatment (at least no treatment for which she provided Lincoln with records), during the five month period following her last visit with Dr. Hopewell on November 17, 2013, as summarized above.

10

47.     Instead of seeking treatment following this five month period, Flanagan instead attended a Functional Capacity Evaluation ("FCE") with Nancy Beisswenger, OTR/L on April 22, 2014, at the request of her attorney, presumably to support her disability claim. (AR at 786-804.)  As part of the testing, Beisswenger instructed Flanagan to stop any movements that caused pain.  (*Id.*) Beisswenger also declined to perform several tests.  (*Id.*) Despite admitting that Flanagan "showed a tendency toward the exaggeration of the degree of task difficulty," Beisswenger noted that the testing revealed that the claimant's lumbar spine and extremities had near full range of motion. (*Id.* at 787.)  The claimant's lower extremity strength was 5/5.  (*Id.*) Beisswenger concluded that Flanagan was restricted to sitting up to 20 minutes at a time. Beisswenger did not indicate for how long in total Flanagan could sit, nor did she state how she reached this conclusion other than based on what Flanagan told her. But in the Oswestry Pain Questionnaire that Flanagan completed for the FCE, she stated that she could sit up to 30 minutes at a time.  (*Id.* at 792.)  Beisswenger found that Plaintiff was able to occasionally stand and walk.  She found that Plaintiff could occasionally lift up to 7 pounds, though this testing was simply performed up to alleged "permanent restrictions" (*Id.* at 786, 804) and Plaintiff's frequent lifting capabilities were not tested.  (*Id.* at 747.)  Beisswenger stated that, in her opinion, these restrictions meant Flanagan had less than sedentary work capacity, but she provided no basis for this opinion.  (*Id.*)

48.     Via letter dated April 23, 2014, Flanagan's counsel notified Lincoln that Flanagan had been approved for Social Security Disability ("SSDI") benefits in the amount of $2,289 per month with an onset date of August 22, 2013. (AR at 813.)  The letter did not indicate what condition(s) the SSA found disabling or the SSA's rationale.  (*Id.*)  Flanagan provided no other information to Lincoln pertaining to her SSDI award. (*Id.* at 814-819.)

11

49. Via letter dated May 6, 2014, Flanagan's counsel formally appealed Lincoln's determination that she had not met her burden of proving total disability from her own occupation. (AR at 785.)

50. Lincoln assigned Senior Claims Examiner, Reid Hastings, an employee who had no prior role in Flanagan's claim, to manage Flanagan's appeal. (AR at 757.)

51. The only information Flanagan submitted on appeal was the Functional Capacity Evaluation ("FCE") completed by Beisswenger on April 22, 2014 at the request of Flanagan's attorney, which is summarized above.

52. On May 16, 2014, Lincoln referred Flanagan's job description to a vocational consultant, who determined that Flanagan's occupation of nurse practitioner was light.[2] (AR at 750-755.)

53. To provide a full and fair review of Flanagan's appeal, Mr. Hastings referred Flanagan's file to independent medical vendor University Disability Consortium ("UDC") following an Appeal Direction review (AR at 101), in which an additional medical practitioner and separate claims manager, agreed that Mr. Hastings should ask a vendor to arrange for a physician to review all the medical information and answer specific questions about Flanagan's condition and functionality. (AR at 741.)

54. UDC selected Meghana Karande, M.D., board certified in physical medicine and rehabilitation, to review the entirety of Flanagan's record. (AR at 741-749.) Dr. Karande provided a detailed report dated June 9, 2014. (AR at 741-749.) As part of Dr. Karande's review, she contacted Dr. Hopewell, who admitted that the only basis for what he wrote on the

---

[2] Light work involves exerting up to 20 pounds of force occasionally, or up to 10 pounds of force frequently to move objects. It also requires frequent walking/standing as well as frequent sitting. By contrast, sedentary work involves exerting up to 10 pounds of force occasionally or a negligible amount of force frequently to lift or move objects. It also requires frequent sitting with minimal walking or standing.

12

November 17, 2013 APS was acceptance of Flanagan's subjective complaints at face value. (*Id.* at 743.) According to Dr. Karande, "[Dr. Hopewell] informed me that the restrictions and limitations he had established were based on 'what the patient told him.'" (*Id.*) Dr. Karande also reviewed the FCE and remarked that it was "incomplete as isometric strength testing was not performed due to therapist discretion, secondary to multiple diagnoses and lifting restrictions. Furthermore, there is no quantification of muscle strength or range of motion. Thus, this test would have to be interpreted with caution." (*Id.* at 748) After examining Flanagan's medical records and diagnostic studies, Dr. Karande concluded that Flanagan's pain was stable and should not preclude occupational functioning. Dr. Karande stated:

> on the basis on lumbar degenerative disease status post lumbar fusion and chronic but stable pain, restrictions and limitations would include: The claimant may stand/walk up to two hours each out of eight hours with normal breaks. The claimant may sit up to 6 out of 8 hours with normal breaks. She would require position changes for five minutes every hour. The claimant may lift, carry push, and pull up to 20 lbs occasionally and 10 lbs frequently. Reach would not be restricted in all directions. The claimant may climb stairs, kneel, bend, stoop, squat, and crouch occasionally. Climbing ropes, ladders and scaffolds and crawl would be never. Handling, fingering, and feeling would be unrestricted.
> . . .
>
> Dr. Hopewell her Neurologist documented her neurologic examinations were all normal. He does not quantify her pain at each visit by using measurable pain scales. His opinions are based largely on reported symptoms rather than on clinical examination findings and/or diagnostic findings and are not consistent with the documented medical findings.

(*Id.* at 749.)

55. Since Dr. Karande's restrictions and limitations were consistent with sedentary[3] work, but not light work, Lincoln determined that Flanagan was entitled to LTD benefits during

---

[3] Sedentary work requires "[e]xerting up to 10 pounds of force occasionally or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time." *See Ex. B.* By contrast, light work means "[e]xerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly to move objects. Physical

13

the 24 month own occupation period, which ran from November 24, 2013 to November 24, 2015.  Mr. Hastings notified Flanagan of this determination via letter dated June 16, 2014.  (AR at 738-739.)

56.     Lincoln transferred Flanagan's file to LTD Senior Claims Examiner Theresa Elder, for further handling of claim verification and benefit payment. (AR at 738.)

57.     On October 22, 2014, Flanagan returned to Dr. Hopewell stating that she had a flare up of back pain because she "walking more than usual" while looking at properties to purchase. (AR at 688.)  Dr. Flanagan noted that Flanagan had no new weakness, sensory change, or bowel symptoms.  (*Id.*)  He also stated that Flanagan's "[n]eurological examination on this date remains normal." (*Id.*)

58.     On November 24, 2014, Ms. Elder notified Flanagan via letter that Lincoln required proof of continued disability per the terms of the LTD Policy.  (AR at 729.) Specifically, Lincoln requested updated records from Dr. Hopewell.

59.     Via letter dated December 23, 2014, Ms. Elder requested that Flanagan sign an authorization form to allow Lincoln to obtain more of Flanagan's medical records. (AR at 722.)

60.     When Flanagan did not respond, Ms. Elder sent a second request for Flanagan to execute an authorization form via letter dated January 8, 2015. (AR at 716.)

61.     Flanagan returned the completed form on January 20, 2015. (AR at 712.)

62.     Via letter dated February 3, 2015, Lincoln notified Flanagan that Claims Examiner II, Ashley Devine, was going to take over handling of her claim. (AR at 710.)

---

demand requirements are in excess of those for Sedentary Work." *Id.* Within these definitions, "occasionally" means up to 1/3 of the time and frequently means 1/3 to 2/3 of the time. *Id.*

14

63.     Via letter dated March 2, 2015, Ms. Devine notified Flanagan that the LTD Policy provides 24 months of benefits as long as she is unable to perform the main duties of her Own Occupation. (AR at 690-691.) Ms. Devine explained Flanagan's Own Occupation Period was ending on November 24, 2015. (*Id.*)  As a result, Lincoln would evaluate Flanagan's claim to determine if she was Totally Disability from **any occupation**. (*Id.*) (emphasis added). To make this determination, Ms. Devine requested several items including an Insured's Supplementary Statement Form, Treating Medical Professionals Form, Educational Background Form, and another records authorization. (*Id.*)

64.     On April 1, 2015, Lincoln reminded Flanagan via letter that she still had not provided any of the requested forms from Ms. Devine's March 2, 2015 letter. (AR at 662-663.)

65.     On April 6, 2015, Flanagan notified Lincoln via telephone that she had traveled to Texas to care of her ill father and would send the requested forms once she returned home. (AR at 83.)

66.     On April 21, 2015 Lincoln received the requested forms from Flanagan. (AR at 82.)

67.     Flanagan's Educational Background form dated March 27, 2015 indicated that she had a Masters of Science in Nursing from Missouri Southern State University. (AR at 647-648.)

68.     Flanagan also completed an Insured's Supplementary Statement on March 27, 2015.  (AR at 644.)  On this form she stated that she never anticipated being able to return to work due to bilateral arm pain, spasms, severe fatigue, forgetfulness, nausea, headaches, back pain, and bilateral leg weakness. (*Id.*).  She claimed that she could not complete many household

tasks including cooking, cleaning, and shaving her legs. (*Id.*) She also stated that she could not sit or stand for more than five to ten minutes in one position despite recently traveling from rural Missouri to Texas. (*Id.*) She also wrote that she could not drive further than 20 minutes due to leg pain. (*Id.*) Specifically, she stated that "I spend a majority of my day reading & watching TV. I don't leave the house much because it is too hard for me." (*Id.*)

69. Dr. Hopewell completed an Abilities Form on April 21, 2015. (AR at 637.) He checked boxes indicating that Flanagan could sit frequently 20 minutes at a time, reach above her shoulder frequently, stand/walk/drive occasionally, and finger/handle frequently. (*Id.*) These restrictions and limitations were consistent with sedentary work. *See Ex. B* (defining sedentary work as "[e]xerting up to 10 pounds of force occasionally or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time."). Dr. Hopewell also checked a box, directly contrary to the FCE, and without providing any basis for the opinion whatsoever, that Plaintiff had no lifting capacity at all. (*Id.*)

70. Lincoln requested and received records from Mercy Medical on August 16, 2015 including multiple office visits with Dr. Hopewell. These records revealed the following:

    a. Following her October 22, 2014 visit, Flanagan did not return to Dr. Hopewell again until January 20, 2015 complaining of difficulty sleeping. (AR at 574.) Dr. Hopewell noted that her neurological examination was normal. (*Id.*)

    b. Flanagan then went several more months without any treatment and it was during this time period, in April, 2015, when she traveled from Missouri to Texas to care for her ill father. (AR at 83.)

16

c. The records showed that after travelling to Texas and back, Flanagan returned to Dr. Hopewell on April 16, 2015, stating that her low back pain flared up due to weather changes, prolonged car rides, and personal stress due to the loss of her father. (AR at 575.) Yet her neurological examination remained normal. (*Id.*)

d. At her next visit to Dr. Hopewell on June 3, 2015, Flanagan reported that she had recently fallen and landed on her right buttock, which increased her back pain. (AR at 576.) Dr. Hopewell noted that her neurological examination was normal. (*Id.*)

e. Flanagan returned to Dr. Hopewell on July 15, 2015 and he stated that "overall her pain is marginally controlled." (AR at 577.) Dr. Hopewell noted that her neurological examination was normal. (*Id.*) Dr. Hopewell also remarked that Flanagan was having "significant depressive symptomatology." (*Id.*) He stated that Flanagan's mood was "significantly increasing her pain issue." (*Id.*) Dr. Hopewell recommended that Flanagan speak to her primary care physician about altering her antidepressant medication regime. (*Id.*)

71. Dr. Hopewell's records, summarized above, were the only new records Lincoln received while evaluating Flanagan's claim to determine if she was totally disabled from Any Occupation. (AR at 574-577, 688.)

72. On September 2, 2015, Nurse Disability Consultant Ted Hartsock, RN phoned Dr. Hopewell's office in an attempt to obtain clarification regarding Dr. Hopewell's lifting restriction. (AR at 71). Dr. Hopewell's nurse stated that Flanagan herself or "MD would know how much weight she can lift." (*Id.*)

17

73.    Thus, on September 3, 2015, Nurse Hartsock contacted Flanagan via telephone to inquire about her ability complete Activities of Daily Living ("ADLs"). (AR at 71.)  Although Flanagan had previously stated in her March 27, 2015 Supplementary Statement that she could not perform certain ADL's, (AR at 644) and although Dr. Hopewell's April 21, 2015 Abilities Form indicated no lifting at all (AR at 637), Flanagan stated that she was now able to complete most ADLs on her own like bathing, showering, dressing, and cooking. (AR at 71.). Flanagan also stated that she cannot sit for long periods of time unless she is able to change positions.  (*Id.* at 71.)

74.    Also on September 3, 2015, Nurse Hartsock reviewed Flanagan's medical records and determined that there "does not appear to be evidence of physical exam changes or worsening symptoms that would change the previous UDC peer [Dr. Karande] determination that claimant can lift up to 20 lbs, short periods of standing and walking, frequent fingering, handling, can occasionally kneel, stoop and reach." (AR at 70.)

75.    On September 17, 2015, Clinical Operations Manager Karen Greni, RN reviewed Flanagan's file and determined that another peer review was not necessary given the lack of evidence of any worsening, which might call Dr. Karande's prior opinion into question.  (AR at 70-71.)

76.    Utilizing the restrictions and limitations outlined by Dr. Karande, independent vocational rehabilitation counselor, Stacey Nidositko, MS, completed a transferable skills analysis ("TSA") on September 23, 2015.  (AR at 568.)  Ms. Nidositko listed Flanagan's education and training, including that Flanagan had a Master's of Science in Nursing and had taken several courses toward a Doctorate in Nursing Practices.  (*Id.*).  She detailed the relevant medical restrictions and limitations as set forth by Dr. Karande including frequent sitting with

18

the ability to take normal breaks, occasional standing and walking with the ability to take breaks, and the ability to lift and carry up to 20 pounds occasionally and 10 pounds frequently. (*Id.*). Ms. Nidositko also listed Plaintiff's transferable skills including "[a]pplying technical knowledge, common sense, and special medical skills to care for or treat sick or handicapped people; using eyes, hands, and fingers skillfully; adapting quickly to emergency situations; instructing, planning, and directing work of others; keeping accurate records; and distinguishing shapes, forms, and colors," as well as the wage requirement of $5252.52 per month. (*Id.*) Ms. Nidositko then identified several sedentary occupations that Flanagan could perform, including nurse consultant and call center nurse given her skills, educational background, experience, wage requirement, and physical limitations. (*Id.*) Ms. Nidositko listed her source document for the duties of both occupations, as OES 2014.[4]

77. Based on Dr. Karande's opinion that Flanagan had at least sedentary work capacity and Ms. Nidositko identifying multiple sedentary occupations that Flanagan could work in the TSA, Mr. Machian notified Flanagan via letter dated September 28, 2015 that no LTD benefits were payable beyond November 24, 2015 — the date that the Own Occupation Period changed to Any Occupation. (AR at 564-567) Mr. Machian further detailed Flanagan's repeated normal examinations with Dr. Hopewell and lack of objective proof as to why Lincoln correctly determined that Flanagan had failed to meet her burden of proving disability from any occupation. (*Id.*)

---

[4] The Occupational Employment Statistics (OES) program by the U.S. Bureau of Labor Statistics conducts a semi-annual mail survey designed to produce estimates of employment and wages for specific occupations. The OES program collects data on wage and salary workers to produce employment and wage estimates for about 800 occupations by geographic area and by industry. *See* https://catalog.data.gov/dataset/occupational-employment-statistics-employment-and-wages.

**F.      Flanagan Appeals and Lincoln Obtains Advice From a Second Independent Board Certified Physician Who Concludes That Evidence of Impairment From Sedentary Functioning in Any Occupation is Lacking.**

78.      Flanagan, through counsel, appealed Lincoln's determination via letter dated January 25, 2016.  (AR at 548.)

79.      As part of her appeal, Flanagan submitted only two new radiologic studies and one office visitation note from Dr. Hopewell, as summarized below:  (AR at 548.)

   a. A lumbar spine MRI dated October 15, 2015 indicated "PLIF L5-S1 without complicating feature and L4-5 facet joint arthropathy and left extraforaminal zone disc protrusion with annual fissure."  (AR at 549.)

   b. A lumbar CT scan also on October 15, 2015 showed "PLIF L5-S1 without complicating feature and expected postoperative change. Degenerative disk disease and spondylosis L4-5 with facet joint arthropathy and disk bulge/protrusion left subarticular and extraforaminal zone. There is contact with the existing left L4 nerve root but no definite impingement."  (AR at 551.)

   c. A progress note from Dr. Hopewell dated December 9, 2015 noted a conversation about trying to assist her with obtaining LTD benefits. (AR at 553.)  However, Dr. Hopewell wrote that "[o]verall her pain is doing reasonably well on her current regimen without complications."  (*Id.*)

80.      On February 10, 2016, Lincoln received a fax from Flanagan's counsel attaching a letter from Dr. Hopewell dated December 9, 2015 stating that he had no recollection of any conversations with "the patient's insurance company regarding her disability claim."  (AR at 539.)  This is not surprising since it was an outside independent physician, Dr. Karande, not Lincoln, who discussed the claim with Dr. Hopewell.  (*Id.* at 743.)  This brief letter did not

20

provide any further medical information or any opinions regarding Plaintiff's functionality or work capacity. (AR at 539).

81. On March 2, 2016, at the recommendation of Medical Appeals Manager Nurse Gall (AR at 45) Lincoln referred Flanagan's complete medical file to a second independent vendor, Reliable Review Services ("RRS"). (AR at 526.) RRS retained Joseph Thomas, M.D., board certified in occupational medicine, to review the full medical record. After doing so, Dr. Thomas produced a detailed report dated March 9, 2016. (AR at 523-528) Dr. Thomas noted that the FCE revealed near normal range of motion and strength with respect to Plaintiff's lumbar spine. (AR at 524). He also noted Dr. Hopewell's essentially sedentary restrictions but for the zero lifting restrictions and Dr. Hopewell's belief that depression was affecting Plaintiff's pain. (*Id.*) Dr. Thomas acknowledged that based on post-laminectomy syndrome and chronic pain, Plaintiff would have limitations on prolonged sitting, walking, lifting, stooping and balancing. In this respect, Dr. Thomas agreed with Dr. Hopewell's Abilities Form "with the exception of lifting" wherein Dr. Thomas agreed with the FCE which found greater lifting capacity. (*Id.*) Specifically, Dr. Thomas determined that Flanagan had the following restrictions and limitations from November 25, 2015 and forward:

- The claimant could lift up to 7 pounds occasionally.
- She could perform frequent sitting with 20 minutes of continuous sitting.
- She could perform occasional standing/walking with 10 minutes of continuous standing or walking.
- She could perform occasional bending and stooping.
- She could perform frequent reaching and fingering.
- These limitations are for an 8 hour work day and 40 hour work week.

(*Id.*)

82. Based on Dr. Thomas' conclusions, Lincoln obtained a second vocational review with a different vocational rehabilitation counselor, Brandy Thomas, MA. (AR at 520-521.) Ms.

Thomas determined on March 21, 2016 that, based on Dr. Thomas' restrictions and limitations, Flanagan could perform several sedentary occupations (nurse consultant (DOT Code 075.127-014) and call center nurse (eDOT Code 075.374-916)), consistent with the prior vocational review. (*Id.*) Ms. Thomas listed her source document as ERI 2016, which revealed that both occupations require frequent sitting with the ability to change positions (consistent with Dr. Thomas's sitting restrictions), occasional standing and walking with the ability to change positions (consistent with Dr. Thomas's standing and walking restrictions) and the ability either to lift ten pounds occasionally (i.e. up to 1/3 of the time) or a negligible amount of weight frequently (i.e. from 1/3 to 2/3 of the time) (consistent with Dr. Thomas's lifting restriction of 7 pounds occasionally). (*Id.* at 520); *See also* DOT and eDOT[5] occupational descriptions for nurse consultant and call center nurse, attached hereto as Exhibit B.

83. Via letter dated April 26, 2016, Senior Claims Examiner Reid Hastings notified Flanagan that Lincoln was upholding its prior, correct decision that she failed to meet her burden of proving disability from any occupation beyond November 24, 2015. (AR at 515-519.) Mr. Hastings also explained why his decision may have been different than the SSA's prior determination from back in April of 2014:

> We are aware that your client is receiving other income benefits, such as Social Security Disability Income (SSDI). However, please understand our group policy and review process is independent from that of the Social Security Administration (SSA). Although benefits have been approved for SSDI, this decision was based on the SSA's plan provisions and information received by the SSA. The claim decision made under your client's Lincoln Financial Group policy was based upon information we have obtained from you, your client, your client's treating medical professionals and the results of any internal and/or external reviews of your client's claim by clinical staff.

(*Id.* at 518.)

---

[5] The eDOT stands for Enhanced Dictionary of Occupational Titles, which is a resource akin to the DOT that vocational experts routinely rely upon.

**G.  Flanagan Submits Second Appeal But Still Fails To Meet Her Burden of Proving Total Disability From Any Occupation.**

84.  Flanagan, through counsel, appealed for a second time via letter dated October 18, 2016. (AR at 440.)

85.  The only material submitted as part of Flanagan's second appeal was a vocational evaluation by Phillip Eldred, MS, CRC dated October 5, 2016 completed at Flanagan's counsel's request. (AR at 441-464.)  Despite not being a medical practitioner, Mr. Eldred interviewed Flanagan, assessed her self-reported problems and limitations, and purported to summarize the medical records.  (*Id.*)  Mr. Eldred opined that Flanagan was "unemployable and unable to work in any occupation."   (*Id.* at 464.)   Mr. Eldred contended, with no basis or explanation whatsoever, that Dr. Thomas's restrictions and limitations were "sub-sedentary." (*Id.* at 462.)  He also claimed, with no explanation or basis upon which to disagree with the two TSA's Lincoln had performed, that Flanagan somehow cannot perform either of the identified occupations, consistent with Dr. Thomas's restrictions and limitations. (*Id.* at 461.)   As for the nurse consultant occupation, Mr. Eldred contended it was a "sedentary job that she is not physically able to perform according to Nancy (Dickey) Beisswenger, PT, Dr. Donald Hopewell, and Dr. Joseph Thomas," despite the fact that neither of those professionals ever examined the specific demands of the position of a nurse consultant to determine whether or not Flanagan could actually perform them.  (*Id.*)  As for the call center nurse occupation, Mr. Eldred simply skipped any analysis of this occupation because he claimed he could not find the DOT number, despite the fact that it was an eDOT number clearly set forth in Ms. Thomas' assessment as eDOT Code 075.374-916. (*Id.* at 520-521)

86.     Lincoln assigned Senior Claims Examiner, Joseph Jackson, an employee who had no prior role in Flanagan's claim or first appeal, to handle Flanagan's second appeal.  (AR at 394-395.)

87.     Via letter dated October 28, 2016, Mr. Jackson, in an attempt to provide a full and fair review, wrote to Flanagan's counsel seeking any new medical evidence to support Flanagan's claim. (AR at 394-95.)

88.     Flanagan's counsel responded via letter dated November 21, 2016 enclosing records from Elite Pain Management ("Elite"), Mercy Hospital, and CoxHealth, spanning the time frame from December 7, 2015 to October 31, 2016, i.e. long after Lincoln terminated benefits and Plaintiff's coverage under the Group Policy ended.[6]  (AR at 347-348.)  Nonetheless, those records revealed that Plaintiff saw no less than five medical professionals during this time period including specialists in neurology, rheumatology, and pain management.   But yet Flanagan's counsel provided no new opinions from any of these professionals in any way supporting Plaintiff's disability claim.  Nor did the records themselves in any way support any functional or occupational impairment.  Rather the new records demonstrated as follows:

   a.  Included in the CoxHealth records was a visitation note with Dr. Mace dated December 7, 2015. (AR at 285-299.)  The last record of Flanagan seeing Dr. Mace was from three years prior on September 19, 2012. (AR at 926.)   Flanagan continued complaining about low back pain, but denies leg weakness. (*Id.* at 285.)  Dr. Mace remarked that there was "[n]o role for surgical intervention at this time, she will try water exercises and exercise for core strengthening." (*Id.* at 286.)  Dr.

_____

[6] Per the termination provisions of the Group Policy, if Flanagan was not disabled at the change in definition from own occupation to any occupation, which she was not, then she was not covered for a subsequent disability. (AR at 136.)

Mace did not at any time provide any opinions to Lincoln supporting disability or occupational restrictions.

b.  Flanagan returned to CoxHealth on January 28, 2016 to see Crystal Powell, PA for a refill of an Epi Pen due to allergies.  Ms. Powell noted that Flanagan was in "no acute distress. Alert & Oriented. Behavior and affect appropriate to situation." (*Id.* at 279-280.)  Ms. Powell did not at any time provide any opinions to Lincoln supporting disability or occupational restrictions.

c.  Flanagan returned to Dr. Hopewell on February 29, 2016 with continued complaints of chronic back pain.  (AR at 272.)  Dr. Hopewell stated that her pain was "reasonably controlled" on her current medication regimen. (*Id.*)

d.  On May 28, 2016, Flanagan returned to Dr. Hopewell reporting a flare up in her back pain with no specific "precipitating factor."  (AR at 277.)  Dr. Hopewell remarked that Flanagan's "[n]eurologic examination on this date remains normal, but the patient does have muscle tenderness in the lower extremities particularly in the calves bilaterally."  (*Id.*)

e.  Flanagan returned to CoxHealth to see rheumatologist Anne Winkler, M.D. on June 16, 2016 for "UCTD" or undifferentiated connective tissue disease.  (*Id.* at 281.)  Flanagan stated that she "was ok for some time" but now had developed swelling in her hands and fingers. (*Id.*)  Dr. Winkler did not at any time provide Lincoln with any opinions supporting disability or occupational restrictions.

f.  The records also revealed that soon thereafter, Flanagan took a vacation to Florida as she telephoned Laura Newman, LPN at Mercy Hospital to ask a question about

25

pain medication on June 28, 2016 and Nurse Newman noted that Flanagan had traveled from rural Missouri to Florida. (AR at 278.)

g.  Flanagan followed up with Dr. Winkler on September 1, 2016 (AR 283-284.) Flanagan reported that her Medrol dose pack relieved her pain for about two months. (*Id.*)  Her physical examination was normal.  (*Id.* at 284.)

h.  Included in the Elite records was a visit to Melissa Kokoszka, M.D. dated October 5, 2016 where Flanagan complained of bilateral lower back pain radiating into her right lower extremity.  (AR at 352-362.)  However, Dr. Kokoszka noted that Flanagan's physical and neurological examinations were normal.  (*Id.* at 358.) Dr. Kokoszka did not at any time provide Lincoln with any opinions supporting disability or occupational restrictions.

i.  Flanagan visited David Tonkin, M.D. at Elite on October 12, 2016 and reported 60% pain relief.  (AR at 367.)  Dr. Tonkin ordered Flanagan a lumbar brace.  (AR at 371.)  Dr. Tonkin did not at any time provide Lincoln with any opinions supporting disability or occupational restrictions.

j.  Flanagan returned to Elite on October 24, 2016 for fitting and instruction on usage of her lumbar brace.  (AR at 373-382.)

k.  Flanagan next returned to Elite on October 31, 2016 and reported that her symptoms had worsened since she started treating at Elite. (AR at 383-392.) This was her last visit to Elite documented in the record.

89.  On November 29, 2016, Flanagan's counsel sent a letter to Lincoln seeking additional time to submit additional medical records. (AR at 269.)

26

90.    On December 7, 2016, Mr. Jackson wrote to Flanagan's counsel agreeing to an extension to allow Flanagan to supplement her appeal.  (AR at 232-233.)

91.    Via letter dated January 9, 2017, (AR at 229.) Flanagan's counsel supplemented the appeal with a single visitation note from family practitioner Steve Newbold, M.D. dated November 16, 2015.  (AR at 230-231.)   At this visit, Dr. Newbold stated that Flanagan "is actually doing well except she's had recurring episodes of urticarial and angioedema. . . Anxiety depression well controlled as is her pain for the most part." (*Id.*)  Just as with all of the other new practitioners set forth in the records summarized above, Dr. Newbold offered no opinions supporting disability or any functional or occupational restrictions or limitations.  (*Id.*)

92.    On January 27, 2017 Mr. Jackson obtained an internal medical records review. Karen Mills, RN reviewed the entirety of Flanagan's file to determine Flanagan's functionality (AR at 205-209).  Nurse Mills concluded that

> Medical findings submitted in file did not support clmt had functional limitations/ impairment that would preclude ability to perform duties of any sedentary occupation, ability to lift/carry up to 10lbs occasionally, ability to sit up to total of 6 hours/8 hour workday and continuously for 20 min at a time, can stand or walk up to total of 2 hours /8 hour workday allowing for position changes as needed for comfort, unrestricted fingering/handling/reaching/ gripping /keyboarding/ typing/ interacting with coworkers, problem solving as needed on full time basis . . . There was no MD exam documentation of any focal motor weakness/sensory loss/cognitive or memory deficits, and no gait issues identified. . . . The clmt's HTN, GERD, depression and pain overall is stated by MD notes to be well controlled on steady medication regimen, has full ROM all extremities with intact sensation throughout, and normal gait without use of assistive device. . . . The clmt admitted to having good pain control and wearing lumbar brace helps pain. There are no clinical findings noted in file demonstrating any functional limitation that would support clmt unable to perform duties of any sedentary occupation detailed above.

(*Id.* at 209.)

93.     Based on the reports of two board certified physicians and a registered nurse, as well as two TSA's identifying sedentary occupations Plaintiff can perform, Lincoln correctly upheld its initial determination via letter dated February 6, 2017. (AR at 223-228.)  Mr. Jackson explained that Flanagan had not met her burden of proving that she was totally disabled from any occupation. (*Id.*)  He also explained why his decision may have been different than the SSA's. (AR at 227.)

94.     Via letter dated February 17, 2017, Flanagan's counsel requested a copy of Flanagan's claim file.  (AR at 221.)

95.     Lincoln provided the complete file to Flanagan's counsel on February 27, 2017. (AR at 219.)

96.     This suit ensued.

## III.   ARGUMENT

I.   <u>The Administrative Record Shows That Lincoln's Determination Was Correct and Would Withstand Any Standard of Review.</u>

The Employee Retirement Income Security Act of 1974 ("ERISA") represents a "'careful balancing' between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 215 (2004), quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54 (1987).   ERISA "induc[es] employers to offer benefits by assuring a predictable set of liabilities, under uniform standards of primary conduct and a uniform regime of ultimate remedial orders and awards when a violation has occurred."   *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 379 (2002).   *See also Conkright v. Frommert*, 130 S. Ct. 1640, 1644-46 (2010).

Putting these principles into practice, in an ERISA benefits case of this nature, the Court is called upon to review Lincoln's administrative decision based on a fixed administrative record — the record that was before Lincoln when it made its decision.   The Court "sits more as an appellate tribunal than as a trial court."   *Leahy v. Raytheon Co.*, 315 F.3d 11, 18 (1st Cir. 2002). The Court's review is undertaken by examining the evidence that was before Lincoln when it made its decision.   The court does not take evidence, but, rather, "'must focus on the evidence available to the administrators at the time of [its] decision [i.e. the administrative record]." *Pearson v. Metro. Life Ins. Co.*, 2009 WL 35339, at *5 (N.D. Iowa Jan. 6, 2009) (quoting *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 999 (8th Cir. 2005).   There is no jury trial in ERISA actions. *In re Vorpahl*, 695 F.2d 318, 322 (8th Cir. 1982). Rather, ERISA cases are resolved on cross dispositive motions.   *Menz v. Procter & Gamble Health Care Plan*, 520 F.3d 865, 871 (8th Cir. 2008).   Thus, a motion for judgment on the administrative record is merely a vehicle for deciding an ERISA benefits case; the factual record is fixed and the sole issue is

29

whether Lincoln's decision based on that record passes muster under the appropriate standard of review.

Here, the Certificate of Coverage that Lincoln issued to the plan administrator, Lester E. Cox Medical Center, for distribution to employees, states that "The Lincoln National Life Insurance Company has the sole discretionary authority to determine eligibility and to administer claims in accord with its interpretation of policy provisions, on the Plan Administrator's behalf." (AR at 200.) The Eighth Circuit has issued conflicting opinions regarding the standard of review when a grant of discretion is contained in an insurance certificate. *Compare Johnson v. United of Omaha Life Ins. Co.*, 775 F.3d 983, 987-88 (8th Cir. 2014) *with Jobe v. Medical Life Ins. Co.*, 598 F.3d 478, 486 (8th Cir. 2010). This Court need not delve into such issues because Lincoln's determination would withstand any standard of review, including *de novo* review, where the Court "reviews the entire record available to the plan administrator at the time of the adverse decisions, but does not give any deference to the administrator's determination . . ." *Johnson v. G&K Servs., Inc. Long Term Disability Plan*, 2017 WL 9274764, at *4-5 (D. Minn. Sept. 27, 2017).

II.      Flanagan Bore The Burden Of Proof At All Times.

As stated, the LTD Policy places the burden of proving total disability squarely on the claimant. (AR at 131, 140) (requiring claimants to submit "Proof of Claim" which must show "the date the Disability began, its cause and degree."). Consistent with the terms of the LTD Policy, the Eighth Circuit has repeatedly emphasized that a claimant seeking benefits under an ERISA plan bears the burden of demonstrating entitlement thereto and the administrator has no burden to disprove the claim. *See, e.g.*, *Sahulka v. Lucent Technologies, Inc.*, 206 F.3d 763, 769 (8th Cir. 2000) ("when a plan placed the burden on the claimant to provide necessary

30

information, the claimant cannot shift the burden of investigation to the plan administrator”); *Torres v. UNUM Life Ins. Co. of America*, 405 F.3d 670, 678 (8th Cir. 2005) (insurer is not required to “articulate a theory” for claimant’s inability to perform his or her job, but rather the claimant bears burden of submitting evidence proving disability); *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992) (stating that it is “plaintiff’s burden of proving covered benefits”); *Glover v. Jefferson Pilot Fin. Ins. Co.*, 2007 WL 552114, at \*2 (E.D. Ark. Feb. 21, 2007) (“claimant for disability benefits must submit proof to show that she is disabled in the first instance”).

In this instance, Flanagan bore the burden of proving, with medical and/or vocational evidence, that she was “Totally Disabled” as defined in the LTD Policy. For the purposes of this lawsuit, this means that “due to an Injury or Sickness the Insured Employee is “unable to perform all of the Main Duties of any occupation for which [her] training, education, experience or physical or mental capacity will reasonably allow.” (*Id.*); *see also MacNally v. Life Ins. Co. of N. Am.*, 2009 WL 1458275, at \*2 (D. Minn. May 26, 2009) (“the any-occupation definition of disability will be more difficult to meet than the own-occupation definition”). Flanagan did not meet her burden.

III.    Lincoln’s Decision Was Correct.

Lincoln afforded Flanagan a thorough and fair claims process and review of the information she supplied. It is undisputed in the administrative record that Flanagan has some restrictions and limitations based on chronic back pain. It is also clear that Flanagan has no desire or intent to return to work in any capacity because she subjectively feels she cannot do so. (AR at 791.) But that is a far cry from proving disability, as Lincoln correctly found.

31

**A. Plaintiff's medical evidence failed to satisfy her burden of proving total disability from any occupation. The medical evidence is clear that she has at least sedentary capacity.**

During the initial any occupation review, Flanagan attempted to meet her burden simply with her own subjective self-assessments, as perhaps accepted at face value by one of her several physicians, Dr. Hopewell. Plaintiff's own subjective view of her limitations was obviously insufficient. If it were otherwise, insurers would essentially have to pay all claims. *See, e.g.*, *Bailey v. Provident Life & Accident Ins. Co.*, 2000 WL 33980014, at *4 (N.D. Fla. June 13, 2000) ("Although . . . subjective information should be considered, . . . reliance on such complaints, without more, would result in insurance companies paying virtually all claims.").

Moreover, here, good reasons exist to question Flanagan's subjective complaints. Among other things, they were internally inconsistent or at the very least evolving, and to the extent they evolved, such evolution supported work capacity, not disability. For example, on March 27, 2015, Flanagan stated in the Insured's Supplementary Statement that she could not cook, clean, or shave her own legs. (AR at 644.) But in her telephone interview with Nurse Hartsock several months later, on September 3, 2015, Flanagan stated that she could complete ADLs on her own including, bathing, showering, dressing, and cooking. (AR at 71.) Compare also her statements claiming that she could not sit for long periods of time (AR at 71) and that she could not drive more than 20 minutes (AR at 644) with her ability to travel from rural Missouri to East Texas and Florida. Flanagan's self-assessed disability status was also inconsistent with all the objective evidence including the FCE which, despite its questionable validity, revealed normal lumbar range of motion and strength, as well as the contemporaneous medical records which noted consistently normal examinations. (AR at 277, 284, 358, 553, 574, 575, 576, 688, 926-927, 945, 953, and 954) Indeed, within those records, Flanagan admitted to

32

her physicians on multiple occasions that her pain was well controlled. (AR at 230-231, 272, 577).

Similarly, the ambiguous, lukewarm, and untimely support Plaintiff received from just one of her many doctors, Dr. Hopewell, was entirely insufficient to meet her burden of proving disability from any occupation during the relevant time period (i.e. at the change in definition which took place on November 24, 2015). As a matter of law, courts consistently recognize the inherent limitations of a treating physician's opinion. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) (administrator has no duty to defer to treating physicians and no discrete burden of explaining disagreements because, in part, "a treating physician 'may favor a finding of disability'"); *see also Schmitz v. Sun Life Assurance Company of Canada,* 57 F. Supp. 3d 1095, 1120 (D. Minn. 2014) (a plan administrator's decision is not incorrect "merely because it rejects the opinion of a treating physician") *aff'd*, 840 F.3d 956 (8th Cir. 2016); *Hobbs v. Hartford Life & Acc. Ins. Co.*, 751 F. Supp. 2d 1111, 1115–16 (W.D. Mo. 2010) ("treating physicians are not automatically entitled to special weight under ERISA disability determinations").

These courts recognize that a treating physician's opinions may be suspect both because he must accept as true his patient's subjective complaints even when an objective physician might find them doubtful and because the treating physician might feel a responsibility to act as the patient's advocate. While there is nothing wrong with this from a treatment perspective, since an unsupportive physician may jeopardize the trust necessary to facilitate a doctor/patient relationship, and thereby endanger the continued vitality of that relationship (perhaps to the physician's financial detriment) it certainly does not lead to accurate disability determinations. *See, e.g.*, *Ellis v. Liberty Life Assur. Co. of Boston*, 394 F.3d 262, 274 (5th Cir. 2004) ("In short,

33

treating physicians are certainly inclined to believe their patient's subjective complaints, at the least, because of natural professional empathy."); *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 607 (7th Cir. 2007) ("[m]ost of the time, physicians accept at face value what patients tell them about their symptoms; but insurers . . . must consider the possibility that applicants are exaggerating in an effort to win benefits"); *Maniatty v. UnumProvident*, 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002), *aff'd*, 62 F. App'x 413 (2d Cir. 2003) (noting that treating physicians frequently reach opinions based on acceptance of subjective complaints; "an acceptance more or less required of treating physicians but by no means required of the administrator"); *Waldoch v. Medtronic, Inc.*, 953 F. Supp. 2d 979, 1006 (D. Minn. 2013) (administrator not required to accord special weight to treating physicians' opinions that "appeared to have been based on [plaintiff's] subjective reports").

The teachings of *Nord* and its progeny are particularly apt here, for a number of reasons. First, and perhaps most significantly, Dr. Hopewell *expressly admitted* to Dr. Karande on June 2, 2014 that despite numerous normal physical examinations, he set forth restrictions and limitations based purely on what Flanagan told him. (AR at 743.)

Second, Dr. Hopewell declined to provide any narrative reports or letters explaining his opinions, though he had every opportunity to do so. Rather, his opinions were set forth on two forms. The first form, a Physician's Statement dated November 17, 2013 (i.e. long before the relevant time period) stated that Flanagan's restrictions and limitations were "unquantifiable" and thus, he declined to complete the full form. (AR at 923-925.) The second form, an Abilities Form dated April 16, 2015 (AR at 637), indicated that Flanagan could frequently sit, finger, and handle with occasional standing and walking; restrictions entirely consistent with sedentary functioning. *See Ex. B* (defining sedentary work).

34

This form also contained, however, a conclusory and unexplained lifting restriction of zero. As Lincoln correctly concluded, this restriction found no support anywhere in the record. Indeed, upon review of this form, Nurse Hartsock called Dr. Hopewell for clarification, and his nurse simply stated that Flanagan would know how much she could lift. (AR at 71.) Thus, Nurse Hartsock called Flanagan and she acknowledged the ability to do ADL's[7] and to travel, which was contrary to the no lifting box Dr. Hopewell had checked. (AR at 71, 83, 278.) In fact, Dr. Hopewell's no lifting restriction not only lacked any basis in testing or objective analysis,[8] it was actually inconsistent with Dr. Hopewell's own contemporaneous medical records which repeatedly set forth normal exams and even subjective pain that was well controlled.[9] (AR at 272, 553.) It was also inconsistent with the FCE which, despite its questionable validity,

---

[7] The ability to perform ADLs is an indicator of a claimant's capacity to work in a sedentary position. *See Acord v. Metro. Life Ins. Co.*, 2006 WL 2433432, at \*5 (W.D. Mo. Aug. 21, 2006) (granting defendant's motion for summary judgment on a claim for STD benefits because, in part, "[f]ile lacks mention of specific ADL impairment by her healthcare provider or need for home health aide that would support an impairment from a sedentary position.").

[8] Consistent with the Group Policy's proof requirements and the case law, Lincoln correctly gave more weight to the objective evidence than to Flanagan's subjective complaints. *See Jackson v. Prudential Ins. Co. of Am.*, 530 F.3d 696, 701 (8th Cir. 2009).; *Maniatty*, 218 F. Supp. 2d at 504 (*aff'd*, 62 F. App'x 413 (2d Cir. 2003) (noting that "the plan does state that 'proof' of continued disability must be provided, . . . the very concept of proof connotes objectivity", and that if insurers could not weigh objective proof more heavily, they would have to pay all claims).

[9] It is axiomatic that contemporaneous treatment records deserve more weight than post-hoc, conclusory, advocacy statements or "disability" certifications. *See, e.g., Hilbert v. Lincoln National Life Ins. Co.*, 2017 WL 2633503, at \*8 (June 19, 2017) ("post-hoc disability certifications that are inconsistent with contemporaneous medical records do not constitute proof of disability"); *Young v. Am. Int'l Life Assur. Co. of N.Y.*, 357 F. App'x 464, 469 (3d Cir. 2009) (treating doctor's advocacy statement that plaintiff could not return to work was "seriously undermined" by doctor's own treatment records showing normal exams and tests); *Dramse v. Delta Family-Care Disability & Survivorship Plan*, 269 F. App'x 470, 480 (5th Cir. 2008) (treating physician's advocacy letter "was unsupported by his contemporaneous notes"); *Louis v. Genworth Life & Health Ins. Co.*, 2008 WL 4450264, at \*8 (D. Mass. Sept. 30, 2008) ("reasonable for Genworth to give greater weight to the more contemporaneous reports, including those made for the purpose of diagnosis or treatment); *Bumpas v. Unum Life Ins. Co.*, 2005 WL 2428537, at \*5 (M.D. Fla. Sept. 30, 2005) (upholding benefits denial under *de novo* standard of review and finding that administrator was correct "to rely on the contemporaneous treatment notes of Plaintiff's physicians, rather than [their] post hoc certification of disability. . ."); *Price v. Disability RMS*, 2008 WL 763255, at \*18 (D. Mass. March 21, 2008) (granting judgment for defendant under *de novo* standard "[w]hile the record includes statements . . . offering opinions that [plaintiff] was not able to work . . ., what is lacking is record support for those opinions.").

35

demonstrated an ability to lift at least seven pounds occasionally. (*Id.* at 786.) And it was inconsistent with the fact that Plaintiff saw no less than five other practitioners whose records Dr. Hopewell did not even purport to have reviewed, not one of whom set forth any functional limitations at all. (AR at 277, 284, 286, 358, 367, 926-927.) Indeed, the records submitted by Flanagan and reviewed by Lincoln as seen in the chart below document more than four years of consistently normal examinations and stable spinal imaging:

| DATE | PROVIDER | DESCRIPTION |
|---|---|---|
| 07/10/12 | Cervical spine MRI | Revealed mild C5-6 and C6-7 disc bulging but "no cord violation or nerve root entrapment." (AR at 944-495) John Bartow, M.D. remarked that the findings "are so common" that "while we report their presence they must be interpreted with cautioned." (sic) (*Id.*) |
| 09/19/12 | Charles Mace, M.D. | Normal physical examination and normal mental status examination (AR at 926-927) |
| 11/02/12 | Lumbar myelogram | Showed "stable" spondylolisthesis unchanged since October of 2011 (AR at 940) |
| 11/02/12 | Cervical spine CT | Showed mild degenerative changes with no cord compression, no neural foraminal narrowing, and no nerve root compression. (AR at 936.) The CT scan also revealed that Flanagan's C5-6 disc bulge had actually decreased in size since July of 2012. (*Id.*) |
| 12/28/12 | Thoracic spine MRI | Completely normal. (AR at 933.) |
| 01/09/13 | Lumbar spine X-ray | Indicated some postsurgical changes of the posterior lumbar interbody fusion at L5-S1, but "no interval change and no evidence of instability." (AR at 930.) |
| 01/24/13 | Dr. Hopewell | Normal neurological examination. (AR at 961.) |
| 04/25/13 | Dr. Hopewell | Normal neurological examination (AR at 960.) |
| 07/23/13 | Dr. Hopewell | Normal neurological examination (AR at 959.) |
| *08/25/13* | | *Flanagan stopped working.* |
| 09/19/13 | Dr. Hopewell | Normal neurological examination with "no true motor deficits" (AR at 954.) |
| 10/31/13 | Dr. Hopewell | Normal neurological examination (AR at 953.) |
| *12/14/13* | | *Lincoln informed Flanagan that she had not met her burden of proving disability. (AR at 841-847.)* |
| ***11/17/13-10/22/14*** | | ***No record of medical treatment.*** |
| 04/22/14 | Nancy Beisswenger, OTR | Flanagan's FCE. (AR at 786-804.) |

| 10/22/14 | Dr. Hopewell | Normal neurological examination (AR at 688.) |
|---|---|---|
| 01/20/15 | Dr. Hopewell | Normal neurological examination (AR at 574.) |
| *04/06/15* | | *Flanagan travels from Crane, Missouri to Texas (AR at 83.)* |
| 04/16/15 | Dr. Hopewell | Normal neurological examination (AR at 575.) |
| 04/21/15 | Dr. Hopewell | Completed an Abilities Form indicating that Flanagan could sit frequently 20 minutes at a time, reach above her shoulder frequently, stand/walk/drive occasionally, and finger/handle frequently despite not seeing her for four months. (AR at 637.) |
| 06/03/15 | Dr. Hopewell | Normal neurological examination (AR at 576.) |
| 07/15/15 | Dr. Hopewell | Flanagan stated that "overall her pain is marginally controlled." (AR at 577.) Dr. Hopewell noted that her neurological examination was normal. (*Id.*) Dr. Hopewell also remarked that Flanagan was having "significant depressive symptomatology." (*Id.*) |
| *09/03/15* | | *Flanagan informs Nurse Hartsock via telephone that she can complete ADLs. (AR at 71.)* |
| *09/28/15* | | *Lincoln notified Flanagan that no LTD benefits were payable beyond 11/24/15 – the change from own occupation to any occupation. (AR at 564-567.)* |
| 10/15/15 | Lumbar spine CT | Showed "PLIF L5-S1 without complicating feature and expected postoperative change. Degenerative disk disease and spondylosis L4-5 with facet joint arthropathy and disk bulge/protrusion left subarticular and extraforminal zone. There is contact with the existing left L4 nerve root but no definite impingement." (AR at 551.) |
| 11/16/15 | Steve Newbold, M.D. | Dr. Newbold stated that Flanagan "is actually doing well except she's had recurring episodes of urticarial and angioedema. . . Anxiety depression well controlled as is her pain for the most part." (AR at 230-231.) |
| *11/24/15* | | *Disability definition changes from "own occupation" to "any occupation."* |
| 12/07/15 | Dr. Mace | Normal examination and Dr. Mace remarked that there was "[n]o rule for surgical intervention at this time, she will try water exercises and exercise for core strengthening." (*Id.* at 286.) |
| 12/09/15 | Dr. Hopewell | Dr. Hopewell wrote that "[o]verall her pain is doing reasonably well on her current regimen without complications." (AR at 553.) |
| *01/25/16* | | *Flanagan's counsel appeals Lincoln's determination.* |
| 02/29/16 | Dr. Hopewell | Dr. Hopewell stated that her pain was "reasonably controlled" on her current medication regimen. (AR at 272.) |
| *04/26/16* | | *Lincoln notified Flanagan that it was upholding its initial determination that no LTD benefits were payable beyond 11/24/15. (AR at 515-519.)* |
| 05/28/16 | Dr. Hopewell | Dr. Hopewell remarked that Flanagan's "[n]eurologic examination on this date remains normal" (AR at 277.) |

37

| | | |
|---|---|---|
| *06/28/16* | | *Flanagan travels to Florida for vacation (AR at 278.)* |
| 09/1/16 | Anne Winkler, M.D. | Normal physical examination (AR at 284.) |
| 10/05/16 | Melissa Kokoszka, M.D. | Normal physical and neurological examinations (AR at 358.) |
| 10/12/16 | David Tonkin, M.D. | Flanagan reports 60% pain relief. (AR at 367.) |
| *10/18/16* | | *Flanagan's counsel files second administrative appeal.* |
| *02/06/17* | | *Lincoln notified Flanagan that it was upholding its initial determination that no LTD benefits were payable beyond 11/24/15.* (AR at 223-228.) |

Dr. Hopewell's unsupported lifting restriction was also inconsistent with the opinions of all three practitioners who reviewed the claim for Lincoln and concluded that Plaintiff could lift at least seven pounds occasionally, if not more. *See* Dr. Karande's review (finding lifting capacity of 20 pounds occasionally and 10 pounds frequently) (AR at 749); (Dr. Thomas' review finding lifting capacity of 7 pounds occasionally) (AR at 524); (Nurse Mills' review finding lifting capacity of up to 10 pounds occasionally) (AR at 209.).

Finally, Dr. Hopewell's lifting restriction was not timely and obviously not based on a review of the complete record as it continued to develop. Rather, it was set forth on a brief form Dr. Hopewell completed on April 21, 2015, months prior to the change in definition and prior to the collection of all the evidence summarized above. After that time, and despite having every opportunity to do so, Dr. Hopewell never provided Lincoln with any updated opinion on functionality or supported Plaintiff's disability claim in any way. Presumably, if Dr. Hopewell believed that Plaintiff could not work in any sedentary occupation, he would have said so at some point during the two independent appellate reviews that Lincoln conducted.

Given the inadequacy of Plaintiff's subjective complaints and Dr. Hopewell's ambiguous opinions, Plaintiff's lawyer attempted to satisfy her burden by commissioning and submitting an FCE. But this submission did not help her cause. As Dr. Karande expressly noted, the FCE was

"incomplete as isometric strength testing was not performed due to therapist discretion" and "there is no quantification of muscle strength or range of motion. Thus, this test would have to be interpreted with caution." (AR at 748)

Accordingly, the FCE clearly did not constitute an accurate assessment of Plaintiff's maximum functionality. (*Id.*) Even taking the FCE at face value, however, it failed to support Plaintiff's claim of disability from even sedentary occupations. Again, sedentary work requires "[e]xerting up to 10 pounds of force occasionally or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time." *See Ex. B.* The FCE showed, directly contrary to Dr. Hopewell's entirely unsupported, previous lifting restriction of zero, that Flanagan could lift at least seven pounds occasionally and thus negligible amounts of weight frequently. (AR at 786.) It also showed that Flanagan had no restrictions with reaching, could sit for up to 20 minutes at a time, and stand/walk for up to 10 minutes at a time. (AR at 804.)

Ms. Beisswenger never indicated how many total hours per day Flanagan could perform those actions, nor did she purport to have tested Flanagan's abilities in this regard. But all three practitioners who reviewed the claim for Lincoln unanimously agreed that Plaintiff's lifting, sitting, and standing/walking abilities, as demonstrated in the incomplete FCE as well as the numerous contemporaneous medical visits that took place after the FCE, were consistent with sedentary capacity. *See* Dr. Karande's June 9, 2014 report (noting that FCE was "incomplete" and determining that Flanagan could frequently sit up to 6 hours in an 8 hour day, occasionally stand/walk up to 2 hours per day, frequently lift up to 10 pounds, and occasionally lift up to 20 pounds) (AR at 748-749); *see also* Dr. Thomas' March 9, 2016 report (noting that Flanagan

39

could perform "*frequent* sitting with 20 minutes of continuous sitting, occasional standing/walking with 10 minutes of continuous standing/walking, frequently reach and lift up to 7 pounds occasionally in an 8-hour work day and 40-hour work week) (AR at 523-528.); *see also* Nurse Mills' January 27, 2017 report ("[m]edical findings submitted in file did not support clmt had functional limitations/ impairment that would preclude ability to perform duties of any sedentary occupation, ability to lift/carry up to 10lbs occasionally, ability to sit up to total of 6 hours/8 hour workday and continuously for 20 min at a time, can stand or walk up to total of 2 hours /8 hour workday allowing for position changes as needed for comfort . . .") (*Id.* at 209.)[10]

Thus, contrary to Ms. Beisswenger's unsupported statement of "sub-sedentary" capacity, all of the identified restrictions are completely consistent with sedentary functioning. *See* Nidositko and Thomas TSAs identifying multiple sedentary occupations that Flanagan is capable of performing. (AR at 520-521, 568.).

In summary, the medical evidence in the record is virtually undisputed that Plaintiff has at least full time sedentary capacity, at least as of the relevant time period, November, 2015. The FCE, though incomplete, supported sedentary capacity. Lincoln's three medical reviewers

---

[10] Plaintiffs in ERISA cases frequently criticize so-called "paper reviews" that do not include in-person physical examinations. The law is clear, however, that administrators may rely on medical records reviews instead of in-person examinations. *See e.g.*, *Coker v. Metro. Life Ins. Co.*, 281 F.3d 793, 799 (8th Cir. 2002) (an administrator may rely on a paper review in its benefits decision); *Torres v. Unum Life Ins. Co. of Am.*, 405 F.3d 670, 678 (8th Cir. 2005) (no requirement to obtain an in person examination). More importantly, any such critique in this case is utterly misplaced. As explained, the reviewing physicians were able to review and rely on the numerous in-person examinations that were conducted; all of which were normal. They were also able to review the FCE which was consistent with sedentary capacity. And the only medical opinion to the contrary, Dr. Hopewell's lifting restriction of zero, found no support anywhere in the record. In this case then, an in-person examination would have served no purpose. *See, e.g., Hobson v. Metro. Life Ins. Co.,* 574 F.3d 75, 91 (2d Cir. 2009) ("We share the Seventh Circuit's concern that requiring the plan administrator to order an IME, despite the absence of objective evidence supporting the applicant's claim for benefits, risks casting doubt upon, and inhibiting, 'the commonplace practice of doctors arriving at professional opinions after reviewing medical files,' which reduces the 'financial burden of conducting repetitive tests and examinations.'") *Id.* (quoting *Davis v. Unum Life Ins. Co.,* 444 F.3d 569, 577 (7th Cir. 2006)).

unanimously opined as such, based on their detailed review of the contemporaneous medical records which set forth repeatedly normal examinations, unremarkable diagnostic studies, and Flanagan's admission that her pain was well controlled. And none of Plaintiff's numerous physicians ever opined to the contrary, save for Dr. Hopewell, whose only sub sedentary limitation was with respect to lifting, which was not timely to the relevant period, not based on a review of the complete record as subsequently developed, and contrary to virtually all of the evidence in the file.

Thus, on this record, Lincoln could have reached no other conclusion.

**B.**     **Plaintiff's vocational evidence could not possibly meet her burden of proving disability from any occupation. Mr. Eldred's "vocational review" improperly reached medical conclusions and provided no basis upon which to disagree with the two TSA's that identified occupations Plaintiff can perform consistent with her undisputed sedentary capacity.**

As explained, Lincoln obtained two separate Transferrable Skills Analyses which identified occupations Plaintiff could perform consistent with her skills, education, work history, and medical restrictions and limitations. First, Ms. Nidositko reviewed the file on September 23, 2015 and identified Plaintiff's transferable skills, including "[a]pplying technical knowledge, common sense, and special medical skills to care for or treat sick or handicapped people; using eyes, hands, and fingers skillfully; adapting quickly to emergency situations; instructing, planning, and directing work of others; keeping accurate records; and distinguishing shapes, forms, and colors." (AR at 568.) Utilizing Dr. Karande's restrictions and limitations, Ms. Nidositko identified several occupations Plaintiff could perform based on her transferable skills and within Dr. Karande's restrictions and limitations, including call center nurse and nurse consultant. (*Id.*)

41

Second, Ms. Thomas reviewed the file on March 21, 2016 and, having received no evidence to the contrary from Plaintiff, identified the same set of transferable skills as Ms. Nidositko. Ms. Thomas utilized Dr. Thomas' slightly more restrictive restrictions and limitations (which, again, were consistent with the FCE despite it's questionable validity), and identified at least two sedentary occupations — nurse consultant and call center nurse (AR at 520-521) — that Plaintiff could perform, consistent with Ms. Nidositko's prior TSA. (AR at 568.)

These TSA's constituted proper and correct vocational analyses. Vocational reviewers are not physicians and thus cannot not opine on medical issues such as appropriate medical restrictions and limitations. *See, e.g.*, *Coleman v. Berryhill*, 2017 WL 326284, at *4 (D.S.C. July 31, 2017) (citing *Fisher v. Barnhart*, 181 Fed. App'x 359, 364 (4th Cir. 2006)) ("vocational experts are also not . . . experts qualified to render medical opinions; rather, they are able to opine as to whether certain jobs exist in the national economy given certain mental or physical demands of different jobs as compared to a given residual functional capacity."). Rather, they must compare the transferable skills they identify to assumed medical restrictions and limitations in order to determine a claimant's capacity to perform any given occupation. This is exactly what Ms. Nidositko and Ms. Thomas did, and their conclusions that Flanagan can perform the sedentary occupations of nurse consultant and call center nurse, are unassailable.

As both TSA's set forth, the two identified occupations are characterized as sedentary. Per the Department of Labor's Dictionary of Occupational Titles, sedentary work involves "[e]xerting up to 10 pounds of force occasionally or a negligible amount of force frequently . . . Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time." *See Ex. B.* "Occasionally" means an "activity or condition [that] exists up to 1/3 of the time." *Owens v. Colvin*, 727 F.3d 850, 851-52 (8th Cir. 2013). "Frequently" means an

"activity or condition [that] exists from 1/3 to 2/3 of the time." *Id.* at 851. Here, both of the identified occupations – call center nurse and nurse consultant – require "[e]xerting up to 10 pounds of force occasionally or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects." *See Ex. B.*

The physical demands of the sedentary occupations that Ms. Thomas and Ms. Nidositko identified, nurse consultant and call center nurse, align with the FCE, with the opinions of all three medical reviewers who reviewed the file for Lincoln, and even with most of Dr. Hopewell's restrictions. Both occupations require frequent sitting (but allow for breaks), as well as occasional standing/walking. *See Ex. B.* There is no disagreement that Flanagan can frequently sit (with breaks) and occasionally stand/walk. Dr. Karande determined that Flanagan could sit up to six hours per day and stand/walk up to two hours per day with normal breaks. (AR at 749.) Dr. Thomas found that Flanagan can frequently sit and occasionally stand/walk. (AR at 524.) Nurse Mills concluded that Flanagan could sit up to six hours per day and stand/walk up to two hours per day with normal position changes. (AR at 209.) And even Dr. Hopewell, in his April 21, 2015 Abilities Form stated that Flanagan could frequently sit and occasionally stand/walk. (AR at 637.)

Similarly, except for Dr. Hopewell's stale and unsupported opinion that Plaintiff cannot lift a pencil, there is no dispute that Plaintiff can lift at least 7 pounds occasionally (Dr. Thomas and the FCE), if not at least ten pounds occasionally (Nurse Mills), or twenty pounds occasionally (Dr. Karande). As defined above, Flanagan's ability to lift at least 7 pounds occasionally represents lifting or carrying a negligible amount of force at least 1/3 of the time, thus meeting the defined sedentary physical demand strength level. *See* 20 C.F.R. § 404.1567. In reviewing the essential duties of each occupation, Ms. Thomas and Ms. Nidositko correctly

determined that these tasks would require lifting negligible amounts occasionally. (AR at 520-521, 568.) This is also consistent with Flanagan's undisputed ability to perform ADL's including bathing, dressing, and cooking. (AR at 71.)

Flanagan's only effort to challenge these conclusions, constituted the Vocational Rehabilitation Evaluation ("VRE") of Flanagan's hired supporter, Philip Eldred, MS. But this effort entirely failed. First, contrary to the proper role of a vocational consultant, Mr. Eldred purported to analyze medical issues, including setting forth a summary of Flanagan's medical records. Even if this were an appropriate exercise for a vocational consultant, which it is not, it was certainly not an accurate one, since he never mentioned the numerous normal examinations performed by Dr. Hopewell or Flanagan's admissions to multiple physicians that her pain was controlled, or her statements to Lincoln that she can perform ADL's. (AR at 397-399.)

Second, even beyond summarizing the medical records, Mr. Eldred actually purported to reach medical conclusions, including his statement that Flanagan is allegedly impaired due to side effects from her medication negatively impacting her memory, concentration, and digestive system. (*Id.* at 399.) Again, even if it were proper for Mr. Eldred to engage in this analysis, which it is not, such statements were entirely unsupported in the record. Allegedly impairing side effects from medications are not mentioned anywhere in the contemporaneous medical records and no physician ever found, or even implied, that Flanagan is cognitively impaired. Indeed, what the medical records do show, and what Mr. Eldred never mentioned, is that Flanagan continued to work full time on the exact same pain medication for more than two years after her surgery, without complaining of allegedly impairing side effects.[11]

---

[11] Interestingly, Mr. Eldred's efforts to improperly assess medical issues revealed even more evidence that supports Lincoln's determination. The VRE documented that Flanagan told Mr. Eldred that she could sit up to 1 hour, stand up to 30 minutes, and walk up to 10 minutes without pain. (AR at 406.) This actually exceeds Dr. Thomas' restrictions and limitations of sitting up to 20 minutes at a time and

Third, Mr. Eldred incorrectly claimed that Dr. Thomas, Dr. Hopewell, and Ms. Beisswenger gave Flanagan less than sedentary work capacity. (*Id.* at 416.) This is simply false. Again, the only sub-sedentary restriction assessed by any practitioner, was Dr. Hopewell's unsupported weight restriction of zero. Otherwise, as explained, all of the restrictions and limitations set forth align with the ability to perform at least two identified sedentary positions, nurse consultant and call center nurse, as Ms. Thomas and Ms. Nidositko separately determined utilizing the same restrictions and limitations that Mr. Eldred allegedly considered.

Most telling, however, is that Mr. Eldred failed to actually analyze the requirements of these two positions. He baldly stated that the position of a nurse consultant is a "sedentary job that [Flanagan] is not physically able to perform according to Nancy (Dickey) Beisswenger, PT, Dr. Donald Hopewell, and Dr. Joseph Thomas." (*Id.* at 416.) But this is both factually wrong and unsupported by any analysis. Neither Ms. Beisswenger, Dr. Hopewell, nor Dr. Thomas evaluated whether Flanagan could perform the specific occupations of nurse consultant or call center nurse, as that was not their role. Thus, they were actually never asked to do so. Rather, they merely set forth physical restrictions and limitations which they all generally agreed on. The only two vocational professionals to properly apply those restrictions and limitations to specific occupations were Ms. Thomas and Ms. Nidositko. Ms. Thomas and Ms. Nidositko independently determined that Flanagan could, even with frequent position changes, work fulltime as a nurse consultant or call center nurse, and specifically cited the source documentation from DOT and eDOT, from which they obtained the duties of those occupations. (AR at 520-521, 568.)

standing/walking up to 10 minutes a time. Thus, there is no denying that Flanagan, by her own admission, is capable of working with the same restrictions that Dr. Thomas found. In addition, Flanagan told Mr. Eldred that her pain level had not changed in the past 12 months (*Id.* at 407-408.), which his consistent with all of the physicians documenting that her condition did not worsen since she stopped working, but rather was stable and controlled.

Mr. Eldred, by contrast, did not analyze or even discuss any of the specific requirements of either position as compared to Flanagan's medical restrictions and limitations. Rather, he simply stated, without any support, that Flanagan cannot perform the occupation of nurse consultant. (AR at 461.) Nowhere did he explain which duties of that occupation Flanagan allegedly cannot perform and what assumptions he used to make that determination.

Similarly, Mr. Eldred applied even less analysis to the occupation of call center nurse, simply stating that he was unable to find the DOT description for that occupation. (AR at 461.) But Ms. Thomas did not use the DOT as her source for the duties of this occupation. Rather, she used the eDOT, and she specifically included the eDOT number in her vocational assessment. (*Id.* at 520-521.) Mr. Eldred's failure to actually analyze these occupations further demonstrates that his report cannot possibly satisfy Flanagan's burden to prove disability from any occupation.[12]

In sum, Flanagan simply failed to provide proof of disability from any occupation. Rather, all of the evidence indicates that Flanagan is capable of at least sedentary work. Accordingly, Lincoln's decision was correct and would withstand any standard of review.

---

[12] Flanagan's receipt of SSDI does not help her cause. As the Supreme Court held in *Black & Decker*, ERISA claims administrators are not bound by a SSDI determination because of the vast differences in the two different types of benefits programs, including the SSA's requirement to defer to treating physicians. 538 U.S. at 823; *see also Riedle v. General Am. Life Ins. Co.*, 248 F.3d 753, 759 (8th Cir. 2001) ("the Social Security Administration's determination is not binding" on ERISA administrators). Moreover, because Flanagan did not submit the entire SSDI file to Lincoln, the basis for the SSA's determination is unclear. *See Sahulka v. Lucent Techs., Inc.*, 206 F.3d 763, 768 (8th Cir. 2000) (claimant bears burden of substantiating claim); *Ferrari v. Teachers Ins. & Annuity Ass'n*, 278 F.3d 801, 806 (8th Cir. 2002) (fault for claimant's failure to submit documentation that might have affected the administrator's decision lies with claimant himself). What is clear, however, is that the SSA made its decision at a different time, and based on different evidence, as the SSA undisputedly did not review the two independent record reviews obtained by Lincoln. *See Farfalla v. Mutual of Omaha Ins. Co.*, 324 F.3d 971, 975 (8th Cir. 2003) (explaining that an administrator is not bound by a SSDI determination based on different evidence and occurring at a different time).

46

## **CONCLUSION**

For the reasons discussed above, the Court should grant Lincoln's motion and award judgment in Lincoln's favor in all respects.

Respectfully submitted,

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

By: /s/ AnnRene S. Braun
     AnnRene S. Braun    MO #67962
     4520 Main Street, Suite 400
     Kansas City, MO 64111
     816-410-2249
     816-471-1303 (*Facsimile*)
     annrene.braun@ogletree.com

       and

     Steven J. Silver (*pro hac vice*)
     PIERCE ATWOOD, LLP
     254 Commercial Street
     Portland, Maine 04101
     207-791-1145
     207-791-1350 (*Facsimile*)
     ssilver@pierceatwood.com

     **ATTORNEYS FOR DEFENDANT**

**CERTIFICATE OF SERVICE**

I hereby certify that on May 15, 2018, I made service of the above on counsel of record by electronically filing said document with the Court's ECF system, which will effect service on all registered participants:

Rick S. Vasquez      MO #41317
LAW OFFICES OF RICK S. VASQUEZ
1736 E. Sunshine Street, Suite 103
Springfield, MO  65804
(417) 889-7735
(417) 889-7096 (*Facsimile*)
vasquezlaw@sbcglobal.net
**ATTORNEY FOR PLAINTIFF**

By: /s/ AnnRene S. Braun
**ATTORNEY FOR DEFENDANT**

48