Functional Capacity Evaluation
Flanagan, Jamie
DOB: ████████
Page 7

***Upper Extremity ROM and Strength*** (NT=NOT TESTED)

Upper Extremity ROM was WFL/WNL and Strength was 5/5 unless noted. AROM ≈ PROM unless noted. ROM was tested for all UE movements. Strength was tested in the following areas:

| UE ROM: Movement | ROM | Strength |
|---|---|---|
| Shoulder Flexion | WNL | 5/5 |
| Shoulder Extension | WNL | 5/5 |
| Shoulder Abduction | WNL | 5/5 |
| Shoulder Adduction | WNL | 5/5 |
| Shoulder Internal Rotation | WNL | 5/5 |
| Shoulder External Rotation | WNL | 5/5 |
| Shoulder Horizontal Abduction | WNL | 5/5 |
| Shoulder Horizontal Adduction | WNL | 5/5 |
| Elbow Flexion | WNL | 5/5 |
| Elbow Extension | WNL | 5/5 |
| Pronation | WNL | Left = 5-/5 |
| Supination | WNL | Left = 5-/5 |
| **Other** | Minimal pain behaviors with muscle strength testing. | |

***Lumbar Range of Motion*** is as follows:

| Lumbar ROM | ROM | Comments |
|---|---|---|
| Lateral Flexion | Minimal limits | Discomfort suggested |
| Rotation | Minimal limits in each direction | Discomfort suggested |
| Flexion | Minimal limits with hands at lower calves | Discomfort suggested |
| Extension | Moderate limits | End range pain suggested and reported |
| **Other** | Good repeat trial consistency | |

***Lower Extremity ROM and Strength*** was noted as follows:

NT= NOT TESTED; A≈PROM and R=L unless noted

Lower Extremity ROM was WFL/WNL and Strength was 5/5 unless noted. The following areas were tested:

| LE ROM: Movement | ROM | Strength |
|---|---|---|
| Hip Flexion | WNL | Right = 5-/5 |
| Hip Extension | WNL | 5/5 |
| Hip Abduction | WFL End range pain bilaterally with right pain greater than left. | Right = 5-/5 |
| Hip Adduction | WNL | 5/5 |
| Hip Internal Rotation | WNL | Right = 5-/5 |
| Hip External Rotation | WNL | 5/5 |
| Knee Flexion | WNL | 5/5 |
| Knee Extension | WNL | Right = 5-/5 |
| Dorsiflexion | WNL | Right = 5-/5 |
| Plantar Flexion | WNL | Right = 4+/5 |
| Great Toe Extension | WNL | Right = 5-/5 |

Generated by CamScanner

Functional Capacity Evaluation
Flanagan, Jamie
DOB: █████
Page 8

**Other Physical Assessments:**

| | |
|---|---|
| Toe Raises (10 Reps) | 6 on left with good height and balance bilaterally. Stopped due to pain. Fair height and balance on right. Stopped after 5 due to balance and decreasing height. |
| Straight Leg Raises | Right = 40° and 45° with pain in low back and buttocks. Left = 75° and 80° with no pain and no pain behaviors. |
| Waddell Signs/Non Organic Signs | None |
| Posture | Forward head position and rounded shoulders, decrease in lumbar lordosis, flat footed (eversion). |
| Sensation | Some decrease in protective sensation on lateral calves (bilateral) |
| Swelling | None noted or reported |
| Spontaneous Movement and guarding | Very guarded low back motions and slowed transitional movements. |
| Skin Description | Soft and clean |
| Sensitivity over incision | None with firm pressure |
| Provocation Tests | R SLR, prolonged sitting and standing |
| Atrophy/Muscle Bulk | None noted |

**GAIT ANALYSIS:** The client was instructed to walk 30 ft times 2 at a regular pace and 30 ft times 2 at a fast pace. She has a short stride, softened heel strike and decrease in pelvic rotation. Pace was slightly slowed. With fast walking the same gait pattern was noted and was (appropriately) more pronounced. Pace was faster than normal pace but was not fast.

Client was requested to heel and toe walk x 10 steps. With heel walking, fair to good height and balance on right. With toe walking, good height and balance bilaterally.

**REPETITIVE MOVEMENT TESTS**
The client is tested for three common work activities: repetitive bending, squatting and reaching. The client is asked to perform one repetition and ten repetitions at a controlled speed for all three movements and ten fast repetitions for bending and reaching. The results are analyzed for each test sequence before proceeding to the next test sequence. If pain increases significantly or if the client requests to stop, the test is stopped. Consistency of the movement pattern, willingness to move, pain, spasm, symmetry of movement, velocity of motion and end range stretch are critically evaluated and an estimation is made regarding the client's ability to move during an eight hour work shift.

Pain guidelines were reviewed prior to testing.
She rated her pain at: 6

The results are as follows:

**Reaching:** Not Restricted
**Squatting:** Very Occasional to Not Recommended
**Bending:** Not Recommended

A description of each test sequence is as follows:

**Overhead Reaching - 1 controlled, 10 controlled, and 10 fast (Normal is less than 10 seconds):**
Range of Motion: WNL /symmetrical
End Range Stretch: Present
Velocity: good; she performed 10 fast in 6 seconds.
Crepitus: Not noted. Left shoulder has intermittent "clunk."
Movement Patterns: Movement pattern suggested some discomfort with weight shift noted.

Generated by CamScanner

Functional Capacity Evaluation
Flanagan, Jamie
DOB: ████
Page 5

Pain Reports: No pain increase was noted or reported.
Weight shift: Noted

**Reciprocal Elbow Flexion and Extension- x 1 controlled, x10 controlled and x 10 fast:**
Range of Motion: WNL /symmetrical
End Range Stretch: Present
Velocity: good; she performed 10 fast in 8 seconds.
Crepitus: Not noted.
Movement Patterns: Movement pattern suggested some discomfort with weight shift noted.
Pain Reports: No pain increase was noted or reported.
Weight shift: Noted

**Reciprocal Pronation/Supination- x 1 controlled, x10 controlled and x 10 fast:**
Range of Motion: WNL /symmetrical
End Range Stretch: Present
Velocity: good; she performed 10 fast in 7 seconds.
Crepitus: Not noted.
Movement Patterns: Movement pattern suggested some discomfort with weight shift noted.
Pain Reports: No pain increase was noted or reported.
Weight shift: Noted

**Reciprocal Wrist Flexion and Extension- x 1 controlled, x10 controlled and x 10 fast:**
Range of Motion: WNL /symmetrical
End Range Stretch: Present
Velocity: good; she performed 10 fast in 7 seconds.
Crepitus: Not noted.
Movement Patterns: Movement pattern suggested some discomfort with weight shift noted.
Pain Reports: No pain increase was noted or reported.
Weight shift: Noted

**Reciprocal Finger Flexion and Extension- x 1 controlled, x10 controlled and x 10 fast:**
Range of Motion: WNL /symmetrical
End Range Stretch: Present
Velocity: good; she performed 10 fast in 6 seconds.
Crepitus: Not noted.
Movement Patterns: Movement pattern suggested some discomfort with weight shift noted.
Pain Reports: No pain increase was noted or reported.
Weight shift: Noted

**Squatting - 1 controlled:**
Range of Motion: WNL /symmetrical
End Range Stretch: Present
Velocity: good
Crepitus: Not noted.
Movement Patterns: Movement pattern did not indicate pain.
Pain Reports: No pain increase was noted or reported.

**Squatting - 10 controlled (first trial):**
Range of Motion: WNL /symmetrical
End Range Stretch: Present
Velocity: good
Crepitus: Not noted.
Movement Patterns: Movement pattern did not indicate pain, but suggested some quad weakness. Gluteal substitution noted at 5, and test was stopped.

Generated by CamScanner

Functional Capacity Evaluation
Flanagan, Jamie
DOB: ███████
Page 10

Pain Reports: No pain increase was noted or reported.

**Squatting - 10 controlled (second trial): Not Tested due to weakness**

**Forward Bending- 1 controlled:**
Range of Motion: WFL /symmetrical
End Range Stretch: Not present
Velocity: good
Crepitus: Not noted.
Movement Patterns: Discomfort suggested and/or slight decreases in ROM.
Pain Reports: No pain increase was noted or reported.

**Forward Bending -10 controlled:**
Range of Motion: WFL, decreasing to minimal limits /symmetrical
End Range Stretch: Not present
Velocity: WFL with some decrease with test progression.
Crepitus: Not noted.
Movement Patterns: Pain suggested; ROM and speed was decreasing with test progression. Stopped at 8, due to pain.
Pain Reports: Stopped at 8, due to pain.

**Forward Bending -10 fast (Normal is less than 14 seconds): Not Tested due to reports of pain.**

**ISOMETRIC STRENGTH TESTING:** Not tested, per therapist's discretion, secondary to multiple diagnoses and current lifting restrictions.

**OCCASIONAL MATERIAL HANDLING**
A psychophysical protocol is used which means that the client chooses the weights appropriate for the Occasional frequency after lifting progressively increasing and decreasing weights for single and multiple repetitions. If any weight causes an increase in pain, a lighter weight is chosen as the acceptable weight for occasional material handling. Occasional Material Handling is limited more by biomechanical stress rather than physiological stress. Results are as follows:

Prior to testing the RPE (Rate of Perceived Exertion) scale was explained. The difference between pain and exertion was defined and the client understood the instructions and concepts.

Aspects of the Frequent Lifting Tests were incorporated in the Occasional Lifting Tests.

Pain guidelines were reviewed prior to testing. She rates her pain at: 6 ½

Preferred Lift: Torso/Leg lift

**Lifting to Shoulder Level**

| Maximum Lift | 6 lb. lifted, but not lowered |
|---|---|
| Optimum Lift | 5 lb. |
| Further Lifting limited by | Shoulder pain |
| Comments | Mild biomechanical stress noted |
| At Maximum Levels | |
| Heart Rate | 66 |
| RPE | 11 |
| Pain | 7, with increase in shoulder pain |

Generated by CamScanner

Functional Capacity Evaluation
Flanagan, Jamie
DOB ▮▮▮▮▮
Page 11

## Overhead Lifting

| Maximum Lift | 6 lb. to shoulder level |
|---|---|
| Optimum Lift | 5 lb. |
| Further Lifting limited by | Pain with 6 lb. to shoulder level. |

## Torso/Leg Lift

| Maximum Lift | 7 lb. |
|---|---|
| Optimum Lift | 7 lb. |
| Further Lifting limited by | Permanent lifting restriction |
| Comments | No pain behaviors. No biomechanical stress noted. |
| At Maximum Levels | |
| Heart Rate | 78 |
| RPE | 11 |
| Pain | 7 |

## Carry

| Maximum Carry | 7 lb. |
|---|---|
| Optimum Carry | 7 lb. |
| Further Carrying limited by | Permanent lifting restriction |
| Comments | No pain behaviors. No biomechanical stress noted. |
| At Maximum Levels | |
| Heart Rate | 69 |
| RPE | 11 |
| Pain | 7 "my back is [still] throbbing. |

**FREQUENT MATERIAL HANDLING:**
Not tested as the client does not qualify for Frequent Lifting, secondary to decrease tolerance of repetitive motion.

**NON-MATERIAL HANDLING**

**Sitting:** Occasional. 20 minute duration

**Standing:** Occasional to Very Occasional. 10 minute duration

**Balance:** The client was instructed to stand on one leg for 30 seconds and then the other, for 30 seconds.

| Standing on Right Leg | |
|---|---|
| Able to Perform Task | Yes |
| Upper Body Sway | Minimal, intermittent |
| Ankle Strategies | Yes |
| Hip Strategies | No |
| Touching foot to the ground | No |
| Comments | Minimal, but present, pain behaviors. |

Generated by CamScanner

Functional Capacity Evaluation
Flanagan, Jamie
DOB ████████
Page 12

| Standing on Left Leg | |
|---|---|
| Able to Perform Task | Yes |
| Upper Body Sway | Minimal, intermittent |
| Ankle Strategies | Yes |
| Hip Strategies | No |
| Touching foot to the ground | Yes, toe touch x 1 and resumes one leg stand quickly. |
| Comments | Minimal, but present, pain behaviors. |

**Stair Climbing**

The client was requested to ascend one step and descend one step (by stepping backwards) x100 steps. The test was to stop after 30 steps, 70 steps, and 100 steps to monitor status.

| Prior to stair climbing tests, pain was rated at | 7 |
|---|---|

| 30 Steps | Stopped at 26 steps, due to leg pain |
|---|---|
| Heart Rate | 80 |
| Time | One Minute and 13 seconds |
| RPE | 13 |
| Pain | 7 with increased right leg pain. |
| Comments | Gait pattern was noted to be as follows: ascends and descends with the right. Some mild balancing problems noted with stepping backwards. |

**Crawling**

The client demonstrated ability to crawl on a carpeted surface with no complaints of pain or discomfort. She had a slow transition from standing to floor.

**Walking:**

| Prior to walking tests she rated her pain as | 7 |
|---|---|
| Distance Attempted | ≈ 180' x 8 |
| Distance Walked | ≈ 180' x 5 |
| Time | 3 Minutes and 35 Seconds |
| Heart Rate | 72 |
| RPE | 13 |
| Pain at end of walking test | 8 |
| Comments | Gait pattern was as previously stated, with decrease pelvic rotation. Increased right leg limp noted with test progression. |

**VALPAR SAMPLE #8**

Simulated Assembly. In this Valpar Work Sample, the client stands and assembles small units on a rotating wheel for a 20 minute time period. The test helps to identify the ability to tolerate repetitive upper extremity tasks, as well as an index to the client's standing tolerance. The client is reminded to stop the task, at any point, if an increase in pain is noted.

Pain guidelines were reviewed prior to testing.

| Actual Performance | |
|---|---|
| Number of Assemblies Completed | 24 |
| Number of Minutes Performed | 2 Minutes |
| MTM % Score | 10% |

Generated by CamScanner

Functional Capacity Evaluation
Flanagan, Jamie
DOB: ███████
Page 13

| Performance Extrapolated for 20 Minutes | |
|---|---|
| Number of Assemblies Completed | 240 |
| Number of Minutes Performed | 20 minutes |
| MTM % Score | 103% |

The Client had complaints of back and leg pain fatigue or discomfort. Difficulty in standing tolerance (as noted by weight shift) was noted.

**Post Test Pain Rating:** 7 to 8 (She stated she had some pain increases, secondary to time to take pain meds).

**Distracted Movement Patterns:** The client's movement patterns are observed by distraction throughout the evaluation. If there are any improvements in the movement patterns by distractions, including increased range of motion, increased velocity, decreased holding, decreased splinting, decreased limping, or any other change which signifies an improvement in the client's movement patterns, or if the client's pain behaviors decrease or their affect is improved compared to performance during tasks when the client was asked to give her best effort, it indicates that the client's movement ability is better than what was demonstrated during the voluntary testing when given ample opportunity to demonstrate best effort. This represents a Failed Validity Criteria, non-organic sign, and indicates that the client has attempted to control the test results.

**Summary of Observed Distracted Movement Patterns:** The Client's movement patterns did not change with distraction throughout the evaluation. She showed good consistency in movement patterns, suggesting, in this aspect of testing, good validity in her performance.

**ASSESSMENT:** The Client was cooperative throughout the evaluation in that she followed directions without difficulty. She was willing to attempt tests. She was able to stop all tests, if needed, if an increase in pain was noted and/or reported. Information regarding the tests sensitivity (to if she was giving her best effort according to pain guidelines) was explained to her. She verbalized understanding directions.

**Validity:** Met/Passed. A passed validity criterion indicates that the client met the majority of the validity criteria in testing and suggests that she gave maximum voluntary effort; the test results appear to have measured her full functional abilities.

**Movement Patterns by Distraction:** The Client's movement patterns did not change with distraction throughout the evaluation. She showed good consistency in movement patterns, suggesting, in this aspect of testing, good validity in her performance.

**Pain Rating/Self Perception:** Over the last 30 days, the client rated pain as ranging from moderate to very high levels, 4 to 10+, on a 0 to 10+ pain scale. At the initiation of the FCE, pain was rated at high levels, 6. Pain ranged from moderate to high, 4 to 8, during the FCE. Her movement patterns suggested pain and discomfort by lack of movement pattern changes with distraction, some changes in movement patterns with changes in pain ratings, consistent and appropriate guarding, and overall quality of motion. Her self perception of his abilities was similar to her actual performance. She showed a tendency toward the exaggeration of the degree of task difficulty. Her perception of her ability to work is limited, secondary to limited activity tolerances.

**General Strength and Conditioning:** No cardiovascular compromise was noted. Heart Rate stayed within acceptable ranges with activity.

Upper Extremity ROM and strength was WNL/WFL and 5/5 (including pronation and supination 5-/50 unless noted.

Generated by CamScanner

Functional Capacity Evaluation
Flanagan, Jamie
DOB: ███████
Page 14

Lower Extremity ROM and strength was as follows:

| LE ROM: Movement | ROM | Strength |
|---|---|---|
| Hip Flexion | WNL | Right = 5-/5 |
| Hip Extension | WNL | 5/5 |
| Hip Abduction | WFL End range pain bilaterally with right pain greater than left. | Right = 5-/5 |
| Hip Adduction | WNL | 5/5 |
| Hip Internal Rotation | WNL | Right = 5-/5 |
| Hip External Rotation | WNL | 5/5 |
| Knee Flexion | WNL | 5/5 |
| Knee Extension | WNL | Right = 5-/5 |
| Dorsiflexion | WNL | Right = 5-/5 |
| Plantar Flexion | WNL | Right = 4+/5 |
| Great Toe Extension | WNL | Right = 5-/5 |

Cervical ROM and Lumbar ROM were as follows:

| Cervical ROM | ROM | Comments |
|---|---|---|
| Lateral Flexion | WNL | Pain suggested and reported at the right side of the neck (for both right and left lateral bending) |
| Rotation | WNL | Pain not indicated or reported |
| Flexion | Minimal limits (2 finger limit) | Pain suggested and reported (back of neck) |
| Extension | WNL | Pain not indicated or reported |
| Other | Standing (weight shifted noted throughout testing) | |

| Lumbar ROM | ROM | Comments |
|---|---|---|
| Lateral Flexion | Minimal limits | Discomfort suggested |
| Rotation | Minimal limits in each direction | Discomfort suggested |
| Flexion | Minimal limits with hands at lower calves | Discomfort suggested |
| Extension | Moderate limits | End range pain suggested and reported |
| Other | Good repeat trial consistency | |

Other Physical Assessments:

| Toe Raises (10 Reps) | 6 on left with good height and balance bilaterally. Stopped due to pain. Fair height and balance on right. Stopped after 5 due to balance and decreasing height. |
|---|---|
| Straight Leg Raises | Right = 40° and 45° with pain in low back and buttocks. Left = 75° and 80° with no pain and no pain behaviors. |
| Waddell Signs/Non Organic Signs | None |
| Posture | Forward head position and rounded shoulders, decrease in lumbar lordosis, flat footed (eversion). |
| Sensation | Some decrease in protective sensation on lateral calves (bilateral) |
| Swelling | None noted or reported. |
| Spontaneous Movement and guarding | Very guarded low back motions and slowed transitional movements. |
| Skin Description | Soft and clean |
| Sensitivity over incision | None with firm pressure |
| Provocation Tests | R SLR, prolonged sitting and standing |
| Atrophy/Muscle Bulk | None noted |

Generated by CamScanner

Functional Capacity Evaluation
Flanagan, Jamie
DOB: ████
Page 15

**ISOMETRIC STRENGTH TESTING:** Not tested, per therapist's discretion, secondary to multiple diagnoses and current lifting restrictions.

The client demonstrates the abilities to perform the following:

**Reaching:** Not Restricted
**Squatting:** Very Occasional to Not Recommended
**Bending:** Not Recommended
**Sitting:** Occasional. 20 minute duration
**Standing:** Occasional to Very Occasional. 10 minute duration
**Walking:** Occasional
**Stair Climbing:** Very Occasional
**Balance:** Protective Heights
**Crawling:** Very Occasional to Not Recommended

**Occasional Material Handling:** 7 lb., Tested only to (stated) permanent restrictions

**Frequent Material Handling:** Not Tested. Frequent lifting is Not Recommended

**Work Speed:** Functional approach to tasks

**Work Level:** Less than Sedentary

The client was given information (written and verbal) to contact me if she had any problems (such as increase pain, swelling, etc.) following the evaluation. The telephone number to this facility was given. She was told to call within 24 hours and leave a voice mail message if I was not available to talk to her. At the time of the preparation of this report, the client did not initiate contact. An addendum to this report will be prepared if she does call with concerns.

If I can be of further assistance to you, please contact me at 417-881-1282.

*Nancy Beisswenger. m*

Nancy (Dickey) Beisswenger, OTR/L
Occupational Therapist

Generated by CamScanner

# Social Security Administration
## Retirement, Survivors and Disability Insurance
Notice of Award

Office of Central Operations
1500 Woodlawn Drive
Baltimore, Maryland 21241-1500
Date: April 14, 2014
Claim Number: █████████

JAMIE S FLANAGAN
986 S HEDGE DR
NIXA, MO 65714

You are entitled to monthly disability benefits beginning February 2014.

**The Date You Became Disabled**

We found that you became disabled under our rules on August 22, 2013.

To qualify for disability benefits, you must be disabled for five full calendar months in a row. The first month you are entitled to benefits is February 2014.

**What We Will Pay And When**

- You will receive $3,433.50 around April 20, 2014.

- This is the money you are due for February 2014 and March 2014.

- Your next payment of $2,289.00, which is for April 2014, will be received on or about the second Wednesday of May 2014.

- After that you will receive $2,289.00 on or about the second Wednesday of each month.

- Later in this letter, we will show you how we figured these amounts.

- New rules require you to receive your payments electronically, unless you get an exemption from the U.S. Department of the Treasury. Please call Treasury at 1-888-224-2950 to see if you qualify for an exemption.

- The day of the month you receive your payments depends on your date of birth.

**Information About Representative's Fees**

We have approved the fee agreement between you and your representative.



See Next Page

Your past-due benefits are $4,578.00 for February 2014 and March 2014. Under the fee agreement, the representative cannot charge you more than $1,144.50 for his or her work. The amount of the fee does not include any out-of-pocket expenses (for example, costs to get copies of doctors' or hospitals' reports). This is a matter between you and the representative.

## How To Ask Us To Review The Determination On The Fee Amount

You, the representative or the person who decided your case can ask us to review the amount of the fee we say the representative can charge.

If you think the amount of the fee is too high, write us within 15 days from the day you get this letter. Tell us that you disagree with the amount of the fee and give your reasons. Send your request to this address:

Social Security Administration
Office of Disability Adjudication and Review
Attorney Fee Branch
5107 Leesburg Pike
Falls Church, Virginia 22041-3255

The representative also has 15 days to write us if he or she thinks the amount of the fee is too low.

If we do not hear from you or the representative, we will assume you both agree with the amount of the fee shown.

## Information About Past-Due Benefits Withheld To Pay A Representative

Based on the law, we must withhold part of past-due benefits to pay an appointed representative. We cannot withhold more than 25 percent of past-due benefits to pay an authorized fee. We withheld $1,144.50 from your past-due benefits to pay the representative.

We are paying the representative from the benefits we withheld. Therefore, we must collect a service charge from him or her. The service charge is 6.3 percent of the fee amount we pay, but not more than $89, which is the most we can collect in each case under the law. We will subtract the service charge from the amount payable to the representative.

The representative cannot ask you to pay for the service charge. If the representative disagrees with the amount of the service charge, he or she must write to the address shown at the top of this letter. The representative must tell us why he or she disagrees within 15 days from the day he or she gets this letter.

## Other Social Security Benefits

This benefit is the only benefit you can receive from us at this time. In the future, if you think you might qualify for another benefit from us, you will need to apply again.



## Your Responsibilities

We based our decision on information you gave us. If this information changes, it could affect your benefits. For this reason, it is important that you report changes to us right away.

We have enclosed a pamphlet, "What You Need To Know When You Get Social Security Disability Benefits." It tells you what you must report and how to report. Please be sure to read the parts of the pamphlet that tell you what to do if you go to work or your health improves.

A vocational rehabilitation or employment services provider may contact you to help you in going to work. The provider may be from a State agency or work under contract with Social Security.

If you go to work, we have special rules that let us continue your cash payments and health care coverage. To learn more about how work and earnings affect disability benefits, visit our website at www.socialsecurity.gov/work/. You may also call or visit any Social Security office to ask for the following publications:

- Social Security - Working While Disabled...How We Can Help (SSA Publication No. 05-10095).

- Social Security - If You Are Blind--How We Can Help (SSA Publication No. 05-10052).

## Your Benefits May Be Taxed

You may have to pay taxes on the benefits you get from us. Part of your Social Security benefits may be taxed if:

- you are single and your total income is more than $25,000 or
- you are married and you and your spouse have total income of more than $32,000.

You can decide if you want to have federal taxes withheld from your benefits. If you want taxes withheld, you need to complete and return a Form W-4V, Voluntary Withholding Request. You can get Form W-4V from the Internal Revenue Service by calling 1-800-829-3676. You can also get this form at www.ssa.gov/planners/taxwithold.htm on our website. After you complete and sign the form, return it to your local Social Security office by mail or in person.

You can find more information on paying taxes in the enclosed pamphlet, "What You Need To Know When You Get Social Security Disability Benefits".

## Other Information

We are sending a copy of this notice to RICK STEVEN VASQUEZ.



### If You Disagree With The Decisions

If you disagree with the decisions, you have the right to appeal. A person who did not make the first decision will decide your case. We will review those parts of the decisions you disagree with and will look at any new facts you have. We may also review those parts of the case that you believe are correct and may make them unfavorable or less favorable to you.

### About The Appeals

If you disagree with the nonmedical decisions we made on your case, the appeal is called a reconsideration. Some examples of nonmedical decisions are the amount of your payment, and the month your payment starts. You will not meet with the person who decides your case.

If you disagree with the disability (medical) decision made by the state, the appeal is called a hearing. Some examples of medical decisions are the date your disability started or whether you are still disabled.

### If You Want To Appeal

- You have 60 days to ask for an appeal.

- The 60 days start the day after you receive this letter. We assume you got this letter 5 days after the date on it unless you show us that you did not get it within the 5-day period.

- You must have a good reason if you wait more than 60 days to ask for an appeal.

- You can file an appeal with any Social Security office. You must ask for an appeal in writing. Please use our "Request for Reconsideration" form SSA-561-U2, or "Request for Hearing" form HA-501. You may go to our website at www.socialsecurity.gov/online/ to find the forms. You can also call, write, or visit us to request the forms. If you need help to fill out the forms, we can help you by phone or in person.

### If You Ask For A Reconsideration And A Hearing

If you ask for both a reconsideration and a hearing, we will process the hearing first, even if you made the reconsideration request first. When we make our decisions, we will send you letters explaining our decisions on both the reconsideration and the hearing.

### How The Hearing Process Works

After we send your case for a hearing, an Administrative Law Judge (ALJ) will mail you a letter at least 20 days before the hearing to tell you its date, time and place. The letter will explain the law in your case and tell you what has to be decided. Since the ALJ will review all the facts in your case, it is important that you give us any new facts as soon as you can.



The hearing is your chance to tell the ALJ why you disagree with the decisions in your case. You can give the ALJ new evidence and bring people to testify for you. The ALJ also can require people to bring important papers to your hearing and give facts about your case. You can question these people at your hearing.

## It Is Important To Go To The Hearing

It is very important that you go to the hearing. If for any reason you can't go, contact the ALJ as soon as possible before the hearing and explain why. The ALJ will reschedule the hearing if you have a good reason.

If you don't go to the hearing and don't have a good reason for not going, the ALJ may dismiss your request for a hearing.

## Things To Remember For The Future

We decided that you are disabled under our rules. But, this decision must be reviewed once every 3 years. We will send you a letter before we start the review. Based on that review, your benefits will continue if you are still disabled, but will end if you are no longer disabled.

## If You Have Any Questions

We invite you to visit our website at www.socialsecurity.gov on the Internet to find general information about Social Security. If you have any specific questions, you may call us toll-free at 1-800-772-1213, or call your local Social Security office at 1-877-545-7548. We can answer most questions over the phone. If you are deaf or hard of hearing, you may call our TTY number, 1-800-325-0778. You can also write or visit any Social Security office. The office that serves your area is located at:

> SOCIAL SECURITY
> STE 100
> 1570 W BATTLEFIELD ST
> SPRINGFIELD MO 65807

If you do call or visit an office, please have this letter with you. It will help us answer your questions. Also, if you plan to visit an office, you may call ahead to make an appointment. This will help us serve you more quickly when you arrive at the office.

Carolyn W. Colvin
Acting Commissioner of
Social Security



# PAYMENT SUMMARY

## Your Payment Of $3,433.50

Here is how we figured your
first payment:

      Benefits due for February 2014
and March 2014,
less monthly rounding of benefits ........................$ 4,578.00

      Amount we subtracted because of

        ●  money to pay
           your representative ............................ 1,144.50

This equals the amount of
your first payment ......................................$ 3,433.50

## Your Regular Monthly Payment

Here is how we figured your
regular monthly payment effective April 2014:

      You are entitled to a monthly benefit of .................$ 2,289.50

      Amount we subtracted because of

        ●  rounding (we must round down to
           a whole dollar) ................................. .50

This equals the amount of
your regular monthly payment ............................$ 2,289.00



# Social Security Administration
# Retirement, Survivors and Disability Insurance
Important Information

Office of Central Operations
1500 Woodlawn Drive
Baltimore, Maryland 21241-1500
Date: April 14, 2014
Claim Number: ██████████



005004 1 MB 0.435 0022 LR M08P7 0410 01

RICK STEVEN VASQUEZ
1736 E SUNSHINE STREET
SUITE 103
SPRINGFIELD, MO 65804-1327

Enclosed is a copy of a letter we sent to JAMIE S FLANAGAN.

## If You Have Any Questions

We invite you to visit our website at www.socialsecurity.gov on the Internet to find general information about Social Security. If you have any specific questions, call us toll-free at 1-800-772-1213. We can answer most questions over the phone. If you prefer to visit one of our offices, please check the local telephone directory for the office nearest you. Or call us and we can give you the office address. Please have this letter with you if you call or visit an office. It will help us answer your questions.

Carolyn W. Colvin
Acting Commissioner of
Social Security

C



REC'D APR 2 5 2014



**Law Offices of**
**RICK S. VASQUEZ**
1736 E. Sunshine, Suite 103
Springfield, Missouri 65804

The Lincoln National Life Insurance Company
Po Box 2337
Omaha, NE
68103



HASLER

04/23/14

$0.69

014H14158225

US POSTAGE

LIN00812

RECVD APR 2 5 2014


## Law Offices of Rick S. Vasquez

1736 East Sunshine, Suite 103
Springfield, Missouri 65804

—

Telephone (417) 889-7735
Facsimile (417) 889-7096

April 23, 2014

The Lincoln National Life Insurance Company
Po Box 2337
Omaha, NE
68103

Re:  *Jamie Flanagan*
*Group Policy# 00001015732600000*
*Group Claim# 1130226196*

Dear Sir/Madam:

I am counsel for Jamie Flanagan with respect to her long term disability claim with The Lincoln National Life Insurance Company. Mrs. Flanagan has been awarded Social Security Disability finding her disabled under the Social Security Disability rules on August 22, 2013. Please find the Notice of Award enclosed.

Thank you for your time and attention to this matter.

Most Sincerely,

R.S. Vasquez/cu
Rick S. Vasquez
Attorney at Law

RSV: ch
CC: Jamie Flanagan
Enclosure

LIN00313

# Social Security Administration
## Retirement, Survivors and Disability Insurance
Notice of Award

Office of Central Operations
1500 Woodlawn Drive
Baltimore, Maryland 21241-1500
Date: April 14, 2014
Claim Number: █████████

JAMIE S FLANAGAN
986 S HEDGE DR
NIXA, MO 65714

You are entitled to monthly disability benefits beginning February 2014.

**The Date You Became Disabled**

We found that you became disabled under our rules on August 22, 2013.

To qualify for disability benefits, you must be disabled for five full calendar months in a row. The first month you are entitled to benefits is February 2014.

**What We Will Pay And When**

- You will receive $3,433.50 around April 20, 2014.

- This is the money you are due for February 2014 and March 2014.

- Your next payment of $2,289.00, which is for April 2014, will be received on or about the second Wednesday of May 2014.

- After that you will receive $2,289.00 on or about the second Wednesday of each month.

- Later in this letter, we will show you how we figured these amounts.

- New rules require you to receive your payments electronically, unless you get an exemption from the U.S. Department of the Treasury. Please call Treasury at 1-888-224-2950 to see if you qualify for an exemption.

- The day of the month you receive your payments depends on your date of birth.

**Information About Representative's Fees**

We have approved the fee agreement between you and your representative.



See Next Page

Your past-due benefits are $4,578.00 for February 2014 and March 2014. Under the fee agreement, the representative cannot charge you more than $1,144.50 for his or her work. The amount of the fee does not include any out-of-pocket expenses (for example, costs to get copies of doctors' or hospitals' reports). This is a matter between you and the representative.

## How To Ask Us To Review The Determination On The Fee Amount

You, the representative or the person who decided your case can ask us to review the amount of the fee we say the representative can charge.

If you think the amount of the fee is too high, write us within 15 days from the day you get this letter. Tell us that you disagree with the amount of the fee and give your reasons. Send your request to this address:

Social Security Administration
Office of Disability Adjudication and Review
Attorney Fee Branch
5107 Leesburg Pike
Falls Church, Virginia 22041-3255

The representative also has 15 days to write us if he or she thinks the amount of the fee is too low.

If we do not hear from you or the representative, we will assume you both agree with the amount of the fee shown.

## Information About Past-Due Benefits Withheld To Pay A Representative

Based on the law, we must withhold part of past-due benefits to pay an appointed representative. We cannot withhold more than 25 percent of past-due benefits to pay an authorized fee. We withheld $1,144.50 from your past-due benefits to pay the representative.

We are paying the representative from the benefits we withheld. Therefore, we must collect a service charge from him or her. The service charge is 6.3 percent of the fee amount we pay, but not more than $89, which is the most we can collect in each case under the law. We will subtract the service charge from the amount payable to the representative.

The representative cannot ask you to pay for the service charge. If the representative disagrees with the amount of the service charge, he or she must write to the address shown at the top of this letter. The representative must tell us why he or she disagrees within 15 days from the day he or she gets this letter.

## Other Social Security Benefits

This benefit is the only benefit you can receive from us at this time. In the future, if you think you might qualify for another benefit from us, you will need to apply again.



## Your Responsibilities

We based our decision on information you gave us. If this information changes, it could affect your benefits. For this reason, it is important that you report changes to us right away.

We have enclosed a pamphlet, "What You Need To Know When You Get Social Security Disability Benefits." It tells you what you must report and how to report. Please be sure to read the parts of the pamphlet that tell you what to do if you go to work or your health improves.

A vocational rehabilitation or employment services provider may contact you to help you in going to work. The provider may be from a State agency or work under contract with Social Security.

If you go to work, we have special rules that let us continue your cash payments and health care coverage. To learn more about how work and earnings affect disability benefits, visit our website at www.socialsecurity.gov/work/. You may also call or visit any Social Security office to ask for the following publications:

- Social Security - Working While Disabled...How We Can Help (SSA Publication No. 05-10095).

- Social Security - If You Are Blind--How We Can Help (SSA Publication No. 05-10052).

## Your Benefits May Be Taxed

You may have to pay taxes on the benefits you get from us. Part of your Social Security benefits may be taxed if:

- you are single and your total income is more than $25,000 or
- you are married and you and your spouse have total income of more than $32,000.

You can decide if you want to have federal taxes withheld from your benefits. If you want taxes withheld, you need to complete and return a Form W-4V, Voluntary Withholding Request. You can get Form W-4V from the Internal Revenue Service by calling 1-800-829-3676. You can also get this form at www.ssa.gov/planners/taxwithold.htm on our website. After you complete and sign the form, return it to your local Social Security office by mail or in person.

You can find more information on paying taxes in the enclosed pamphlet, "What You Need To Know When You Get Social Security Disability Benefits".

## Other Information

We are sending a copy of this notice to RICK STEVEN VASQUEZ.



### If You Disagree With The Decisions

If you disagree with the decisions, you have the right to appeal. A person who did not make the first decision will decide your case. We will review those parts of the decisions you disagree with and will look at any new facts you have. We may also review those parts of the case that you believe are correct and may make them unfavorable or less favorable to you.

### About The Appeals

If you disagree with the nonmedical decisions we made on your case, the appeal is called a reconsideration. Some examples of nonmedical decisions are the amount of your payment, and the month your payment starts. You will not meet with the person who decides your case.

If you disagree with the disability (medical) decision made by the state, the appeal is called a hearing. Some examples of medical decisions are the date your disability started or whether you are still disabled.

### If You Want To Appeal

- You have 60 days to ask for an appeal.

- The 60 days start the day after you receive this letter. We assume you got this letter 5 days after the date on it unless you show us that you did not get it within the 5-day period.

- You must have a good reason if you wait more than 60 days to ask for an appeal.

- You can file an appeal with any Social Security office. You must ask for an appeal in writing. Please use our "Request for Reconsideration" form SSA-561-U2, or "Request for Hearing" form HA-501. You may go to our website at www.socialsecurity.gov/online/ to find the forms. You can also call, write, or visit us to request the forms. If you need help to fill out the forms, we can help you by phone or in person.

### If You Ask For A Reconsideration And A Hearing

If you ask for both a reconsideration and a hearing, we will process the hearing first, even if you made the reconsideration request first. When we make our decisions, we will send you letters explaining our decisions on both the reconsideration and the hearing.

### How The Hearing Process Works

After we send your case for a hearing, an Administrative Law Judge (ALJ) will mail you a letter at least 20 days before the hearing to tell you its date, time and place. The letter will explain the law in your case and tell you what has to be decided. Since the ALJ will review all the facts in your case, it is important that you give us any new facts as soon as you can.



The hearing is your chance to tell the ALJ why you disagree with the decisions in your case. You can give the ALJ new evidence and bring people to testify for you. The ALJ also can require people to bring important papers to your hearing and give facts about your case. You can question these people at your hearing.

### It Is Important To Go To The Hearing

It is very important that you go to the hearing. If for any reason you can't go, contact the ALJ as soon as possible before the hearing and explain why. The ALJ will reschedule the hearing if you have a good reason.

If you don't go to the hearing and don't have a good reason for not going, the ALJ may dismiss your request for a hearing.

### Things To Remember For The Future

We decided that you are disabled under our rules. But, this decision must be reviewed once every 3 years. We will send you a letter before we start the review. Based on that review, your benefits will continue if you are still disabled, but will end if you are no longer disabled.

### If You Have Any Questions

We invite you to visit our website at www.socialsecurity.gov on the Internet to find general information about Social Security. If you have any specific questions, you may call us toll-free at 1-800-772-1213, or call your local Social Security office at 1-877-545-7548. We can answer most questions over the phone. If you are deaf or hard of hearing, you may call our TTY number, 1-800-325-0778. You can also write or visit any Social Security office. The office that serves your area is located at:

> SOCIAL SECURITY
> STE 100
> 1570 W BATTLEFIELD ST
> SPRINGFIELD MO 65807

If you do call or visit an office, please have this letter with you. It will help us answer your questions. Also, if you plan to visit an office, you may call ahead to make an appointment. This will help us serve you more quickly when you arrive at the office.

Carolyn W. Colvin
Acting Commissioner of
Social Security



## PAYMENT SUMMARY

**Your Payment Of $3,433.50**

Here is how we figured your
first payment:

    Benefits due for February 2014
    and March 2014,
    less monthly rounding of benefits ........................$ 4,578.00

    Amount we subtracted because of

    ● money to pay
      your representative ............................ 1,144.50

This equals the amount of
your first payment ...................................$ 3,433.50

**Your Regular Monthly Payment**

Here is how we figured your
regular monthly payment effective April 2014:

    You are entitled to a monthly benefit of .................$ 2,289.50

    Amount we subtracted because of

    ● rounding (we must round down to
      a whole dollar) ................................. .50

This equals the amount of
your regular monthly payment ...........................$ 2,289.00





Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

January 9, 2014

**The Lincoln National Life**
**Insurance Company**

Service Office:

8801 Indian Hills Drive
Omaha, NE 68114-4066
toll free (800) 423-2765
www.LFG.com

LAW OFFICES OF RICK S. VASQUEZ
ATTN RICK VASQUEZ
1736 EAST SUNSHINE, SUITE 103
SPRINGFIELD MO 65804

FAX 417-889-7096
PHONE 417-889-7735

Re: Policy Number: 00001015732600000
   Claim Number: 1130226196
   Claimant:    Jamie Flanagan

Dear Mr. Vasquez:

We are writing in reference to your client's claim for Long Term Disability. We have received your letter of representation and request for:

Copies of all documents and records
Any information relevant to Mrs. Flanagan's claim

I have included a copy of Mrs. Flanagan's LTD claim application, medical records, and the letters that were sent to her and her employer. Please advise if any additional information is required.

Please contact our office with any questions you may have at the number listed above or email us at Claims@LFG.com.

Sincerely,

Loreena M. Lobdell
Sr. LTD Benefit Specialist
The Lincoln National Life Insurance Company



Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

December 4, 2013

**The Lincoln National Life
Insurance Company**
Service Office:

8801 Indian Hills Drive
Omaha, NE 68114-4066
toll free (800) 423-2765
www.LFG.com

JAMIE FLANAGAN
986 S. HEDGE DR
NIXA MO 65714

Re: Group Policy Number: 00001015732600000
Group Claim Number: 1130226196

Dear Mrs. Flanagan:

We have completed our review of your Long Term Disability claim and have determined that no benefits are payable.

To be eligible for benefits under the policy issued to your employer, an individual must satisfy all of the provisions of the policy. This includes but is not limited to the following:

**PROOF OF CLAIM.** The Company must be given written proof of claim within 90 days after the end of the Elimination Period. When it is not reasonably possible to give written proof in the time required, the claim will not be reduced or denied solely for this reason, if the proof is filed:
1. as soon as reasonably possible; and
2. in no event later than one year after it was required.
These time limits will not apply while an Insured Employee lacks legal capacity.

Proof of claim must be provided at the Insured Employee's own expense. It must show the date the Disability began, its cause and degree. Documentation must include:
1. completed statements by the Insured Employee and the Employer;
2. a completed statement by the attending Physician, which must describe any restrictions on the Insured Employee's performance of the duties of his or her Regular Occupation;
3. proof of any other income received;
4. proof of any benefits available from other income sources, which may affect Policy benefits;
5. a signed authorization for the Company to obtain more information; and
6. any other items the Company may reasonably require in support of the claim.

**TOTAL DISABILITY** or **TOTALLY DISABLED** will be defined as follows:
1. During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of his or her Own Occupation.
2. After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of any occupation which his or her training, education or experience will reasonably allow.
The loss of a professional license, an occupational license or certification, or a driver's license for any reason does **not**, by itself, constitute Total Disability.

Jamie Flanagan
12/4/2013
Page **2** of **7**

ELIMINATION PERIOD: 90 calendar days of Disability caused by the same or a related Sickness or Injury, which must be accumulated within a 180 calendar day period.

**MAIN DUTIES** or **MATERIAL AND SUBSTANTIAL DUTIES** means those job tasks that:
1. are normally required to perform the Insured Employee's Own Occupation; and
2. could not reasonably be modified or omitted.

To determine whether a job task could reasonably be modified or omitted, the Company will apply the Americans with Disabilities Act's standards concerning reasonable accommodation. It will apply the Act's standards, whether or not:
1. the Employer is subject to the Act; or
2. the Insured Employee has requested such a job accommodation.
An Employer's failure to modify or omit other job tasks does **not** render the Insured Employee unable to perform the Main Duties of the job.

**OWN OCCUPATION or REGULAR OCCUPATION** means the occupation, trade or profession:
1. in which the Insured Employee was employed with the Employer prior to Disability; and
2. which was his or her main source of earned income prior to Disability.

It means a collective description of related jobs, as defined by the U.S. Department of Labor Dictionary of Occupational Titles. It includes any work in the same occupation for pay or profit, regardless of:
1. whether such work is with the Employer, with some other firm, or on a self-employed basis; or
2. whether a suitable opening is currently available with the Employer or in the local labor market.

**OWN OCCUPATION PERIOD** means a period as shown in the Schedule of Benefits.

**Information reviewed and action taken**

After a thorough review of the information currently contained in your claim file, we have determined that you do not meet the definition of Total Disability, as defined above. Outlined below is the information reviewed which led to our determination.

In our review process, all information previously submitted as well as any new documentation is used to make a determination. The documentation contained in your claim file includes the following:

- Employer Statement completed by Judy Hampton on 11/15/2013
- Job Description for Nurse Practitioner
- Employee Statement completed on 11/10/2013
- Attending Physician Statement completed by Dr. Donald Hopewell on 11/17/2013

LIN00822

Jamie Flanagan
12/4/2013
Page 3 of 7

- Medical records with diagnostic testing for the dates of 10/8/2010 to 1/9/2013 and office notes for the dates of 8/2/11 to 10/31/2013 including:
    - Charles Mace, M.D. (Neurosurgeon): office visit, imaging report, myelogram, 04/01/11-01/09/13.
    - Donald Hopewell, M.D. (Neurology): office visit, 08/02/12 -10/31/13.
    - Wayne Wallender, D.O. (Pain Medicine): office visit, 08/15/13.

According to the information contained in your claim file, you stopped working on 8/26/2013 due to a diagnosis of lumbar spondylosis with post laminectomy syndrome.

We have a 10/22/2010 office visit note with Dr. Donald Hopewell - Cox Pain and Neurology Branson. During this visit it is noted that you had been experiencing pain for the past two weeks. This was prior to your 4/1/2011 lumbar fusion.

The medical records provided show that as of 9/19/2012 office visit date with Springfield Neurological & Spinal Institute (Dr. Charles Mace) you had complaints of low back pain, bilateral leg pain, neck pain and left shoulder pain. You had a L5-S1 fusion on 4/1/2011. You continue to complain of low back pain, bilateral leg pain and shin pain, bilateral foot pain and heel pain that have all been worsening. It is noted that symptoms improved when wearing the lumbar brace. You had no leg weakness or bowel or bladder issues. You also complained of neck pain that radiates into the left shoulder. The physical exam on this visit was normal, with no range of motion deficits and normal strength and tone. Your medications included Robaxin as needed for pain, Hydrodocone as needed for pain, Avinza, Soma, and Wellbutrin. The lumbar CT showed no confluent bone at L5-S1, cage and screws look fine, progressive endplate sclerosis, cervical MRI shows left C5-6 disc herniation. Will try PT and traction for cervical if no better consider ACDF - may be a spinal cord stimulator candidate long term. for lumbar will recheck myelogram and consider re-exploration.

The 11/2/12 CT scan and 12/28/12 MRI of the lumbar spine showed normal vertebral body heights with no abnormal signal intensity or lesions. T12-L1, L1-L2, L2-L3, L3-L4 were all unremarkable. The L4-L5 and L5-S1 shows post-surgical changes with evidence of post-operative fibrosis.

The 1/9/2013 x-rays showed surgical changes to the lumbar interbody fusion at L5-S1, with all hardware intact. There was no evidence of instability or interval change.

The below records are all from Dr. Donald Hopewell - Neurology and Pain.

On 8/2/11 it is noted that you had no improvement with the second epidural injection, your back pain and leg pain is variable with activity, and worse late in the day and as the week goes on.

On 11/2/11 it is noted again low back pain variable with activity. Good response to muscle relaxers and Lidoderm.

Jamie Flanagan
12/4/2013
Page **4** of **7**

On 2/1/2012 you had a routine medication follow-up. It was noted in this office visit that there were discussions of re-operation and possibly spinal cord stimulator. He advises that clearly you have post laminectomy syndrome with fixed L4-5, L5-S1 root injury. It is also noted in this visit that you can't take Amitriptyline, but can take nortriptyline.

In the 5/1/12 office note it advises you are not taking the Nortriptyline or Keppra due to not liking the side effects. You were prescribed low-dose Sevalla and advised to monitor for GI side effects.

You were seen again on 5/9/12 at your request with four weeks of intermittent aching of the elbow toward the wrist. Yesterday developed shoulder pain. You advised of some neck pain and decreased range of motion. You also complained of some knee symptoms occasionally. You were referred to Rheumatology.

On 7/31/12 you were seen for routine follow-up. Joint and neck pain were less prominent, you still get episodic neck pain usually with movement. It notes an MRI was done which did not show any significant pathology. You had not seen Rheumatology. You were advised to continue with current meds and see a Rheumatologist.

Your next visit was on 10/29/2012. At this visit it is noted that you did see a Rheumatologist. Blood work was negative, but feels it is likely an auto-immune disease. For low back pain you are seeing neurosurgeon - fusion has failed. Having a myelogram for lumbar and cervical symptoms next week. Pain is highly variable secondary to multiple etiologies and activity related processes. You wanted to hold on further med changes.

On 1/24/13 it was noted that the recent MRI showed root scarring and that you have plans to do a cord stimulator trial. You couldn't afford Avinza and were switched to Morphine 120 BID.

On 4/25/13 you were seen to discuss options. You complained of hyper somnolence from Morphine and advise that you have to decrease when working or stagger doses. You advised of drug coverage issues - preclude anything but generics, only Morphine and Methadone. You are sensitive to adhesives and can't use Fentanyl, and don't want Methadone. It was advised to continue current medications and that you will explore options with drug reps, possibly consider implantables.

On 7/23/2013 it is noted that you have pain in the lumbar with spread down legs, parallels activity - worse as week goes on. Your cord stimulator trial is scheduled for next month. You continue to have somnolence issues with medications.

On 9/19/13 you were seen on your request for a complaint of weakness in the legs. There were no true motor deficits. It was noted that your insurance denied SCS, but you will appeal.

LIN00324

Jamie Flanagan
12/4/2013
Page **5** of **7**

You were seen again on 10/31/13 at your request to discuss that you had the SCS trial and there were no benefits. You were prescribed a trial of Methadone for Morphine.

You were seen on 8/15/2013 by Ozarks Pain Specialists. This visit notes that you are suffering from significant epidural fibrosis and are on high dose narcotics. Despite treatment you are in significant pain. All of your diagnostic test results from 2010 to current are described in this office visit. It was advised that SCS is recommended and a perc trial process was discussed.

The neurologic exam, as well as the rest of the Systems exam is normal throughout all of your office visits.

You worked until 8/26/2013. The office notes show that as far back as 8/2/2011 you stated there was no improvement with 2nd epidural injection and your low back pain is variable with activity. Leg pain is consistent, down the posterior leg into the right heel. You advised at this time that the pain was worse the more you were up on your feet and gets worse late in the day and as the week goes on.

It is important to note that the policy under which you are covered refers to and is governed by the main duties of your regular "occupation" and not by the duties of your specific job. Nearly every job in the economy is performed slightly different from one employer to another. However, the Department of Labor groups jobs into occupations based on their similarities. The term "occupation" refers to a collective description of a number of individual jobs that are performed, with variations, in many establishments. Consequently, there will be similarities between the main duties of your occupation and those of your job. There may also be some differences.

*In addition to the medical documentation submitted to our office, we obtained your written job description, your employer's description of your job duties, and the description of your occupation from the Department of Labor's Dictionary of Occupation Titles (DOT). In order to be eligible for* **Long Term Disability** *benefits, you must have been unable to perform each of the main duties of your occupation, as they would be performed in a typical setting for an employer, beginning 8/26/2013 and through the 90 day elimination period to the LTD Benefit Start Date of 11/24/13 and beyond.*

Based on information obtained from your employer and occupational information contained within the *Dictionary of Occupational Titles* (DOT), we have determined that your occupation as a Nurse Practitioner is best defined as a Nurse Practitioner in the national workforce. The material and substantial duties of a Nurse Practitioner include but are not limited to the following:

- *Diagnose and treat chronic health conditions. May prescribe medication. Perform patient examinations. May order and interpret diagnostic tests*

Jamie Flanagan
12/4/2013
Page **6** of **7**

We reviewed the medical documentation provided in conjunction with the written job description, your employer's description of your job duties, and the Department of Labor's Dictionary of Occupational Titles (DOT) and fail to find that the medical evidence supports your inability to perform these material and substantial duties of your regular occupation.

## Summary

In summary, the medical documentation contained in your claim file does not support Total Disability as defined by this policy. Based on the medical documentation provided, you have had ongoing complaints of low back pain since at least 10/22/2010. You had an L5-S1 fusion 4/1/2011. You have continued to complain of ongoing symptoms since this date. However, you have continued to work with this condition. There was no significant event prior to the 8/25/2013 date last worked that would substantiate any significant decline in your medical condition that would support you now being unable to perform your occupation as you had been performing previously. Your physical findings report relatively good range of motion with hardware intact and no instability noted. Neurological and motor exam is normal. There is no substantiation that you are unable to stand, ambulate, and use your upper and lower extremities in a functional manner. Pain is subjective and cannot be objectively quantifies, although it is reasonable to assume that some degree of discomfort in your back is present. Restrictions of the ability to change positions as needed would be understandable - and in your occupation this would not be a disabling restriction.

If you disagree with our decision, you may appeal this determination by following the steps outlined below.

## Appeal Rights

If you wish, you may request copies of the pertinent documents upon which our decision was based, prior to submitting a formal appeal.

You, your attorney or a person legally authorized as your representative may request a review of your denied claim. Such request must be made in writing and submitted to us at the address below within 180 days after you receive this denial notice. We will then provide you with a full written explanation of the decision within 45 days of receipt of your appeal.

**Risk Services –**
**The Lincoln National Life Insurance Company**
**PO Box 2337**
**Omaha, NE 68103**
**Fax: 402-361-1460**

Jamie Flanagan
12/4/2013
Page **7** of **7**

Your request for an appeal needs to include the following:

- A letter of appeal outlining the reason(s) for your appeal.
- Please include your policy number and claim number.
- Medical records to support your appeal such as office and treatment notes, laboratory results, x-rays and testing results.

If you have no medical records to submit, but would like for us to review your claim again with the information currently in file, please state this in your letter of appeal.

You and your plan may have other voluntary alternative dispute resolution options, such as mediation, if your plan is subject to ERISA. One way to find out what may be available is to contact your local U.S. Department of Labor Office and your State insurance regulatory agency. In addition, once all required reviews of your claim have been completed; you have the right to bring a civil action under applicable law.

Please contact our office with any questions you may have at the number listed above or email us at Claims@LFG.com. You can also register for our website at www.Lincoln4Benefits.com to view your benefits and claim status online 24 hours a day.

Sincerely,

Loreena M. Lobdell
Sr. LTD Benefit Specialist
The Lincoln National Life Insurance Company

LIN00827



REC'D JAN 06 2014

# Law Offices of Rick S. Vasquez

1736 East Sunshine, Suite 103
Springfield, Missouri 65804

—

Telephone (417) 889-7735
Facsimile (417) 889-7096

January 2, 2014

The Lincoln National Life Insurance Company
Po Box 2337
Omaha, NE
68103

*Re:*   *Jamie Flanagan*
       *Group Policy# 000010157326000000*
       *Group Claim# 1130226196*

Dear Sir/Madam:

I am counsel for Jamie Flanagan with respect to her long term disability claim with The Lincoln National Life Insurance Company. Mrs. Flanagan has provided me with a copy of the 12-04-13 denial of benefits. Pursuant to the denial I am enclosing here with a medical release signed by Mrs. Flanagan and I am requesting:

1. Copies of all documents and records;
2. Any information relevant to Mrs. Flanagan's claim.

Please provide this information to my office.

Thank you for your time and attention to this matter.

Most Sincerely,

Rick S. Vasquez
Attorney at Law

RSV: ch
CC: Jamie Flanagan
Enclosure

## Authorization to Release Medical Records

**DIRECTED TO:** *The Lincoln National Life Insurance Co.*

**IN REGARD TO:** *Jamie Flanagan* ███████████████

Name                     SS#:              DOB:

I hereby authorize the above-noted healthcare provider to furnish to:

**LAW OFFICES of RICK S. VASQUEZ**
Attorney at Law
1736 East Sunshine, Suite 103
Springfield, MO 65804

or his representatives, the following information regarding my healthcare for the periods of care provided between *January 1, 2010* and *present*

- ☒ Consultation
- ☒ Evaluations
- ☒ Office Notes
- ☒ Report Summaries
- ☒ Specialist Assessments
- ☒ Physical Therapy
- ☒ X-ray/MRI reports
- ☒ Surgery Reports
- ☒ Admit/Discharge Summaries
- ☒ Emergency Dept. Reports
- ☒ ER Assessment Form
- ☒ Medical Records
- ☒ RFC Form
- ☒ MSS Form
- ☒ VI Form

☒ Other: *All documents regarding Long Term Disability claim.*

The requested information is to be used for the purpose of administrative proceedings before the Social Security Administration, the Division of Workers' Compensation and/or Long Term Disability. This medical information may be used by the recipient, Rick S. Vasquez, Attorney at Law, and may be subject to re-disclosure by the recipient at which point it is no longer protected by the Health and Insurance Portability and Accountability Act (HIPPA) of 1996.

It is my full understanding that my medical records and the information connected with my treatment may contain references to my mental health, psychiatric care, developmental disabilities, alcohol and drug abuse, Acquired Immune Deficiency Syndrome (AIDS/HIV) test results, sexually transmitted disease, Hepatitis B or C testing and/or other sensitive information, and I fully consent to the release of that information by my signed authorization below.

This authorization to release medical records form does not authorize re-disclosure of medical information beyond the limits of this consent.

The above medical provider cannot condition treatment, payment, enrollment or eligibility for benefits simply by virtue of my signature on this form.

I can revoke this authorization to release medical records by submitting a written notice to the above medical provider at any time, except to the extent that action has been taken in reliance on this authorization. Unless this authorization is revoked, it will expire on the following date or event _____, **or one year from the date below, unless otherwise specified.**

A photo static copy of this authorization shall be considered as effective as the original.

Signature: *Jamie Flanagan*      Date *2/18/13*

Relationship: _____

ᴬᴸᴳ JAN 0 6 2014

Law Offices of
RICK S. VASQUEZ
1736 E. Sunshine, Suite 103
Springfield, Missouri 65804

The Lincoln National Life Insurance Company
Po Box 2337
Omaha, NE
68103

6810323373?

HASLER
015H14158225
$0.66
01/02/14
Mailed From 63804
US POSTAGE



RECD JAN 0 6 2014

# Law Offices of Rick S. Vasquez

1736 East Sunshine, Suite 103
Springfield, Missouri 65804

—

Telephone (417) 889-7735
Facsimile (417) 889-7096

January 2, 2014

The Lincoln National Life Insurance Company
Po Box 2337
Omaha, NE
68103

*Re:* *Jamie Flanagan*
*Group Policy# 000010015732600000*
*Group Claim# 1130226196*

Dear Sir/Madam:

I am counsel for Jamie Flanagan with respect to her long term disability claim with The Lincoln National Life Insurance Company. Mrs. Flanagan has provided me with a copy of the 12-04-13 denial of benefits. Pursuant to the denial I am enclosing here with a medical release signed by Mrs. Flanagan and I am requesting:

1. Copies of all documents and records;
2. Any information relevant to Mrs. Flanagan's claim.

Please provide this information to my office.

Thank you for your time and attention to this matter.

Most Sincerely,

Rick S. Vasquez
Attorney at Law

RSV: ch
CC: Jamie Flanagan
Enclosure

LIN00831

## Authorization to Release Medical Records

DIRECTED TO: _The Lincoln National Life Insurance Co._

IN REGARD TO: _Jamie Flanagan_ ▮▮▮▮▮▮▮▮

   Name                                    SS#:                        DOB:

I hereby authorize the above-noted healthcare provider to furnish to:

LAW OFFICES of RICK S. VASQUEZ
Attorney at Law
1736 East Sunshine, Suite 103
Springfield, MO  65804

or his representatives, the following information regarding my healthcare for the periods of care

provided between _January 1, 2010_ and _present_

☒ Consultation        ☒ Specialist Assessments   ☒ Admit/Discharge Summaries   ☒ RFC Form
☒ Evaluations         ☒ Physical Therapy          ☒ Emergency Dept. Reports      ☒ MSS Form
☒ Office Notes        ☒ X-ray/MRI reports         ☒ ER Assessment Form           ☒ VI Form
☒ Report Summaries   ☒ Surgery Reports            ☒ Medical Records
☒ Other: _All documents regarding Long Term Disability claim_.

   The requested information is to be used for the purpose of administrative proceedings before the Social Security Administration, the Division of Workers' Compensation and/or Long Term Disability.  This medical information may be used by the recipient, Rick S. Vasquez, Attorney at Law, and may be subject to re-disclosure by the recipient at which point it is no longer protected by the Health and Insurance Portability and Accountability Act (HIPPA) of 1996.

   It is my full understanding that my medical records and the information connected with my treatment may contain references to my mental health, psychiatric care, developmental disabilities, alcohol and drug abuse, Acquired Immune Deficiency Syndrome (AIDS/HIV) test results, sexually transmitted disease, Hepatitis B or C testing and/or other sensitive information, and I fully consent to the release of that information by my signed authorization below.

   This authorization to release medical records form does not authorize re-disclosure of medical information beyond the limits of this consent.

   The above medical provider cannot condition treatment, payment, enrollment or eligibility for benefits simply by virtue of my signature on this form.

   I can revoke this authorization to release medical records by submitting a written notice to the above medical provider at any time, except to the extent that action has been taken in reliance on this authorization.  Unless this authorization is revoked, it will expire on the following date or event _____, **or one year from the date below, unless otherwise specified.**

   A photo static copy of this authorization shall be considered as effective as the original.

Signature: _Jamie Flanagan_          Date _2/18/13_

Relationship: _____



Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

December 4, 2013

**The Lincoln National Life
Insurance Company**
Service Office:

8801 Indian Hills Drive
Omaha, NE 68114-4066
toll free (800) 423-2765
www.LFG.com

JAMIE FLANAGAN
986 S. HEDGE DR
NIXA MO 65714

Re: Group Policy Number: 00001015732600000
Group Claim Number: 1130226196

Dear Mrs. Flanagan:

We have completed our review of your Long Term Disability claim and have determined that no benefits are payable.

To be eligible for benefits under the policy issued to your employer, an individual must satisfy all of the provisions of the policy. This includes but is not limited to the following:

**PROOF OF CLAIM.** The Company must be given written proof of claim within 90 days after the end of the Elimination Period. When it is not reasonably possible to give written proof in the time required, the claim will not be reduced or denied solely for this reason, if the proof is filed:
1. as soon as reasonably possible; and
2. in no event later than one year after it was required.
These time limits will not apply while an Insured Employee lacks legal capacity.

Proof of claim must be provided at the Insured Employee's own expense. It must show the date the Disability began, its cause and degree. Documentation must include:
1. completed statements by the Insured Employee and the Employer;
2. a completed statement by the attending Physician, which must describe any restrictions on the Insured Employee's performance of the duties of his or her Regular Occupation;
3. proof of any other income received;
4. proof of any benefits available from other income sources, which may affect Policy benefits;
5. a signed authorization for the Company to obtain more information; and
6. any other items the Company may reasonably require in support of the claim.

**TOTAL DISABILITY** or **TOTALLY DISABLED** will be defined as follows:
1. During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of his or her Own Occupation.
2. After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of any occupation which his or her training, education or experience will reasonably allow.
The loss of a professional license, an occupational license or certification, or a driver's license for any reason does **not**, by itself, constitute Total Disability.

LIN00833

Jamie Flanagan
12/4/2013
Page **2** of **7**

ELIMINATION PERIOD: 90 calendar days of Disability caused by the same or a related Sickness or Injury, which must be accumulated within a 180 calendar day period.

**MAIN DUTIES** or **MATERIAL AND SUBSTANTIAL DUTIES** means those job tasks that:
1. are normally required to perform the Insured Employee's Own Occupation; and
2. could not reasonably be modified or omitted.

To determine whether a job task could reasonably be modified or omitted, the Company will apply the Americans with Disabilities Act's standards concerning reasonable accommodation. It will apply the Act's standards, whether or not:
1. the Employer is subject to the Act; or
2. the Insured Employee has requested such a job accommodation.
An Employer's failure to modify or omit other job tasks does **not** render the Insured Employee unable to perform the Main Duties of the job.

**OWN OCCUPATION or REGULAR OCCUPATION** means the occupation, trade or profession:
1. in which the Insured Employee was employed with the Employer prior to Disability; and
2. which was his or her main source of earned income prior to Disability.

It means a collective description of related jobs, as defined by the U.S. Department of Labor Dictionary of Occupational Titles. It includes any work in the same occupation for pay or profit, regardless of:
1. whether such work is with the Employer, with some other firm, or on a self-employed basis; or
2. whether a suitable opening is currently available with the Employer or in the local labor market.

**OWN OCCUPATION PERIOD** means a period as shown in the Schedule of Benefits.

**Information reviewed and action taken**

After a thorough review of the information currently contained in your claim file, we have determined that you do not meet the definition of Total Disability, as defined above. Outlined below is the information reviewed which led to our determination.

In our review process, all information previously submitted as well as any new documentation is used to make a determination. The documentation contained in your claim file includes the following:

- Employer Statement completed by Judy Hampton on 11/15/2013
- Job Description for Nurse Practitioner
- Employee Statement completed on 11/10/2013
- Attending Physician Statement completed by Dr. Donald Hopewell on 11/17/2013

LIN00834

Jamie Flanagan
12/4/2013
Page 3 of 7

- Medical records with diagnostic testing for the dates of 10/8/2010 to 1/9/2013 and office notes for the dates of 8/2/11 to 10/31/2013 including:
  - Charles Mace, M.D. (Neurosurgeon): office visit, imaging report, myelogram, 04/01/11-01/09/13.
  - Donald Hopewell, M.D. (Neurology): office visit, 08/02/12 -10/31/13.
  - Wayne Wallender, D.O. (Pain Medicine): office visit, 08/15/13.

According to the information contained in your claim file, you stopped working on 8/26/2013 due to a diagnosis of lumbar spondylosis with post laminectomy syndrome.

We have a 10/22/2010 office visit note with Dr. Donald Hopewell - Cox Pain and Neurology Branson. During this visit it is noted that you had been experiencing pain for the past two weeks. This was prior to your 4/1/2011 lumbar fusion.

The medical records provided show that as of 9/19/2012 office visit date with Springfield Neurological & Spinal Institute (Dr. Charles Mace) you had complaints of low back pain, bilateral leg pain, neck pain and left shoulder pain. You had a L5-S1 fusion on 4/1/2011. You continue to complain of low back pain, bilateral leg pain and shin pain, bilateral foot pain and heel pain that have all been worsening. It is noted that symptoms improved when wearing the lumbar brace. You had no leg weakness or bowel or bladder issues. You also complained of neck pain that radiates into the left shoulder. The physical exam on this visit was normal, with no range of motion deficits and normal strength and tone. Your medications included Robaxin as needed for pain, Hydrodocone as needed for pain, Avinza, Soma, and Wellbutrin. The lumbar CT showed no confluent bone at L5-S1, cage and screws look fine, progressive endplate sclerosis, cervical MRI shows left C5-6 disc herniation. Will try PT and traction for cervical if no better consider ACDF - may be a spinal cord stimulator candidate long term. for lumbar will recheck myelogram and consider re-exploration.

The 11/2/12 CT scan and 12/28/12 MRI of the lumbar spine showed normal vertebral body heights with no abnormal signal intensity or lesions. T12-L1, L1-L2, L2-L3, L3-L4 were all unremarkable. The L4-L5 and L5-S1 shows post-surgical changes with evidence of post-operative fibrosis.

The 1/9/2013 x-rays showed surgical changes to the lumbar interbody fusion at L5-S1, with all hardware intact. There was no evidence of instability or interval change.

The below records are all from Dr. Donald Hopewell - Neurology and Pain.

On 8/2/11 it is noted that you had no improvement with the second epidural injection, your back pain and leg pain is variable with activity, and worse late in the day and as the week goes on.

On 11/2/11 it is noted again low back pain variable with activity. Good response to muscle relaxers and Lidoderm.

LIN00835

Jamie Flanagan
12/4/2013
Page **4** of **7**

On 2/1/2012 you had a routine medication follow-up. It was noted in this office visit that there were discussions of re-operation and possibly spinal cord stimulator. He advises that clearly you have post laminectomy syndrome with fixed L4-5, L5-S1 root injury. It is also noted in this visit that you can't take Amitriptyline, but can take nortriptyline.

In the 5/1/12 office note it advises you are not taking the Nortriptyline or Keppra due to not liking the side effects. You were prescribed low-dose Sevalla and advised to monitor for GI side effects.

You were seen again on 5/9/12 at your request with four weeks of intermittent aching of the elbow toward the wrist. Yesterday developed shoulder pain. You advised of some neck pain and decreased range of motion. You also complained of some knee symptoms occasionally. You were referred to Rheumatology.

On 7/31/12 you were seen for routine follow-up. Joint and neck pain were less prominent, you still get episodic neck pain usually with movement. It notes an MRI was done which did not show any significant pathology. You had not seen Rheumatology. You were advised to continue with current meds and see a Rheumatologist.

Your next visit was on 10/29/2012. At this visit it is noted that you did see a Rheumatologist. Blood work was negative, but feels it is likely an auto-immune disease. For low back pain you are seeing neurosurgeon - fusion has failed. Having a myelogram for lumbar and cervical symptoms next week. Pain is highly variable secondary to multiple etiologies and activity related processes. You wanted to hold on further med changes.

On 1/24/13 it was noted that the recent MRI showed root scarring and that you have plans to do a cord stimulator trial. You couldn't afford Avinza and were switched to Morphine 120 BID.

On 4/25/13 you were seen to discuss options. You complained of hyper somnolence from Morphine and advise that you have to decrease when working or stagger doses. You advised of drug coverage issues - preclude anything but generics, only Morphine and Methadone. You are sensitive to adhesives and can't use Fentanyl, and don't want Methadone. It was advised to continue current medications and that you will explore options with drug reps, possibly consider implantables.

On 7/23/2013 it is noted that you have pain in the lumbar with spread down legs, parallels activity - worse as week goes on. Your cord stimulator trial is scheduled for next month. You continue to have somnolence issues with medications.

On 9/19/13 you were seen on your request for a complaint of weakness in the legs. There were no true motor deficits. It was noted that your insurance denied SCS, but you will appeal.

Jamie Flanagan
12/4/2013
Page **5** of **7**

You were seen again on 10/31/13 at your request to discuss that you had the SCS trial and there were no benefits. You were prescribed a trial of Methadone for Morphine.

You were seen on 8/15/2013 by Ozarks Pain Specialists. This visit notes that you are suffering from significant epidural fibrosis and are on high dose narcotics. Despite treatment you are in significant pain. All of your diagnostic test results from 2010 to current are described in this office visit. It was advised that SCS is recommended and a perc trial process was discussed.

The neurologic exam, as well as the rest of the Systems exam is normal throughout all of your office visits.

You worked until 8/26/2013. The office notes show that as far back as 8/2/2011 you stated there was no improvement with 2nd epidural injection and your low back pain is variable with activity. Leg pain is consistent, down the posterior leg into the right heel. You advised at this time that the pain was worse the more you were up on your feet and gets worse late in the day and as the week goes on.

It is important to note that the policy under which you are covered refers to and is governed by the main duties of your regular "occupation" and not by the duties of your specific job. Nearly every job in the economy is performed slightly different from one employer to another. However, the Department of Labor groups jobs into occupations based on their similarities. The term "occupation" refers to a collective description of a number of individual jobs that are performed, with variations, in many establishments. Consequently, there will be similarities between the main duties of your occupation and those of your job. There may also be some differences.

*In addition to the medical documentation submitted to our office, we obtained your written job description, your employer's description of your job duties, and the description of your occupation from the Department of Labor's Dictionary of Occupation Titles (DOT). In order to be eligible for **Long Term Disability** benefits, you must have been unable to perform each of the main duties of your occupation, as they would be performed in a typical setting for an employer, beginning 8/26/2013 and through the 90 day elimination period to the LTD Benefit Start Date of 11/24/13 and beyond.*

Based on information obtained from your employer and occupational information contained within the *Dictionary of Occupational Titles* (DOT), we have determined that your occupation as a Nurse Practitioner is best defined as a Nurse Practitioner in the national workforce. The material and substantial duties of a Nurse Practitioner include but are not limited to the following:

- *Diagnose and treat chronic health conditions. May prescribe medication. Perform patient examinations. May order and interpret diagnostic tests*

Jamie Flanagan
12/4/2013
Page **6** of **7**

We reviewed the medical documentation provided in conjunction with the written job description, your employer's description of your job duties, and the Department of Labor's Dictionary of Occupational Titles (DOT) and fail to find that the medical evidence supports your inability to perform these material and substantial duties of your regular occupation.

## Summary

In summary, the medical documentation contained in your claim file does not support Total Disability as defined by this policy. Based on the medical documentation provided, you have had ongoing complaints of low back pain since at least 10/22/2010. You had an L5-S1 fusion 4/1/2011. You have continued to complain of ongoing symptoms since this date. However, you have continued to work with this condition. There was no significant event prior to the 8/25/2013 date last worked that would substantiate any significant decline in your medical condition that would support you now being unable to perform your occupation as you had been performing previously. Your physical findings report relatively good range of motion with hardware intact and no instability noted. Neurological and motor exam is normal. There is no substantiation that you are unable to stand, ambulate, and use your upper and lower extremities in a functional manner. Pain is subjective and cannot be objectively quantifies, although it is reasonable to assume that some degree of discomfort in your back is present. Restrictions of the ability to change positions as needed would be understandable - and in your occupation this would not be a disabling restriction.

If you disagree with our decision, you may appeal this determination by following the steps outlined below.

## Appeal Rights

If you wish, you may request copies of the pertinent documents upon which our decision was based, prior to submitting a formal appeal.

You, your attorney or a person legally authorized as your representative may request a review of your denied claim. Such request must be made in writing and submitted to us at the address below within 180 days after you receive this denial notice. We will then provide you with a full written explanation of the decision within 45 days of receipt of your appeal.

**Risk Services –**
**The Lincoln National Life Insurance Company**
**PO Box 2337**
**Omaha, NE 68103**
**Fax: 402-361-1460**

Jamie Flanagan
12/4/2013
Page 7 of 7

Your request for an appeal needs to include the following:

- A letter of appeal outlining the reason(s) for your appeal.
- Please include your policy number and claim number.
- Medical records to support your appeal such as office and treatment notes, laboratory results, x-rays and testing results.

If you have no medical records to submit, but would like for us to review your claim again with the information currently in file, please state this in your letter of appeal.

You and your plan may have other voluntary alternative dispute resolution options, such as mediation, if your plan is subject to ERISA. One way to find out what may be available is to contact your local U.S. Department of Labor Office and your State insurance regulatory agency. In addition, once all required reviews of your claim have been completed; you have the right to bring a civil action under applicable law.

Please contact our office with any questions you may have at the number listed above or email us at Claims@LFG.com. You can also register for our website at www.Lincoln4Benefits.com to view your benefits and claim status online 24 hours a day.

Sincerely,

Loreena M. Lobdell
Sr. LTD Benefit Specialist
The Lincoln National Life Insurance Company



Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

December 5, 2013

**The Lincoln National Life Insurance Company**

Service Office:

8801 Indian Hills Drive
Omaha, NE 68114-4066
toll free (800) 423-2765
www.LFG.com

LESTER E. COX MEDICAL CENTER
ATTN COURTNEY BURLISON
3801 S NATIONAL AVE
SPRINGFIELD MO 65807

Re:   Policy Number: 00001015732600000
      Claim Number: 1130226196
      Claimant:  Jamie Flanagan

Dear Courtney Burlison:

This letter is to inform you that the Long Term Disability claim for Jamie Flanagan has been denied.

Based upon the medical documentation submitted for our review, we have determined that Mrs. Flanagan does not meet the definition of disability as stated in this policy.

A detailed letter has been sent to Mrs. Flanagan explaining why we have made this decision regarding the claim.  We are unable to provide you with a copy of the denial letter sent to your employee due to its confidential nature.

Please contact our office with any questions you may have at the number listed above or email us at Claims@LFG.com.  You can also register for our website at www.Lincoln4Benefits.com to view your benefits and claim status online 24 hours a day.

Sincerely,

Loreena M. Lobdell
Sr. LTD Benefit Specialist
The Lincoln National Life Insurance Company

LIN00840



Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

December 4, 2013

**The Lincoln National Life
Insurance Company**

Service Office:

8801 Indian Hills Drive
Omaha, NE 68114-4066
toll free (800) 423-2765
www.LFG.com

JAMIE FLANAGAN
986 S. HEDGE DR
NIXA MO 65714

Re: Group Policy Number: 00001015732600000
Group Claim Number: 1130226196

Dear Mrs. Flanagan:

We have completed our review of your Long Term Disability claim and have determined that no benefits are payable.

To be eligible for benefits under the policy issued to your employer, an individual must satisfy all of the provisions of the policy. This includes but is not limited to the following:

**PROOF OF CLAIM**. The Company must be given written proof of claim within 90 days after the end of the Elimination Period. When it is not reasonably possible to give written proof in the time required, the claim will not be reduced or denied solely for this reason, if the proof is filed:
   1. as soon as reasonably possible; and
   2. in no event later than one year after it was required.
These time limits will not apply while an Insured Employee lacks legal capacity.

Proof of claim must be provided at the Insured Employee's own expense. It must show the date the Disability began, its cause and degree. Documentation must include:
   1. completed statements by the Insured Employee and the Employer;
   2. a completed statement by the attending Physician, which must describe any restrictions on the Insured Employee's performance of the duties of his or her Regular Occupation;
   3. proof of any other income received;
   4. proof of any benefits available from other income sources, which may affect Policy benefits;
   5. a signed authorization for the Company to obtain more information; and
   6. any other items the Company may reasonably require in support of the claim.

**TOTAL DISABILITY** or **TOTALLY DISABLED** will be defined as follows:
   1. During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of his or her Own Occupation.
   2. After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of any occupation which his or her training, education or experience will reasonably allow.
The loss of a professional license, an occupational license or certification, or a driver's license for any reason does **not**, by itself, constitute Total Disability.

ELIMINATION PERIOD:  90 calendar days of Disability caused by the same or a related Sickness or Injury, which must be accumulated within a 180 calendar day period.

**MAIN DUTIES** or **MATERIAL AND SUBSTANTIAL DUTIES** means those job tasks that:
1. are normally required to perform the Insured Employee's Own Occupation; and
2. could not reasonably be modified or omitted.

To determine whether a job task could reasonably be modified or omitted, the Company will apply the Americans with Disabilities Act's standards concerning reasonable accommodation.  It will apply the Act's standards, whether or not:
1. the Employer is subject to the Act; or
2. the Insured Employee has requested such a job accommodation.

An Employer's failure to modify or omit other job tasks does **not** render the Insured Employee unable to perform the Main Duties of the job.

**OWN OCCUPATION or REGULAR OCCUPATION** means the occupation, trade or profession:
1. in which the Insured Employee was employed with the Employer prior to Disability; and
2. which was his or her main source of earned income prior to Disability.

It means a collective description of related jobs, as defined by the U.S. Department of Labor Dictionary of Occupational Titles.  It includes any work in the same occupation for pay or profit, regardless of:
1. whether such work is with the Employer, with some other firm, or on a self-employed basis; or
2. whether a suitable opening is currently available with the Employer or in the local labor market.

**OWN OCCUPATION PERIOD** means a period as shown in the Schedule of Benefits.

**Information reviewed and action taken**

After a thorough review of the information currently contained in your claim file, we have determined that you do not meet the definition of Total Disability, as defined above.  Outlined below is the information reviewed which led to our determination.

In our review process, all information previously submitted as well as any new documentation is used to make a determination.  The documentation contained in your claim file includes the following:

- Employer Statement completed by Judy Hampton on 11/15/2013
- Job Description for Nurse Practitioner
- Employee Statement completed on 11/10/2013
- Attending Physician Statement completed by Dr. Donald Hopewell on 11/17/2013

- Medical records with diagnostic testing for the dates of 10/8/2010 to 1/9/2013 and office notes for the dates of 8/2/11 to 10/31/2013 including:
    - Charles Mace, M.D. (Neurosurgeon): office visit, imaging report, myelogram, 04/01/11-01/09/13.
    - Donald Hopewell, M.D. (Neurology): office visit, 08/02/12 -10/31/13.
    - Wayne Wallender, D.O. (Pain Medicine): office visit, 08/15/13.

According to the information contained in your claim file, you stopped working on 8/26/2013 due to a diagnosis of lumbar spondylosis with post laminectomy syndrome.

We have a 10/22/2010 office visit note with Dr. Donald Hopewell - Cox Pain and Neurology Branson. During this visit it is noted that you had been experiencing pain for the past two weeks. This was prior to your 4/1/2011 lumbar fusion.

The medical records provided show that as of 9/19/2012 office visit date with Springfield Neurological & Spinal Institute (Dr. Charles Mace) you had complaints of low back pain, bilateral leg pain, neck pain and left shoulder pain. You had a L5-S1 fusion on 4/1/2011. You continue to complain of low back pain, bilateral leg pain and shin pain, bilateral foot pain and heel pain that have all been worsening. It is noted that symptoms improved when wearing the lumbar brace. You had no leg weakness or bowel or bladder issues. You also complained of neck pain that radiates into the left shoulder. The physical exam on this visit was normal, with no range of motion deficits and normal strength and tone. Your medications included Robaxin as needed for pain, Hydrodocone as needed for pain, Avinza, Soma, and Wellbutrin. The lumbar CT showed no confluent bone at L5-S1, cage and screws look fine, progressive endplate sclerosis, cervical MRI shows left C5-6 disc herniation. Will try PT and traction for cervical if no better consider ACDF - may be a spinal cord stimulator candidate long term. for lumbar will recheck myelogram and consider re-exploration.

The 11/2/12 CT scan and 12/28/12 MRI of the lumbar spine showed normal vertebral body heights with no abnormal signal intensity or lesions. T12-L1, L1-L2, L2-L3, L3-L4 were all unremarkable. The L4-L5 and L5-S1 shows post-surgical changes with evidence of post-operative fibrosis.

The 1/9/2013 x-rays showed surgical changes to the lumbar interbody fusion at L5-S1, with all hardware intact. There was no evidence of instability or interval change.

The below records are all from Dr. Donald Hopewell - Neurology and Pain.

On 8/2/11 it is noted that you had no improvement with the second epidural injection, your back pain and leg pain is variable with activity, and worse late in the day and as the week goes on.

On 11/2/11 it is noted again low back pain variable with activity. Good response to muscle relaxers and Lidoderm.

On 2/1/2012 you had a routine medication follow-up.  It was noted in this office visit that there were discussions of re-operation and possibly spinal cord stimulator.  He advises that clearly you have post laminectomy syndrome with fixed L4-5, L5-S1 root injury.  It is also noted in this visit that you can't take Amitriptyline, but can take nortriptyline.

In the 5/1/12 office note it advises you are not taking the Nortriptyline or Keppra due to not liking the side effects.  You were prescribed low-dose Sevalla and advised to monitor for GI side effects.

You were seen again on 5/9/12 at your request with four weeks of intermittent aching of the elbow toward the wrist.  Yesterday developed shoulder pain. You advised of some neck pain and decreased range of motion. You also complained of some knee symptoms occasionally. You were referred to Rheumatology.

On 7/31/12 you were seen for routine follow-up.  Joint and neck pain were less prominent, you still get episodic neck pain usually with movement.  It notes an MRI was done which did not show any significant pathology.  You had not seen Rheumatology.  You were advised to continue with current meds and see a Rheumatologist.

Your next visit was on 10/29/2012.  At this visit it is noted that you did see a Rheumatologist.  Blood work was negative, but feels it is likely an auto-immune disease.  For low back pain you are seeing neurosurgeon - fusion has failed.  Having a myelogram for lumbar and cervical symptoms next week.  Pain is highly variable secondary to multiple etiologies and activity related processes. You wanted to hold on further med changes.

On 1/24/13 it was noted that the recent MRI showed root scarring and that you have plans to do a cord stimulator trial.  You couldn't afford Avinza and were switched to Morphine 120 BID.

On 4/25/13 you were seen to discuss options.  You complained of hyper somnolence from Morphine and advise that you have to decrease when working or stagger doses. You advised of drug coverage issues - preclude anything but generics, only Morphine and Methadone.  You are sensitive to adhesives and can't use Fentanyl, and don't want Methadone.  It was advised to continue current medications and that you will explore options with drug reps, possibly consider implantables.

On 7/23/2013 it is noted that you have pain in the lumbar with spread down legs, parallels activity - worse as week goes on.  Your cord stimulator trial is scheduled for next month.  You continue to have somnolence issues with medications.

On 9/19/13 you were seen on your request for a complaint of weakness in the legs. There were no true motor deficits.  It was noted that your insurance denied SCS, but you will appeal.

You were seen again on 10/31/13 at your request to discuss that you had the SCS trial and there were no benefits. You were prescribed a trial of Methadone for Morphine.

You were seen on 8/15/2013 by Ozarks Pain Specialists. This visit notes that you are suffering from significant epidural fibrosis and are on high dose narcotics. Despite treatment you are in significant pain. All of your diagnostic test results from 2010 to current are described in this office visit. It was advised that SCS is recommended and a perc trial process was discussed.

The neurologic exam, as well as the rest of the Systems exam is normal throughout all of your office visits.

You worked until 8/26/2013. The office notes show that as far back as 8/2/2011 you stated there was no improvement with 2nd epidural injection and your low back pain is variable with activity. Leg pain is consistent, down the posterior leg into the right heel. You advised at this time that the pain was worse the more you were up on your feet and gets worse late in the day and as the week goes on.

It is important to note that the policy under which you are covered refers to and is governed by the main duties of your regular "occupation" and not by the duties of your specific job. Nearly every job in the economy is performed slightly different from one employer to another. However, the Department of Labor groups jobs into occupations based on their similarities. The term "occupation" refers to a collective description of a number of individual jobs that are performed, with variations, in many establishments. Consequently, there will be similarities between the main duties of your occupation and those of your job. There may also be some differences.

*In addition to the medical documentation submitted to our office, we obtained your written job description, your employer's description of your job duties, and the description of your occupation from the Department of Labor's Dictionary of Occupation Titles (DOT). In order to be eligible for* **Long Term Disability** *benefits, you must have been unable to perform each of the main duties of your occupation, as they would be performed in a typical setting for an employer, beginning 8/26/2013 and through the 90 day elimination period to the LTD Benefit Start Date of 11/24/13 and beyond.*

Based on information obtained from your employer and occupational information contained within the *Dictionary of Occupational Titles* (DOT), we have determined that your occupation as a Nurse Practitioner is best defined as a Nurse Practitioner in the national workforce. The material and substantial duties of a Nurse Practitioner include but are not limited to the following:

- *Diagnose and treat chronic health conditions. May prescribe medication. Perform patient examinations. May order and interpret diagnostic tests*

LIN00845

We reviewed the medical documentation provided in conjunction with the written job description, your employer's description of your job duties, and the Department of Labor's Dictionary of Occupational Titles (DOT) and fail to find that the medical evidence supports your inability to perform these material and substantial duties of your regular occupation.

## Summary

In summary, the medical documentation contained in your claim file does not support Total Disability as defined by this policy. Based on the medical documentation provided, you have had ongoing complaints of low back pain since at least 10/22/2010. You had an L5-S1 fusion 4/1/2011. You have continued to complain of ongoing symptoms since this date. However, you have continued to work with this condition. There was no significant event prior to the 8/25/2013 date last worked that would substantiate any significant decline in your medical condition that would support you now being unable to perform your occupation as you had been performing previously. Your physical findings report relatively good range of motion with hardware intact and no instability noted. Neurological and motor exam is normal. There is no substantiation that you are unable to stand, ambulate, and use your upper and lower extremities in a functional manner. Pain is subjective and cannot be objectively quantifies, although it is reasonable to assume that some degree of discomfort in your back is present. Restrictions of the ability to change positions as needed would be understandable - and in your occupation this would not be a disabling restriction.

If you disagree with our decision, you may appeal this determination by following the steps outlined below.

## Appeal Rights

If you wish, you may request copies of the pertinent documents upon which our decision was based, prior to submitting a formal appeal.

You, your attorney or a person legally authorized as your representative may request a review of your denied claim. Such request must be made in writing and submitted to us at the address below within 180 days after you receive this denial notice. We will then provide you with a full written explanation of the decision within 45 days of receipt of your appeal.

**Risk Services –**
**The Lincoln National Life Insurance Company**
**PO Box 2337**
**Omaha, NE 68103**
**Fax: 402-361-1460**

Your request for an appeal needs to include the following:

- A letter of appeal outlining the reason(s) for your appeal.
- Please include your policy number and claim number.
- Medical records to support your appeal such as office and treatment notes, laboratory results, x-rays and testing results.

If you have no medical records to submit, but would like for us to review your claim again with the information currently in file, please state this in your letter of appeal.

You and your plan may have other voluntary alternative dispute resolution options, such as mediation, if your plan is subject to ERISA. One way to find out what may be available is to contact your local U.S. Department of Labor Office and your State insurance regulatory agency. In addition, once all required reviews of your claim have been completed; you have the right to bring a civil action under applicable law.

Please contact our office with any questions you may have at the number listed above or email us at Claims@LFG.com. You can also register for our website at www.Lincoln4Benefits.com to view your benefits and claim status online 24 hours a day.

Sincerely,

Loreena M. Lobdell
Sr. LTD Benefit Specialist
The Lincoln National Life Insurance Company



Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

November 21, 2013

**The Lincoln National Life
Insurance Company**

Service Office:

8801 Indian Hills Drive
Omaha, NE 68114-4066
toll free (800) 423-2765
www.LFG.com

LESTER E. COX MEDICAL CENTER
ATTN COURTNEY BURLISON
3801 S NATIONAL AVE
SPRINGFIELD MO 65807

Re:  Policy Number: 00001015732600000
     Claim Number: 1130226196
     Claimant:  Jamie Flanagan

Dear Courtney Burlison:

We have completed our initial review of the application for Long Term Disability benefits filed by Mrs. Flanagan and have determined additional information is needed prior to benefits being considered.

To determine disability, we must evaluate medical documentation to determine if a condition precludes your employee from performing the main duties of her occupation.

We have sent all information received for a full medical review to determine if disability is supported at this time or if more information is necessary.  Once this review is complete we will advise you of our determination regarding this claim.

Please contact our office with any questions you may have at the number listed above or email us at Claims@LFG.com.  You can also register for our website at www.Lincoln4Benefits.com to view your benefits and claim status online 24 hours a day.


Sincerely,


Loreena M. Lobdell
Sr. LTD Benefit Specialist
The Lincoln National Life Insurance Company

LIN00848



Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

November 21, 2013

**The Lincoln National Life Insurance Company**

Service Office:

8801 Indian Hills Drive
Omaha, NE 68114-4066
toll free (800) 423-2765
www.LFG.com

JAMIE FLANAGAN
986 S. HEDGE DR
NIXA MO 65714

Re:  Policy Number: 00001015732600000
      Claim Number: 1130226196

Dear Mrs. Flanagan:

We have completed our initial review of your application for Long Term Disability benefits and have determined additional information is needed prior to benefits being considered.

To determine disability, we must evaluate medical documentation to determine if your condition precludes you from performing the main duties of your occupation.

We have submitted all information received for a full medical review.  Once this review is complete we will advise you of our determination regarding your claim.

Please contact our office with any questions you may have at the number listed above or email us at Claims@LFG.com.  You can also register for our website at www.Lincoln4Benefits.com to view your benefits and claim status online 24 hours a day.

Sincerely,

Loreena M. Lobdell
Sr. LTD Benefit Specialist
The Lincoln National Life Insurance Company



The Lincoln National Life Insurance Company, PO Box 2609, Omaha, NE 68103-2609
toll free (800) 423-2765  Fax (877) 843-3950
www.LincolnFinancial.com

## AUTHORIZATION FOR RELEASE OF INFORMATION

1. I (the undersigned) authorize any physician, medical professional, pharmacist or other provider of health care services, hospital, clinic, other medical or medically related facility; insurance or reinsurance company; government agency; department of labor; acquaintance; group policyholder; employer; or policy or benefit plan administrator to release information from the records of:

Claimant/Patient Name: __Flanagan__ __Jamie__ __Sue__
                                  (Last)                         (First)               (Middle)

Date of Birth: ▓▓▓▓▓▓▓▓        Social Security Number: ▓▓▓▓▓▓▓▓

2. Information to be released:
   - data or records regarding my medical history, treatment, prescriptions, consultations (including medical and psychological reports, records, charts, notes (excluding psychotherapy notes), x-rays, films or correspondence, and any medical condition I may now have or have had];
   - any information regarding insurance coverage; and
   - any information, data or records regarding my activities (including records relating to my Social Security, Workers' Compensation, Retirement Income, financial, earnings and employment history).

3. Information to be released to:    The Lincoln National Life Insurance Company
                                       PO Box 2609
                                       Omaha, NE 68103-2609

4. I understand the information obtained by use of this Authorization will be used by The Lincoln National Life Insurance Company ("Company") to evaluate my claim for disability benefits. The Company will only release such information:
   - to its reinsurer, or other persons or organizations performing business or legal services in connection with my claim(s); or
   - to a vendor, approved by the company, which specializes in the application for Social Security Disability Benefits
   - to vendors/consultants providing the claimant with wellness, disability or leave related services as part of an employer sponsored benefit plan
   - to the employer for self-insured disability plans; or
   - as otherwise may be required by law or as I may further authorize.

   I further understand that refusal to sign this Authorization may result in the denial of benefits.

5. I understand the information used or disclosed may be subject to re-disclosure by the recipient and may no longer be protected by the federal HIPAA Privacy Rule. For Colorado claims, the disclosed information may **not** be redisclosed or reused by the recipient under Colorado law.

6. I understand that I may revoke this Authorization in writing at any time, except to the extent:
   1. the Company has taken action in reliance on this Authorization; or
   2. the Company is using this Authorization in connection with a contestable claim.

   If written revocation is not received, this Authorization will be considered valid for a period of time not to exceed 24 months from the date of my signature below. To initiate revocation of this Authorization, direct all correspondence to the Company at the above address.

7. A photocopy of this Authorization is to be considered as valid as the original.

8. I understand I am entitled to receive a copy of this Authorization.

SIGNATURE: _Jamie Sue Flanagan_        DATE: _11/10/2013_
Claimant/legal representative (Nearest relative, legal guardian, or appointed representative to sign only if claimant/patient is a minor, legally incompetent, or deceased.) Power of attorney or guardianship must be attached.

PRINT NAME: _Jamie Sue Flanagan_

Relationship to Claimant/Patient of personal/legal representative signing for Claimant/Patient: _Self_

ADDRESS: _986 S Hedge Drive_        PHONE NO: _417-459-5879_
        (Street)

_Nixa_        _MO_        _65714_
(City)        (State)        (Zip Code)

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
GLC-01252



**Lincoln**
**Financial Group®**

The Lincoln National Life Insurance Company, PO Box 2609, Omaha, NE 68103-2609
toll free (800) 423-2765 Fax (877) 843-3950
www.LincolnFinancial.com

## GROUP LONG-TERM DISABILITY CLAIM APPLICATION



**EMPLOYEE** – form completion information

### APPLICATION FOR GROUP LTD – Instructions

A. **Complete and sign the authorization on the reverse side of this page.** This will allow our insurance carrier or their representative to secure additional information (if necessary) to make a decision on your request for benefit payments (do not detach).

B. **Complete employee claim statement in full.**

  **Attach** • A copy of Social Security and other income entitlement awards (or forward when received)

C. **Give this authorization and attached claim application to the physician treating you** (if more than one, obtain other forms for completion from employer). Instruct your attending physician to send his statement along with yours to the insurance carrier.

D. When those forms are received by the Insurance Company, they will advise you of your eligibility for benefits or of any additional information that may be needed.

*Do Not Detach*

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
GLC-01252

PAGE 01/54          DONALD HOPEWELL MD          4173361197     09:21     11/18/2013

**Long-Term Disability Claim Employee's Statement**

To Be Completed By The Employee

**A. Information about you**

| Last Name | First | Middle Initial |
|---|---|---|
| Flanagan | Jamie | S |

| Address | City | State/Province | Zip |
|---|---|---|---|
| 986 S Hedge Dr | Niya | MO | 65714 |

Telephone
417-459-5879

| Height | Weight | | | Single | Widowed |
|---|---|---|---|---|---|
| 5'4½" | 112# | ☒ Rt Handed / ☐ Lt Handed | ☐ Male / ☒ Female | ☒ Married | ☐ Divorced |

Your Employer (Include division if applicable)
Cox Medical Center Branson

Occupation
Nurse Practitioner

**B. Information about your family (required to determine your eligibility for Social Security benefits)**

Spouse's Name (Last, First)
Flanagan, Jason

Date of Birth (Month, Day, Year) | Is your spouse employed? ☒ Yes ☐ No

**New Jersey.** Any person who knowingly files a statement of claim containing any false or misleading information is subject to criminal and civil penalties.

**FRAUD NOTICES. For your protection, certain states require that the following notices appear on this form.**

**Alaska.** A person who knowingly and with intent to injure, defraud, or deceive an insurance company files a claim containing false, incomplete or misleading information may be prosecuted under state law.

**Arizona.** For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

**Arkansas, Louisiana, Rhode Island and West Virginia.** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**California.** For your protection California law requires the following to appear on this form: Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**Colorado.** It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**Delaware.** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

**District of Columbia.** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

**Florida.** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

**Idaho.** Any person who knowingly, and with intent to defraud or deceive any insurance company, files a statement or claim containing any false, incomplete or misleading information is guilty of a felony.

**Indiana.** A person who knowingly and with intent to defraud an insurer files a statement of claim containing any false, incomplete, or misleading information commits a felony.

**Kentucky.** Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**Maine.** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**Maryland.** Any person who knowingly and willfully presents a false or fraudulent claim for payment of a loss or benefit or knowingly and willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Minnesota.** A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

**New Hampshire.** Any person who, with a purpose to injure, defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638:20.

Page 8 of 14
12/10

GLC-01252

**E. Information about physicians and hospitals**

First medical attention for the current disability was given by (complete below):

Doctor's Name: Dr. Diane Cornelison, DO
Telephone: 417-385-7222 Fax: 417-385-7224
Specialty: Neurology & Pain Management
Address (Street, City, State, Zip): 121 Cahill Rd Suite Branson, MO 65616
Dates Seen: 10/06/2010 To 04/25/2013

List all other physicians and hospitals you have seen for this condition:

Doctor's Name: Dr. Charles Mace, MD
Telephone: 417-886-3888 Fax:
Specialty: Neurosurgery
Address: 2900 S National Ave, Springfield, MO 65804
Dates Seen: 11/17/2010 To 9/12/2012 - still have open chart

Doctor's Name: Dr. Donald Hopewell
Telephone: 417-336-1181 Fax: 417-336-1197
Specialty: Neurology & Pain Management
Address: 500 W Main, Suite 205B Branson, MO 65616 65804
Dates Seen: 06/06/2011 To Current Pending appts

Doctor's Name: Dr. Wayne Wallender, DO
Telephone: 417-269-8226 Fax:
Specialty: Anesthesia & Pain Management
Address: 1011 E Montclair St, Springfield, MO 65804
Dates Seen: 08/15/2013 To 10/17/2013

Hospital: Cox Medical Center Branson (at time of treatment)
Telephone: 417-335-7000 Fax:
Specialty: Community Hospital
Address: 525 Branson Landing Blvd Branson, MO 65616
Dates of Confinement: 04/01/2011 To 04/04/2011

Have you ever had the same or a similar condition in the past? ☐Yes ☒No If yes, complete the following concerning your past treatment:

Doctor's Name: N/A Telephone: Fax: Specialty:
Address: Dates Seen: To
Hospital: Telephone: Fax: Specialty:
Address: Dates of Confinement: To

**F. Information about other disability income**
(Check the other income benefits you are receiving or are eligible to receive as a result of your disability and complete the information requested.)

| Source of Income | Amount | (wk., mon.) | Date claim was filed | Date payments began | Date payments ended |
|---|---|---|---|---|---|
| Social Security Retirement | $ N/A | / | | | |
| Social Security Disability/Yourself | $ | / | | | |
| Social Security Disability/Dependents | $ | / | | | |
| Canadian Pension Plan | $ | / | | | |
| Workers' Compensation | $ | / | | | |
| State Disability | $ | / | | | |
| Pension/Retirement | $ | / | | | |
| Pension/Disability | $ | / | | | |
| Short Term Disability | $ | / | | | |
| Unemployment | $ | / | | | |
| No-Fault Insurance | $ | / | | | |
| Railroad Retirement | $ | / | | | |
| Other (include individual or group benefits): | $ | / | | | |

**G. Information about income tax withholding**
If your request for benefits is approved, should The Lincoln National Life Insurance Company withhold income taxes from your benefit checks?
☒Yes ☐No If yes, how much should be withheld from each check. Federal taxes (minimum is $88.00 per month) $ 100 .00

**H. Signature (Required for all claims)**
Under what other The Lincoln National Life Insurance policies are you currently covered?
The above Statements are true and complete to the best of my knowledge and belief. I have read and understand the attached Fraud Warning statements.

X Jamie Flanagan
Signature of Employee
Date: 11/10/2013

GLC-01252

Page 11 of 14
12/10

11/18/2013 09:21 4173361197 DONALD HOPEWELL MD PAGE 04/54

| tor's Name: eth Knox,FNP (collaborates with Dr. Peter Marcellus, MD) | Telephone: 417-348-6968 or 417-335-8964 Fax: 417-336-0275 | Specialty: Family Practice |
| dress: 450 State Highway 248 Suite 202, Branson MO 65616 | | Dates Seen: 10/01/2010 to current |
| tor's Name: Irine Winkler, MD | Telephone: 417-348-8253 Fax: 417-887-8992 | Specialty: Rheumatology |
| ddress: 21 Cahill Rd, Suite 205, Branson, MO 65616 | | Dates Seen: 09/06/2012 to current |
| octor's Name: Slady Jacob, MD | Telephone: 417-335-7222 Fax: 417-335-7324 | Specialty: Neurology |
| ddress: 21 Cahill Rd, Suite 204, Branson MO 65616 | | Dates Seen: 10/22/2010 (EMG appt) |
| octor's Name: Thomas Woodward, MD | Telephone: Contact Cox Medical Center 417-335-7000→ Fax: Has left the system. | Specialty: Internal Medicine |
| dress: Cox Health 245 Branson Landing Blvd, Branson MO 65616 | | Dates Seen: 10/19/2010-01/19/2011 |
| octor's Name: Dr. Barbara Radovanovich PhD | Telephone: 417-269-5509 Fax: 417-269-5595 | Specialty: PHD-Pain Psych Services |
| dress: Cox Health Psychological Services, Wheeler Heart & Vascular Center. Suite 170, Springfield, MO 65807 | | Dates Seen: 8/20/2013 |
| ospital's Name: Skaggs Pain Center (Cox Health Branson Pain & Neurology) | Telephone: 417-335-7222 Fax: | Specialty: Epidurals, spinal injections, trigger points. |
| ddress: 21 Cahill Rd, Suite 204, Branson, MO 65616 | | Dates Seen: 10/6/2010 - |
| Physical Therapy Services: Cox Health Branson Orthopedic, Neurology & Spine | Telephone: 417-335-7274 Fax: 417-335-7105 | Specialty: Physical Therapy |
| ddress: 21 Cahill Rd, Suite 101, Branson, MO 65616 | | Dates Seen: 10/24/12 11/2012-01/2012 11/26/12 10/7/2010- |

The Above statements are true to the best of my knowledge & belief. I have read & understand the attached Fraud warning statements.

X _Jamie Flanagan_
Signature of Employee

_11/10/2013_
Date

PAGE 05/54          DONALD HOPEWELL MD          4173861197     09:21 11/18/2013

# Long-Term Disability Claim Physician's Statement
This form should be completed by the physician who was treating the claimant when he or she last worked.

## To Be Completed By The Attending Physician

### A. General Information
This claim is for (Patient's Name)

Jamie Sue Flanagan

| Patient's Social Security Number | Height | Weight | Blood Pressure | Date of Birth (Month, Day, Year) |
|---|---|---|---|---|
| ■■■■■■■■ | 65 | 112 | 100/68 | ■■■■■■■■ |

ICM code   Post Lami Syndrome lumbar 722.83 — Spinal stenosis 724.01 — 338.4   chronic pain

### B. Complete this section for normal pregnancy, then go to section E.

| What was the date of the last menstrual period? | What is the expected date of delivery? |
|---|---|
| N/A | |

| What is the expected length of postpartum recovery? | What was the first date of treatment? | What was the last date of treatment? |
|---|---|---|

### C. Complete this section for all conditions except normal pregnancy.

Symptoms   Low back pain c̄ pain spread into lower extremities

Objective Findings   Normal physical exam. X-rays, CT myelogram, MRI - Spondylolisthesis c̄ failed fusion and nerve root scarring

Are there secondary conditions contributing to the disability?
☐ Yes ☒ No   If yes, what are they? (Please include ICD 9 or DSM code.)

| If this is a cardiac condition, what is the functional capacity? (American Heart Association) | ☐ Class 1 - No limitation<br>☐ Class 2 - Slight limitation | ☐ Class 3 - Marked limitation<br>☐ Class 4 - Complete limitation |
|---|---|---|

| When did symptoms first appear?<br>Constant since ca 8/2010 | Date of the patient's first visit (Month, Day, Year)  10/6/2010 | Date you believe the patient was first unable to work (Month, Day, Year)  1/1/2013 |
|---|---|---|

| Date of the patient's last visit (Month, Day, Year)  10/31/13 | How often do you see the patient?  Every 3 months |
|---|---|

Is the patient's condition work related?
☐ Yes ☒ No   If yes, explain:

Has the patient undergone surgery?
☒ Yes ☐ No   If yes, give date, procedure and result.

Failed lumbar fusion   4/1/11

If no, do you expect surgery to be performed in the future?
☐ Yes ☒ No   If yes, give date and type of surgery.

What medication is the patient currently taking?

Please indicate other types and frequencies of treatment.   Epidurals / PT

Has the patient been referred to a medical rehabilitation or therapy program?
☒ Yes ☐ No   If yes, give details.   No benefit

Have you referred the patient for other types of consultations?
☒ Yes ☐ No   If yes, give details.   Spinal Cord stimulator placement - failed

Has the patient been hospital confined?
☐ Yes ☒ No   If yes, complete the following:

Name of Hospital

| Address | Dates of Confinement<br>through |
|---|---|

GLC-01252

**D. Information about the patient's inability to work**

Briefly describe restrictions and limitations. Pain increases through the day (work - unable to control w̄ pain meds span needed)

Restrictions (What the patient SHOULD NOT do) Work w̄ unlimited ability to rest/take breaks

Limitations (What the patient CANNOT do) Same

What is your prognosis for recovery? This will progress over time

Has patient achieved maximum medical improvement?
☒ Yes ☐ No   If no, complete the following:

How soon do you expect fundamental changes in the patient's medical condition?
☐ 1 - 2 months            ☐ 5 -6 months
☐ 3 - 4 months            ☐ more than 6 months

Give details concerning expected improvement or deterioration:

In an eight hour workday, claimant can: (Circle full hourly capacity for each activity).

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sit | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| Stand | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| Walk | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |

Unquantifiable

| Are there restrictions in: | Yes | No | Comments |
|---|---|---|---|
| Lifting/Carrying | ☐ | ☐ | |
| Use of hands in repetitive actions | ☐ | ☐ | |
| Use of feet in repetitive movements | ☐ | ☐ | |
| Bending | ☐ | ☐ | |
| Squatting | ☐ | ☐ | |
| Crawling | ☐ | ☐ | |
| Climbing | ☐ | ☐ | |
| Reaching above shoulder level | ☐ | ☐ | |
| Other (please specify) | ☐ | ☐ | |

When do you expect claimant to return to prior level of functioning? Never

Would you recommend vocational rehabilitation for this patient?
☒ Yes ☐ No

Has your patient had loss of cognitive functioning? "Cognitive impairment" means a permanent deterioration or loss of cognitive or intellectual capacity and requires another person's hands-on help or verbal cues to prevent harm to self or others due to impairment
☐ Yes ☒ No   If yes, please explain and provide supporting medical documentation and testing:

Based on your observations of this patient, medical history and condition, has your patient lost the ability to safely and completely perform Activities of Daily Living (ADLs) without another person's active hands-on help with all or most of the activity:

ADL        Date on which assistance was first required and received
☐ Bathing_____ (washing self in tub, shower or by sponge bath, with or w/o equipment)
☐ Dressing_____ (putting on, taking off garments, braces or any artificial limbs normally worn)
☐ Toileting_____ (getting to, from, on and off toilet; and performing related personal hygiene)
☐ Transferring_____ (moving in & out of bed, chair or any wheelchair, with or w/o equipment)
☐ Continence_____ (voluntarily maintaining control of bladder and bowel function)
☐ Eating_____ (getting nourishment into one's body by any means (table/tray or special equipment)

If the claimant has lost the ability to perform ADLs listed above, please provide any supporting medical documentation and testing.

If the patient has lost the ability to perform any ADLs listed above, do you expect the limitations to be permanent?
☐ Yes ☐ No   If "no", please explain when improvement may be expected:

GLC-01252

Case 3:17-cv-05060-MDH    Document 33-4    Filed 05/15/18    Page 61 of 269    LIN00856

**E. Required Attachments and Signature**

After you have fully completed this form, attach copies of the following materials:
- Office notes for the period of treatment for the last two years
- Test results showing objective findings
- Hospital discharge summaries
- Consulting physician reports

Your Name _Donald K Hopewell_     Degree _MD_

Specialty _Neurology & Pain_     Telephone: _417 336-1181_
Fax: _417 336-1147_

Address _500 W. Main     Branson, MO     65616_

X _____     _11/17/13_
Signature of Attending Physician (no stamp)     Date

GLC-01252

Page 14 of 14
12/10



**The Lincoln National Life Insurance Company, PO Box 2609, Omaha, NE 68103-2609**
toll free (800) 423-2765 Fax (877) 843-3950
www.LincolnFinancial.com

# GROUP LONG-TERM DISABILITY CLAIM APPLICATION



## EMPLOYEE – form completion information

---

### APPLICATION FOR GROUP LTD - Instructions

A. **Complete and sign the authorization on the reverse side of this page.** This will allow our insurance carrier or their representative to secure additional information (if necessary) to make a decision on your request for benefit payments (do not detach).

B. **Complete employee claim statement in full.**

    **Attach**   ●   A copy of Social Security and other income entitlement awards (or forward when received)

C. **Give this authorization and attached claim application to the physician treating you** (if more than one, obtain other forms for completion from employer). Instruct your attending physician to send his statement along with yours to the insurance carrier.

D. When those forms are received by the Insurance Company, they will advise you of your eligibility for benefits or of any additional information that may be needed.

---

Do <u>Not</u> Detach

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
GLC-01252

Page 6 of 14
12/10

11/18/2013 09:30 4173361197 DONALD HOPEWELL MD PAGE 01/07

**FRAUD NOTICES. For your protection, certain states require that the following notices appear on this form.**

**Alaska.** A person who knowingly and with intent to injure. defraud, or deceive an insurance company files a claim containing false, incomplete or misleading information may be prosecuted under state law.

**Arizona.** For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

**Arkansas, Louisiana, Rhode Island and West Virginia.** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**California.** For your protection California law requires the following to appear on this form: Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**Colorado.** It is unlawful to knowingly provide false. incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**Delaware.** Any person who knowingly, and with intent to injure, defraud or deceive any insurer. files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

**District of Columbia.** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

**Florida.** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

**Idaho.** Any person who knowingly, and with intent to defraud or deceive any insurance company, files a statement or claim containing any false, incomplete or misleading information is guilty of a felony.

**Indiana.** A person who knowingly and with intent to defraud an insurer files a statement of claim containing any false, incomplete, or misleading information commits a felony.

**Kentucky.** Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**Maine.** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**Maryland.** Any person who knowingly and willfully presents a false or fraudulent claim for payment of a loss or benefit or knowingly and willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Minnesota.** A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

**New Hampshire.** Any person who, with a purpose to injure, defraud or deceive any insurance company. files a statement of claim containing any false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638:20.

11/18/2013 09:30 4173361197 DONALD HOPEWELL MD PAGE 03/07

**New Jersey.** Any person who knowingly files a statement of claim containing any false or misleading information is subject to criminal and civil penalties.

**New Mexico.** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to civil fines and criminal penalties.

**New York.** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**Ohio.** Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**Oklahoma.** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**Oregon.** Any person who knowingly and with intent to defraud any insurance company or other person: (1) files an application for insurance or statement of claim containing any materially false information; or, (2) conceals for the purpose of misleading, information concerning any material fact, may have committed a fraudulent insurance act.

**Pennsylvania.** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**Puerto Rico.** Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation with the penalty of a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances are present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.

**Tennessee and Washington.** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

**Texas.** Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**FOR ALL OTHER STATES EXCLUDING CONNECTICUT, KANSAS, AND VIRGINIA.** A person may be committing insurance fraud, if he or she submits an application or claim containing a false or deceptive statement with intent to defraud (or knowing that he or she is helping to defraud) an insurance company.

GLC-01252

Case 3:17-cv-05060-MDH   Document 33-4   Filed 05/15/18   Page 65 of 269   LIN00360

## Long-Term Disability Claim Employee's Statement

**To Be Completed By The Employee**

### A. Information about you

| Last Name | First | Middle Initial |
|---|---|---|
| Flanagan | Jamie | S |

| Address | City | State/Province | Zip |
|---|---|---|---|
| 986 S Hedge Dr | Niva | MO | 65714 |

Telephone: 417-459-5879

Social Security Number: ▮▮▮▮▮

| Date of Birth (Month, Day, Year) | Height | Weight | | | | |
|---|---|---|---|---|---|---|
| ▮▮▮▮▮ | 5'4½" | 112# | ☒ Rt Handed ☐ Lt. Handed | ☐ Male ☒ Female | ☐ Single ☒ Married | ☐ Widowed ☐ Divorced |

Your Employer (include division if applicable): Cox Medical Center Branson

Occupation: Nurse Practitioner

### B. Information about your family (required to determine your eligibility for Social Security benefits)

Spouse's Name (Last, First): Flanagan, Jason

| Spouse's Social Security Number | Date of Birth (Month, Day, Year) | Is your spouse employed? |
|---|---|---|
| ▮▮▮▮▮ | ▮▮▮▮▮ | ☒ Yes ☐ No |

| Children (under age 25) Name (Last, First) | | Date of Birth (Month, Day, Year) |
|---|---|---|
| ▮▮▮▮▮ | | ▮▮▮▮▮ |

### C. Information about the condition causing your disability

**1. For pregnancy or (illness) answer the following questions:**

What were your first symptoms? (over a period of 1-2 weeks) Severe acute onset low back pain that began to radiate down the back & lateral sides of my legs.

When did you first notice them? August 2010

Date you were first treated by a physician (Month, Day, Year):

**2. For an injury, answer the following questions:** N/A

Where and how did the injury occur?

Date the injury occurred (Month, Day, Year):

Date you were first treated by a physician (Month, Day, Year):

**3. For (illness) or injury, answer the following questions:**

Why are you unable to work? The pain is severe enough that I cannot perform the duties required of me. I need to change positions frequently due to numbness & pain & several times throughout the day I have to lie down to ease the pain. My medications also create side effects that cause severe fatigue & forgetfulness that can be unsafe when I am at work.

Before you stopped working, did your condition require you to change your job or the way you did your job? ☒ Yes ☐ No If yes, explain: to help with the frequent position changes I had to get a pillow to sit on in each room & sit halfway on / half way off. Bedside tables were brought to my exam room to stand by. A special chair was purchased. Toward the end of my workdays, I did many of my work on the computer at home from my bed at the end of the day.

Is your condition related to your occupation? ☐ Yes ☒ No If yes, explain:

Have you filed, or do you intend to file a Workers' Compensation claim? ☐ Yes ☒ No

Do you require another person's active, hands-on help to safely perform activities of daily living? ☒ Yes ☐ No If yes, please explain what kind of help you receive and who provides it: Not the dressing & normal ADLs, but when in a great deal of pain & take my meds my husband must drive me due to safety & fear of accident

### D. Information about the disability

| Last day you worked before the disability (Month, Day, Year) 08/23/2013 | Did you work a full day? ☐ Yes ☒ No If no, explain: I was finishing up charts because we knew I was going on disability leave (at least short term) | Date you were first unable to work (Month, Day, Year) 08/26/2013 |
|---|---|---|

Have you returned to work? ☐ Yes Part time (date) _____ Full time (date) _____ ☒ No

If you have not returned to work do you expect to? ☐ Yes Part time (date) _____ Full time (date) _____ ☒ No

Are you currently self-employed or working for another employer? ☐ Yes ☒ No If so, give details.

(Continued on next page)

GLC-01252

**Please See Attached Sheet**

## E. Information about physicians and hospitals

First medical attention for the current disability was given by (complete below):

| Doctor's Name | Telephone: 417-335-7322 | Specialty |
|---|---|---|
| Dr. Diane Cornelison, DO | Fax: 417-335-7324 | Neurology & Pain Management |
| Address (Street, City, State, Zip) | | Dates Seen |
| 121 Cahill Rd, Suite, Branson, MO 65616 | | 10/06/2010 To 04/25/2013 |

List all other physicians and hospitals you have seen for this condition:

| Doctor's Name | Telephone: 417-885-3888 | Specialty |
|---|---|---|
| Dr. Charles Mace, MD | Fax: | Neurosurgery |
| Address (Street, City, State, Zip) | | Dates Seen: 9/12/2012 - |
| 2900 S National Ave, Springfield, MO 65804 | | 11/17/2010 To still have open chart |

| Doctor's Name | Telephone: 417-336-1181 | Specialty |
|---|---|---|
| Dr. Donald Hopewell | Fax: 417-336-1197 | Neurology & Pain Management |
| Address (Street, City, State, Zip) | | Dates Seen |
| 500 W Main, Suite 205B Branson, MO 65804 | | 06/06/2011 To Current Pending appts |

| Doctor's Name | Telephone: 417-269-8226 | Specialty |
|---|---|---|
| Dr. Wayne Wallender, DO | Fax: | Anesthesia & Pain Management |
| Address (Street, City, State, Zip) | | Dates Seen |
| 1011 E Montclair St, Springfield, MO 65804 | | 08/15/2013 To 10/17/2013 |

| Hospital | Telephone: 417-335-7000 | Specialty |
|---|---|---|
| Cox Medical Center Branson (5 days at time of treatment) | Fax: | Community Hospital |
| Address (Street, City, State, Zip) | | Dates of Confinement |
| 525 Branson Landing Blvd Branson, MO 65616 | | 04/01/2011 To 04/04/2011 |

Have you ever had the same or a similar condition in the past?
☐ Yes ☒ No  If yes, complete the following concerning your past treatment:

| Doctor's Name | Telephone: | Specialty |
|---|---|---|
| N/A | Fax: | |
| Address (Street, City, State, Zip) | | Dates Seen To |

| Hospital | Telephone: | Specialty |
|---|---|---|
| | Fax: | |
| Address (Street, City, State, Zip) | | Dates of Confinement To |

## F. Information about other disability income
(Check the other income benefits you are receiving or are eligible to receive as a result of your disability and complete the information requested.)

| Source of Income | Amount | (wk., mon.) | Date claim was filed | Date payments began | Date payments ended |
|---|---|---|---|---|---|
| Social Security Retirement | $ N/A | / | | | |
| Social Security Disability/Yourself | $ | / | | | |
| Social Security Disability/Dependents | $ | / | | | |
| Canadian Pension Plan | $ | / | | | |
| Workers' Compensation | $ | / | | | |
| State Disability | $ | / | | | |
| Pension/Retirement | $ | / | | | |
| Pension/Disability | $ | / | | | |
| Short Term Disability | $ | / | | | |
| Unemployment | $ | / | | | |
| No-Fault Insurance | $ | / | | | |
| Railroad Retirement | $ | / | | | |
| Other (include individual or group benefits): | $ | / | | | |

## G. Information about income tax withholding

If your request for benefits is approved, should The Lincoln National Life Insurance Company withhold income taxes from your benefit checks?
☒ Yes ☐ No  If yes, how much should be withheld from each check. Federal taxes (minimum is $88.00 per month) $ 100 .00

## H. Signature (Required for all claims)

Under what other The Lincoln National Life Insurance policies are you currently covered?

The above Statements are true and complete to the best of my knowledge and belief. I have read and understand the attached Fraud Warning statements.

X _Jamie Flanagan_
Signature of Employee

11/10/2013
Date

GLC-01252

Page 11 of 14
12/10

11/18/2013 09:30 4173361197 DONALD HOPEWELL MD PAGE 06/07

| | | |
|---|---|---|
| Doctor's Name: Beth Knox, FNP (collaborates with Dr. Peter Marcellus, MD) | Telephone: 417-348-8968 or 417-335-8968 Fax: 417-336-0975 | Specialty: Family Practice |
| Address: 1450 State Highway 248 Suite 202, Branson MO 65616 | Dates Seen: 10/01/2010 to current | |
| Doctor's Name: Anne Winkler, MD | Telephone: 417-348-8253 Fax: 417-887-8992 | Specialty: Rheumatology |
| Address: 121 Cahill Rd, Suite 205, Branson, MO 65616 | Dates Seen: 09/06/2012 to current | |
| Doctor's Name: Glady Jacob, MD | Telephone: 417-335-7222 Fax: 417-335-7224 | Specialty: Neurology |
| Address: 121 Cahill Rd, Suite 204, Branson, MO 65616 | Dates Seen: 10/22/2010 (EMG appt) | |
| Doctor's Name: Thomas Woodward, MD | Telephone: Contact Cox Medical Center 417-335-7000→ Fax: Has left the System. | Specialty: Internal Medicine |
| Address: Cox Health 545 Branson Landing Blvd, Branson MO 65616 | Dates Seen: 10/19/2010 - 01/19/2011 | |
| Doctor's Name: Dr. Barbara Radovanovich PhD | Telephone: 417-269-5509 Fax: 417-269-5595 | Specialty/ PHD-Pain Psych Services |
| Address: Cox Health Psychological Services, Wheeler-Heart & Vascular Center, Suite 770, Springfield, MO 65807 | Dates Seen: 2/20/2013 | |
| Hospital's Name: Skaggs Pain Center (Cox Health Branson Pain? Neurology?) | Telephone: 417-335-7222 Fax: | Specialty: Epidurals, spinal injections trigger points |
| Address: 121 Cahill Rd, Suite 204, Branson, MO 65616 | Dates Seen: 10/6/2010 - | |
| Physical Therapy Services: Cox Health Branson Orthopedic, Neurology & Spine | Telephone: 417-335-7274 Fax: 417-335-9705 | Specialty: Physical Therapy |
| Address: 121 Cahill Rd, Suite 101, Branson, MO 65616 | Dates Seen: 10/24/12 11/2012 - 01/2012 11/26/12 10/1/2010 - | |

The Above statements are true to the best of my Knowledge & belief. I have read & understand the attached Fraud Warning statements.

X _Janice Flanagan_     _11/10/2013_
Signature of Employee       Date

Case 3:17-cv-05060-MDH   Document 33-4   Filed 05/15/18   Page 68 of 269   LIN00863



The Lincoln National Life Insurance Company, PO Box 2609, Omaha, NE 68103-2609
toll free (800) 423-2765   Fax (877) 843-3950
www.LincolnFinancial.com

## AUTHORIZATION FOR RELEASE OF INFORMATION

1. **I (the undersigned) authorize** any physician, medical professional, pharmacist or other provider of health care services, hospital, clinic, other medical or medically related facility; insurance or reinsurance company; government agency; department of labor; acquaintance; group policyholder; employer; or policy or benefit plan administrator to release information from the records of:

Claimant/Patient Name: **Flanagan** **Jamie** **Sue**
(Last) (First) (Middle)

Date of Birth: [REDACTED]   Social Security Number [REDACTED]

2. Information to be released:
   - data or records regarding my medical history, treatment, prescriptions, consultations (including medical and psychological reports, records, charts, notes (excluding psychotherapy notes), x-rays, films or correspondence, and any medical condition I may now have or have had];
   - any information regarding insurance coverage; and
   - any information, data or records regarding my activities (including records relating to my Social Security, Workers' Compensation, Retirement Income, financial, earnings and employment history).

3. Information to be released to:   The Lincoln National Life Insurance Company
   PO Box 2609
   Omaha, NE 68103-2609

4. I understand the information obtained by use of this Authorization will be used by The Lincoln National Life Insurance Company ("Company") to evaluate my claim for disability benefits. The Company will only release such information:
   - to its reinsurer, or other persons or organizations performing business or legal services in connection with my claim(s); or
   - to a vendor, approved by the company, which specializes in the application for Social Security Disability Benefits
   - to vendors/consultants providing the claimant with wellness, disability or leave related services as part of an employer sponsored benefit plan
   - to the employer for self-insured disability plans; or
   - as otherwise may be required by law or as I may further authorize.

   I further understand that refusal to sign this Authorization may result in the denial of benefits.

5. I understand the information used or disclosed may be subject to re-disclosure by the recipient and may no longer be protected by the federal HIPAA Privacy Rule. For Colorado claims, the disclosed information may **not** be redisclosed or reused by the recipient under Colorado law.

6. I understand that I may revoke this Authorization in writing at any time, except to the extent:
   1. the Company has taken action in reliance on this Authorization; or
   2. the Company is using this Authorization in connection with a contestable claim.
   If written revocation is not received, this Authorization will be considered valid for a period of time not to exceed 24 months from the date of my signature below. To initiate revocation of this Authorization, direct all correspondence to the Company at the above address.

7. A photocopy of this Authorization is to be considered as valid as the original.

8. I understand I am entitled to receive a copy of this Authorization.

SIGNATURE: *Jamie Sue Flanagan*   DATE: 11/10/2013
Claimant/legal representative (Nearest relative, legal guardian, or appointed representative to sign only if claimant/patient is a minor, legally incompetent, or deceased.) Power of attorney or guardianship must be attached.

PRINT NAME: *Jamie Sue Flanagan*

Relationship to Claimant/Patient of personal/legal representative signing for Claimant/Patient: *Self*

ADDRESS: *986 S Hedge Drive*   PHONE NO: *417-459-5879*
(Street)

*Nixa*   *MO*   *65714*
(City) (State) (Zip Code)

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.   Disability   Page 7 of 14
GLC-01252   12/10

11/18/2013 09:30   4173361197   DONALD HOPEWELL MD   PAGE 02/07

## Springfield Neurological & Spine Institute
2900 South National Ave   Springfield, MO 65804
(417) 885-3888  Fax: (417) 520-5959

September 21, 2012
Page 1
Chart Document

**Jamie S Flanagan**
Female  DOB:

87223

Home: (417)459-5879 Work: (417)335-7296
Ins: FMH (120) Grp: SG0000

**09/19/2012 – Office Visit: Follow up**
**Provider: Charles Mace MD**
**Location of Care: Springfield Neurological and Spine Institute**

### Follow up Visit

### History of Present Illness
**Referral source:** Dr. Don Hopewell
**History from:** patient
**cc** Beth Knox
**Reason for visit:** follow up
**Chief Complaint:** Low back pain, bilat leg pains, neck pain, left shoulder pain
**HPI:** 32 year old female returns today for follow up L5-S1 PLIF 4/1/11 for LBP and leg pains.  She
continues to report LBP, bilateral lateral leg pain and shin pain , bilateral foot and heel pain that have all
been worsening.  Also notes burning in toes.  Symptoms improved when she stated wearing lumbar brace.
Denies leg weakness.  Bowel and bladder intact.
Also notes neck pain that will radiate into left shoulder described as shooting pain.  Denies pain past the
shoulder.  Pain worse with certain movements.  Denies changes in fine or gross motor control.
**Treatments:** pain medications, NSAIDs, heat, ice

### Pertinent Medical Findings
neck pain, left shoulder pain
LBP, various bilat LE symptoms, L LSR= leg pains

### Physical Exam
**Appearance:** well developed, well nourished, no acute distress

**Peripheral Vascular**
**Inspection/palpation:** Normal, except as otherwise specified.

**Gait and Station**
**Inspection:** Normal, except as otherwise specified.

**Head and Neck**
**Insp/percuss/palp:** Normal, except as otherwise specified.
**Range of motion:** no limitations
**Stability:** no subluxation or laxity
**Musc strength/tone:** normal strength and tone
**Skin/subcutaneous:** Normal, except as otherwise specified.

**Spine, Ribs, Pelvis**
**Insp/percuss/palps:** Normal, except as otherwise specified.
**Stability:** no subluxation or laxity
**Musc strength/tone:** Normal tone and strength

**Springfield Neurological & Spine Institute**
2900 South National Ave   Springfield, MO 65804
(417) 885-3888  Fax: (417) 520-5959

*September 21, 2012*
*Page 2*
*Chart Document*

**Jamie S Flanagan**
Female  DOB ████████                                87223

Home: (417)459-5879 Work: (417)335-7296
Ins: FMH (120) Grp: SG0000

Skin and subcutaneous: healed surgical incision
Spurling's: positive left

**Upper Extremities**
Insp/percuss/palps: normal, except as otherwise specified
Range of motion: no limitations
Stability: normal, except as otherwise specified
Musc strength/tone: normal tone and strength
Skin and subcutaneous: normal

**Lower Extremities**
Insp/percuss/palps: normal, except as otherwise specified
Range of motion: no limitations
Stability: normal, except as otherwise specified
Musc strength/tone: normal tone and strength
Skin and subcutaneous: normal
Straight Leg Raise: L= ipsilateral leg pain

**Neurologic**
Coordination: normal
Reflexes: 2+, symmetric
Sensation: intact to touch and pin

**Mental Status Exam**
Orientation: oriented to time, place and person
Mood and affect: no dysphoria, anxiety, or agitation

**Respiratory**
Respiratory effort: Normal, except as otherwise specified.

**Vital Signs**
Ht: 64 in.  Wt: 149 lbs.  P: 64  R: 16  BP: 110/60
BMI: 25.57

**Medication:**
ROBAXIN-750 750 MG TABS (METHOCARBAMOL) 1 by mouth three times per day as needed for pain
Substitution permitted
HYDROCODONE-ACETAMINOPHEN 5-325 MG TABS (HYDROCODONE-ACETAMINOPHEN) 1 or 2 by
mouth every 4-6 hours as needed for pain              Substitution permitted
* PEPCID 20MG TABLETS Take one tablet by mouth twice a day while taking steroid.
AVINZA XR24H-CAP (MORPHINE SULFATE BEADS XR24H-CAP)
SOMA 350 MG TABS (CARISOPRODOL)
PROTONIX 40 MG PACK (PANTOPRAZOLE SODIUM)
MIRALAX POWD (POLYETHYLENE GLYCOL 3350)
WELLBUTRIN TABS (BUPROPION HCL TABS)

**Allergies:**
* AMBIEN (Critical)

Case 3:17-cv-05060-MDH   Document 33-4   Filed 05/15/18   Page 71 of 269   LIN00866

**Springfield Neurological & Spine Institute**
2900 South National Ave   Springfield, MO 65804
(417) 885-3888  Fax: (417) 520-5959

September 21, 2012
Page 3
Chart Document

**Jamie S Flanagan**
Female  DOB:█████████          87223

Home: (417)459-5879 Work: (417)335-7296
Ins: FMH (120) Grp: SG0000

\* LUNESTA (Critical)
ADHESIVE TAPE (Moderate)
DARVOCET (Mild)

**Risk Factors**
Smoke status: former smoker
year started: 2000    yr quit: 2003
cigarette packs/day: .25    pack-years: 0.75
cigars/pipes per wk: 0    chewing cans per week: 0    Passive smoke exposure: no
Alcohol use: Social only: Wine, mixed drinks. Never more than 1-2. Usually once per month
Caffeine use: I drink 1-2 diet sodas per day
Drug use: none
HIV high risk behavior: no
Exercise (times/week): 5    Exercise type: stretching and PT home exercises
Seat belt use(%): 100    Sun exposure: occasionally

Review of imaging: lumbar CT at Skags- CD shows no confluent bone at L5-S1,  cage and screws look fine,  progressive endplate sclerosis

cervical MRI shows left C5-6 disc herniation

**Impression**

Ongoing Problems:
THORACIC/LUMBOSACRAL NEURITIS/RADICULITIS UNSPEC (ICD-724.4)
LUMBAGO (ICD-724.2)
LUMBAGO (ICD-724.2)
SPONDYLOLISTHESIS, ACQUIRED (ICD-738.4)
STENOSIS, LUMBAR SPINE (ICD-724.02)
LUMBAR RADICULOPATHY (ICD-724.4)

C5-6 left soft disc herniation with radicular pain into left upper arm and Spurlings sign. Try PT and traction and if no better then consider ACDF. May be spinal stimulator candidate long term

History of L5-S1 PLIF 18 months ago with progressive mechanical back pain and some L5 and S1 radicular symptoms that are quite problematic.  Perhaps L5-S1 pseudarthrosis. Will check myelogram and consider re-exploration

**Springfield Neurological & Spine Institute**
2900 South National Ave   Springfield, MO 65804
(417) 885-3888  Fax: (417) 520-5959

*September 21, 2012*
*Page 4*
Chart Document

**Jamie S Flanagan**
Female  DOB:

87223

Home: (417)459-5879 Work: (417)335-7296
Ins: FMH (120) Grp: SG0000

**Plan**

**Follow-up Plans:**
FU RTC per schedule
RTC: after myelo

**CT MYELO F/E / Recons**
CT Myelo Cervical, Lumbar

**Treatment:**
Physical Therapy: Home Program, Home Tx (Cervical), Strengthening, ROM
PT times per week: 3 PT number of weeks: 3

Clinical Visit Summary handout printed and given to patient.

**Electronically Signed by Charles Mace MD on 09/19/2012 at 11:51 AM**

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB: █████████  MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

**01/09/2013 - Imaging Report: XR SPINE LUMBAR  MIN 6 VIEWS**
**Provider: Diane L Cornelison DO,**
**Location of Care: CoxHealth Branson Clinics**

```
XR SPINE LUMBAR  MIN 6 VIEWS
                SKAGGS COMMUNITY HEALTH CENTER
                     PO Box 650
                  Branson,  MO    65615
          Phone  (417)  272-8911      Fax:  (417)  335-7455

                  - CONSULTATION REPORT -
Patient Name: FLANAGAN, JAMIE S
MRN: 42-06-80
DOB:  ████████████
Sex: F
Ordering MD: CORNELISON, DIANE L
Referring MD: CORNELISON, DIANE L
Procedure: XR SPINE LUMBAR  MIN 6 VIEWS
Account No.: 25938515

Clinical History
Postlaminectomy syndrome lumbar region

Findings
Seven views of the lumbar spine with flexion and extension show prior
surgical changes of posterior lumbar interbody fusion at L5-S1. The
pedicle screws and posterior fixation rods and cross link appear
intact.

Interbody bone cage appears well positioned within the disc space.
There is anterolisthesis of L5 on S1.  These findings are all
concordant with the previous examination of 2 November 2012. Flexion
and extension show no evidence of segmental instability.

Impression

    1. Postsurgical changes of posterior lumbar interbody fusion at
L5-S1.
    2. Four pars defects with grade 2 spondylolisthesis.  Operative
appearance not substantially different than 2 November 2012.  No
interval change and no evidence of instability.

Dictated by: ANTHONY L WHEELER    01/09/2013 07:24 PM
Transcribed By : JUSTUS, DIANE TRANSCRIPTION    01/09/2013 07:24 PM
 Approved by:ANTHONY L WHEELER    01/09/2013 07:24 PM
```

**Electronically Signed by Diane L Cornelison DO, on 01/10/2013 at 1:25 PM**

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB: ████████  MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

**12/28/2012 - Imaging Report: MR SPINE LUMBAR WITH AND WITHOUT CONTRAST**
*Provider: Diane L Cornelison DO,*
**Location of Care: CoxHealth Branson Clinics**

```
            MR SPINE LUMBAR WITH AND WITHOUT CONTRAST
                    SKAGGS COMMUNITY HEALTH CENTER
                            PO Box 650
                        Branson,  MO     65615
            Phone  (417)  272-8911      Fax:  (417)   335-7455
                        - CONSULTATION REPORT -
Patient Name: FLANAGAN, JAMIE S
MRN: 42-06-80
DOB:
Sex:
Ordering MD: CORNELISON, DIANE L
Referring MD: CORNELISON, DIANE L
Procedure: MR SPINE LUMBAR WITH AND WITHOUT CONTRA
Account No.: 25906678

Clinical History
Post laminectomy syndrome lumbar region.


Technique
Multiplanar, multisequence images performed without and with
contrast.  Contrast Agent Omniscan 287 mg/mL 15 mL 12/28/2012
intravenously.


Findings
Vertebral body heights are well maintained.  There is no abnormal
signal intensity or lesions in the vertebral bodies.

The conus terminates normally at the T12-L1 level.

T12-L1, L1-L2, L2-L3, and L3-L4 are unremarkable.

L4-L5 shows generalized disc bulging.  There is an asymmetric lateral
component of disc bulging on the left and there is facet arthrosis
that produces moderate neural foraminal narrowing on the left.  On
the right, there is facet arthrosis and these changes produce
moderate to severe right neural foraminal narrowing.  The central
canal is patent.

L5-S1 shows a grade 1-2 anterolisthesis of L5 on S1 secondary to
bilateral pars intra-articularis defects.  There are postsurgical
changes of posterior lumbar interbody fusion at L5-S1.

The interbody bone cage appears well within the disc space and is
unchanged from a remote study of May 27, 2011.

The pedicle screws appear overall adequately positioned.  No
substantial neural foraminal narrowing or central canal stenosis.
```

Case 3:17-cv-05060-MDH   Document 33-4   Filed 05/15/18   Page 75 of 269   LIN00870

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB:████████  MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

At the operative level, there is a moderate amount of enhancing posterior scar tissue present.  In addition, it extends around both sides of the thecal sac as well as appears to involve the descending left S1 root, which shows abnormal enhancement.  Neural foramina overall are grossly patent.  The central canal is patent.

Impression
Postsurgical changes of posterior lumbar interbody fusion at L5-S1 secondary to pars defects at L5 and grade 2 spondylolisthesis.  There is extensive evidence of postoperative fibrosis in the posterior operative bed extending along the right and left lateral margins of the thecal sac and extending anteriorly on the left to involve the S1 nerve root.

Dictated by: ANTHONY L WHEELER     12/28/2012 05:06 PM
Transcribed By : HOUSTON, SUSAN TRANSCRIPTIONIST     12/28/2012 05:06 PM
 Approved by:ANTHONY L WHEELER     12/28/2012 05:06 PM

**Electronically Signed by Diane L Cornelison DO, on 12/31/2012 at 1:34 PM**

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB: ███████  MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

**12/28/2012 - Imaging Report: MR SPINE THORACIC WITHOUT CONTRAST**
**Provider: Diane L Cornelison DO,**
**Location of Care: CoxHealth Branson Clinics**

```
MR SPINE THORACIC WITHOUT CONTRAST
                    SKAGGS COMMUNITY HEALTH CENTER
                         PO Box 650
                      Branson,  MO   65615
            Phone  (417)  272-8911       Fax:  (417)  335-7455

                    - CONSULTATION REPORT -
Patient Name: FLANAGAN, JAMIE S
MRN: 42-06-80
DOB: ███████
Sex: F
Ordering MD: CORNELISON, DIANE L
Referring MD: CORNELISON, DIANE L
Procedure: MR SPINE THORACIC WITHOUT CONTRAST
Account No.: 25906678

Clinical History

spinal stenosis of thoracic region

Technique
Standard non-contrast MRI.


Findings


Axial images through the thoracic spine with sagittal coronal
reconstructions.  Examination is no evidence of central canal
stenosis.  All discs are preserved vertebral body heights are
preserved.  No evidence of neural foraminal narrowing.

Impression


Normal MRI of the thoracic spine.

Dictated by: RICHARD S MAKUCH    12/28/2012 02:42 PM
Transcribed By : MAKUCH, RICHARD S    12/28/2012 02:42 PM
 Approved by:RICHARD S MAKUCH    12/28/2012 02:42 PM
```

**Electronically Signed by Diane L Cornelison DO, on 12/31/2012 at 1:34 PM**

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
*Female  DOB:* ▓▓▓▓▓  *MRN: 42-06-80*

Home: (417)459-5879 Work: (417)335-7361

---

**11/02/2012 - Imaging Report: CT SPINE LUMBAR SPINE WITH CONTRAST MYELO**
**Provider: Electronic Signature**
**Location of Care: CoxHealth Branson Clinics**

```
CT SPINE LUMBAR SPINE WITH CONTRAST MYELO
                SKAGGS COMMUNITY HEALTH CENTER
                         PO Box 650
                    Branson,  MO    65615
             Phone  (417)  272-8911        Fax:  (417)  335-7455

                    - CONSULTATION REPORT -
Patient Name: FLANAGAN, JAMIE S
MRN: 42-06-80
DOB: ▓▓▓▓▓▓▓▓▓
Sex: F
Ordering MD: MACE, J CHARLES
Referring MD: MACE, J CHARLES
Procedure: CT SPINE LUMBAR SPINE WITH CONTRAST MYE
Account No.: 25613282

Clinical History
Cervical radiculopathy, lumbar radiculopathy.


Findings
Vertebral body heights are well maintained.  No obvious acute
fracture, subluxation, or malalignment.

The conus has a normal morphology and terminates at T12-L1.

T12-L1, L1-L2, L2-L3, and L3-L4 are unremarkable.

At L4-L5, there is posterior disc bulging.  No obvious canal stenosis
and there is moderate left and mild right neural foraminal narrowing.

L5-S1 shows prior postsurgical changes of posterior lumbar interbody
fusion.  There is a grade 1-2 spondylolisthesis of L5 on S1 secondary
to pars defects and the extent of spondylolisthesis is not
substantially changed since the postoperative MRI of May 27, 2011.

In the operative bed, there is a substantial amount of anterior
epidural soft tissue.  This certainly appears to involve the region
of the nerve roots of L5 and S1.

The pedicle screws and posterior fixation rods are intact.

The interbody bone cage appears well positioned within the disc space
and is not substantially changed, however, there does appear to have
been some increase in the erosion of the posterior aspect of the L5
vertebral body in comparison to the remote study of December 16,
2011.  There does appear to be some persistent lucency around the
margin of the bone cage.  The extensive endplate sclerosis is not
changed.
```

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB:████████MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

Impression

    1. Prior changes of posterior lumbar interbody fusion at L5-S1
secondary to pars defects.
    2. Stable anterolisthesis compared to remote studies.  The more
extensive endplate sclerosis and the persistent lucency around the
bone cage as well as some increased in erosion of the posterior
aspect of the L5 vertebral body could represent evidence of disc
space instability.
    3. Anterior epidural soft tissue at the operative level
suggesting an extensive postoperative fibrosis.  MR scan with
contrast is suggested as followup.

Dictated by: ANTHONY L WHEELER     11/05/2012 08:08 AM
Transcribed By : HOUSTON, SUSAN TRANSCRIPTIONIST     11/05/2012 08:08 AM
 Approved by:ANTHONY L WHEELER     11/05/2012 08:08 AM


**Electronically Signed by Electronic Signature on 11/05/2012 at 8:45 AM**

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

*November 18, 2013*
Page 1
Chart Document

**JAMIE SUE FLANAGAN**
*Female*  DOB: ▮▮▮▮▮▮ MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

**11/02/2012 - Imaging Report: CT SPINE CERVICAL WITH CONTRAST MYELO**
**Provider: Electronic Signature**
**Location of Care: CoxHealth Branson Clinics**

```
CT SPINE CERVICAL WITH CONTRAST MYELO
                SKAGGS COMMUNITY HEALTH CENTER
                        PO Box 650
                    Branson,  MO    65615
            Phone  (417)  272-8911       Fax:  (417)  335-7455

                   - CONSULTATION REPORT -
Patient Name: FLANAGAN, JAMIE S
MRN: 42-06-80
DOB: ▮▮▮▮▮▮▮
Sex: F
Ordering MD: MACE, J CHARLES
Referring MD: MACE, J CHARLES
Procedure: CT SPINE CERVICAL WITH CONTRAST MYELO
Account No.: 25613282

Clinical History
Cervical radiculopathy, lumbar radiculopathy

Technique
Axial images with sagittal and coronal reformations.


Findings
Axial images with sagittal and coronal reformations following the
intrathecal injection of 12 mL of Omnipaque 240 mg/mL.

The skull base is unremarkable.

C1-C2 articulation appears intact.

C2-C3, C3-C4 and C4-C5 appear unremarkable.

C5-C6 shows a small left paracentral asymmetric disc bulge.  No
obvious central canal stenosis.  No neural foraminal narrowing. This
is smaller than MRI of July 2012.

C6-C7 shows very minimal slightly right paracentral disc protrusion.
No central canal stenosis or neural foraminal narrowing.

C7-T1 and T1-T2 are unremarkable.

Impression

    1. Mild degenerative changes C5-C6 and C6-C7.  No obvious cord
compression.  No obvious neural foraminal narrowing or nerve root
compression.
    2. The disc present at C5-C6 appears to have decreased in size
since previous cervical MRI of 10 July 2012.

Dictated by: ANTHONY L WHEELER    11/02/2012 05:05 PM
```

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65816
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
*Female  DOB* ▮▮▮▮▮▮▮▮ *MRN: 42-06-80*

Home: (417)459-5879 Work: (417)335-7361

```
Transcribed By : JUSTUS, DIANE TRANSCRIPTION    11/02/2012 05:05 PM
 Approved by:ANTHONY L WHEELER      11/02/2012 05:05 PM
```

**Electronically Signed by Electronic Signature on 11/05/2012 at 7:12 AM**

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB: ███████  MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

**11/02/2012 - Imaging Report: XR SPINE LUMBAR 2 OR 3 VIEWS**
**Provider: Electronic Signature**
**Location of Care: CoxHealth Branson Clinics**

```
XR SPINE LUMBAR 2 OR 3 VIEWS
                  SKAGGS COMMUNITY HEALTH CENTER
                          PO Box 650
                       Branson,  MO    65615
             Phone  (417)  272-8911       Fax:  (417)  335-7455

                      - CONSULTATION REPORT -
Patient Name: FLANAGAN, JAMIE S
MRN: 42-06-80
DOB: ███████
Sex: F
Ordering MD: MACE, J CHARLES
Referring MD: MACE, J CHARLES
Procedure: XR SPINE LUMBAR 2 OR 3 VIEWS
Account No.: 25613282

Clinical History
Cervical radiculopathy, lumbar radiculopathy

Findings
Two views of the lumbar spine with flexion and extension show
vertebral body heights and disc spaces are well maintained.

The patient has posterior lumbar interbody fusion changes at L5-S1.
There is a grade 2 spondylolisthesis of L5 on S1 which is stable and
unchanged dating back to at least October 2011.

The interbody bone cage appears well positioned within the disc
space.  There is no evidence of fracture, subluxation or
malalignment.

Flexion and extension show no evidence of segmental instability.

Impression

     1. Stable appearing changes of posterior lumbar interbody fusion
at L5-S1.
     2. No evidence of segmental instability.

Dictated by: ANTHONY L WHEELER    11/02/2012 05:03 PM
Transcribed By : JUSTUS, DIANE TRANSCRIPTION    11/02/2012 05:03 PM
 Approved by:ANTHONY L WHEELER    11/02/2012 05:03 PM
```

**Electronically Signed by Electronic Signature on 11/05/2012 at 7:12 AM**

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

*November 18, 2013*
Page 1
Chart Document

**JAMIE SUE FLANAGAN**
Female  DOB: ███████  MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

**11/02/2012 - Imaging Report: XR SPINE CERVICAL 2 OR 3 VIEWS**
**Provider: Electronic Signature**
**Location of Care: CoxHealth Branson Clinics**

```
XR SPINE CERVICAL 2 OR 3 VIEWS
                    SKAGGS COMMUNITY HEALTH CENTER
                          PO Box 650
                       Branson,   MO    65615
              Phone  (417)  272-8911       Fax:  (417)  335-7455

                        - CONSULTATION REPORT -
Patient Name: FLANAGAN, JAMIE S
MRN: 42-06-80
DOB: ███████████
Sex: F
Ordering MD: MACE, J CHARLES
Referring MD: MACE, J CHARLES
Procedure: XR SPINE CERVICAL 2 OR 3 VIEWS
Account No.: 25613282

Clinical History
Cervical radiculopathy, lumbar radiculopathy

Findings
Two view cervical spine flexion and extension show vertebral heights
and disc spaces well maintained. There is no obvious fracture,
subluxation or malalignment.

Flexion and extension show no evidence of segmental instability.

Soft tissues are unremarkable.

Impression
Negative cervical spine. No flexion or extension instability.

Dictated by: ANTHONY L WHEELER    11/02/2012 05:03 PM
Transcribed By : JUSTUS, DIANE TRANSCRIPTION    11/02/2012 05:03 PM
 Approved by:ANTHONY L WHEELER    11/02/2012 05:03 PM
```

**Electronically Signed by Electronic Signature on 11/05/2012 at 7:12 AM**

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

*November 18, 2013*
Page 1
Chart Document

**JAMIE SUE FLANAGAN**
Female  DOB: ███████  MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

**11/02/2012 - Imaging Report: XR MYELOGRAM COMPLETE**
**Provider: Electronic Signature**
**Location of Care: CoxHealth Branson Clinics**

```
XR MYELOGRAM COMPLETE
                    SKAGGS COMMUNITY HEALTH CENTER
                          PO Box 650
                       Branson,  MO    65615
              Phone  (417)  272-8911      Fax:  (417)  335-7455

                   - CONSULTATION REPORT -
Patient Name: FLANAGAN, JAMIE S
MRN: 42-06-80
DOB: ████████
Sex: F
Ordering MD: MACE, J CHARLES
Referring MD: MACE, J CHARLES
Procedure: XR MYELOGRAM COMPLETE
Account No.: 25613282
```

Clinical History
Cervical radiculopathy, lumbar radiculopathy

Findings
Procedure: Cervical lumbar myelogram.

Following ,explanation of risk and benefits of procedure the patient elected to proceed.

The patient was placed in a prone oblique position on a fluoroscopic table and the skin overlying the L2 vertebral body was prepped and draped in a sterile fashion and infiltrated with lidocaine without epinephrine.

Under fluoroscopic guidance, a 24-gauge Whitaker needle was advanced into the thecal sac without difficulty with return of clear cerebral spinal fluid.

A total of 12 mL of Omnipaque 240 mg/mL was instilled into the thecal sac without difficulty.

At the conclusion of administration, the needle was then withdrawn and the skin site was cleaned and covered with a Band-Aid.

There is clearly contrast opacification of the lumbar canal.

The patient was then placed in a prone Trendelenburg position with opacification of the cervical central canal.

Impression

   1. Successful lumbar and cervical myelogram.
   2. Remote surgical changes of posterior lumbar interbody fusion at L5-S1 with stable spondylolisthesis of L5-S1, unchanged from 19 October 2011.

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB: ███████  MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

Dictated by: ANTHONY L WHEELER    11/02/2012 05:03 PM
Transcribed By : JUSTUS, DIANE TRANSCRIPTION    11/02/2012 05:03 PM
 Approved by:ANTHONY L WHEELER    11/02/2012 05:03 PM

**Electronically Signed by Electronic Signature on 11/05/2012 at 7:12 AM**

LIN00880

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB: ▮▮▮▮▮  MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

**09/12/2012 - Imaging Report: CT SPINE LUMBAR WITHOUT CONTRAST**
**Provider: Electronic Signature**
**Location of Care: CoxHealth Branson Clinics**

```
CT SPINE LUMBAR WITHOUT CONTRAST
              SKAGGS COMMUNITY HEALTH CENTER
                        PO Box 650
                    Branson, MO    65615
          Phone  (417)  272-8911      Fax:  (417)  335-7455

                    - CONSULTATION REPORT -
Patient Name: FLANAGAN, JAMIE S
MRN: 42-06-80
DOB: ▮▮▮▮▮
Sex: F
Ordering MD: MACE, RICHARD C
Referring MD: MACE, RICHARD C
Procedure: CT SPINE LUMBAR WITHOUT CONTRAST
Account No.: 25560657
```

Clinical History
Stenosis, lumbar spine radiculopathy, lumbago.

Technique
Axial images with sagittal and coronal reformations.

Findings
T12-L1, L1-L2, L2-L3, and L3-L4 appear grossly normal.

L4-L5 shows some mild disc space narrowing.  There is mild
generalized disc bulging posteriorly and the changes produce moderate
bilateral neural foraminal narrowing at L4-L5.

L5-S1 shows postsurgical changes of posterior lumbar interbody fusion.

The pedicle screws at L5 and S1 appear adequately positioned.

There is a slight anterolisthesis of L5 on S1 and the posterior bone
cage appears to extend slightly from the posterior margin of the L5
vertebral body. This appears unchanged. There is endplate sclerosis
on both sides of the disc space and this appears to be greater than
the previous examination of December 16, 2011.  In addition, there
does appear to be some lucency along the margin of the bone cage.

There is a large amount of epidural soft tissue mass at the operative
level, which may represent extensive scar tissue, somewhat difficult
to discern.  This also is essentially unchanged.

Impression

    1. Postsurgical changes of posterior lumbar interbody fusion at
L5-S1.  The spondylolisthesis of L5 on S1 appears stable but there is

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

*November 18, 2013*
Page 2
Chart Document

**JAMIE SUE FLANAGAN**
Female  DOB: ███████ MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

increasing sclerosis of the endplates and lucency around the bone
cage suggesting the possibility of incomplete fusion across the disc
space.
    2. Large amount of epidural soft tissue, which appears to
compromise the level of the thecal sac.  The most likely etiology
would be postsurgical scar tissue and similar changes have been
noticed on previous studies.

Dictated by: ANTHONY L WHEELER    09/12/2012 11:19 AM
Transcribed By : HOUSTON, SUSAN TRANSCRIPTIONIST    09/12/2012 11:19 AM
 Approved by:ANTHONY L WHEELER    09/12/2012 11:19 AM


**Electronically Signed by Electronic Signature on 09/12/2012 at 12:42 PM**

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB: ███████ MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

**07/10/2012 - Imaging Report: MR SPINE CERVICAL WITHOUT CONTRAST**
**Provider: Beth A Knox FNP,**
**Location of Care: CoxHealth Branson Clinics**

```
MR SPINE CERVICAL WITHOUT CONTRAST
                SKAGGS COMMUNITY HEALTH CENTER
                        PO Box 650
                   Branson, MO   65615
           Phone  (417)  272-8911       Fax:  (417)  335-7455

                    - CONSULTATION REPORT -
Patient Name: FLANAGAN, JAMIE S
MRN: 42-06-80
DOB: ██████████
Sex: F
Ordering MD: KNOX, BETH A
Referring MD: KNOX, BETH A
Procedure: MR SPINE CERVICAL WITHOUT CONTRAST
Account No.: 25334525

Clinical History

Cervial spinal stenosis.
Neck pain.

Technique
Standard non-contrast MRI.


Findings


Comparison cervical MRI October 2010.
Normal-appearing cervical and proximal thoracic cord.
Slight Disc bulging L5-L6 and C6-C7.
No marrow mass abnormality.
Limited posterior fossa appears normal.
Symmetric musculature.

Axial examination.
C2-C3:  Normal.
C3-C4:  Normal.
C4-C5:  Normal.
C5-C6:  Sagittal left parasagittal small disc protrusion but no nerve
root or cord entrapment.
C6-C7:  Slight disc bulge but no nerve root entrapment.
C7-T1:  Normal.

Impression

Mild C5-C6 and C6-C7 disc bulging but no cord violation or nerve root
entrapment.

The following findings are so common and people without cervical
pain; while we report their presence they must be interpreted with
```

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB:█████████  MRN:  42-06-80

Home: (417)459-5879 Work: (417)335-7361

cautioned and in the context of clinical situation.

Dictated by: JOHN H BARTOW     07/10/2012 03:51 PM
Transcribed By : BARTOW, JOHN H     |07/10/2012 03:51 PM
 Approved by:JOHN H BARTOW     07/10/2012 03:51 PM


**Electronically Signed by Beth A Knox FNP, on 07/13/2012 at 3:29 PM**

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB: ███████  MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

**12/16/2011 - Imaging Report: XR SPINE LUMBAR MINIMUM 4 VIEWS**
**Provider: Electronic Signature**
**Location of Care: CoxHealth Branson Clinics**

```
XR SPINE LUMBAR MINIMUM 4 VIEWS
                    SKAGGS COMMUNITY HEALTH CENTER
                         PO Box 650
                    Branson,  MO    65615
              Phone  (417)  272-8911      Fax:  (417)  335-7455

                 - CONSULTATION REPORT -
Patient Name:
MRN:  42-06-80
DOB: ████████
Sex:  F
Ordering MD: MACE, J CHARLES
Referring MD: MACE, J CHARLES
Procedure: XR SPINE LUMBAR MINIMUM 4 VIEWS
Account No.: 24741738

Clinical History

LUMBAGO

Findings

Stable subluxation L4 on L5.
Stable appearing L5-S1 laminectomy and fusion.
With flexion-extension no change in alignment.
The limited abdomen pelvis appears nonobstructed with no evidence of
mass.

Impression


Stable L5-S1 internal fixation and alignment.

Dictated by: JOHN H BARTOW     12/16/2011 05:16 PM
Transcribed By : BARTOW, JOHN H     12/16/2011 05:16 PM
 Approved by:JOHN H BARTOW     12/16/2011 05:16 PM
```

**Electronically Signed by Electronic Signature on 12/19/2011 at 7:01 AM**

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

*November 18, 2013*
Page 1
Chart Document

**JAMIE SUE FLANAGAN**
Female  DOB: ▮▮▮▮▮▮ MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

**12/16/2011 - *Imaging Report: CT SPINE LUMBAR WITHOUT CONTRAST***
**Provider: Electronic Signature**
**Location of Care: CoxHealth Branson Clinics**

```
CT SPINE LUMBAR WITHOUT CONTRAST
                    SKAGGS COMMUNITY HEALTH CENTER
                            PO Box 650
                        Branson,  MO    65615
            Phone  (417)  272-8911        Fax:  (417)  335-7455

                      - CONSULTATION REPORT -
Patient Name:
MRN: 42-06-80
DOB: ▮▮▮▮▮▮▮▮▮▮
Sex: F
Ordering MD: MACE, J CHARLES
Referring MD: MACE, J CHARLES
Procedure: CT SPINE LUMBAR WITHOUT CONTRAST
Account No.: 24741738

Clinical History

LOW BACK PAIN

Technique
Standard noncontrasted CT protocol.


Findings

Today's examination is compared with a previous lumbar CT of May 2011.
No change in the appearance of the internal fixation L5-S1.
The grade 2 subluxation L5 on S1 is unchanged.
Disc bulging involves L3-L4 L4-L5.
Stable laminectomy L5.
Left lateral L4-L5 disc bulge abutting the left exiting L4 nerve root.
Marked streak artifact at the surgical slight area degrades neural
foraminal evaluation.

Impression

Grade 2 subluxation L5 on S1 with internal fixation that compares
with the previous examination.
Left L4-L5 disc bulge may affect the exiting left L4 nerve root,
clinical correlation is recommended.

Dictated by: JOHN H BARTOW    12/16/2011 04:07 PM
Transcribed By : BARTOW, JOHN H    12/16/2011 04:07 PM
 Approved by:JOHN H BARTOW    12/16/2011 04:07 PM
```

**Electronically Signed by Electronic Signature on 12/16/2011 at 4:39 PM**

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

*November 18, 2013*
Page 2
Chart Document

**JAMIE SUE FLANAGAN**
Female  DOB:          MRN:  42-06-80

Home: (417)459-5879 Work: (417)335-7361

11/18/2013  09:21  4173361197  DONALD HOPEWELL MD  PAGE  31/54

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB: ███████  MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

**10/19/2011 - Imaging Report: LUMBAR SPINE MINIMUM 4 VIEWS**
**Provider: Electronic Signature**
**Location of Care: CoxHealth Branson Clinics**

```
LUMBAR SPINE MINIMUM 4 VIEWS
  .                 SKAGGS COMMUNITY HEALTH CENTER
  .                       Branson, MO 65737
  .           Phone (417) 272-8911      Fax: (417) 335-7455

  .                    - CONSULTATION REPORT-
-------------------------------------------------------------------------
Patient Name : FLANAGAN , JAMIE , S
MRN.         : 42-06-80
DOB          : ███████████
SEX          : F
Ordering MD  : J CHARLES MACE
Referring MD : J CHARLES MACE
Exam ID      : 1055781
Procedure    : LUMBAR SPINE MINIMUM 4 VIEWS
Service Date : 10/19/2011
Account No.  : 24564163
-------------------------------------------------------------------------
CLINICAL HISTORY: Lumbar radiculopathy.
```

FINDINGS: The patient is status post fusion L5-S1 without complicating features. No instability on flexion and extension views. Relatively good range of motion.

IMPRESSION: Stable postop followup. Hardware is intact. No instability noted. The patient is status post posterior and anterior fusion.

```
  .   Dictated by   : RICHARD MAKUCH .      . 10/19/2011 07 : 24
  .     Transcribed by : DEVANS .        . 10/19/2011 07 : 44
  .     Approved by   : RICHARD MAKUCH .      . 10/19/2011 07 : 44
```

**Signed before import by Electronic Signature**
**Filed automatically on 10/19/2011 at 4:47 PM**

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB: ███████  MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

**04/01/2011 - Imaging Report: LUMBAR SPINE 2 OR 3 VIEWS**
**Provider: Electronic Signature**
**Location of Care: CoxHealth Branson Clinics**

```
LUMBAR SPINE 2 OR 3 VIEWS
  .                     SKAGGS COMMUNITY HEALTH CENTER
  .                          Branson, MO 65737
  .               Phone (417) 272-8911      Fax: (417) 335-7455

  .                        - CONSULTATION REPORT-
---------------------------------------------------------------------------
  Patient Name : FLANAGAN , JAMIE , S
  MRN.         : 42-06-80
  DOB          : ███████
  SEX          : F
  Ordering MD  : J CHARLES MACE
  Referring MD :
  Exam ID      : 999705
  Procedure    : LUMBAR SPINE 2 OR 3 VIEWS
  Service Date : 04/01/2011
  Account No.  : 20968186
---------------------------------------------------------------------------
  Clinical History: Back pain.

Findings:

Operative exam of the lumbar spine. Followup per neurosurgery.

  .    Dictated by   : RICHARD MAKUCH .       . 04/01/2011 09 : 39
  .      Transcribed by : SVHOUSTON .        . 04/01/2011 09 : 41
  .      Approved by   : RICHARD MAKUCH .      . 04/01/2011 09 : 41
```

**Electronically Signed by Electronic Signature on 04/01/2011 at 11:29 AM**

**Donald Hopewell M.D.**
*500 W. Main St. Suite 205B BRANSON, MO 65616*
417-336-1181 Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female DOB: ███████ MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

---

**10/08/2010 - Imaging Report: CERVICAL SPINE COMPLETE-FEO**
**Provider: Diane L Cornelison DO,**
**Location of Care: CoxHealth Branson Clinics**

```
CERVICAL SPINE COMPLETE-FEO
 .                   SKAGGS COMMUNITY HEALTH CENTER
 .                        Branson, MO 65737
 .            Phone (417) 272-8911      Fax: (417) 335-7455

 .                    - CONSULTATION REPORT-
------------------------------------------------------------------------
Patient Name : FLANAGAN , JAMIE , S
MRN.         : 42-06-80
DOB          ████████████
SEX          : F
Ordering MD  : DIANE CORNELISON
Referring MD : DIANE CORNELISON
Exam ID      : 952160
Procedure    : CERVICAL SPINE COMPLETE-FEO
Service Date : 10/08/2010
Account No.  : 20430039
------------------------------------------------------------------------
CLINICAL HISTORY:  Spinal stenosis, 7 projections.

FINDINGS:

With flexion and extension, no subluxations.
Normal alignment.
Neural foramina are patent.

IMPRESSION:  Normal plain film of the cervical spine.

 .    Dictated by    : JOHN BARTOW .      . 10/08/2010 14 : 19
 .      Transcribed by : MJSTRANGE .      . 10/08/2010 16 : 31
 .    Approved by    : JOHN BARTOW .      . 10/08/2010 16 : 31
```

**Electronically Signed by Diane L Cornelison DO, on 10/11/2010 at 7:27 PM**

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

*November 18, 2013*
Page 1
Chart Document

**JAMIE SUE FLANAGAN**
Female  DOB: ██████████  MRN: 42-06-80

Home: (417)459-5879  Work: (417)335-7361

**10/08/2010 - Imaging Report: MRI CERVICAL W/O CONTRAST**
**Provider: Diane L Cornelison DO,**
**Location of Care: CoxHealth Branson Clinics**

```
MRI CERVICAL W/O CONTRAST
 .                    SKAGGS COMMUNITY HEALTH CENTER
 .                           Branson, MO 65737
 .            Phone (417) 272-8911      Fax: (417) 335-7455

 .                      - CONSULTATION REPORT-
--------------------------------------------------------------------------
 Patient Name : FLANAGAN , JAMIE , S
 MRN.         : 42-06-80
 DOB          : ████████████
 SEX          : F
 Ordering MD  : DIANE CORNELISON
 Referring MD : DIANE CORNELISON
 Exam ID      : 952144
 Procedure    : MRI CERVICAL W/O CONTRAST
 Service Date : 10/08/2010
 Account No.  : 20430039
--------------------------------------------------------------------------
 CLINICAL HISTORY:  Spinal stenosis, increased reflexes.

 TECHNIQUE:  Standard noncontrasted cervical MR protocol.

 FINDINGS:

 Normal cervical and proximal thoracic cord.
 What can be seen of the posterior fossa appears normal.
 Very mild disc bulging at C5-C6 and C6-C7, abutting the canal only.
 Normal prevertebral soft tissues.

 Axial Examination:
 C2-C3:  Normal.
 C3-C4:  Normal.
 C4-C5:  Small signal within the annulus; there is a small annular tear, but no entrapment.
 C5-C6:  Slight sagittal, left parasagittal disc bulge abutting the canal only, with
 annular signal that may correlate with a small annular tear.
 C6-C7:  Slight disc bulging, but no entrapment.
 C7-T1:  Normal.

 IMPRESSION:
 1.  Minimal spondylotic changes.
 2.  No nerve root or cord abnormality.

 .    Dictated by    : JOHN BARTOW .      . 10/08/2010 13 : 53
 .     Transcribed by : MJSTRANGE .       . 10/08/2010 15 : 35
 .     Approved by    : JOHN BARTOW .     . 10/08/2010 15 : 35
```

**Electronically Signed by Diane L Cornelison DO, on 10/11/2010 at 7:27 PM**

# FOLLOWUP WORKSHEET

Date: /0.3/-/3

Name: Flanagan, Jamie S. PCP:      REF:
DOB: ████████████

Primary Neurologic Diagnosis: Lumbar Spondylosis z post Lemi Syndroma

Reason for f/u: Pt raquast p̄ cord stimulator trial - no banafit from trial.

**New Problems:**

Ø

**Changes in PMH, SH, FH or ROS:**

Ø

**Current Rx**

Soe EMR

**Rx failures**

Neurologic exam: (Normal) Stable abnormalities:

New findings:

**Plan and f/u**

Trial of methadona for morphina 10mg TID
f/u 3months

Donald Hopewell MD
Neurology & Pain

# FOLLOWUP WORKSHEET

Date: 9-19-13

Name: Flanagan, Jamie S. PCP: Knot     REF:

DOB: ██████████

Primary Neurologic Diagnosis: Lumbar Spondylosis c̄ post lami Syndrome
Lumbar

Reason for f/u: Pt request for "weakness" in legs. No true motor defecits. This is a Sensation not a motor phenomena. Pain worse c̄ prolonged position esp in bed but comfortable in chair. Insurance denied Stimulator - pt will appeal.

New Problems:
∅

Changes in PMH, SH, FH or ROS:
∅

Current Rx
See BMR

Rx failures

Neurologic exam: (Normal) Stable abnormalities:

New findings:

Plan and f/u
Continue Regimen
f/u 3months.

Donald Hopewell MD
Neurology & Pain

Jamie Flanagan

August 15, 2013
Ozarka Pain Specialists
1011 E. Montclair Ste 100
Springfield, MO 65807
417-269-7246

Patient: Jamie Flanagan
DOB: ███████  Age: 33y
Referring Physician: Cornelison, Diane, D.O.

Date: 08/15/2013

Family Physician: Marcellus, Peter

**Vitals:**
Temp: 98.3° F              Resp: 12              Pulse: 69
Blood Pressure: 108/68     Height: ' "          Weight: 118 lbs

**Chief Complaint:** Back pain, evaluation for SCS.
**History of Present Illness:** 33 YOWF presents for evaluation of low back pain and evaluation for SCS as requested by Dr. Cornelison. She reports pain across lower lumbar spine with radiation into bilateral hips, posterior and lateral extremities bilaterally. Her sx have been present since August 2010 with no known accident or injury as cause. She has had previous lumbar fusion of L5-S1 by Dr. Mace in April 2011. She currently see's Dr. Hopewell for pain management however Dr. Cornelison has performed the injections.

**What best describes your pain:** Aching. Throbbing. Burning/Hot. Continuous. numbness
**Pain Rating: Current:** 7          **At Best:** 3          **At Worst:** 10



**Pain affected by:**
Muscle Relaxants: Better
Walking: Worse
Nighttime: Worse
Pain Medications: Better
Lying Down: Worse
Prolonged Position: Worse
Patient is experiencing numbness/tingling. bilateral lower extremities

**Tests Done to Diagnose Pain:** X-ray. CT Scan. MRI Scan.

Jamie Flanagan                                    August 16, 2013

**Diagnostic Reports**
XR SPINE LUMBAR MIN 6 VIEWS 1/9/13
IMPRESSION
1. Postsurgical changes of posterior lumbar interbody fusion at L5-S1.
2. Four pars defects with grade 2 spondylolisthesis. Operative appearance not substantially different than 2 November 2012. No interval change and no evidence of instability.

MRI LUMBAR W/O CONTRAST 9/22/10
IMPRESSION: Pars defects at L5 with spondylolisthesis of L5 on S1 and moderate bilateral neural foraminal narrowing and disc space degeneration.

LUMBAR SPINE MINIMUM 4 VIEWS 10/19/2011
IMPRESSION: Stable postop followup. Hardware is intact. No instability noted. The patient is status post posterior and anterior fusion.

XR SPINE LUMBAR MINIMUM 4 VIEWS 12/16/2011
IMPRESSION: Stable L5-S1 internal fixation and alignment.

CT SPINE LUMBAR WITHOUT CONTRAST 12/16/2011
IMPRESSION
Grade 2 subluxation L5 on S1 with internal fixation that compares with the previous examination.
Left L4-L5 disc bulge may affect the exiting left L4 nerve root, clinical correlation is recommended.

CT SPINE LUMBAR WITHOUT CONTRAST 9/12/2012
IMPRESSION:
1. Postsurgical changes of posterior lumbar interbody fusion at L5-S1. The sponylolisthesis of L5 on S1 appears stable but there is increasing sclerosis of the endplates and lucency around the bone cage suggesting the possibility of incomplete fusion across the disc space.
2. Large amount of epidural soft tissue, which appears to compromise the level of the thecal sac. The most likely etiology would be postsurgical scar tissue and similar changes have been noticed on previous studies.

CT SPINE LUMBAR SPINE WITH CONTRAST MYELO 11/2/2012
IMPRESSION: Not available

MR SPINE LUMBAR WITH AND WITHOUT CONTRAST 12/28/2012
IMPRESSION
Postsurgical changes of posterior lumbar interbody fusion at L5-S1 secondary to pars defects at L5 and grade 2 spondylolisthesis. There is extensive evidence of postoperative fibrosis in the posterior operative bed extending along the right and left lateral margins of the thecal sac and extending anteriorly on the left to involve the S1 nerve root.

**Previous Treatments**
*Right L4 TFESI 4/25/13 with minimal relief.*
LESI's 10/6/10, 10/20/10, 6/22/11, 7/13/11 previously by Dr. Hopewell
Topical analgesics, pain medications, muscle relaxants, heat, back brace, TENS unit
PT prior to and post surgery.

**Past Medical History**
Arthritis/gout: Arthritis/Osteoarthritis
GERD, Congenital flexible flat foot, Insomnia, Spina bifida, Uterine fibroids, Pars defect, Annular tear x2 cervical, *gastric paresis, autoimmune disease, depression*

**Past Surgical History**
Cholecystectomy:
Cesarean Section:
Spinal Fusion: L5-S1 Dr.Mace
Hysterectomy:
Foot surgeries x3, Exploratory lap, Reconstructive breast surgery x3

Jamie Flanagan                                    August 15, 2013
## Social History
Patient does not consume alcohol.
Patient does not consume tobacco.
Patient is married.
Patient lives w/spouse.

## Family History
HTN: Mother •
Thyroid problems: Mother •
CAD: Father •

## Systems Review
**Constitutional Symptoms:** none
**Eyes Symptoms:** none
**Cardiovascular Symptoms:** none
**Respiratory Symptoms:** none
**Allergy Symptoms:** none
**Urinary Symptoms:** none
**Female Reproductive Symptoms:** none
**Psychiatric Symptoms:** • depression
**Endocrine Symptoms:** none
**ENT Symptoms:** none
**Gastrointestinal Symptoms:** • indigestion
**Musculoskeletal Symptoms:** • muscle pain • joint pain
**Neurologic Symptoms:** • numbness
**Skin Symptoms:** none
**Blood Symptoms:** none

## Medications and Allergies
Medications and allergies reviewed.

## Physical Exam
**General:** The patient appears well hydrated and well nourished. There is no acute distress and the patient's appearance is consistent with their stated age.
**Psychiatric:** Patient is alert and oriented. Mood and affect were appropriate. Answers questions appropriately.
**Skin:** Skin was warm and dry without rash, lesion or ulceration.
**HEENT:** The external ears, nose and mouth had a normal appearance.
**Neck:** The neck was supple.
**Heart:** The heartbeat was regular in rhythm and rate. No murmurs, gallops or rubs were observed.
**Lungs:** The lungs were clear to auscultation bilaterally. There was normal breathing effort.
**Abdomen:** The abdomen was soft, non-tender.
**Extremities:** Tenderness over L/S area
**Spine:** Extension, axial loading and lateral side bending of lumbar spine reproduces pain.
**Neurologic:** DTR at the biceps & brachioradialis tendons are 2+ and symmetrical.
DTR at patella & achilles tendons are 2+ and symmetrical
SLR on right is equivocal

## Impression
FBSS- with most of her pain in LE's
Chronic pain Syndrome
Spondylolithels

P.004/005          (FAX)4173880854                    13:38 Ozark Pain     08/16/2013

11/18/2013  09:21    417336197          DONALD HOPEWELL MD          PAGE  40/54

09/16/2013   15:40 Ozark Pain                          (FAX)4172898854      P.005/005

Jamie Flanagan                                                    August 15, 2013

**Plan**

Jamie is suffering from significant epidural fibrosis and is on high dose narcotics. Despite her current conservative treatments for this, she is in significant pain.

At this time I recommend SCS. We discussed perc trial process. An educational handout about the procedure was given to the patient and discussed. The patient will be scheduled.

**PLAN:**

Dr. Rosemary consult not needed. Pt has seen Dr Radovonovich and no contraindications are known

Dual Lead SCS trial

Signed Electronically By: Wayne H. Wallender, D.O.

**Superbill:**

Diagnosis(es): Postlaminectomy Syndrome Lumbar Region: (722.83) • Spondylolysis, Lumbosacral Region: (756.11) • • •

E&M Procedure 99203: (office/outpatient visit new)

Diagnosis(es): • • • • •

E&M Procedure:

**Allergies**

| Allergy | |
|---|---|
| Darvocet | Severe |
| Ambien | Severe |
| Adhesive Tape | Severe |
| Lunesta | |

**Medications**

| Date | Brand | Dosage | FREQ |
|---|---|---|---|
| July 10, 2013 | IBUPROFEN TABLETS | 800 | Q6h |
| July 10, 2013 | XANAX TABLETS | 0.5 | Other |
| July 10, 2013 | PROTONIX EC TABLETS | 40 | BID |
| July 10, 2013 | Zofran | 4 | Q12h |
| July 10, 2013 | Miralax Powder | | Other |
| July 10, 2013 | Wellbutrin SR XR12 | 150 | BID |
| July 10, 2013 | TOPAMAX TABLETS | 50 | BID |
| July 10, 2013 | Belladonna | | Q8h |
| July 10, 2013 | Benryl | 10 | QID |
| July 10, 2013 | PLAQUENIL TABLETS | 200 | Daily |
| July 10, 2013 | Soma | 350 | TID |
| July 10, 2013 | ROBAXIN TABLETS | 750 | TID |
| July 10, 2013 | DILAUDID HYDROMORPHONE HCL TABLETS | 8 | Q4h |
| July 10, 2013 | Morphine Sulfate CR | 60 | BID |
| July 10, 2013 | Morphine Sulfate CR | 30 | BID |
| July 10, 2013 | Morphine Sulfate CR | 15 | BID |

**Prescriptions**

| Date | Brand | Dosage | FREQ |
|---|---|---|---|

EXHIBIT A

# FOLLOWUP WORKSHEET

**Date:** 7-23-13

Name: Flanapan, Jamie S.    PCP: Knox    REF: _Woodward_

DOB: ███████

Primary Neurologic Diagnosis: Lumbar spondylosis c post Lami Syndrome Course (" pain

Reason for f/u: Routine med f/u. Issues all 3 Δ. Pain lumber c spread down legs. Recalls activity worse as week goes on. For cord stimulator trial next month. Continues to have somnolence issues c meds. Options 3 Δ from last visit. 30 min of face to face time

New Problems:
Ꝺ

Changes in PMH, SH, FH or ROS:
Ꝺ

Current Rx
See EMR

Rx failures

Neurologic exam: Normal    Stable abnormalities:

New findings:

Plan and f/u
Continue Regimen
F/u 3 months

Donald Hopewell MD
Neurology & Pain

Case 3:17-cv-05060-MDH    Document 33-4    Filed 05/15/18    Page 103 of 269    LIN00898

# FOLLOWUP WORKSHEET

Date: 4-25-13

Name: Flanagan, Jamie S.    PCP: Knox    REF:

DOB: ██████████████

Primary Neurologic Diagnosis: Lumbar Spondylosis
Lumbar Post Lami Syndrome
Cervical Pain

Reason for f/u: Pt request to discuss options. Having hypersomnolence from morphine ⇒ has to ↑ dosage when working or ↑ sr or closes. Drug coverage issues preclude anything but generics. ⇒ only methline, methadone if orit as options. Has hypersensitivity to adhesiveness ⇒ can't use fent. Doesn't want methadone. 30 minutes spent discussing options.

New Problems:
⊖

Changes in PMH, SH, FH or ROS:
⊖

Current Rx
Sac EMR

Rx failures

Neurologic exam: (Normal)    Stable abnormalities:

New findings:

Plan and f/u
Continua Regimen - she will explore med options c drug reps
Pursuing implantables
f/u 3 months

Donald Hopewell MD
Neurology & Pain

# FOLLOWUP WORKSHEET

**Date:** 1-24-13

Name: Flanagan, Jamie S.    PCP: Knox    REF:

DOB: ████████

Primary Neurologic Diagnosis: Lumbar Spondylosis
Lumbar Post Lami Syndrome
Cervical Pain

Reason for f/u: Routine med f/u. Recent MRI shows root scarring
Has plans to do cord stimulator for trial. No significant neck
pethology. 20 minute discussion of options. Can't
afford Zvinza

**New Problems:**

⊖

**Changes in PMH, SH, FH or ROS:**

⊖

**Current Rx**

See EMR.

**Rx failures**

Neurologic exam: Normal    Stable abnormalities:

**New findings:**

Plan and f/u
↑ to Morphine 120 BID
Probably needs to ↑ nerc's - but will holdotherwise
f/u 3 months.

Donald Hopewell MD
Neurology & Pain

# FOLLOWUP WORKSHEET

**Date:** 10-29-12

**Name:** Flanagan, Jamie S.    **PCP:** Knox    **REF:** Woodward
**DOB:** ██████████

**Primary Neurologic Diagnosis:** Lumber Spondylolisthosis
Lumbar post lam. Syndrome
cervical pain

**Reason for f/u:** Routine med flu. Has seen Rheum. Blood work ⊖ but feels likely autoimmune disease. LBP-f/u by NSurg - fusion has failed. Having myelogram for both lumber; cervical Sx's next week. Pain highly variable 2° to multiple etiologies & activity related processes. Wants to hold on further med Δ until we ; Rx plans made

**New Problems:**

⊖

**Changes in PMH, SH, FH or ROS:**

⊖

**Current Rx**

See EMR

**Rx failures**

**Neurologic exam** (Normal)    **Stable abnormalities:**

**New findings:**

**Plan and f/u**
Continue Reg. then
f/u 3 months.

Donald Hopewell MD
Neurology & Pain

11/18/2013 09:21    4173361197    DONALD HOPEWELL MD    PAGE 45/54

# FOLLOWUP WORKSHEET

**Date:** 7-31-12

**Name:** Flanigan, Jamie S.   **PCP:** Knox   **REF:** Woodward
**DOB:** ▓▓▓▓▓▓▓

**Primary Neurologic Diagnosis:** Lumbar Spondylolisthosis
Lumbar post Lami Syndrome

**Reason for f/u:** Routine med f/u. Joint & neck pain less prominent.
Still gets episodic neck pain - stabbing to electric usually c̄
movement. MRI done by PcP which did not show sig pathology.
Neck pain may cause spasm for days. Has not seen Rheumeblogs.

**New Problems:**
⊖

**Changes in PMH, SH, FH or ROS:**
⊖

**Current Rx**
SEE EMR

**Rx failures**
⊖

**Neurologic exam:** (Normal)   **Stable abnormalities:**

**New findings:**

**Plan and f/u**
Continue Regimen
f/u c̄ Rheum
f/u here 3 months

Donald Hopewell MD
Neurology & Pain

Case 3:17-cv-05060-MDH   Document 33-4   Filed 05/15/18   Page 107 of 269   LIN00902

## FOLLOWUP WORKSHEET

Date: 5-9-12

Name: Flanagan, Jamie S.   PCP: Knox   REF: Woodward
DOB: ████████████

Primary Neurologic Diagnosis: Lumbar Spondylolisthosis
Lumbar Post Kemi Syndrome

Reason for f/u: Pt request - 4 weeks of intermittent aching elbow toward wrist. Yesterday developed also @ shoulder pain. Has had some neck pain c ↓ROM. Occ pops c electrical sensation in neck. Some ? neck swelling mid cervical. No radicular spread of pain c No correlation between neck & arm sx's. Joints never swollen red or hot. Has had knee sx's as well from time to time

New Problems:
as above

Changes in PMH, SH, FH or ROS:
⊖

Current Rx
See EMR

Rx failures

Neurologic exam: (Normal)   Stable abnormalities:

New findings:

NL Neck & splints to L
NL joint exam UE's

Plan and f/u
1. Arthralgia
2. Neckpain
- NSAID's regular
- Rheum eval

Donald Hopewell MD
Neurology & Pain

# FOLLOWUP WORKSHEET

**Date:**
5-1-12

Name: Flanagan, Jamie S   PCP: Knox   REF: *Woodward*
DOB: ████████

Primary Neurologic Diagnosis: Lumbar Spondylolisthesis
Lumbar post Lami Syndrome

Reason for f/u: Routine med f/u. Failed nortriptyline and Keppra now
also. Both caused problems. Pain s̄ Δ Posterior or posterolateral
on ⊕ leg. Discussed options again in detail. ~20 minutes face
to face.

**New Problems:**
~~6~~

**Changes in PMH, SH, FH or ROS:**
∅

**Current Rx**
See CMR

**Rx failures**

**Neurologic exam:** (Normal)   **Stable abnormalities:**

**New findings:**

**Plan and f/u**
Low dose Savella; monitor for GI side effects - titrate up as tolor tocl
f/u 3 months

Donald Hopewell MD
Neurology & Pain

# FOLLOWUP WORKSHEET

**Date:** 2-1-12

**Name:** Flanagan, Jamie S.  **PCP:** Knox  **REF:**
**DOB:** ████████

Primary Neurologic Diagnosis: Lumbar Spondylolisthasis
Lumbar Post Lemni Syndroma

Reason for f/u: Routine med f/u. Couldn't take, tolerate amitriptyline (but could take nortriptyline. Pain = A. Posterior or postero lateral on (R) leg. Saw N-Surg; zero A's of ? bone rezhsorption @ surgical site => repeat in 6 months } may need re-operation i also brought up possible spinal cord stimulator. Pt clearly in my mind is lumbar post Lemni Syndroma = fixed L4-5 L5 root injury. Some somnolance ~ 2 hours p evince dose

**New Problems:**
Ø

**Changes in PMH, SH, FH or ROS:**
Ø

**Current Rx**
See EMR

**Rx failures**

**Neurologic exam** (Normal) **Stable abnormalities:**

**New findings:**

**Plan and f/u**
Restart nortriptyline @ 50mg – plan to titrate up.
Take evince on arrising ~ 1/2 hours later
OK to use both Soma & Robaxin
& ~ 3 months

Donald Hopewell MD
Neurology & Pain

# FOLLOWUP WORKSHEET

**Date:** 11-02-11

**Name:** Flanigan, Jamie S. **PCP:** Knox/Marcellus
**DOB:** ██████████

**Primary Neurologic Diagnosis:** Lumbar spondylolisthesis

**Reason for f/u:** Routine med f/u. LBP variable ē activity. Leg pain more consistent. Variable location. postero lat leg may cross to medial knee. Burning lat fore-foot. Good response to muscle relaxers, lidoderm.

**New Problems:**


**Changes in PMH, SH, FH or ROS:**


**Current Rx**
See EMR

**Rx failures**

**Neurologic exam:** (Normal) **Stable abnormalities:**

**New findings:**

**Plan and f/u**
Continue Regimen
f/u 3 months.
Trial of amitriptyline @ HS

Donald Hopewell MD
Neurology & Pain

# FOLLOWUP WORKSHEET

Date: 8-2-11

Name: Flanagan, Jamie S.   PCP: Knox / marcelles
DOB: ███████████

Primary Neurologic Diagnosis: Lumber Spondalolisthasis

Reason for f/u: No improvement ā 2nd epi. LBP variable c̄ activity
Leg pain consistent-down posterior leg Ⓡ į into Ⓛ heel.
Worse the more she is up on foot. Worse late in day;
as week goes on.

New Problems:

⊖

Changes in PMH, SH, FH
or ROS:

⊖

Current Rx
Sta CMR

Rx failures

Neurologic exam ( Normal )  Stable abnormalities:

New findings:

Plan and f/u
Continue Regimen
Consider epi c̄ Widless - discuss c̄ Cornalison
f/u 3 months

Donald Hopewell MD
Neurology & Pain

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
*Female  DOB:* ▮▮▮▮▮ *MRN:  42-06-80*

Home: (417)459-5879 Work: (417)335-7361

**10/22/2010 - Office Visit: Neurology Office Visit- EMG**
**Provider: Glady Jacob MD,**
**Location of Care: Cox Pain and Neurology Branson**

**Requesting Physician:** woodward
**Chief Complaint:** emg- BL/LE

**Vital Signs**
**Pulse rate:** 80
**Pulse rhythm:** regular
**Respirations:** 18
**Blood Pressure:** 110/80 mm Hg

**Pain Assessment**
The patient is currently experiencing pain.
The patient has experienced pain in the last 2 weeks.
**Location:** back
**Intensity (0-10):** 4
The patient's medication list has been reviewed and updated.  **Medications (including medications added during this visit):**
HYDROCODONE-ACETAMINOPHEN 10-325 MG/15ML SOLN (HYDROCODONE-ACETAMINOPHEN) 1-2 PO Q 6 HOURS AS NEEDED FOR PAIN
NEURONTIN 300 MG CAPS (GABAPENTIN) take one every am, and two every pm.
LEXAPRO 20 MG TABS (ESCITALOPRAM OXALATE) one tab po daily
ROBAXIN 500 MG TABS (METHOCARBAMOL) one three times a day as needed
XANAX 0.25 MG TABS (ALPRAZOLAM) one tid as needed
LYRICA 50 MG CAPS (PREGABALIN) one cap at night
KETOROLAC TROMETHAMINE 10 MG TABS (KETOROLAC TROMETHAMINE) take 1 tab bid x 3 days.
ZITHROMAX 250 MG TABS (AZITHROMYCIN) 2 po day 1, 1 po daily, days 2-5
AVINZA 30 MG XR24H-CAP (MORPHINE SULFATE BEADS) 1 daily
DEXAMETHASONE 4 MG TABS (DEXAMETHASONE) take 3 tabs on day 1, take 2 tabs on day 2 and take 1 tab on day 3 and stop. take this medication in the am and w/ food.

**Allergies:**
! DARVOCET (PROPOXYPHENE N-APAP)
! * AMBIEN
! ADHESIVE TAPE
! * LUNESTA}}
COR
FLANAGAN, JAMIE S
DOB: ▮▮▮▮▮
Patient Number:   42-06-80
DocType:   079
10/22/2010


ELECTROMYOGRAM AND NERVE CONDUCTION STUDY

CLINICAL HISTORY: The patient is a 30-year-old who has pain
 in her lower back with pain radiating down the right lower
 extremity. This EMG/nerve conduction study is done to
 evaluate for lumbosacral radiculopathy.

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB: ███████  MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

DESCRIPTION OF EMG AND NERVE CONDUCTION STUDIES:
Motor nerve conduction study from the right peroneal showed a distal latency of 4.3 milliseconds. Amplitude was 6.1 millivolts and conduction velocity was 46 meters per second below knee and 50 above knee.
Motor nerve conduction study from the right tibial showed a distal latency of 4.4 milliseconds. Amplitude was 8.6 millivolts and conduction velocity was 49 meters per second.
Motor nerve conduction study from the left tibial showed a distal latency of 4 milliseconds. Amplitude was 12.8 millivolts and conduction velocity was 51 meters per second.

F-wave studies from the right peroneal showed an F-latency of 51.2.
F-wave studies from the right tibial showed an F-latency of 52.1.
F-wave studies from the left tibial showed an F-latency of 52.2.

Sensory nerve conduction study from the right sural showed a peak latency of 3.8. Amplitude was 24.
Sensory nerve conduction study from the left sural showed a peak latency of 3.5. Amplitude was 21.5.

EMG studies were done of the right tibialis anterior, gastrocnemius, and extensor hallucis longus and the left tibialis anterior and gastrocnemius. All these muscles showed normal motor units, no spontaneous activity, and normal recruitment. The right vastus lateralis, short head of biceps, and gluteus medius showed normal motor units, no spontaneous activity, and normal recruitment. The lumbar paraspinal muscles were tested bilaterally at 3 levels. There was 1+ positive waves in the right lumbosacral paraspinal muscles at the lower level.

CONCLUSION: Abnormal study – Nerve conduction studies were within normal limits. However eletromyogram studies show electrophysiological evidence of lumbosacral radiculopathy predominantly affecting the right L5-S1 nerve roots.

Voice ID: 586986
10/22/2010 12:00:38 by Glady Jacob M.D.
10/23/2010 11:05:46 by 3059
**Assessment**


**Plan**

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB ███████ MRN:  42-06-80

Home: (417)459-5879 Work: (417)335-7361

**Electronically Signed by Glady Jacob MD, on 10/22/2010 at 12:10 PM**

LIN00910



The Lincoln National Life Insurance Company, PO Box 2609, Omaha, NE 68103-2609
toll free (800) 423-2765 Fax (877) 843-3950
www.LincolnFinancial.com

## GROUP LONG-TERM DISABILITY CLAIM APPLICATION



**EMPLOYEE** – form completion information

---

### APPLICATION FOR GROUP LTD – Instructions

A. **Complete and sign the authorization on the reverse side of this page.** This will allow our insurance carrier or their representative to secure additional information (if necessary) to make a decision on your request for benefit payments (do not detach).

B. **Complete employee claim statement in full.**

    **Attach**   ●    A copy of Social Security and other income entitlement awards (or forward when received)

C. **Give this authorization and attached claim application to the physician treating you** (if more than one, obtain other forms for completion from employer). Instruct your attending physician to send his statement along with yours to the insurance carrier.

D. When those forms are received by the Insurance Company, they will advise you of your eligibility for benefits or of any additional information that may be needed.

---

Do <u>Not</u> Detach

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
GLC-01252

Page 6 of 14
12/10

11/18/2013 09:30    4173361197    DONALD HOPEWELL MD    PAGE 01/07



The Lincoln National Life Insurance Company, PO Box 2609, Omaha, NE 68103-2609
toll free (800) 423-2765   Fax (877) 843-3950
www.LincolnFinancial.com

## AUTHORIZATION FOR RELEASE OF INFORMATION

1. **I (the undersigned) authorize** any physician, medical professional, pharmacist or other provider of health care services, hospital, clinic, other medical or medically related facility; insurance or reinsurance company; government agency; department of labor; acquaintance; group policyholder; employer; or policy or benefit plan administrator to release information from the records of:

Claimant/Patient Name: __Flanagan__ __Jamie__ __Sue__
(Last)             (First)             (Middle)

Date of Birth: ████████████     Social Security Number: ████████████

2. Information to be released:
   - data or records regarding my medical history, treatment, prescriptions, consultations (including medical and psychological reports, records, charts, notes (excluding psychotherapy notes), x-rays, films or correspondence, and any medical condition I may now have or have had];
   - any information regarding insurance coverage; and
   - any information, data or records regarding my activities (including records relating to my Social Security, Workers' Compensation, Retirement Income, financial, earnings and employment history).

3. Information to be released to:   The Lincoln National Life Insurance Company
PO Box 2609
Omaha, NE 68103-2609

4. I understand the information obtained by use of this Authorization will be used by The Lincoln National Life Insurance Company ("Company") to evaluate my claim for disability benefits. The Company will only release such information:
   - to its reinsurer, or other persons or organizations performing business or legal services in connection with my claim(s); or
   - to a vendor, approved by the company, which specializes in the application for Social Security Disability Benefits
   - to vendors/consultants providing the claimant with wellness, disability or leave related services as part of an employer sponsored benefit plan
   - to the employer for self-insured disability plans; or
   - as otherwise may be required by law or as I may further authorize.

   I further understand that refusal to sign this Authorization may result in the denial of benefits.

5. I understand the information used or disclosed may be subject to re-disclosure by the recipient and may no longer be protected by the federal HIPAA Privacy Rule. For Colorado claims, the disclosed information may not be redisclosed or reused by the recipient under Colorado law.

6. I understand that I may revoke this Authorization in writing at any time, except to the extent:
   1. the Company has taken action in reliance on this Authorization; or
   2. the Company is using this Authorization in connection with a contestable claim.
   If written revocation is not received, this Authorization will be considered valid for a period of time not to exceed 24 months from the date of my signature below. To initiate revocation of this Authorization, direct all correspondence to the Company at the above address.

7. A photocopy of this Authorization is to be considered as valid as the original.

8. I understand I am entitled to receive a copy of this Authorization.

SIGNATURE: _Jamie Sue Flanagan_   DATE: _11/10/2013_
Claimant/legal representative (Nearest relative, legal guardian, or appointed representative to sign only if claimant/patient is a minor, legally incompetent, or deceased.) Power of attorney or guardianship must be attached.

PRINT NAME: _Jamie Sue Flanagan_

Relationship to Claimant/Patient of personal/legal representative signing for Claimant/Patient: _Self_

ADDRESS: _986 S Hedge Drive_     PHONE NO: _417-459-5879_
(Street)

_Nixa_     _MO_     _65714_
(City)     (State)     (Zip Code)

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
GLC-01252

Disability   Page 7 of 14
12/10

**FRAUD NOTICES. For your protection, certain states require that the following notices appear on this form.**

**Alaska.** A person who knowingly and with intent to injure, defraud, or deceive an insurance company files a claim containing false, incomplete or misleading information may be prosecuted under state law.

**Arizona.** For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

**Arkansas, Louisiana, Rhode Island and West Virginia.** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**California.** For your protection California law requires the following to appear on this form: Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**Colorado.** It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**Delaware.** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

**District of Columbia.** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

**Florida.** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

**Idaho.** Any person who knowingly, and with intent to defraud or deceive any insurance company, files a statement or claim containing any false, incomplete or misleading information is guilty of a felony.

**Indiana.** A person who knowingly and with intent to defraud an insurer files a statement of claim containing any false, incomplete, or misleading information commits a felony.

**Kentucky.** Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**Maine.** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**Maryland.** Any person who knowingly and willfully presents a false or fraudulent claim for payment of a loss or benefit or knowingly and willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Minnesota.** A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

**New Hampshire.** Any person who, with a purpose to injure, defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638:20.

11/18/2013 09:30 4173361197 DONALD HOPEWELL MD PAGE 03/07

**New Jersey.** Any person who knowingly files a statement of claim containing any false or misleading information is subject to criminal and civil penalties.

**New Mexico.** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to civil fines and criminal penalties.

**New York.** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**Ohio.** Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**Oklahoma.** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**Oregon.** Any person who knowingly and with intent to defraud any insurance company or other person: (1) files an application for insurance or statement of claim containing any materially false information; or, (2) conceals for the purpose of misleading, information concerning any material fact, may have committed a fraudulent insurance act.

**Pennsylvania.** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**Puerto Rico.** Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation with the penalty of a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances are present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.

**Tennessee and Washington.** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

**Texas.** Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**FOR ALL OTHER STATES EXCLUDING CONNECTICUT, KANSAS, AND VIRGINIA.** A person may be committing insurance fraud, if he or she submits an application or claim containing a false or deceptive statement with intent to defraud (or knowing that he or she is helping to defraud) an insurance company.

**Long-Term Disability Claim Employee's Statement**

To Be Completed By The Employee

**A. Information about you**

Last Name: Flanagan
First: Jamie
Middle Initial: S

Address: 986 S Hedge Dr
City: Niva
State/Province: MO
Zip: 65714

Telephone: 417-459-5879
Social Security Number: 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

Date of Birth (Month, Day, Year): 04/03/1980
Height: 5'4½"
Weight: 112#
☒ Rt Handed ☐ Lt Handed
☐ Male ☒ Female
☐ Single ☒ Married
☐ Widowed ☐ Divorced

Your Employer (include division if applicable): Cox Medical Center Branson

Occupation: Nurse Practitioner

**B. Information about your family** (required to determine your eligibility for Social Security benefits)

Spouse's Name (Last, First): Flanagan, Jason

Spouse's Social Security Number: ▉▉▉▉▉
Date of Birth (Month, Day, Year): ▉▉▉▉▉
Is your spouse employed? ☒ Yes ☐ No

Children under age 25: Name (Last, First): ▉▉▉▉▉
Date of Birth (Month, Day, Year): ▉▉▉▉▉

**C. Information about the condition causing your disability**

1. For pregnancy or (illness) answer the following questions:

What were your first symptoms? (over a period of 1-2 weeks)
Severe acute onset Low back pain that began to radiate down the back & lateral sides of my legs.

When did you first notice them? August 2010
Date you were first treated by a physician (Month, Day, Year):

2. For an injury, answer the following questions: N/A
Where and how did the injury occur?

Date the injury occurred (Month, Day, Year):
Date you were first treated by a physician (Month, Day, Year):

3. For (illness) or injury, answer the following questions:

Why are you unable to work? The pain is severe enough that I cannot perform the duties required of me. I need to change positions frequently due to numbness & pain & several times throughout the day I have to lie down and to find pain. My medications also create side effects that cause severe fatigue & forgetfulness that can be unsafe when tel[...]

Before you stopped working, did your condition require you to change your job or the way you did your job? ☒ Yes ☐ No If yes, explain: I had to get a pillow to sit on in each room & sit halfway on & halfway off the hospital chair purchased. Toward the end of my workdays, I did many of my work on the computer at home from my bed at the end of the day.

Is your condition related to your occupation? ☐ Yes ☒ No If yes, explain:

Have you filed, or do you intend to file a Workers' Compensation claim? ☐ Yes ☒ No

Do you require another person's active, hands-on help to safely perform activities of daily living? ☒ Yes ☐ No If yes, please explain what kind of help you receive and who provides it:
Not the dressing & normal ADLs, but when in a great deal of pain & take my meds my husband must drive me due to safety & fear of accident

**D. Information about the disability**

Last day you worked before the disability (Month, Day, Year): 08/23/2013
Did you work a full day? ☐ Yes ☒ No If no, explain: I was finishing up charts because we knew this would be an disability leave (at least short term)
Date you were first unable to work (Month, Day, Year): 08/26/2013

Have you returned to work? ☐ Yes Part time (date) _____ Full time (date) _____ ☒ No
If you have not returned to work do you expect to? ☐ Yes Part time (date) _____ Full time (date) _____ ☒ No

Are you currently self-employed or working for another employer? ☐ Yes ☒ No If so, give details.

(Continued on next page)

GLC-01252

**Please See Attached Sheet**

### E. Information about physicians and hospitals

First medical attention for the current disability was given by (complete below):

| Doctor's Name | Telephone: 417-335-7222 | Specialty |
|---|---|---|
| Dr. Diane Cornelison, DO | Fax: 417-335-7224 | Neurology & Pain Management |
| Address (Street, City, State, Zip) | | Dates Seen |
| 121 Cahill Rd, Suite Branson, MO 65616 | | 10/06/2010 To 04/25/2013 |

List all other physicians and hospitals you have seen for this condition:

| Doctor's Name | Telephone: 417-885-3888 | Specialty |
|---|---|---|
| Dr. Charles Mace, MD | Fax: | Neurosurgery |
| Address (Street, City, State, Zip) | | Dates Seen  9/2/2012 - |
| 2900 S National Ave, Springfield, MO 65804 | | 11/17/2010 To still have open chart |

| Doctor's Name | Telephone: 417-336-1181 | Specialty |
|---|---|---|
| Dr. Donald Hopewell | Fax: 417-336-1197 | Neurology & Pain Management |
| Address (Street, City, State, Zip) | | Dates Seen |
| 500 W Main, Suite 205B      Branson, MO 65804 | | 06/06/2011 To Current Pending appts |

| Doctor's Name | Telephone: 417-269-8226 | Specialty |
|---|---|---|
| Dr. Wayne Wallender, DO | Fax: | Anesthesia & Pain Management |
| Address (Street, City, State, Zip) | | Dates Seen |
| 1011 E Montclair St, Springfield, MO 65804 | | 08/15/2013 To 10/17/2013 |

| Hospital | Telephone: 417-335-7000 | Specialty |
|---|---|---|
| Cox Medical Center Branson (9 days at time of treatment) | Fax: | Community Hospital |
| Address (Street, City, State, Zip) | | Dates of Confinement |
| 525 Branson Landing Blvd      Branson, MO 65616 | | 04/01/2011 To 04/04/2011 |

Have you ever had the same or a similar condition in the past?
☐ Yes ☒ No  If yes, complete the following concerning your past treatment:

| Doctor's Name | Telephone: | Specialty |
|---|---|---|
| N/A | Fax: | |
| Address (Street, City, State, Zip) | | Dates Seen            To |

| Hospital | Telephone: | Specialty |
|---|---|---|
| | Fax: | |
| Address (Street, City, State, Zip) | | Dates of Confinement          To |

### F. Information about other disability income

(Check the other income benefits you are receiving or are eligible to receive as a result of your disability and complete the information requested.)

| Source of Income | Amount | (wk., mon.) | Date claim was filed | Date payments began | Date payments ended |
|---|---|---|---|---|---|
| Social Security Retirement | $ N/A | / | | | |
| Social Security Disability/Yourself | $ | / | | | |
| Social Security Disability/Dependents | $ | / | | | |
| Canadian Pension Plan | $ | / | | | |
| Workers' Compensation | $ | / | | | |
| State Disability | $ | / | | | |
| Pension/Retirement | $ | / | | | |
| Pension/Disability | $ | / | | | |
| Short Term Disability | $ | / | | | |
| Unemployment | $ | / | | | |
| No-Fault Insurance | $ | / | | | |
| Railroad Retirement | $ | / | | | |
| Other (include individual or group benefits): | $ | / | | | |

### G. Information about income tax withholding

If your request for benefits is approved, should The Lincoln National Life Insurance Company withhold income taxes from your benefit checks?
☒ Yes ☐ No   If yes, how much should be withheld from each check. Federal taxes (minimum is $88.00 per month) $ 100 .00

### H. Signature (Required for all claims)

Under what other The Lincoln National Life Insurance policies are you currently covered?

The above Statements are true and complete to the best of my knowledge and belief. I have read and understand the attached Fraud Warning statements.

x Jamie Flanagan                           11/10/2013
Signature of Employee                      Date

GLC-01252

Page 11 of 14
12/10

Case 3:17-cv-05060-MDH    Document 33-4    Filed 05/15/18    Page 121 of 269    LIN00916

| Doctor's Name: Beth Knox, FNP (collaborates with Dr. Peter Marcellus, MD) | Telephone: 417-348-8968 or 417-335-8968 Fax: 417-336-0275 | Specialty: Family Practice |
|---|---|---|
| Address: 1450 State Highway 248, Suite 202, Branson, MO 65616 | | Dates Seen: 10/01/2010 to current |
| Doctor's Name: Anne Winkler, MD | Telephone: 417-348-8253 Fax: 417-887-8992 | Specialty: Rheumatology |
| Address: 121 Cahill Rd, Suite 205, Branson, MO 65616 | | Dates Seen: 09/06/2012 to current |
| Doctor's Name: Glady Jacob, MD | Telephone: 417-335-7222 Fax: 417-335-7224 | Specialty: Neurology |
| Address: 121 Cahill Rd, Suite 204, Branson, MO 65616 | | Dates Seen: 10/22/2010 (EMG appt) |
| Doctor's Name: Thomas Woodward, MD | Telephone: Contact Cox Medical Center 417-335-7000 → Fax: Has left the system. | Specialty: Internal Medicine |
| Address: Cox Health 545 Branson Landing Blvd, Branson MO 65616 | | Dates Seen: 10/19/2010 - 01/19/2011 |
| Doctor's Name: Dr. Barbara Radovanovich, PhD | Telephone: 417-269-5509 Fax: 417-269-5595 | Specialty/Psych Services PHD-Pain |
| Address: Cox Health Psychological Services, Wheeler-Heart & Vascular Center, Suite 770, Springfield, MO 65807 | | Dates Seen: 2/20/2013 |
| Hospital's Name: Skaggs Pain Center (CoxHealth Branson Pain/Neurology) | Telephone: 417-335-7222 Fax: | Specialty: epidurals, spinal injections, trigger points |
| Address: 121 Cahill Rd, Suite 204, Branson, MO 65616 | | Dates Seen: 10/6/2010 - |
| Physical Therapy Services: Cox Health Branson Orthopedic, Neurology & Spine | Telephone: 417-335-7274 Fax: 417-335-7105 | Specialty: Physical Therapy |
| Address: 121 Cahill Rd, Suite 101, Branson, MO 65616 | | Dates Seen: 10/24/12 11/2012 - 01/2012 11/26/12 10/7/2010 - |

The Above statements are true to the best of my knowledge & belief. I have read & understand the attached Fraud Warning statements.

X _Jamie Flanagan_
Signature of Employee

_11/10/2013_
Date

11/18/2013 09:30 4173361197 DONALD HOPEWELL MD PAGE 07/07



The Lincoln National Life Insurance Company, PO Box 2609, Omaha, NE 68103-2609
toll free (800) 423-2765 Fax (877) 843-3950
www.LincolnFinancial.com

## GROUP LONG-TERM DISABILITY CLAIM APPLICATION



## EMPLOYEE – form completion information

### APPLICATION FOR GROUP LTD – Instructions

A. **Complete and sign the authorization on the reverse side of this page.** This will allow our insurance carrier or their representative to secure additional information (if necessary) to make a decision on your request for benefit payments (do not detach).

B. **Complete employee claim statement in full.**

    **Attach**  •  A copy of Social Security and other income entitlement awards (or forward when received)

C. **Give this authorization and attached claim application to the physician treating you** (if more than one, obtain other forms for completion from employer). Instruct your attending physician to send his statement along with yours to the insurance carrier.

D. When those forms are received by the Insurance Company, they will advise you of your eligibility for benefits or of any additional information that may be needed.

*Do Not Detach*

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
GLC-01252

Page 6 of 14
12/10

11/18/2013 09:21   41733611917   DONALD HOPEWELL MD   PAGE 01/54



**Lincoln**
**Financial Group®**

The Lincoln National Life Insurance Company, PO Box 2609, Omaha, NE 68103-2609
toll free (800) 423-2765   Fax (877) 843-3950
www.LincolnFinancial.com

## AUTHORIZATION FOR RELEASE OF INFORMATION

1. I (the undersigned) authorize any physician, medical professional, pharmacist or other provider of health care services, hospital, clinic, other medical or medically related facility; insurance or reinsurance company; government agency; department of labor; acquaintance; group policyholder; employer; or policy or benefit plan administrator to release information from the records of:

Claimant/Patient Name: __Flanagan__ __Jamie__ __Sue__
　　　　　　　　　　　　　　(Last)　　　　　　　　(First)　　　　　　　(Middle)

Date of Birth ███████████　　　　　Social Security Number ███████████

2. Information to be released:

   - data or records regarding my medical history, treatment, prescriptions, consultations (including medical and psychological reports, records, charts, notes (excluding psychotherapy notes), x-rays, films or correspondence, and any medical condition I may now have or have had];

   - any information regarding insurance coverage; and

   - any information, data or records regarding my activities (including records relating to my Social Security, Workers' Compensation, Retirement Income, financial, earnings and employment history).

3. Information to be released to:　　The Lincoln National Life Insurance Company
　　　　　　　　　　　　　　　　　PO Box 2609
　　　　　　　　　　　　　　　　　Omaha, NE 68103-2609

4. I understand the information obtained by use of this Authorization will be used by The Lincoln National Life Insurance Company ("Company") to evaluate my claim for disability benefits. The Company will only release such information:

   - to its reinsurer, or other persons or organizations performing business or legal services in connection with my claim(s); or

   - to a vendor, approved by the company, which specializes in the application for Social Security Disability Benefits

   - to vendors/consultants providing the claimant with wellness, disability or leave related services as part of an employer sponsored benefit plan

   - to the employer for self-insured disability plans; or

   - as otherwise may be required by law or as I may further authorize.

   I further understand that refusal to sign this Authorization may result in the denial of benefits.

5. I understand the information used or disclosed may be subject to re-disclosure by the recipient and may no longer be protected by the federal HIPAA Privacy Rule. For Colorado claims, the disclosed information may **not** be redisclosed or reused by the recipient under Colorado law.

6. I understand that I may revoke this Authorization in writing at any time, except to the extent:

   1. the Company has taken action in reliance on this Authorization; or

   2. the Company is using this Authorization in connection with a contestable claim.

   If written revocation is not received, this Authorization will be considered valid for a period of time not to exceed 24 months from the date of my signature below. To initiate revocation of this Authorization, direct all correspondence to the Company at the above address.

7. A photocopy of this Authorization is to be considered as valid as the original.

8. I understand I am entitled to receive a copy of this Authorization.

SIGNATURE: _Jamie Sue Flanagan_　　　　　　　　DATE: _11/10/2013_
Claimant/legal representative (Nearest relative, legal guardian, or appointed representative to sign only if claimant/patient is a minor, legally incompetent, or deceased.) Power of attorney or guardianship must be attached.

PRINT NAME: _Jamie Sue Flanagan_

Relationship to Claimant/Patient of personal/legal representative signing for Claimant/Patient: _Self_

ADDRESS: _986 S Hedge Drive._　　　　　　　　PHONE NO: _417-459-5879_
　　　　　　(Street)

_Nixa_　　　　　　　　_MO_　　　　　_65714_
(City)　　　　　　　　　(State)　　　　　(Zip Code)

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.　　　　Disability　　Page 7 of 14
GLC-01252　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　12/10

**Long-Term Disability Claim Employee's Statement**

To Be Completed By The Employee

**A. Information about you**

| Last Name | First | Middle Initial |
|---|---|---|
| Flanagan | Jamie | S |

| Address | City | State/Province | Zip |
|---|---|---|---|
| 986 S Hedge Dr | Niya | MO | 65714 |

| Telephone | Social Security Number |
|---|---|
| 417-459-5879 | ▮ |

| Date of Birth (Month, Day, Year) | Height | Weight | ☒ R't Handed ☐ L't Handed | ☐ Male ☒ Female | ☐ Single ☒ Married | ☐ Widowed ☐ Divorced |
|---|---|---|---|---|---|---|
| ▮ | 5'4½" | 12# | | | | |

Employer (last person if applicable): Cox Medical Center Branson

Occupation: Nurse Practitioner

**B. Information about your family (required to determine your eligibility for Social Security benefits)**

Spouse's Name (Last, First): Flanagan, Jason

| Spouse's Social Security Number | Date of Birth (Month, Day, Year) | Is your spouse employed? |
|---|---|---|
| ▮ | ▮ | ☒ Yes ☐ No |

**New Jersey.** Any person who knowingly files a statement of claim containing any false or misleading information is subject to criminal and civil penalties.

**FRAUD NOTICES. For your protection, certain states require that the following notices appear on this form.**

**Alaska.** A person who knowingly and with intent to injure, defraud, or deceive an insurance company files a claim containing false, incomplete or misleading information may be prosecuted under state law.

**Arizona.** For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

**Arkansas, Louisiana, Rhode Island and West Virginia.** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**California.** For your protection California law requires the following to appear on this form: Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**Colorado.** It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**Delaware.** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

**District of Columbia.** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

**Florida.** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

**Idaho.** Any person who knowingly, and with intent to defraud or deceive any insurance company, files a statement or claim containing any false, incomplete or misleading information is guilty of a felony.

**Indiana.** A person who knowingly and with intent to defraud an insurer files a statement of claim containing any false, incomplete, or misleading information commits a felony.

**Kentucky.** Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**Maine.** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**Maryland.** Any person who knowingly and willfully presents a false or fraudulent claim for payment of a loss or benefit or knowingly and willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Minnesota.** A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

**New Hampshire.** Any person who, with a purpose to injure, defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638:20.

GLC-01252

## E. Information about physicians and hospitals

First medical attention for the current disability was given by (complete below):

| Doctor's Name | Telephone: 417-385-7222 | Specialty |
|---|---|---|
| Dr. Diane Cornelison, DO | Fax: 417-385-7224 | Neurology & Pain Management |
| Address (Street, City, State, Zip) | | Dates Seen |
| 121 Cahill Rd Suite ___ Branson, MO 65616 | | 10/06/2010 to 04/25/2013 |

List all other physicians and hospitals you have seen for this condition:

| Doctor's Name | Telephone: 417-885-3888 | Specialty |
|---|---|---|
| Dr. Charles Mace, MD | Fax: | Neurosurgery |
| Address (Street, City, State, Zip) | | Dates Seen |
| 2900 S National Ave, Springfield, MO 65804 | | 11/17/2010 To 9/12/2012 – still have open chart |

| Doctor's Name | Telephone: 417-336-1181 | Specialty |
|---|---|---|
| Dr. Donald Hopewell | Fax: 417-336-1197 | Neurology & Pain Management |
| Address (Street, City, State, Zip) | | Dates Seen |
| 500 W Main, Suite 205B    Branson, MO 65804 65616 | | 06/06/2011 To Current Pending appts |

| Doctor's Name | Telephone: 417-269-8226 | Specialty |
|---|---|---|
| Dr. Wayne Wallender, DO | Fax: | Anesthesia & Pain Management |
| Address (Street, City, State, Zip) | | Dates Seen |
| 1011 E Montclair St, Springfield, MO 65804 | | 08/15/2013 To 10/17/2013 |

| Hospital | Telephone: 417-335-7000 | Specialty |
|---|---|---|
| Cox Medical Center Branson (at time of treatment) | Fax: | Community Hospital |
| Address (Street, City, State, Zip) | | Dates of Confinement |
| 525 Branson Landing Blvd    Branson, MO 65616 | | 04/01/2011 To 04/04/2011 |

Have you ever had the same or a similar condition in the past?
☐ Yes ☒ No  If yes, complete the following concerning your past treatment:

| Doctor's Name | Telephone: | Specialty |
|---|---|---|
| N/A | Fax: | |
| Address (Street, City, State, Zip) | | Dates Seen |
| | | To |
| Hospital | Telephone: | Specialty |
| | Fax: | |
| Address (Street, City, State, Zip) | | Dates of Confinement |
| | | To |

## F. Information about other disability income

(Check the other income benefits you are receiving or are eligible to receive as a result of your disability and complete the information requested.)

| Source of Income | Amount | (wk., mon.) | Date claim was filed | Date payments began | Date payments ended |
|---|---|---|---|---|---|
| Social Security Retirement | $ N/A | / | | | |
| Social Security Disability/Yourself | $ | / | | | |
| Social Security Disability/Dependents | $ | / | | | |
| Canadian Pension Plan | $ | / | | | |
| Workers' Compensation | $ | / | | | |
| State Disability | $ | / | | | |
| Pension/Retirement | $ | / | | | |
| Pension/Disability | $ | / | | | |
| Short Term Disability | $ | / | | | |
| Unemployment | $ | / | | | |
| No-Fault Insurance | $ | / | | | |
| Railroad Retirement | $ | / | | | |
| Other (include individual or group benefits): | $ | / | | | |

## G. Information about income tax withholding

If your request for benefits is approved, should The Lincoln National Life Insurance Company withhold income taxes from your benefit checks?
☒ Yes ☐ No  If yes, how much should be withheld from each check. Federal taxes (minimum is $88.00 per month) $ 100 .00

## H. Signature (Required for all claims)

Under what other The Lincoln National Life Insurance policies are you currently covered?

The above Statements are true and complete to the best of my knowledge and belief. I have read and understand the attached Fraud Warning statements.

X Jamie Flanagan                          11/10/2013
Signature of Employee                     Date

GLC-01252

Page 11 of 14
12/10

Case 3:17-cv-05060-MDH   Document 33-4   Filed 05/15/18   Page 126 of 269   LIN00921

Please See Attached Sheet

| tor's Name: eth Knox, FNP (collaborates with Dr. Peter Marcellus, MD) | Telephone: 417-348-0968 or 417-335-8964 Fax: 417-336-0875 | Specialty: Family Practice |
| dress: 450 State Highway 248 Suite 202, Branson MO 65616 | Dates Seen: 10/01/2010 to current | |
| tor's Name: trine Winkler, MD | Telephone: 417-348-8253 Fax: 417-337-8992 | Specialty: Rheumatology |
| dress: 21 Cahill Rd. Suite 205, Branson, MO 65616 | Dates Seen: 09/06/2012 to current | |
| octor's Name: Slady Jacob, MD | Telephone: 417-335-7222 Fax: 417-335-7324 | Specialty: Neurology |
| ddress: 21 Cahill Rd, Suite 204, Branson MO 65616 | Dates Seen: 10/22/2010 (EMG appt) | |
| octor's Name: Thomas Woodward, MD | Telephone: Contact Cox Medical Center 417-335-7000 → Fax: Has left the System. | Specialty: Internal Medicine |
| dress: Cox Health 245 Branson Landing Blvd, Branson MO 65616 | Dates Seen: 10/19/2010 - 01/19/2011 | |
| octor's Name: Dr. Barbara Bradovanovich, PhD | Telephone: 417-269-5509 Fax: 417-269-5595 | Specialty PHD-Pain Psych Services |
| ddress: Cox Health Psychological Services, Wheeler Heart & Vascular Center. Suite 110, Springfield, MO 65807 | Dates Seen: 2/20/2013 | |
| ospital's Name: Skaggs Pain Center (Cox Health Branson Pain? Neurology) | Telephone: 417-335-7222 Fax: | Specialty: Epidurals, spinal injections trigger points? |
| ddress: 21 Cahill Rd. Suite 204, Branson, MO 65616 | Dates Seen: 10/6/2010 - | |
| Physical Therapy Services: Cox Health Branson Orthopedic, Neurology & Spine. | Telephone: 417-335-7274 Fax: 417-335-7105 | Specialty: Physical Therapy |
| ddress: 121 Cahill Rd, Suite 101, Branson, MO 65616 | Dates Seen: 10/24/12 11/2013 - 01/2012 11/26/12 10/7/2010 - | |

The Above statements are true to the best of my knowledge & belief. I have read & understand the attached Fraud Warning statements.

X _Jamie Flanagan_
Signature of Employee

_11/10/2013_
Date

PAGE 05/54     DONALD HOPEWELL MD     4173361197     21:60  ɛ10Z/81/11

# Long-Term Disability Claim Physician's Statement

This form should be completed by the physician who was treating the claimant when he or she last worked.

To Be Completed By The Attending Physician

### A. General Information

This claim is for (Patient's Name)

Jamie Sue Flanagan

| Patient's Social Security Number | Height | Weight | Blood Pressure | Date of Birth (Month, Day, Year) |
|---|---|---|---|---|
| ▓▓▓▓▓▓▓▓ | 65 | 112 | 100/68 | ▓▓▓▓▓▓▓ |

Primary Diagnosis including ICD 9 or DSM code

Post Lami Syndrome lumbar 722.83 — Spinal stenosis 724.01 — 338.4  pain

### B. Complete this section for normal pregnancy, then go to section E.

| What was the date of the last menstrual period? | What is the expected date of delivery? |
|---|---|
| N/A | |

| What is the expected length of postpartum recovery? | What was the first date of treatment? | What was the last date of treatment? |
|---|---|---|
| | | |

### C. Complete this section for all conditions except normal pregnancy.

Symptoms  Low back pain & pain spread into lower extremities

Objective Findings  Normal physical exam, X-rays, CT myelogram & MRI - Spondylolisthasis & failed fusion and nerve root scarring

Are there secondary conditions contributing to the disability?
☐ Yes ☒ No  If yes, what are they? (Please include ICD 9 or DSM code.)

| If this is a cardiac condition, what is the functional capacity? (American Heart Association) | ☐ Class 1 - No limitation <br> ☐ Class 2 - Slight limitation | ☐ Class 3 - Marked limitation <br> ☐ Class 4 - Complete limitation |
|---|---|---|

| When did symptoms first appear? Constant since ca 8/2010 | Date of the patient's first visit (Month, Day, Year) 10/16/2010 | Date you believe the patient was first unable to work (Month, Day, Year) 1/1/2013 |
|---|---|---|

| Date of the patient's last visit (Month, Day, Year) 10/31/13 | How often do you see the patient? Every 3 months |
|---|---|

Is the patient's condition work related?
☐ Yes ☒ No  If yes, explain:

Has the patient undergone surgery?
☒ Yes ☐ No  If yes, give date, procedure and result.
Failed lumbar fusion    4/1/11

If no, do you expect surgery to be performed in the future?
☐ Yes ☒ No  If yes, give date and type of surgery.

What medication is the patient currently taking?

Please indicate other types and frequencies of treatment.
Epidurals / PT

Has the patient been referred to a medical rehabilitation or therapy program?
☒ Yes ☐ No  If yes, give details.  No benefit

Have you referred the patient for other types of consultations?
☒ Yes ☐ No  If yes, give details.  Spinal Cord stimulator placement—failed

Has the patient been hospital confined?
☐ Yes ☒ No  If yes, complete the following:

Name of Hospital

| Address | Dates of Confinement through |
|---|---|

GLC-01252

Page 12 of 14
12/10

**D. Information about the patient's inability to work**

Briefly describe restrictions and limitations.

Pain increases through the day (work - unable to control ⊂ pain meds

Restrictions (What the patient SHOULD NOT do)

Work ⊂ unlimited ability to rest/take breaks

Limitations (What the patient CANNOT do)

Same

What is your prognosis for recovery?

This will progress over time

Has patient achieved maximum medical improvement?
☒ Yes ☐ No   If no, complete the following:

How soon do you expect fundamental changes in the patient's medical condition?
☐ 1 - 2 months          ☐ 5 -6 months
☐ 3 - 4 months          ☐ more than 6 months

Give details concerning expected improvement or deterioration:

In an eight hour workday, claimant can: (Circle full hourly capacity for each activity),

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sit | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| Stand | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| Walk | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |

Are there restrictions in:

| | Yes | No | Comments |
|---|---|---|---|
| Lifting/Carrying | ☐ | ☐ | |
| Use of hands in repetitive actions | ☐ | ☐ | |
| Use of feet in repetitive movements | ☐ | ☐ | |
| Bending | ☐ | ☐ | |
| Squatting | ☐ | ☐ | |
| Crawling | ☐ | ☐ | |
| Climbing | ☐ | ☐ | |
| Reaching above shoulder level | ☐ | ☐ | |
| Other (please specify) | ☐ | ☐ | |

Unquatifiable

When do you expect claimant to return to prior level of functioning?   Never

Would you recommend vocational rehabilitation for this patient?
☒ Yes ☐ No

Has your patient had loss of cognitive functioning? "Cognitive impairment" means a permanent deterioration or loss of cognitive or intellectual capacity and requires another person's hands-on help or verbal cues to prevent harm to self or others due to impairment
☐ Yes ☒ No   If yes, please explain and provide supporting medical documentation and testing:

Based on your observations of this patient, medical history and condition, has your patient lost the ability to safely and completely perform Activities of Daily Living (ADLs) without another person's active hands-on help with all or most of the activity:

ADL          Date on which assistance was first required and received
☐ Bathing_____ (washing self in tub. shower or by sponge bath, with or w/o equipment)
☐ Dressing_____ (putting on, taking off garments, braces or any artificial limbs normally worn)
☐ Toileting_____ (getting to, from, on and off toilet; and performing related personal hygiene)
☐ Transferring_____ (moving in & out of bed, chair or any wheelchair, with or w/o equipment)
☐ Continence_____ (voluntarily maintaining control of bladder and bowel function)
☐ Eating_____ (getting nourishment into one's body by any means (table/tray or special equipment)

If the claimant has lost the ability to perform ADLs listed above, please provide any supporting medical documentation and testing.

If the patient has lost the ability to perform any ADLs listed above, do you expect the limitations to be permanent?
☐ Yes ☐ No   If "no", please explain when improvement may be expected:

11/18/2013 09:21   4173361197   DONALD HOPEWELL MD   PAGE 07/54

**E. Required Attachments and Signature**

After you have fully completed this form, attach copies of the following materials:
- Office notes for the period of treatment for the last two years
- Test results showing objective findings
- Hospital discharge summaries
- Consulting physician reports

Your Name _Donald K Hopewell_    Degree _MD_

Specialty _Neurology & Pain_    Telephone: _417 336-1181_
                                Fax: _417 336-1147_

Address _500 W. Main    Branson, MO    65616_

X _____    _11/17/13_
Signature of Attending Physician (no stamp)    Date

PAGE 08/54        DONALD HOPEWELL MD        4173361197    09:21    11/18/2013

## Springfield Neurological & Spine Institute
2900 South National Ave   Springfield, MO 65804
(417) 885-3888   Fax: (417) 520-5959

*September 21, 2012*
Page 1
Chart Document

**Jamie S Flanagan**
Female  DOB

87223

Home: (417)459-5879 Work: (417)335-7296
Ins: FMH (120) Grp: SG0000

**09/19/2012 – Office Visit: Follow up**
**Provider: Charles Mace MD**
**Location of Care: Springfield Neurological and Spine Institute**

## Follow up Visit

## History of Present Illness
**Referral source:** Dr. Don Hopewell
**History from:** patient
cc Beth Knox
**Reason for visit:** follow up
**Chief Complaint:** Low back pain, bilat leg pains, neck pain, left shoulder pain
**HPI:** 32 year old female returns today for follow up L5-S1 PLIF 4/1/11 for LBP and leg pains. She continues to report LBP, bilateral lateral leg pain and shin pain , bilateral foot and heel pain that have all been worsening. Also notes burning in toes. Symptoms improved when she stated wearing lumbar brace. Denies leg weakness. Bowel and bladder intact.
Also notes neck pain that will radiate into left shoulder described as shooting pain. Denies pain past the shoulder. Pain worse with certain movements. Denies changes in fine or gross motor control.
**Treatments:** pain medications, NSAIDs, heat, ice

## Pertinent Medical Findings
neck pain, left shoulder pain
LBP, various bilat LE symptoms, L LSR= leg pains

## Physical Exam
**Appearance:** well developed, well nourished, no acute distress

**Peripheral Vascular**
**Inspection/palpation:** Normal, except as otherwise specified.

**Gait and Station**
**Inspection:** Normal, except as otherwise specified.

**Head and Neck**
**Insp/percuss/palp:** Normal, except as otherwise specified.
**Range of motion:** no limitations
**Stability:** no subluxation or laxity
**Musc strength/tone:** normal strength and tone
**Skin/subcutaneous:** Normal, except as otherwise specified.

**Spine, Ribs, Pelvis**
**Insp/percuss/palps:** Normal, except as otherwise specified.
**Stability:** no subluxation or laxity
**Musc strength/tone:** Normal tone and strength

**Springfield Neurological & Spine Institute**
2900 South National Ave   Springfield, MO 65804
(417) 885-3888  Fax: (417) 520-5959

*September 21, 2012*
*Page 2*
*Chart Document*

**Jamie S Flanagan**
Female  DOB [REDACTED]                          87223

Home: (417)459-5879 Work: (417)335-7296
Ins: FMH (120) Grp: SG0000

**Skin and subcutaneous:** healed surgical incision
**Spurling's:** positive left

**Upper Extremities**
**Insp/percuss/palpe:** normal, except as otherwise specified
**Range of motion:** no limitations
**Stability:** normal, except as otherwise specified
**Musc strength/tone:** normal tone and strength
**Skin and subcutaneous:** normal

**Lower Extremities**
**Insp/percuss/palpe:** normal, except as otherwise specified
**Range of motion:** no limitations
**Stability:** normal, except as otherwise specified
**Musc strength/tone:** normal tone and strength
**Skin and subcutaneous:** normal
**Straight Leg Raise:** L= ipsilateral leg pain

**Neurologic**
**Coordination:** normal
**Reflexes:** 2+, symmetric
**Sensation:** intact to touch and pin

**Mental Status Exam**
**Orientation:** oriented to time, place and person
**Mood and affect:** no dysphoria, anxiety, or agitation

**Respiratory**
**Respiratory effort:** Normal, except as otherwise specified.

**Vital Signs**
Ht: 64 in.  Wt: 149 lbs.  P: 64  R: 16  BP: 118/60
BMI: 25.57

**Medication:**
ROBAXIN-750 750 MG TABS (METHOCARBAMOL) 1 by mouth three times per day as needed for pain
Substitution permitted
HYDROCODONE-ACETAMINOPHEN 5-325 MG TABS (HYDROCODONE-ACETAMINOPHEN) 1 or 2 by
mouth every 4-6 hours as needed for pain          Substitution permitted
* PEPCID 20MG TABLETS Take one tablet by mouth twice a day while taking steroid.
AVINZA XR24H-CAP (MORPHINE SULFATE BEADS XR24H-CAP)
SOMA 350 MG TABS (CARISOPRODOL)
PROTONIX 40 MG PACK (PANTOPRAZOLE SODIUM)
MIRALAX POWD (POLYETHYLENE GLYCOL 3350)
WELLBUTRIN TABS (BUPROPION HCL TABS)

**Allergies:**
* AMBIEN (Critical)

**Springfield Neurological & Spine Institute**
2900 South National Ave   Springfield, MO 65804
(417) 885-3888  Fax: (417) 520-5959

*September 21, 2012*
*Page 3*
*Chart Document*

**Jamie S Flanagan**
Female  DOB:                              87223

Home: (417)459-5879 Work: (417)335-7296
Ins: FMH (120) Grp: SG0000

\* LUNESTA (Critical)
ADHESIVE TAPE (Moderate)
DARVOCET (Mild)

**Risk Factors**
**Smoke status:** former smoker
**year started:** 2000    **yr quit:** 2003
**cigarette packs/day:** .25    **pack-years:** 0.75
**cigars/pipes per wk:** 0    **chewing cans per week:** 0    **Passive smoke exposure:** no
**Alcohol use:** Social only: Wine, mixed drinks. Never more than 1-2. Usually once per month
**Caffeine use:** I drink 1-2 diet sodas per day
**Drug use:** none
**HIV high risk behavior:** no
**Exercise (times/week):** 5    **Exercise type:** stretching and PT home exercises
**Seat belt use(%):** 100    **Sun exposure:** occasionally

**Review of imaging:** lumbar CT at Skags- CD shows no confluent bone at L5-S1,   cage and screws look fine,  progressive endplate sclerosis

cervical MRI shows left C5-6 disc herniation

**Impression**

Ongoing Problems:
THORACIC/LUMBOSACRAL NEURITIS/RADICULITIS UNSPEC (ICD-724.4)
LUMBAGO (ICD-724.2)
LUMBAGO (ICD-724.2)
SPONDYLOLISTHESIS, ACQUIRED (ICD-738.4)
STENOSIS, LUMBAR SPINE (ICD-724.02)
LUMBAR RADICULOPATHY (ICD-724.4)

C5-6 left soft disc herniation with radicular pain into left upper arm and Spurlings sign.  Try PT and traction and if no better then consider ACDF.  May be spinal stimulator candidate long term

History of L5-S1 PLIF 18 months ago with progressive mechanical back pain and some L5 and S1 radicular symptoms that are quite problematic.  Perhaps L5-S1 pseudarthrosis. Will check myelogram and consider re-exploration

**Springfield Neurological & Spine Institute**
2900 South National Ave   Springfield, MO 65804
(417) 885-3888  Fax: (417) 520-5959

*September 21, 2012*
*Page 4*
Chart Document

**Jamie S Flanagan**
Female  DOB:

87223

Home: (417)459-5879 Work: (417)335-7296
Ins: FMH (120) Grp: SG0000

**Plan**

**Follow-up Plans:**
FU RTC per schedule
RTC: after myelo

**CT MYELO F/E / Recons**
CT Myelo Cervical, Lumbar

**Treatment:**
Physical Therapy: Home Program, Home Tx (Cervical), Strengthening, ROM
PT times per week: 3 PT number of weeks: 3

Clinical Visit Summary handout printed and given to patient.

**Electronically Signed by Charles Mace MD on 09/19/2012 at 11:51 AM**

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB: ███████  MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

**01/09/2013 - Imaging Report: XR SPINE LUMBAR  MIN 6 VIEWS**
**Provider: Diane L Cornelison DO,**
**Location of Care: CoxHealth Branson Clinics**

```
XR SPINE LUMBAR  MIN 6 VIEWS
                SKAGGS COMMUNITY HEALTH CENTER
                      PO Box 650
                  Branson,  MO    65615
          Phone  (417)  272-8911        Fax:  (417)  335-7455

                    - CONSULTATION REPORT -
Patient Name: FLANAGAN, JAMIE S
MRN: 42-06-80
DOB:
Sex: F
Ordering MD: CORNELISON, DIANE L
Referring MD: CORNELISON, DIANE L
Procedure: XR SPINE LUMBAR  MIN 6 VIEWS
Account No.: 25938515

Clinical History
Postlaminectomy syndrome lumbar region

Findings
Seven views of the lumbar spine with flexion and extension show prior
surgical changes of posterior lumbar interbody fusion at L5-S1. The
pedicle screws and posterior fixation rods and cross link appear
intact.

Interbody bone cage appears well positioned within the disc space.
There is anterolisthesis of L5 on S1.  These findings are all
concordant with the previous examination of 2 November 2012. Flexion
and extension show no evidence of segmental instability.

Impression

    1. Postsurgical changes of posterior lumbar interbody fusion at
L5-S1.
    2. Four pars defects with grade 2 spondylolisthesis.  Operative
appearance not substantially different than 2 November 2012.  No
interval change and no evidence of instability.

Dictated by: ANTHONY L WHEELER    01/09/2013 07:24 PM
Transcribed By : JUSTUS, DIANE TRANSCRIPTION    01/09/2013 07:24 PM
 Approved by:ANTHONY L WHEELER    01/09/2013 07:24 PM
```

**Electronically Signed by Diane L Cornelison DO, on 01/10/2013 at 1:25 PM**

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B BRANSON, MO 65616
417-336-1181 Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB[REDACTED]MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

**12/28/2012 - Imaging Report: MR SPINE LUMBAR WITH AND WITHOUT CONTRAST**
*Provider: Diane L Cornelison DO,*
**Location of Care: CoxHealth Branson Clinics**

```
MR SPINE LUMBAR WITH AND WITHOUT CONTRAST
                 SKAGGS COMMUNITY HEALTH CENTER
                        PO Box 650
                     Branson,  MO    65615
             Phone  (417)  272-8911     Fax:  (417)  335-7455

                     - CONSULTATION REPORT -
Patient Name: FLANAGAN, JAMIE S
MRN: 42-06-80
DOB: [REDACTED]
Sex: F
Ordering MD: CORNELISON, DIANE L
Referring MD: CORNELISON, DIANE L
Procedure: MR SPINE LUMBAR WITH AND WITHOUT CONTRA
Account No.: 25906678

Clinical History
Post laminectomy syndrome lumbar region.


Technique
Multiplanar, multisequence images performed without and with
contrast.  Contrast Agent Omniscan 287 mg/mL 15 mL 12/28/2012
intravenously.


Findings
Vertebral body heights are well maintained.  There is no abnormal
signal intensity or lesions in the vertebral bodies.

The conus terminates normally at the T12-L1 level.

T12-L1, L1-L2, L2-L3, and L3-L4 are unremarkable.

L4-L5 shows generalized disc bulging.  There is an asymmetric lateral
component of disc bulging on the left and there is facet arthrosis
that produces moderate neural foraminal narrowing on the left.  On
the right, there is facet arthrosis and these changes produce
moderate to severe right neural foraminal narrowing.  The central
canal is patent.

L5-S1 shows a grade 1-2 anterolisthesis of L5 on S1 secondary to
bilateral pars intra-articularis defects.  There are postsurgical
changes of posterior lumbar interbody fusion at L5-S1.

The interbody bone cage appears well within the disc space and is
unchanged from a remote study of May 27, 2011.

The pedicle screws appear overall adequately positioned.  No
substantial neural foraminal narrowing or central canal stenosis.
```

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

*November 18, 2013*
Page 2
Chart Document

**JAMIE SUE FLANAGAN**
Female  DOB:          MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

At the operative level, there is a moderate amount of enhancing
posterior scar tissue present.  In addition, it extends around both
sides of the thecal sac as well as appears to involve the descending
left S1 root, which shows abnormal enhancement.  Neural foramina
overall are grossly patent.  The central canal is patent.


Impression
Postsurgical changes of posterior lumbar interbody fusion at L5-S1
secondary to pars defects at L5 and grade 2 spondylolisthesis.  There
is extensive evidence of postoperative fibrosis in the posterior
operative bed extending along the right and left lateral margins of
the thecal sac and extending anteriorly on the left to involve the S1
nerve root.

Dictated by: ANTHONY L WHEELER     12/28/2012 05:06 PM
Transcribed By : HOUSTON, SUSAN TRANSCRIPTIONIST     12/28/2012 05:06 PM
 Approved by:ANTHONY L WHEELER     12/28/2012 05:06 PM


**Electronically Signed by Diane L Cornelison DO, on 12/31/2012 at 1:34 PM**

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**                    Home: (417)459-5879 Work: (417)335-7361
Female  DOB: ███████  MRN: 42-06-80

**12/28/2012 - Imaging Report: MR SPINE THORACIC WITHOUT CONTRAST**
**Provider: Diane L Cornelison DO,**
**Location of Care: CoxHealth Branson Clinics**

```
MR SPINE THORACIC WITHOUT CONTRAST
                    SKAGGS COMMUNITY HEALTH CENTER
                            PO Box 650
                        Branson,   MO     65615
            Phone   (417)   272-8911        Fax:  (417)   335-7455

                    - CONSULTATION REPORT -
Patient Name: FLANAGAN, JAMIE S
MRN: 42-06-80
DOB: ██████████
Sex: F
Ordering MD: CORNELISON, DIANE L
Referring MD: CORNELISON, DIANE L
Procedure: MR SPINE THORACIC WITHOUT CONTRAST
Account No.: 25906678

Clinical History

spinal stenosis of thoracic region

Technique
Standard non-contrast MRI.


Findings


Axial images through the thoracic spine with sagittal coronal
reconstructions.  Examination is no evidence of central canal
stenosis.  All discs are preserved vertebral body heights are
preserved.  No evidence of neural foraminal narrowing.

Impression


Normal MRI of the thoracic spine.

Dictated by: RICHARD S MAKUCH    12/28/2012 02:42 PM
Transcribed By : MAKUCH, RICHARD S    12/28/2012 02:42 PM
 Approved by:RICHARD S MAKUCH    12/28/2012 02:42 PM
```

**Electronically Signed by Diane L Cornelison DO, on 12/31/2012 at 1:34 PM**

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

*November 18, 2013*
Page 1
Chart Document

**JAMIE SUE FLANAGAN**
*Female  DOB:* ████████ *MRN: 42-06-80*

Home: (417)459-5879 Work: (417)335-7361

**11/02/2012 - Imaging Report: CT SPINE LUMBAR SPINE WITH CONTRAST MYELO**
**Provider: Electronic Signature**
**Location of Care: CoxHealth Branson Clinics**

```
CT SPINE LUMBAR SPINE WITH CONTRAST MYELO
                SKAGGS COMMUNITY HEALTH CENTER
                        PO Box 650
                    Branson,   MO    65615
          Phone  (417)  272-8911        Fax:  (417)  335-7455

                    - CONSULTATION REPORT -
Patient Name: FLANAGAN, JAMIE S
MRN: 42-06-80
DOB: ███████████
Sex: F
Ordering MD: MACE, J CHARLES
Referring MD: MACE, J CHARLES
Procedure: CT SPINE LUMBAR SPINE WITH CONTRAST MYE
Account No.: 25613282
```

Clinical History
Cervical radiculopathy, lumbar radiculopathy.

Findings
Vertebral body heights are well maintained.  No obvious acute
fracture, subluxation, or malalignment.

The conus has a normal morphology and terminates at T12-L1.

T12-L1, L1-L2, L2-L3, and L3-L4 are unremarkable.

At L4-L5, there is posterior disc bulging.  No obvious canal stenosis
and there is moderate left and mild right neural foraminal narrowing.

L5-S1 shows prior postsurgical changes of posterior lumbar interbody
fusion.  There is a grade 1-2 spondylolisthesis of L5 on S1 secondary
to pars defects and the extent of spondylolisthesis is not
substantially changed since the postoperative MRI of May 27, 2011.

In the operative bed, there is a substantial amount of anterior
epidural soft tissue.  This certainly appears to involve the region
of the nerve roots of L5 and S1.

The pedicle screws and posterior fixation rods are intact.

The interbody bone cage appears well positioned within the disc space
and is not substantially changed, however, there does appear to have
been some increase in the erosion of the posterior aspect of the L5
vertebral body in comparison to the remote study of December 16,
2011.  There does appear to be some persistent lucency around the
margin of the bone cage.  The extensive endplate sclerosis is not
changed.

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB: ███████  MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

Impression

    1. Prior changes of posterior lumbar interbody fusion at L5-S1
secondary to pars defects.
    2. Stable anterolisthesis compared to remote studies.  The more
extensive endplate sclerosis and the persistent lucency around the
bone cage as well as some increased in erosion of the posterior
aspect of the L5 vertebral body could represent evidence of disc
space instability.
    3. Anterior epidural soft tissue at the operative level
suggesting an extensive postoperative fibrosis.  MR scan with
contrast is suggested as followup.

Dictated by: ANTHONY L WHEELER    11/05/2012 08:08 AM
Transcribed By : HOUSTON, SUSAN TRANSCRIPTIONIST    11/05/2012 08:08 AM
 Approved by:ANTHONY L WHEELER    11/05/2012 08:08 AM


**Electronically Signed by Electronic Signature on 11/05/2012 at 8:45 AM**

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
*Female* DOB: ███████  MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

**11/02/2012 - Imaging Report: CT SPINE CERVICAL WITH CONTRAST MYELO**
**Provider: Electronic Signature**
**Location of Care: CoxHealth Branson Clinics**

```
CT SPINE CERVICAL WITH CONTRAST MYELO
               SKAGGS COMMUNITY HEALTH CENTER
                       PO Box 650
                   Branson,  MO   65615
           Phone  (417)  272-8911       Fax:  (417)  335-7455

                  - CONSULTATION REPORT -
Patient Name: FLANAGAN, JAMIE S
MRN: 42-06-80
DOB: ███████
Sex: F
Ordering MD: MACE, J CHARLES
Referring MD: MACE, J CHARLES
Procedure: CT SPINE CERVICAL WITH CONTRAST MYELO
Account No.: 25613282

Clinical History
Cervical radiculopathy, lumbar radiculopathy

Technique
Axial images with sagittal and coronal reformations.


Findings
Axial images with sagittal and coronal reformations following the
intrathecal injection of 12 mL of Omnipaque 240 mg/mL.

The skull base is unremarkable.

C1-C2 articulation appears intact.

C2-C3, C3-C4 and C4-C5 appear unremarkable.

C5-C6 shows a small left paracentral asymmetric disc bulge.  No
obvious central canal stenosis.  No neural foraminal narrowing. This
is smaller than MRI of July 2012.

C6-C7 shows very minimal slightly right paracentral disc protrusion.
No central canal stenosis or neural foraminal narrowing.

C7-T1 and T1-T2 are unremarkable.

Impression

     1. Mild degenerative changes C5-C6 and C6-C7.  No obvious cord
compression.  No obvious neural foraminal narrowing or nerve root
compression.
     2. The disc present at C5-C6 appears to have decreased in size
since previous cervical MRI of 10 July 2012.

Dictated by: ANTHONY L WHEELER    11/02/2012 05:05 PM
```

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

## JAMIE SUE FLANAGAN
*Female  DOB:*　　　　　*MRN: 42-06-80*

Home: (417)459-5879 Work: (417)335-7361

Transcribed By : JUSTUS, DIANE TRANSCRIPTION    11/02/2012 05:05 PM
 Approved by:ANTHONY L WHEELER    11/02/2012 05:05 PM

**Electronically Signed by Electronic Signature on 11/05/2012 at 7:12 AM**

Case 3:17-cv-05060-MDH    Document 33-4    Filed 05/15/18    Page 142 of 269    LIN00937

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB: ███████  MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

**11/02/2012 - Imaging Report: XR SPINE LUMBAR 2 OR 3 VIEWS**
**Provider: Electronic Signature**
**Location of Care: CoxHealth Branson Clinics**

```
XR SPINE LUMBAR 2 OR 3 VIEWS
                SKAGGS COMMUNITY HEALTH CENTER
                        PO Box 650
                    Branson,  MO    65615
            Phone  (417)  272-8911      Fax:  (417)  335-7455

                  - CONSULTATION REPORT -
Patient Name: FLANAGAN, JAMIE S
MRN: 42-06-80
DOB: ████████
Sex: F
Ordering MD: MACE, J CHARLES
Referring MD: MACE, J CHARLES
Procedure: XR SPINE LUMBAR 2 OR 3 VIEWS
Account No.: 25613282

Clinical History
Cervical radiculopathy, lumbar radiculopathy

Findings
Two views of the lumbar spine with flexion and extension show
vertebral body heights and disc spaces are well maintained.

The patient has posterior lumbar interbody fusion changes at L5-S1.
There is a grade 2 spondylolisthesis of L5 on S1 which is stable and
unchanged dating back to at least October 2011.

The interbody bone cage appears well positioned within the disc
space.  There is no evidence of fracture, subluxation or
malalignment.

Flexion and extension show no evidence of segmental instability.

Impression

    1. Stable appearing changes of posterior lumbar interbody fusion
at L5-S1.
    2. No evidence of segmental instability.

Dictated by: ANTHONY L WHEELER    11/02/2012 05:03 PM
Transcribed By : JUSTUS, DIANE TRANSCRIPTION    11/02/2012 05:03 PM
 Approved by:ANTHONY L WHEELER    11/02/2012 05:03 PM
```

**Electronically Signed by Electronic Signature on 11/05/2012 at 7:12 AM**

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB:█████████  MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

**11/02/2012 - Imaging Report: XR SPINE CERVICAL 2 OR 3 VIEWS**
**Provider: Electronic Signature**
**Location of Care: CoxHealth Branson Clinics**

```
XR SPINE CERVICAL 2 OR 3 VIEWS
                SKAGGS COMMUNITY HEALTH CENTER
                        PO Box 650
                    Branson,  MO    65615
            Phone  (417)  272-8911      Fax:  (417)  335-7455

                    - CONSULTATION REPORT -
Patient Name: FLANAGAN, JAMIE S
MRN: 42-06-80
DOB: ███████████
Sex: F
Ordering MD: MACE, J CHARLES
Referring MD: MACE, J CHARLES
Procedure: XR SPINE CERVICAL 2 OR 3 VIEWS
Account No.: 25613282

Clinical History
Cervical radiculopathy, lumbar radiculopathy

Findings
Two view cervical spine flexion and extension show vertebral heights
and disc spaces well maintained. There is no obvious fracture,
subluxation or malalignment.

Flexion and extension show no evidence of segmental instability.

Soft tissues are unremarkable.

Impression
Negative cervical spine. No flexion or extension instability.

Dictated by: ANTHONY L WHEELER    11/02/2012 05:03 PM
Transcribed By : JUSTUS, DIANE TRANSCRIPTION    11/02/2012 05:03 PM
 Approved by:ANTHONY L WHEELER    11/02/2012 05:03 PM
```

**Electronically Signed by Electronic Signature on 11/05/2012 at 7:12 AM**

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB ▇▇▇▇▇▇  MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

**11/02/2012 - Imaging Report: XR MYELOGRAM COMPLETE**
**Provider: Electronic Signature**
**Location of Care: CoxHealth Branson Clinics**

XR MYELOGRAM COMPLETE
                    SKAGGS COMMUNITY HEALTH CENTER
                              PO Box 650
                          Branson,  MO    65615
             Phone  (417)  272-8911       Fax:  (417)  335-7455

                    - CONSULTATION REPORT -
Patient Name: FLANAGAN, JAMIE S
MRN: 42-06-80
DOB: ▇▇▇▇▇▇
Sex: F
Ordering MD: MACE, J CHARLES
Referring MD: MACE, J CHARLES
Procedure: XR MYELOGRAM COMPLETE
Account No.: 25613282

Clinical History
Cervical radiculopathy, lumbar radiculopathy

Findings
Procedure: Cervical lumbar myelogram.

Following ,explanation of risk and benefits of procedure the patient
elected to proceed.

The patient was placed in a prone oblique position on a fluoroscopic
table and the skin overlying the L2 vertebral body was prepped and
draped in a sterile fashion and infiltrated with lidocaine without
epinephrine.

Under fluoroscopic guidance, a 24-gauge Whitaker needle was advanced
into the thecal sac without difficulty with return of clear cerebral
spinal fluid.

A total of 12 mL of Omnipaque 240 mg/mL was instilled into the thecal
sac without difficulty.

At the conclusion of administration, the needle was then withdrawn
and the skin site was cleaned and covered with a Band-Aid.

There is clearly contrast opacification of the lumbar canal.

The patient was then placed in a prone Trendelenburg position with
opacification of the cervical central canal.

Impression

    1. Successful lumbar and cervical myelogram.
    2. Remote surgical changes of posterior lumbar interbody fusion
at L5-S1 with stable spondylolisthesis of L5-S1, unchanged from 19
October 2011.

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB:████████RN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

Dictated by: ANTHONY L WHEELER     11/02/2012 05:03 PM
Transcribed By : JUSTUS, DIANE TRANSCRIPTION     11/02/2012 05:03 PM
 Approved by:ANTHONY L WHEELER     11/02/2012 05:03 PM

**Electronically Signed by Electronic Signature on 11/05/2012 at 7:12 AM**

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B BRANSON, MO 65616
417-336-1181 Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female DOB:█████████ MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

**09/12/2012 - Imaging Report: CT SPINE LUMBAR WITHOUT CONTRAST**
**Provider: Electronic Signature**
**Location of Care: CoxHealth Branson Clinics**

```
CT SPINE LUMBAR WITHOUT CONTRAST
                SKAGGS COMMUNITY HEALTH CENTER
                        PO Box 650
                    Branson,  MO    65615
            Phone  (417)  272-8911      Fax:  (417)  335-7455

                    - CONSULTATION REPORT -
Patient Name: FLANAGAN, JAMIE S
MRN: 42-06-80
DOB: ███████████
Sex: F
Ordering MD: MACE, RICHARD C
Referring MD: MACE, RICHARD C
Procedure: CT SPINE LUMBAR WITHOUT CONTRAST
Account No.: 25560657
```

Clinical History
Stenosis, lumbar spine radiculopathy, lumbago.

Technique
Axial images with sagittal and coronal reformations.

Findings
T12-L1, L1-L2, L2-L3, and L3-L4 appear grossly normal.

L4-L5 shows some mild disc space narrowing. There is mild generalized disc bulging posteriorly and the changes produce moderate bilateral neural foraminal narrowing at L4-L5.

L5-S1 shows postsurgical changes of posterior lumbar interbody fusion.

The pedicle screws at L5 and S1 appear adequately positioned.

There is a slight anterolisthesis of L5 on S1 and the posterior bone cage appears to extend slightly from the posterior margin of the L5 vertebral body. This appears unchanged. There is endplate sclerosis on both sides of the disc space and this appears to be greater than the previous examination of December 16, 2011. In addition, there does appear to be some lucency along the margin of the bone cage.

There is a large amount of epidural soft tissue mass at the operative level, which may represent extensive scar tissue, somewhat difficult to discern. This also is essentially unchanged.

Impression

1. Postsurgical changes of posterior lumbar interbody fusion at L5-S1. The spondylolisthesis of L5 on S1 appears stable but there is

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B BRANSON, MO 65616
417-336-1181 Fax: 417-336-1197

**JAMIE SUE FLANAGAN**                          Home: (417)459-5879 Work: (417)335-7361
Female  *DOB:* ▓▓▓▓▓▓ *MRN: 42-06-80*

increasing sclerosis of the endplates and lucency around the bone
cage suggesting the possibility of incomplete fusion across the disc
space.
     2. Large amount of epidural soft tissue, which appears to
compromise the level of the thecal sac.  The most likely etiology
would be postsurgical scar tissue and similar changes have been
noticed on previous studies.

Dictated by: ANTHONY L WHEELER    09/12/2012 11:19 AM
Transcribed By : HOUSTON, SUSAN TRANSCRIPTIONIST    09/12/2012 11:19 AM
 Approved by:ANTHONY L WHEELER    09/12/2012 11:19 AM


**Electronically Signed by Electronic Signature on 09/12/2012 at 12:42 PM**

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B BRANSON, MO 65616
417-336-1181 Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female DOB: ███████ MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

**07/10/2012 - Imaging Report: MR SPINE CERVICAL WITHOUT CONTRAST**
**Provider: Beth A Knox FNP,**
**Location of Care: CoxHealth Branson Clinics**

```
MR SPINE CERVICAL WITHOUT CONTRAST
                    SKAGGS COMMUNITY HEALTH CENTER
                             PO Box 650
                        Branson, MO    65615
            Phone  (417)  272-8911        Fax:  (417)  335-7455

                    - CONSULTATION REPORT -
Patient Name: FLANAGAN, JAMIE S
MRN: 42-06-80
DOB: ██████████
Sex: F
Ordering MD: KNOX, BETH A
Referring MD: KNOX, BETH A
Procedure: MR SPINE CERVICAL WITHOUT CONTRAST
Account No.: 25334525
```

Clinical History

Cervial spinal stenosis.
*Neck pain.*

Technique
Standard non-contrast MRI.

Findings

Comparison cervical MRI October 2010.
Normal-appearing cervical and proximal thoracic cord.
Slight Disc bulging L5-L6 and C6-C7.
No marrow mass abnormality.
Limited posterior fossa appears normal.
Symmetric musculature.

Axial examination.
C2-C3:  Normal.
C3-C4:  Normal.
C4-C5:  Normal.
C5-C6:  Sagittal left parasagittal small disc protrusion but no nerve
root or cord entrapment.
C6-C7:  Slight disc bulge but no nerve root entrapment.
C7-T1:  Normal.

Impression

Mild C5-C6 and C6-C7 disc bulging but no cord violation or nerve root
entrapment.

The following findings are so common and people without cervical
pain; while we report their presence they must be interpreted with

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB: ███████  MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

cautioned and in the context of clinical situation.

Dictated by: JOHN H BARTOW     07/10/2012 03:51 PM
Transcribed By : BARTOW, JOHN H     07/10/2012 03:51 PM
 Approved by:JOHN H BARTOW     07/10/2012 03:51 PM


**Electronically Signed by Beth A Knox FNP, on 07/13/2012 at 3:29 PM**

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB: ███████  MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

**12/16/2011 - Imaging Report: XR SPINE LUMBAR MINIMUM 4 VIEWS**
**Provider: Electronic Signature**
**Location of Care: CoxHealth Branson Clinics**

```
XR SPINE LUMBAR MINIMUM 4 VIEWS
                    SKAGGS COMMUNITY HEALTH CENTER
                             PO Box 650
                        Branson,   MO    65615
              Phone   (417)   272-8911        Fax:  (417)   335-7455

                   - CONSULTATION REPORT -
Patient Name:
MRN: 42-06-80
DOB: ████████
Sex: F
Ordering MD: MACE, J CHARLES
Referring MD: MACE, J CHARLES
Procedure: XR SPINE LUMBAR MINIMUM 4 VIEWS
Account No.: 24741738

Clinical History

LUMBAGO

Findings

Stable subluxation L4 on L5.
Stable appearing L5-S1 laminectomy and fusion.
With flexion-extension no change in alignment.
The limited abdomen pelvis appears nonobstructed with no evidence of
mass.

Impression


Stable L5-S1 internal fixation and alignment.

Dictated by: JOHN H BARTOW     12/16/2011 05:16 PM
Transcribed By : BARTOW, JOHN H    12/16/2011 05:16 PM
 Approved by:JOHN H BARTOW     12/16/2011 05:16 PM
```

**Electronically Signed by Electronic Signature on 12/19/2011 at 7:01 AM**

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB: ███████ MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

---

**12/16/2011 - *Imaging Report: CT SPINE LUMBAR WITHOUT CONTRAST***
**Provider: Electronic Signature**
**Location of Care: CoxHealth Branson Clinics**

```
CT SPINE LUMBAR WITHOUT CONTRAST
                    SKAGGS COMMUNITY HEALTH CENTER
                            PO Box 650
                        Branson,  MO    65615
             Phone  (417)  272-8911        Fax:  (417)  335-7455

                        - CONSULTATION REPORT -
Patient Name:
MRN:  42-06-80
DOB: ███████████
Sex:  F
Ordering MD:  MACE, J CHARLES
Referring MD:  MACE, J CHARLES
Procedure:  CT SPINE LUMBAR WITHOUT CONTRAST
Account No.: 24741738

Clinical History

LOW BACK PAIN

Technique
Standard noncontrasted CT protocol.


Findings

Today's examination is compared with a previous lumbar CT of May 2011.
No change in the appearance of the internal fixation L5-S1.
The grade 2 subluxation L5 on S1 is unchanged.
Disc bulging involves L3-L4 L4-L5.
Stable laminectomy L5.
Left lateral L4-L5 disc bulge abutting the left exiting L4 nerve root.
Marked streak artifact at the surgical slight area degrades neural
foraminal evaluation.

Impression

Grade 2 subluxation L5 on S1 with internal fixation that compares
with the previous examination.
Left L4-L5 disc bulge may affect the exiting left L4 nerve root,
clinical correlation is recommended.

Dictated by: JOHN H BARTOW    12/16/2011 04:07 PM
Transcribed By : BARTOW, JOHN H     12/16/2011 04:07 PM
 Approved by:JOHN H BARTOW    12/16/2011 04:07 PM
```

**Electronically Signed by Electronic Signature on 12/16/2011 at 4:39 PM**

---

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB: ███████  MRN:  42-06-80

Home: (417)459-5879 Work: (417)335-7361

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB ███████████  MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

---

**10/19/2011 - Imaging Report: LUMBAR SPINE MINIMUM 4 VIEWS**
**Provider: Electronic Signature**
**Location of Care: CoxHealth Branson Clinics**

```
LUMBAR SPINE MINIMUM 4 VIEWS
    .                    SKAGGS COMMUNITY HEALTH CENTER
    .                          Branson, MO 65737
    .              Phone (417) 272-8911      Fax: (417) 335-7455

    .                        - CONSULTATION REPORT-
--------------------------------------------------------------------------
Patient Name : FLANAGAN , JAMIE , S
MRN.         : 42-06-80
DOB          : ███████████
SEX          : F
Ordering MD  : J CHARLES MACE
Referring MD : J CHARLES MACE
Exam ID      : 1055781
Procedure    : LUMBAR SPINE MINIMUM 4 VIEWS
Service Date : 10/19/2011
Account No.  : 24564163
--------------------------------------------------------------------------
CLINICAL HISTORY: Lumbar radiculopathy.
```

FINDINGS: The patient is status post fusion L5-S1 without complicating features. No instability on flexion and extension views. Relatively good range of motion.

IMPRESSION: Stable postop followup. Hardware is intact. No instability noted. The patient is status post posterior and anterior fusion.

```
    .    Dictated by    : RICHARD MAKUCH .       . 10/19/2011 07 : 24
    .     Transcribed by : DEVANS .           . 10/19/2011 07 : 44
    .     Approved by    : RICHARD MAKUCH .       . 10/19/2011 07 : 44
```

**Signed before import by Electronic Signature**
**Filed automatically on 10/19/2011 at 4:47 PM**

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB: ███████  MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

**04/01/2011 - Imaging Report: LUMBAR SPINE 2 OR 3 VIEWS**
**Provider: Electronic Signature**
**Location of Care: CoxHealth Branson Clinics**

```
LUMBAR SPINE 2 OR 3 VIEWS
 .                  SKAGGS COMMUNITY HEALTH CENTER
 .                        Branson, MO 65737
 .              Phone (417) 272-8911      Fax: (417) 335-7455

 .                      - CONSULTATION REPORT-
------------------------------------------------------------------------
Patient Name : FLANAGAN , JAMIE , S
MRN.         : 42-06-80
DOB          : ███████████
SEX          : F
Ordering MD  : J CHARLES MACE
Referring MD :
Exam ID      : 999705
Procedure    : LUMBAR SPINE 2 OR 3 VIEWS
Service Date : 04/01/2011
Account No.  : 20968186
------------------------------------------------------------------------
Clinical History: Back pain.

Findings:

Operative exam of the lumbar spine. Followup per neurosurgery.

 .   Dictated by    : RICHARD MAKUCH .         . 04/01/2011 09 : 39
 .     Transcribed by : SVHOUSTON .         . 04/01/2011 09 : 41
 .     Approved by    : RICHARD MAKUCH .       . 04/01/2011 09 : 41
```

**Electronically Signed by Electronic Signature on 04/01/2011 at 11:29 AM**

**Donald Hopewell M.D.**
*500 W. Main St. Suite 205B  BRANSON, MO 65616*
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB: ▮▮▮▮▮  MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

**10/08/2010 - Imaging Report: CERVICAL SPINE COMPLETE-FEO**
**Provider: Diane L Cornelison DO,**
**Location of Care: CoxHealth Branson Clinics**

```
CERVICAL SPINE COMPLETE-FEO
.                   SKAGGS COMMUNITY HEALTH CENTER
.                           Branson, MO 65737
.               Phone (417) 272-8911      Fax: (417) 335-7455

.                       - CONSULTATION REPORT-
------------------------------------------------------------------------
Patient Name : FLANAGAN , JAMIE , S
MRN.         : 42-06-80
DOB          : ▮▮▮▮▮▮▮▮▮
SEX          : F
Ordering MD  : DIANE CORNELISON
Referring MD : DIANE CORNELISON
Exam ID      : 952160
Procedure    : CERVICAL SPINE COMPLETE-FEO
Service Date : 10/08/2010
Account No.  : 20430039
------------------------------------------------------------------------
CLINICAL HISTORY:  Spinal stenosis, 7 projections.

FINDINGS:

With flexion and extension, no subluxations.
Normal alignment.
Neural foramina are patent.

IMPRESSION:  Normal plain film of the cervical spine.

.    Dictated by   : JOHN BARTOW .        . 10/08/2010 14 : 19
.      Transcribed by : MJSTRANGE .       . 10/08/2010 16 : 31
.    Approved by   : JOHN BARTOW .        . 10/08/2010 16 : 31
```

**Electronically Signed by Diane L Cornelison DO, on 10/11/2010 at 7:27 PM**

11/18/2013  09:21  4173361197  DONALD HOPEWELL MD  PAGE 34/54

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

*November 18, 2013*
Page 1
Chart Document

**JAMIE SUE FLANAGAN**
Female  DOB: ███████  MRN:  42-06-80

Home: (417)459-5879 Work: (417)335-7361

**10/08/2010 - Imaging Report: MRI CERVICAL W/O CONTRAST**
**Provider: Diane L Cornelison DO,**
**Location of Care: CoxHealth Branson Clinics**

```
MRI CERVICAL W/O CONTRAST
 .                  SKAGGS COMMUNITY HEALTH CENTER
 .                         Branson, MO 65737
 .              Phone (417) 272-8911      Fax: (417) 335-7455

 .                    - CONSULTATION REPORT-
------------------------------------------------------------------------
 Patient Name : FLANAGAN , JAMIE , S
 MRN.         : 42-06-80
 DOB          : ████████████
 SEX          : F
 Ordering MD  : DIANE CORNELISON
 Referring MD : DIANE CORNELISON
 Exam ID      : 952144
 Procedure    : MRI CERVICAL W/O CONTRAST
 Service Date : 10/08/2010
 Account No.  : 20430039
------------------------------------------------------------------------
 CLINICAL HISTORY:  Spinal stenosis, increased reflexes.

 TECHNIQUE:  Standard noncontrasted cervical MR protocol.

 FINDINGS:

 Normal cervical and proximal thoracic cord.
 What can be seen of the posterior fossa appears normal.
 Very mild disc bulging at C5-C6 and C6-C7, abutting the canal only.
 Normal prevertebral soft tissues.

 Axial Examination:
 C2-C3:  Normal.
 C3-C4:  Normal.
 C4-C5:  Small signal within the annulus; there is a small annular tear, but no entrapment.
 C5-C6:  Slight sagittal, left parasagittal disc bulge abutting the canal only, with
 annular signal that may correlate with a small annular tear.
 C6-C7:  Slight disc bulging, but no entrapment.
 C7-T1:  Normal.

 IMPRESSION:
 1.  Minimal spondylotic changes.
 2.  No nerve root or cord abnormality.

 .     Dictated by    : JOHN BARTOW .      . 10/08/2010 13 : 53
 .      Transcribed by : MJSTRANGE .       . 10/08/2010 15 : 35
 .      Approved by    : JOHN BARTOW .      . 10/08/2010 15 : 35
```

**Electronically Signed by Diane L Cornelison DO, on 10/11/2010 at 7:27 PM**

# FOLLOWUP WORKSHEET

Date: /0-3/-/3

Name: *Flanagan, Jamie S.*  PCP:  REF:

DOB: ███████████

Primary Neurologic Diagnosis: Lumbar Spondylosis c post Lami Syndroma

Reason for f/u: Pt request c cord stimulator trial - no benefit from trial. ⊖

New Problems:  ⊖

Changes in PMH, SH, FH or ROS:  ⊖

Current Rx
See EMR

Rx failures

Neurologic exam: (Normal) Stable abnormalities:

New findings:

Plan and f/u
Trial of methadona for morphine 10mg TID
f/u 3 months



Donald Hopewell MD
Neurology & Pain

# FOLLOWUP WORKSHEET

**Date:** 9-19-13

**Name:** Flanagan, Jamie S. **PCP:** Knot **REF:**
**DOB:** ███████████

**Primary Neurologic Diagnosis:** Lumbar Spondylosis c̄ post lami Syndrome
Lumbar

**Reason for f/u:** Pt request for "weakness" in legs. No true motor deficits.
This is a Sensation not a motor phenomenon. Pain worse c̄ prolonged
position esp in bed but comfortable in chair. Insurance denied
Stimulator - pt will appeal.

**New Problems:**
Ø

**Changes in PMH, SH, FH or ROS:**
Ø

**Current Rx**
See BMR

**Rx failures**

**Neurologic exam:** Normal  Stable abnormalities:

**New findings:**

**Plan and f/u**
Continue Regimen
for 3 months.

Donald Hopewell MD
Neurology & Pain

Jamie Flanagan

August 15, 2013
Ozarks Pain Specialists
1011 E. Montclair Ste 100
Springfield, MO 65807
417-269-7246

**Patient:** Jamie Flanagan
**DOB:** ███████ **Age:** 33y
**Referring Physician:** Cornelison, Diane, D.O.

**Date:** 08/15/2013

**Family Physician:** Marcellus, Peter

**Vitals:**
Temp: 98.3° F
Blood Pressure: 108/68

Resp: 12
Height: ' "

Pulse: 69
Weight: 118 lbs

**Chief Complaint:** Back pain, evaluation for SCS.
**History of Present Illness:** 33 YOWF presents for evaluation of low back pain and evaluation for SCS as requested by Dr. Cornelison. She reports pain across lower lumbar spine with radiation into bilateral hips, posterior and lateral extremities bilaterally. Her sx have been present since August 2010 with no known accident or injury as cause. She has had previous lumbar fusion of L5-S1 by Dr. Mace in April 2011. She currently see's Dr. Hopewell for pain management however Dr. Cornelison has performed the injections.

**What best describes your pain:** Aching. Throbbing. Burning/Hot. Continuous. numbness
**Pain Rating: Current:** 7        **At Best:** 3        **At Worst:** 10



**Pain affected by:**
**Muscle Relaxants:** Better
**Walking:** Worse
**Nighttime:** Worse
**Pain Medications:** Better
**Lying Down:** Worse
**Prolonged Position:** Worse
**Patient is experiencing numbness/tingling.** bilateral lower extremities

**Tests Done to Diagnose Pain:** X-ray. CT Scan. MRI Scan.

Jamie Flanagan                                    August 16, 2013

**Diagnostic Reports**
XR SPINE LUMBAR MIN 6 VIEWS 1/9/13
IMPRESSION
1. Postsurgical changes of posterior lumbar interbody fusion at L5-S1.
2. Four pars defects with grade 2 spondylolisthesis. Operative appearance not substantially different than 2 November 2012. No interval change and no evidence of instability.

MRI LUMBAR W/O CONTRAST 9/22/10
IMPRESSION: Pars defects at L5 with spondylolisthesis of L5 on S1 and moderate bilateral neural foraminal narrowing and disc space degeneration.

LUMBAR SPINE MINIMUM 4 VIEWS 10/19/2011
IMPRESSION: Stable postop followup. Hardware is intact. No instability noted. The patient is status post posterior and anterior fusion.

XR SPINE LUMBAR MINIMUM 4 VIEWS 12/16/2011
IMPRESSION: Stable L5-S1 internal fixation and alignment.

CT SPINE LUMBAR WITHOUT CONTRAST 12/16/2011
IMPRESSION
Grade 2 subluxation L5 on S1 with internal fixation that compares with the previous examination.
Left L4-L5 disc bulge may affect the exiting left L4 nerve root, clinical correlation is recommended.

CT SPINE LUMBAR WITHOUT CONTRAST 9/12/2012
IMPRESSION:
1. Postsurgical changes of posterior lumbar interbody fusion at L5-S1. The sponyiolisthesis of L5 on S1 appears stable but there is increasing sclerosis of the endplates and lucency around the bone cage suggesting the possibility of incomplete fusion across the disc space.
2. Large amount of epidural soft tissue, which appears to compromise the level of the thecal sac. The most likely etiology would be postsurgical scar tissue and similar changes have been noticed on previous studies.

CT SPINE LUMBAR SPINE WITH CONTRAST MYELO 11/2/2012
IMPRESSION: Not available

MR SPINE LUMBAR WITH AND WITHOUT CONTRAST 12/28/2012
IMPRESSION
Postsurgical changes of posterior lumbar interbody fusion at L5-S1 secondary to pars defects at L5 and grade 2 spondyliolisthesis. There is extensive evidence of postoperative fibrosis in the posterior operative bed extending along the right and left lateral margins of the thecal sac and extending anteriorly on the left to involve the S1 nerve root.

**Previous Treatments**
*Right L4 TFESI 4/25/13 with minimal relief.*
LESI's 10/6/10, 10/20/10, 6/22/11, 7/13/11 previously by Dr. Hopewell
Topical analgesics, pain medications, muscle relaxants, heat, back brace, TENS unit
PT prior to and post surgery.

**Past Medical History**
Arthritis/gout: Arthritis/Osteoarthritis
GERD, Congenital flexible flat foot, Insomnia, Spina bifida, Uterine fibroids, Pars defect, Annular tear x2 cervical, *gastric paresis, autoimmune disease, depression*

**Past Surgical History**
Cholecystectomy:
Cesarean Section:
Spinal Fusion: L5-S1 Dr.Mace
Hysterectomy:
Foot surgeries x3, Exploratory lap, Reconstructive breast surgery x3

Jamie Flanagan        August 15, 2013

**Social History**
Patient does not consume alcohol.
Patient does not consume tobacco.
Patient is married.
Patient lives w/spouse.

**Family History**
HTN: Mother •
Thyroid problems: Mother •
CAD: Father •

**Systems Review**
Constitutional Symptoms: none
Eyes Symptoms: none
Cardiovascular Symptoms: none
Respiratory Symptoms: none
Allergy Symptoms: none
Urinary Symptoms: none
Female Reproductive Symptoms: none
Psychiatric Symptoms: • depression
Endocrine Symptoms: none
ENT Symptoms: none
Gastrointestinal Symptoms: • indigestion
Musculoskeletal Symptoms: • muscle pain • joint pain
Neurologic Symptoms: • numbness
Skin Symptoms: none
Blood Symptoms: none

**Medications and Allergies**
Medications and allergies reviewed.

**Physical Exam**
General: The patient appears well hydrated and well nourished. There is no acute distress and the patient's appearance is consistent with their stated age.
Psychiatric: Patient is alert and oriented. Mood and affect were appropriate. Answers questions appropriately.
Skin: Skin was warm and dry without rash, lesion or ulceration.
HEENT: The external ears, nose and mouth had a normal appearance.
Neck: The neck was supple.
Heart: The heartbeat was regular in rhythm and rate. No murmurs, gallops or rubs were observed.
Lungs: The lungs were clear to auscultation bilaterally. There was normal breathing effort.
Abdomen: The abdomen was soft, non-tender.
Extremities: Tenderness over L/S area
Spine: Extension, axial loading and lateral side bending of lumbar spine reproduces pain.
Neurologic: DTR at the biceps & brachioradialis tendons are 2+ and symmetrical.
DTR at patella & achilles tendons are 2+ and symmetrical
SLR on right is equivocal

**Impression**
FBSS– with most of her pain in LE's
Chronic pain Syndrome
Spondylolitheis

08/16/2013    13:38 Ozark Pain      (FAX)4173888854      P. 004/005

11/18/2013 09:21   4173361197      DONALD HOPEWELL MD      PAGE 40/54

Jamie Flanagan                                    August 15, 2013

**Plan**
Jamie is suffering from significant epidural fibrosis and is on high dose narcotics. Despite her current conservative treatments for this, she is in significant pain.
At this time I recommend SCS. We discussed perc trial process
An educational handout about the procedure was given to the patient and discussed. The patient will be scheduled.

Dr. Rosemary consult not needed. Pt has seen Dr Radovonovich and no contraindications are known
PLAN:
Dual Lead SCS trial

Signed Electronically By: Wayne H. Wallender, D.O.

**Superbill**
Diagnosis(es): Postlaminectomy Syndrome Lumbar Region: (722.83) • Spondylolysis, Lumbbosacral Region: (756.11) • • •
E&M Procedure: 99203: (office/outpatient visit new)

Diagnosis(es): • • • •
E&M Procedure:

**Allergies**

| Allergy | Severity |
|---|---|
| Darvocet | Severe |
| Ambien | Severe |
| Adhesive Tape | Severe |
| Lunesta | Severe |

**Medications**

| Date | Brand | Dosage | FREQ |
|---|---|---|---|
| July 10, 2013 | IBUPROFEN TABLETS | 800 | Q6h |
| July 10, 2013 | XANAX TABLETS | 0.5 | Other |
| July 10, 2013 | PROTONIX EC TABLETS | 40 | BID |
| July 10, 2013 | Zofran | 4 | Q12h |
| July 10, 2013 | Miralax Powder | | Other |
| July 10, 2013 | Wellbutrin SR XR12 | 150 | BID |
| July 10, 2013 | TOPAMAX TABLETS | 50 | BID |
| July 10, 2013 | Belladonna | | Q6h |
| July 10, 2013 | Bentyl | 10 | QID |
| July 10, 2013 | PLAQUENIL TABLETS | 200 | Daily |
| July 10, 2013 | Soma | 350 | TID |
| July 10, 2013 | ROBAXIN TABLETS | 750 | TID |
| July 10, 2013 | DILAUDID HYDROMORPHONE HCL TABLETS | 8 | Q4h |
| July 10, 2013 | Morphine Sulfate CR | 60 | BID |
| July 10, 2013 | Morphine Sulfate CR | 80 | BID |
| July 10, 2013 | Morphine Sulfate CR | 15 | BID |

**Prescriptions**

| Date | Brand | Dosage | FREQ |
|---|---|---|---|

# FOLLOWUP WORKSHEET

**Date:** 7-23-13

**Name:** Flanagan, Jamie S. **PCP:** Knox **REF:** Woodward

**DOB:** [redacted]

**Primary Neurologic Diagnosis:** lumbar spondylosis c post lami syndrome
coccyx pain

**Reason for f/u:** Routine med f/u. Issues all s Δ. Pain lumbar c spread down legs. Parallels activity; worse as week goes on. For cord stimulator trial next month. Continues to have somnolence issues c meds. Options s Δ from last visit. 30 min of face to face time

**New Problems:**
Ø

**Changes in PMH, SH, FH or ROS:**
Ø

**Current Rx**
See EMR

**Rx failures**

**Neurologic exam:** Normal (circled) **Stable abnormalities:**

**New findings:**

**Plan and f/u**
Continue Regimen
F/u 3 months

Donald Hopewell MD
Neurology & Pain

# FOLLOWUP WORKSHEET

Date: 4-25-13

Name: Flanagan, Jamie S.    PCP: Knox    REF:

DOB: ███████████

Primary Neurologic Diagnosis: Lumbar Spondylosis
Lumbar Post Lami Syndrome
Cervical Pain

Reason for f/u: Pt request to discuss options. Having hypersomnolence
from morphine ⟹ has to titrate when working or staff or doses
Drug coverage issues preclude anything but generics. ⟹ only morphine,
methadone + fent as options. Has hypersensitivity to adhesiveness ⟹
can't use fent. Doesn't want methadone. 30 minutes spent discussing
options.

New Problems:
∅

Changes in PMH, SH, FH or ROS:
∅

Current Rx
See EMR

Rx failures

Neurologic exam: (Normal)    Stable abnormalities:

New findings:

Plan and f/u
Continue Regimen - She will explore med options c̄ drug reps
Pursuing implent oblas
f/u 3 months

Donald Hopewell MD
Neurology & Pain

EXHIBIT A

# FOLLOWUP WORKSHEET

**Date:** 1-24-13

**Name:** Flanagan, Jame S. **PCP:** Knox **REF:**

**DOB:** [redacted]

**Primary Neurologic Diagnosis:** Lumbar Spondylosis
Lumbar Post Lami Syndrome
Cervical Pain

**Reason for f/u:** Routine med f/u. Recent MRI shows root scarring. Has plans to do cord stimulator trial. No significant neck pathology. 20 minute discussion of options. Can't afford Zipza

**New Problems:** ⊖

**Changes in PMH, SH, FH or ROS:** ⊖

**Current Rx**
See EMR.

**Rx failures**

**Neurologic exam:** Normal **Stable abnormalities:**

**New findings:**

**Plan and f/u**
↓ to Morphine 120 BID
Probably needs to ↓ narc's - but will hold otherwise
f/u 3 months.

Donald Hopewell MD
Neurology & Pain

11/18/2013 09:21 4173361197 DONALD HOPEWELL MD PAGE 44/54

# FOLLOWUP WORKSHEET

Date: 10-29-12

Name: Flanagan, Jamie S.     PCP: Knox     REF: Woodward
DOB: ███████████

Primary Neurologic Diagnosis: Lumber Spondylolisthosis
Lumber post lem. Syndrome
cervical pain

Reason for f/u: Routine med flu. Has seen Rheum. Blood work ⊝ but feels
likely autoimmune disease. LBP—f/u by NSurg – fusion has failed.
Having myelogram for both lumber; cervical 8x's next week.
Pain highly variable 2° to multiple etiologies & activity related
processes. Wants to hold on further med △ until we ;
℞ plans made

New Problems:

⊝

Changes in PMH, SH, FH
or ROS:

⊝

Current Rx

See EMR

Rx failures

Neurologic exam / (Normal)    Stable abnormalities:

New findings:

Plan and f/u
Continue Reg. then
f/u 3 months.

_Donald Hopewell MD_
Neurology & Pain

# FOLLOWUP WORKSHEET

**Date:** 7-31-12

**Name:** Flanigan, Jamie S.  **PCP:** Knox  **REF:** Woodward
**DOB:** ███████████

**Primary Neurologic Diagnosis:** Lumbar Spondylolisthesis
Lumbar post Lami Syndrome

**Reason for f/u:** Routine med f/u. Joint + neck pain less prominent.
Still gets episodic neck pain - stabbing to ache/tric usually ē
movement. MR ī done by PCP which did not show sig pathology.
Neck pain may cause spasm for days. Has not seen Rheumatologs.

**New Problems:**
∅

**Changes in PMH, SH, FH or ROS:**
∅

**Current Rx**
SEE EMR

**Rx failures**
∅

**Neurologic exam:** (Normal)  **Stable abnormalities:**

**New findings:**

**Plan and f/u**
Continue Regimen
PM ē Rheum
f/u here 3 months

Donald Hopewell MD
Neurology & Pain

# FOLLOWUP WORKSHEET

Date: 5-9-12

Name: Flanagan, Jamie S. PCP: Knox    REF: Woodward

DOB: ████████████████████

Primary Neurologic Diagnosis: Lumbar Spondylolisthosis
Lumbar Post Rami Syndroma

Reason for f/u: Pt request - 4 weeks of intermittent aching elbow toward wrist. Yesterday developed also @ shoulder pain. Has had some neck pain & ↓ ROM. Occ pops & electrical sensation in neck. Some ? neck swelling mid cervical. No radicular spread of pain i No correlation between neck i arm sx's. Joints never swollen, red or hot. Has had knee sx's as well from time to time

**New Problems:**

as above

**Changes in PMH, SH, FH or ROS:**

⊖

**Current Rx**

See EMR

**Rx failures**

Neurologic exam: (Normal)    Stable abnormalities:

NL Neck & splints to L
NL joint exam UE's

**New findings:**

**Plan and f/u**

1. Arthralgia
2. Neckpain
- NSAID's regular
- Rheum eval

Donald Hopewell MD
Neurology & Pain

# FOLLOWUP WORKSHEET

**Date:**
5-1-12

Name: Flanagan, Jamie S     PCP: Knox     REF: Woodward

DOB: ████████████

Primary Neurologic Diagnosis: Lumber Spondylolisthesis
Lumber post Lami Syndrome

Reason for f/u: Routine med f/u. Failed nortriptyline and keppra now
also. Both caused problems. Pain s̄ Δ Posterior or posterolateral
on ® leg. Discussed options again in detail. ~20 minutes face
to face.

**New Problems:**
⊖

**Changes in PMH, SH, FH or ROS:**
Ⓢ

**Current Rx**
See CMR

**Rx failures**

Neurologic exam: (Normal)   Stable abnormalities:

**New findings:**

**Plan and f/u**
Low dose Savella ; monitor for GI side effects -titrate up as tolerated
f/u 3 months

Donald Hopewell MD
Neurology & Pain

# FOLLOWUP WORKSHEET

**Date:** 2-1-12

**Name:** Flanagan, Jamie S.    **PCP:** Knox    **REF:**
**DOB:** ████████

**Primary Neurologic Diagnosis:** Lumbar Spondylolisthesis
Lumbar Post Lami Syndrome

**Reason for f/u:** Routine med f/u. Couldn't take tolerate amitriptyline (but
could take nortriptyline. Pain S A. posterior or postero lateral on
(R) leg. Saw N-Surj; zero A's of ? bone reabsorption @
surgical site ⇒ repeat in 6 months & may need re-operation
i also brought up possible spinal cord stimulator. Pt
clearly in my mind is lumbar post Lami syndrome z ftxed
L4-L5S₁ root injury. Some somnolence ~ 2 hours p avinze dose

**New Problems:**
∅

**Changes in PMH, SH, FH or ROS:**
∅

**Current Rx**
SccEmR

**Rx failures**

**Neurologic exam** (Normal) **Stable abnormalities:**

**New findings:**

**Plan and f/u**
Restart nortriptyline @ 50mg – plan to titrate up.
Take avinze on arrising 1/2 hours later
OK to use both Soma & Robaxin
8L 3months

Donald Hopewell MD
Neurology & Pain

# FOLLOWUP WORKSHEET

**Date:** 11-02-11

**Name:** Flanagan, Jamie S. **PCP:** Knox/Marcellus
**DOB:** ███████████

**Primary Neurologic Diagnosis:** Lumbar spondylolisthesis

**Reason for f/u:** Routine med f/u. LBP variable c̄ activity. Leg pain more consistant. Variable location. postero lat leg may cross to medial knee. Burning lat fore-foot. Good response to muscle relaxers, lidoderm.

**New Problems:** ∅

**Changes in PMH, SH, FH or ROS:** ∅

**Current Rx**
See EMR

**Rx failures**

**Neurologic exam:** (Normal) **Stable abnormalities:**

**New findings:**

**Plan and f/u**
Continue Regimen
f/u 3 months.
Trial of amitriptyline @ HS

Donald Hopewell MD
Neurology & Pain

Case 3:17-cv-05060-MDH    Document 33-4    Filed 05/15/18    Page 172 of 269    LIN00967

# FOLLOWUP WORKSHEET

**Date:** 8-2-11

**Name:** Flanagan, Jamie S.     **PCP:** Knox / marcellus
**DOB:** ████████████████

**Primary Neurologic Diagnosis:** Lumber Spondalolisthasis

**Reason for f/u:** No improvement c̄ 2nd epi. LBP variable c̄ activity
Leg pain consistent-down posterior leg R i into R heal.
Worse the more she is up on foot. Worse late in day;
as week goes on.

**New Problems:**

⊖

**Changes in PMH, SH, FH or ROS:**

⊖

**Current Rx**
Sig CMR

**Rx failures**

**Neurologic exam** (Normal) **Stable abnormalities:**

**New findings:**

**Plan and f/u**
Continue Regimen
Consider epi c̄ W/disc - discuss c̄ Comparison
f/u 3 months

Donald Hopewell MD
Neurology & Pain

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
*Female  DOB:* ▓▓▓▓  *MRN:  42-06-80*

Home: (417)459-5879 Work: (417)335-7361

**10/22/2010 - Office Visit: Neurology Office Visit- EMG**
**Provider: Glady Jacob MD,**
**Location of Care: Cox Pain and Neurology Branson**

**Requesting Physician:** woodward
**Chief Complaint:** emg- BL/LE

**Vital Signs**
**Pulse rate:** 80
**Pulse rhythm:** regular
**Respirations:** 18
**Blood Pressure:** 110/80 mm Hg

**Pain Assessment**
The patient is currently experiencing pain.
The patient has experienced pain in the last 2 weeks.
**Location:** back
**Intensity (0-10):** 4
The patient's medication list has been reviewed and updated. **Medications (including medications added during this visit):**
HYDROCODONE-ACETAMINOPHEN 10-325 MG/15ML SOLN (HYDROCODONE-ACETAMINOPHEN) 1-2 PO Q 6 HOURS AS NEEDED FOR PAIN
NEURONTIN 300 MG CAPS (GABAPENTIN) take one every am, and two every pm.
LEXAPRO 20 MG TABS (ESCITALOPRAM OXALATE) one tab po daily
ROBAXIN 500 MG TABS (METHOCARBAMOL) one three times a day as needed
XANAX 0.25 MG TABS (ALPRAZOLAM) one tid as needed
LYRICA 50 MG CAPS (PREGABALIN) one cap at night
KETOROLAC TROMETHAMINE 10 MG TABS (KETOROLAC TROMETHAMINE) take 1 tab bid x 3 days.
ZITHROMAX 250 MG TABS (AZITHROMYCIN) 2 po day 1, 1 po daily, days 2-5
AVINZA 30 MG XR24H-CAP (MORPHINE SULFATE BEADS) 1 daily
DEXAMETHASONE 4 MG TABS (DEXAMETHASONE) take 3 tabs on day 1, take 2 tabs on day 2 and take 1 tab on day 3 and stop. take this medication in the am and w/ food.

**Allergies:**
! DARVOCET (PROPOXYPHENE N-APAP)
! * AMBIEN
! ADHESIVE TAPE
! * LUNESTA}}
COR
FLANAGAN, JAMIE S
DOB: ▓▓▓▓
Patient Number:  42-06-80
DocType:  079
10/22/2010

ELECTROMYOGRAM AND NERVE CONDUCTION STUDY

CLINICAL HISTORY: The patient is a 30-year-old who has pain in her lower back with pain radiating down the right lower extremity. This EMG/nerve conduction study is done to evaluate for lumbosacral radiculopathy.

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB ███████  MRN: 42-06-80

Home: (417)459-5879 Work: (417)335-7361

```
DESCRIPTION OF EMG AND NERVE CONDUCTION STUDIES:
Motor nerve conduction study from the right peroneal showed
 a distal latency of 4.3 milliseconds. Amplitude was 6.1
 millivolts and conduction velocity was 46 meters per
 second below knee and 50 above knee.
Motor nerve conduction study from the right tibial showed a
 distal latency of 4.4 milliseconds. Amplitude was 8.6
 millivolts and conduction velocity was 49 meters per
 second.
Motor nerve conduction study from the left tibial showed a
 distal latency of 4 milliseconds. Amplitude was 12.8
 millivolts and conduction velocity was 51 meters per
 second.

F-wave studies from the right peroneal showed an F-latency
 of 51.2.
F-wave studies from the right tibial showed an F-latency of
 52.1.
F-wave studies from the left tibial showed an F-latency of
 52.2.

Sensory nerve conduction study from the right sural showed
 a peak latency of 3.8. Amplitude was 24.
Sensory nerve conduction study from the left sural showed a
 peak latency of 3.5. Amplitude was 21.5.

EMG studies were done of the right tibialis anterior,
 gastrocnemius, and extensor hallucis longus and the left
 tibialis anterior and gastrocnemius. All these muscles
 showed normal motor units, no spontaneous activity, and
 normal recruitment. The right vastus lateralis, short head
 of biceps, and gluteus medius showed normal motor units,
 no spontaneous activity, and normal recruitment. The
 lumbar paraspinal muscles were tested bilaterally at 3
 levels. There was 1+ positive waves in the right
 lumbosacral paraspinal muscles at the lower level.

CONCLUSION: Abnormal study - Nerve conduction studies were
 within normal limits. However eletromyogram studies show
 electrophysiological evidence of lumbosacral radiculopathy
 predominantly affecting the right L5-S1 nerve roots.



Voice ID: 586986
10/22/2010 12:00:38 by Glady Jacob M.D.
10/23/2010 11:05:46 by 3059
```
**Assessment**


**Plan**

**Donald Hopewell M.D.**
500 W. Main St. Suite 205B  BRANSON, MO 65616
417-336-1181  Fax: 417-336-1197

**JAMIE SUE FLANAGAN**
Female  DOB: ███████  MRN:  42-06-80

Home: (417)459-5879 Work: (417)335-7361

**Electronically Signed by Glady Jacob MD, on 10/22/2010 at 12:10 PM**



# F A X   C O V E R   L E T T E R

**Company Name:** Lincoln National Life Insurance Co          **Fax Number:** 1-877-843-3950

**Attn.:**      Long Term Disability Claims

| | |
|---|---|
| **From:** | Cox Medical Center Branson |
| **Department:** | Human Resources |
| **Phone Number:** 417-335-7262 | **Fax Number:** 417-335-7166 |

**RE**          LTD Claims

**Date** _____          **Time** _____

**Number of Pages:**                    **Cover Page**

If all pages are not received, please call
**Name**          Judy Hampton

**Phone**          417-335-7262

**Additional information:**

**Action required:**

### CONFIDENTIALITY NOTICE

The information contained in this message and any attachments are privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any reading, dissemination, distribution, copying, or other use of this communication or any of its attachments is strictly prohibited. If you have received this communication in error, please notify the sender immediately and delete/destroy this message, any attachments, all copies and backups.

P.O. Box 650 - Branson, MO  65615

LINC00972

## Long-Term Disability Claim Employer's Statement

**To Be Completed By The Employer**

This claim is for (Employee's Name and Address) | Social Security Number | Date of Birth
JAMIE FLANAGAN

**A. Information about the employer**

Company's Name
LESTER E. COX MEDICAL CENTER | Group Policy Number 000010157326 | Class Number

Address (Street, City, State, Zip) | Telephone:
Fax:

Name and address of division where employee works (if different from above) | Telephone: 417-335-7262
525 BRANSON LANDING BIVD  BRANSON MO 65616 | Fax: 417-348-8285

**B. Information about the employee**

Date employee was hired (Month, Day, Year) 3/1/10 | Date employee became insured under this plan? 5/1/2013  Date employee became insured under prior plan? 3/1/2010 | What was the employee's regularly scheduled work week?  hours per week 40   hours per day 8

**C. Information needed for withholding and reporting taxes**

Does employee contribute post-tax dollars toward the premium? ☐ Yes ⊙No  If yes, what percent is paid by the employee? _____ %
**If you leave this section blank, we will assume it is 100% employer contribution and calculate FICA taxes accordingly.**

**D. Information about the claim**

Were there any changes to the employee's job responsibilities due to the disabling condition before the employee became fully disabled?
☐ Yes ☒No  If yes, what were the changes and when were they made?

What was the employee's permanent job on his or her last day at work?
NURSE PRACTIONER | How long had the employee been in this job?
3 YRS   5 MOS

Last day employee actually worked (Month, Day, Year) 8/25/2013 | On that day, did the employee work a full day?
☐ Yes ☒No  If no, how many hours were worked? 4

Why did employee stop working? | Is the employee's condition work related?
☐ Yes ☐ No

Has a claim been filed with Workers' Compensation?
☐ Yes ☒No  If yes, send initial report of illness or injury and award notice.

Name, address and telephone number of your compensation carrier

Name, address and telephone number of your medical insurance carrier

**E. Information about your pension plan (do not complete for maternity claim)**

Do you have a pension plan?
☒Yes ☐ No | If yes, what type?  ☐ Defined benefit  ☒Defined contribution | ☐ 401(k)  ☐ Profit sharing | ☐ Other: (specify)

Is the employee eligible for your pension plan?
☒Yes ☐ No  If no, why? | If eligible, does the employee participate?
☒Yes ☐ No  If no, why?

If the employee is participating, when is he or she eligible for benefits under the plan? (Month, Day, Year)
UPON TERMINATION OF EMPLOYMENT OR AT AGE 59 1/2

**NOTE: If any portion of this pension benefit is attributable to the employee's contribution, please provide details including the percentage of his/her contribution to the total contribution. This should include a copy of the contract.**

**F. Information about your rehire or return-to-work policies**

Does your company have a rehire or return-to-work policy for disabled employees?
☒Yes ☐ No

What is the name and title of the manager we should contact if we identify a rehabilitation or return-to-work option?
CHERYL DUNN — EMPLOYEE RELATIONS MANAGER

**G. Information about the employee's salary**

The employee (Check all that apply)
☒is paid hourly (what is the hourly rate?) $ 43.29 | ☐ is salaried  ☐ receives commissions  ☐ receives bonuses

Will employee file for disability benefits provided by any employer/employee labor management, state disability or union welfare plan?
☐ Yes ☒No  If yes, what is the weekly amount? $ ___ — ___ When do benefits begin? _____ End? _____

Is this employee eligible for salary continuation?
☐ Yes ☒No  If yes, what is the weekly amount? $ _____ When do benefits begin? _____ End? _____

(Continued on next page)

Reporting the employee's basic monthly earnings

Find the definition of basic monthly earnings that matches your contract for this employee and follow the instructions given.

**Definitions of Basic Monthly Earnings**

a.  salary only (no commissions, bonuses, etc.), complete question 1 below
b.  previous year's W-2 form, complete question 5 below (attach W-2)
c.  sole proprietor, complete question 8 below
d.  previous year's K-1 form, complete question 6 below (attach K-1)

e.  salary and commissions, complete questions 1 and 3 below
f.  salary, commissions and bonuses, complete questions 1, 3 and 4 below
g.  salary and deferred compensation, complete questions 1 and 2 below
h.  salary, deferred compensation and commissions, complete questions 1, 2 and 3 below
i.  salary, deferred compensation, commissions and bonuses, complete questions 1, 2, 3 and 4 below
j.  salary and K-1 earnings, complete questions 1 and 6 below

k.  W-2 with deferred compensation, complete questions 2 and 5 below
l.  partnership agreement, complete question 7 below
m.  teacher's contract, complete question 1 below
n.  any other definition, complete question 9 below

1)  On the last day employee worked, what was his or her basic monthly salary? (Divide annual salary by 12 or multiply weekly salary by 52 and divide by 12. Teachers divide annual salary by 12)  1  __7,503.60__

2)  On the last day the employee worked, what was his or her monthly pre-tax contribution to your deferred compensation plan?  2 _____

3)  How much had the employee received in commissions in the 12 months (or the period of employment if less than 12 months) immediately preceding the last day worked? $ _____. Divide this number by 12, or the length of employment if less than 12 months, to find the average monthly commissions.  3 _____

4)  How much had the employee received in bonuses in the 12 months (or the period of employment if less than 12 months) immediately preceding the last day worked? $ _____. Divide this number by 12, or the length of employment if less than 12 months, to find the average monthly bonuses.  4 _____

5)  What were the employee's earnings as shown on the W-2 form of the year immediately preceding the disability?  5 _____

6)  What were the employee's earnings as shown on the K-1 form of the year immediately preceding the disability?  6 _____

7)  As of the last day the employee worked, what were the budgeted annual earnings as determined by the written partnership agreement in effect? (Do not include dividends, interest or return of capital) $ _____.  7 _____

8)  As of the last day the employee worked, what was the sole proprietor's annual net profit (1040 Schedule C gross income minus total deductions minus depreciation) averaged over the 3 years immediately preceding the disability or the period of sole proprietorship if less than 3 years?  8 _____

9)  For definitions other than those above, calculate the monthly earnings as they are defined in your contract. If earnings are based on salary as expressed on a particular document, send us a copy of the document.  9 _____

**H.  Required Attachments and Signature**

If the employee contributes to the premiums, attach a copy of the enrollment form.

If salary is based on a W-2, K-1, 1099, or a similar document, attach a copy of the document.

If you have medical information from the employee's file relating to this disability, please attach copies.

If a workers' compensation claim is filed, send initial report of injury or illness and award notice.

Name of person completing this form (If this claim is approved for disability benefits, the benefit check will be sent to the employee with a carbon copy to you.)

X _~~Judy Hampton~~_                    _HR Supervisor_                    _11-15-13_
Signature                               Title                              Date

Case 3:17-cv-05060-MDH    Document 33-4    Filed 05/15/18    Page 179 of 269    LINC00974

## Long-Term Disability Claim Job Analysis

To Be Completed By The Employee's Supervisor

This claim is for (Employee's Name)

_JAMIE FLANAGAN_

| Employee's Social Security Number | Date of Disability (Month, Day, Year) |
|---|---|
| ████████████ | |

A. General information about the employee's job

| Job Title  _NURSE PRACTIONER_ | Minimum education or training required |
|---|---|

Does the employee perform supervisory functions?

☐ Yes  ☐ No   If yes, how many people are supervised? _____  Describe job duties.

Check the items below that relate to the employee's job. Use these definitions for the frequency of occurrence:
   **Occasionally** means the person does the activity up to 33% of the time.
   **Frequently** means the person does the activity 34% to 66% of the time.      _SEE JOB DESCRIPTION_
   **Continuously** means the person does the activity 67% to 100% of the time.

|  | Occasionally | Frequently | Continuously |
|---|---|---|---|
| Relate to others | ☐ | ☐ | ☐ |
| Written and verbal communication | ☐ | ☐ | ☐ |
| Reasoning, math and language | ☐ | ☐ | ☐ |
| Makes independent judgments | ☐ | ☐ | ☐ |

Which of the following describe the employee's working environment? Check all that apply.

☐ Unprotected heights          ☐ Changes in temperature or humidity        ☐ Exposure to dust, fumes and gases
☐ Being near moving machinery  ☐ Driving automotive equipment              ☐ Other hazards

Is the employee required to travel?

☐ Yes  ☒ No   If yes, complete the following information:

How does the employee travel? (Automobile, plane, train, etc.)

Where does the employee travel? _____   What percent of the time does the employee travel?

B. Information about the physical aspects of the employee's job

Check the items below that relate to the employee's job and complete the information requested. Use these definitions for the frequency of occurrence:
   **Occasionally** means the person does the activity up to 33% of the time.
   **Frequently** means the person does the activity 34% to 66% of the time.      _SEE JOB DESCRIPTION_
   **Continuously** means the person does the activity 67% to 100% of the time.

| Activity | Frequency of Occurrence | | | | |
|---|---|---|---|---|---|
|  | Occasionally | Frequently | Continuously | | |
| ☐ Standing | ☐ | ☐ | ☐ | | |
| ☐ Walking | ☐ | ☐ | ☐ | | |
| ☐ Sitting | ☐ | ☐ | ☐ | | |
| ☐ Balancing | ☐ | ☐ | ☐ | | |
| ☐ Stooping | ☐ | ☐ | ☐ | | |
| ☐ Kneeling | ☐ | ☐ | ☐ | | |
| ☐ Crouching | ☐ | ☐ | ☐ | | |
| ☐ Crawling | ☐ | ☐ | ☐ | | |
| ☐ Reaching/working overhead | ☐ | ☐ | ☐ | | |
| ☐ Climbing: | ☐ | ☐ | ☐ | | |
| ☐ Stairs | ☐ | ☐ | ☐ | | |
| Number of stairs: _____ | | | | | |
| ☐ Ladders | ☐ | ☐ | ☐ | **Describe Activity** | **Weight** |
| Height of Ladder: _____ | | | | | |
| ☐ Pushing | ☐ | ☐ | ☐ | _____ | _____ lbs. |
| ☐ Pulling | ☐ | ☐ | ☐ | _____ | _____ lbs. |
| ☐ Lifting/carrying | ☐ | ☐ | ☐ | _____ | _____ lbs. |

(Continued on next page)

**Can the job be performed by alternating sitting and standing?**
☐ Yes  ☒ No

Does the job require using the feet to operate foot controls?
☐ Yes  ☒ No   If yes, on what type of equipment?

How important is good vision in the job?   _IMPORTANT_

| What are the major tasks requiring use of one or both hands? | One Hand | Both Hands |
|---|---|---|
| _SEE JOB DESCRIPTION_ | ☐ | ☐ |
| | ☐ | ☐ |
| | ☐ | ☐ |
| | ☐ | ☐ |

**C. Information about the job as it relates to the disability**

Can the job be modified to accommodate the disability either temporarily or permanently?
☐ Yes  ☐ No   If yes, explain

Is it possible to offer the employee assistance in doing the job (through use of technology or personal assistance for example)?
☐ Yes  ☐ No   If yes, explain

**D. Attachments and Signature** (Attach a copy of the employee's job description)

Name of person completing this form

X _Judy Hampton_                          _HR Supervisor_          _11-15-13_
  Signature                                 Title                    Date

                                          Telephone _417-335-7262_ Fax _417-348-8285_

Case 3:17-cv-05060-MDH   Document 33-4   Filed 05/15/18   Page 181 of 269   LINC00976

*SKAGGS Regional Medical Center*

# Job Description

## Job Title: Nurse Practitioner

Department: Varies
Reports to: Director of Physician Services
FLSA Status: Exempt
Job Code: 7150
Effective Date: June 23, 2009

### SUMMARY:
Provides general medical care and treatment to patients in medical clinic(s), under direction of Physician, by performing the duties listed below.

### SUPERVISORY RESPONSIBILITIES:
This job has indirect supervisory responsibilities over clinical staff.

### ESSENTIAL DUTIES AND RESPONSIBILITIES:
- Provide exceptional service and/or care to all patients, customers and team members.
- Performs physical examinations and preventive health measures within prescribed guidelines and instructions of Physician.
- Orders, interprets, and evaluates diagnostic tests to identify and assess patient's clinical problems and health care needs. Recognizes need for further screening or referral to PT, Speech, OT, Dietician, etc.
- Records physical findings, and formulates plan and prognosis, based on patient's condition.
- Discusses case with Physician and other health professionals to prepare comprehensive patient care plan.
- Submits health care plan and goals of individual patients for periodic review and evaluation by Physician.
- Prescribes or recommends drugs or other forms of treatment such as physical therapy, inhalation therapy, or related therapeutic procedures.
- Refers patients to Physician for consultation or to specialized health resources for treatment.
- Adapts care to spiritual, psychosocial, and cultural needs of patients when appropriate.
- Reports suspected abuse using hospital procedure.
- Assesses the patient and family needs for teaching and identifies patient's learning level, needs, and barriers as well as ability to comprehend instructions.
- Provides education to meet the patient or support person's needs
- Collaborates with supervising physician in the treatment and plan of care of patients

**Nurse Practitioner**
**Page 2**

   according to parameters defined by the collaborating physician.
- Timely documents services provided to patients, signs and dates orders, use EMR efficiently, and maintain the patient's medical record accurately and timely.
- Assures that responses to patient are timely in reporting ancillary testing results and informing patient of further treatment regiments.
- Responds to physician needs for assistance as requested.
- Assists Office Manager by providing input when evaluating work performance of the clinical staff.
- Perform other duties as required.

## QUALIFICATION REQUIREMENTS:
To perform this job successfully, an individual must be able to perform each essential duty satisfactorily. The requirements listed below are representative of the knowledge, skills, and abilities required. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

**Education and/or Experience:**
- Master's Degree

**License(s), Certification(s), Registration(s), Accreditation(s)**
- Current Missouri RN License
- Current Missouri Nurse Practitioner License
- CPR

**Knowledge, Skills and Abilities:**
- Ability to communicate effectively.
- Ability to read, analyze, and interpret, professional journals, technical procedures, or governmental regulations.
- Ability to write reports.
- Ability to effectively present information and respond to questions from groups of managers, employees, patients, and the general public.
- Knowledge of Microsoft Office software products, primarily Excel and Word.
- Knowledge of Database software and EMR Word Processing Software.
- Skill in operation of tools, equipment, and materials listed below.

## PERFORMANCE REQUIREMENTS:
- Prompt and regular attendance according to policy
- Comply with dress code and appearance standards.
- Interact with patients, customers, the general public, management, and team members in a professional, courteous, and tactful manner.
- Work with integrity, uphold Skaggs' mission, values, and maintain confidentiality in all situations.

**Nurse Practitioner**
**Page 3**

- Follow safety & security policies & procedures, immediately report suspicious activities and unsafe conditions.  Use equipment, tools & materials properly.
- Participate in all mandatory job training and meetings as directed which may include overnight travel and extended stays as applicable.
- Adhere to requirements, policies and procedures outlined in the Employee Handbook and/or other Hospital/Clinic practices.

## EQUIPMENT OPERATED:
- General office equipment
- Computer
- Diagnostic testing equipment
- Various types of medical instruments & equipment.

## PHYSICAL DEMANDS AND WORK ENVIRONMENT:
The physical demands and work environment characteristics described here are representative of those that must be met by an employee to successfully perform the essential functions of this job.  Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

- While performing the duties of this job, the employee is regularly required to stand; walk; use hands to finger, handle, or feel; reach with hands and arms and talk or hear. The employee is occasionally required to stoop and kneel. The employee must regularly lift and/or move 30 pounds, frequently lift and/or move 50 pounds and occasionally lift up to up to 100 pounds.

- Specific vision abilities required by this job include close vision, distance vision, color vision, peripheral vision, depth perception and ability to adjust focus.

- The noise level in the work environment is usually moderate.

- The employee is frequently exposed to blood borne pathogens, body fluids, contagious diseases, blood, and bio-hazard materials.

## SELECTION GUIDELINES:
*Formal application; verification of education, and experience; verification of license(s), certification(s), registration(s), accreditation(s) if applicable; oral interview, reference and background checks; job related tests may be required.*

LIN00979

**Nurse Practitioner**
**Page 4**

> The duties listed above are intended only as illustrations of the various types of work that may be performed.  The omission of specific statements of duties does not exclude them from the position.  The job description does not constitute an employment agreement between the Hospital/Clinic and the employee.  The job description is subject to change as the needs of the Hospital/Clinic and requirements of the job change.

**Employee Signature:**  I have read and agree that I can perform the essential functions of this position.


_____          _____
Print Name                    Date         Signature


_____
HR Rep. Signature             Date


**Job Description Revision History:**
_List date(s) revised: 6/2009_

LINC00980



# F A X   C O V E R   L E T T E R

**Company Name:** Lincoln National Life Insurance Co          **Fax Number:** 1-877-843-3950

**Attn.:**       Long Term Disability Claims

| | |
|---|---|
| **From:** | Cox Medical Center Branson |
| **Department:** | Human Resources |
| **Phone Number:** 417-335-7262 | **Fax Number:** 417-335-7166 |

**RE**          LTD Claims

**Date** _____          **Time** _____

**Number of Pages:**          **Cover Page**

If all pages are not received, please call

**Name**          Judy Hampton

**Phone**          417-335-7262

**Additional information:**

**Action required:**

---

### CONFIDENTIALITY NOTICE

The information contained in this message and any attachments are privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any reading, dissemination, distribution, copying, or other use of this communication or any of its attachments is strictly prohibited. If you have received this communication in error, please notify the sender immediately and delete/destroy this message, any attachments, all copies and backups.

P.O. Box 650 - Branson, MO  65615

## Long-Term Disability Claim Employer's Statement

**To Be Completed By The Employer**

This claim is for (Employee's Name and Address)          Social Security Number    Date of Birth

JAMIE FLANAGAN

**A. Information about the employer**

Company's Name
LESTER E. COX MEDICAL CENTER        Group Policy Number    Class Number
                                     0000101573a6

Address (Street, City, State, Zip)                        Telephone:
                                                          Fax:

Name and address of division where employee works (if different from above)    Telephone: 417-335-7262
525 BRANSON LANDING BLVD  BRANSON MO 65616    Fax: 417-348-8285

**B. Information about the employee**

Date employee was hired     Date employee became insured under this plan? 5/1/2013    What was the employee's regularly scheduled work week?
(Month, Day, Year) 3/1/10   Date employee became insured under prior plan? 3/1/2010    hours per week 40    hours per day 8

**C. Information needed for withholding and reporting taxes**

Does employee contribute post-tax dollars toward the premium?  h Yes ⓝNo  If yes, what percent is paid by the employee?            %
**If you leave this section blank, we will assume it is 100% employer contribution and calculate FICA taxes accordingly.**

**D. Information about the claim**

Were there any changes to the employee's job responsibilities due to the disabling condition before the employee became fully disabled?
☐ Yes ☒No  If yes, what were the changes and when were they made?

What was the employee's permanent job on his or her last day at work?    How long had the employee been in this job?
NURSE PRACTIONER                                        3 YRS  5 MOS

Last day employee actually worked                       On that day, did the employee work a full day?
(Month, Day, Year) 8/25/2013                            ☐ Yes ☒No  If no, how many hours were worked? 4

Why did employee stop working?                          Is the employee's condition work related?
                                                        ☐ Yes ☐ No

Has a claim been filed with Workers' Compensation?
☐ Yes ☒No  If yes, send initial report of illness or injury and award notice.

Name, address and telephone number of your compensation carrier

Name, address and telephone number of your medical insurance carrier

**E. Information about your pension plan (do not complete for maternity claim)**

Do you have a pension plan?     If yes, what type?  ☐ Defined benefit    ☐ 401(k)    ☐ Other: (specify)
☒Yes ☐ No                                          ☒Defined contribution ☐ Profit sharing

Is the employee eligible for your pension plan?          If eligible, does the employee participate?
☒Yes ☐ No  If no, why?                                  ☒Yes ☐ No  If no, why?

If the employee is participating, when is he or she eligible for benefits under the plan? (Month, Day, Year)
UPON TERMINATION OF EMPLOYMENT OR AT AGE 59 1/2

**NOTE: If any portion of this pension benefit is attributable to the employee's contribution, please provide details including the percentage of his/her contribution to the total contribution. This should include a copy of the contract.**

**F. Information about your rehire or return-to-work policies**

Does your company have a rehire or return-to-work policy for disabled employees?
☒Yes ☐No

What is the name and title of the manager we should contact if we identify a rehabilitation or return-to-work option?
CHERYL DUNN — EMPLOYEE RELATIONS MANAGER

**G. Information about the employee's salary**

The employee (Check all that apply)
☒is paid hourly (what is the hourly rate?) $ 43.29    ☐ is salaried    ☐ receives commissions    ☐ receives bonuses

Will employee file for disability benefits provided by any employer/employee labor management, state disability or union welfare plan?
☐ Yes ☒No  If yes, what is the weekly amount? $ _____ - _____  When do benefits begin? _____  End? _____

Is this employee eligible for salary continuation?
☐ Yes ☒No  If yes, what is the weekly amount? $ _____  When do benefits begin? _____  End? _____

(Continued on next page)

Case 3:17-cv-05060-MDH    Document 33-4    Filed 05/15/18    Page 187 of 269    LINC00982

Reporting the employee's basic monthly earnings

Find the definition of basic monthly earnings that matches your contract for this employee and follow the instructions given.

**Definitions of Basic Monthly Earnings**

a.  salary only (no commissions, bonuses, etc.), complete question 1 below
b.  previous year's W-2 form, complete question 5 below (attach W-2)
c.  sole proprietor, complete question 8 below
d.  previous year's K-1 form, complete question 6 below (attach K-1)

e.  salary and commissions, complete questions 1 and 3 below
f.  salary, commissions and bonuses, complete questions 1, 3 and 4 below
g.  salary and deferred compensation, complete questions 1 and 2 below
h.  salary, deferred compensation and commissions, complete questions 1, 2 and 3 below
i.  salary, deferred compensation, commissions and bonuses, complete questions 1, 2, 3 and 4 below
j.  salary and K-1 earnings, complete questions 1 and 6 below

k.  W-2 with deferred compensation, complete questions 2 and 5 below
l.  partnership agreement, complete question 7 below
m.  teacher's contract, complete question 1 below
n.  any other definition, complete question 9 below

1)  On the last day employee worked, what was his or her basic monthly salary? (Divide annual salary by 12 or multiply weekly salary by 52 and divide by 12. Teachers divide annual salary by 12)      1 _7,503.60_

2)  On the last day the employee worked, what was his or her monthly pre-tax contribution to your deferred compensation plan?      2 _____

3)  How much had the employee received in commissions in the 12 months (or the period of employment if less than 12 months) immediately preceding the last day worked? $ _____ . Divide this number by 12, or the length of employment if less than 12 months, to find the average monthly commissions.      3 _____

4)  How much had the employee received in bonuses in the 12 months (or the period of employment if less than 12 months) immediately preceding the last day worked? $ _____ . Divide this number by 12, or the length of employment if less than 12 months, to find the average monthly bonuses.      4 _____

5)  What were the employee's earnings as shown on the W-2 form of the year immediately preceding the disability?      5 _____

6)  What were the employee's earnings as shown on the K-1 form of the year immediately preceding the disability?      6 _____

7)  As of the last day the employee worked, what were the budgeted annual earnings as determined by the written partnership agreement in effect? (Do not include dividends, interest or return of capital) $ _____ .      7 _____

8)  As of the last day the employee worked, what was the sole proprietor's annual net profit (1040 Schedule C gross income minus total deductions minus depreciation) averaged over the 3 years immediately preceding the disability or the period of sole proprietorship if less than 3 years?      8 _____

9)  For definitions other than those above, calculate the monthly earnings as they are defined in your contract. If earnings are based on salary as expressed on a particular document, send us a copy of the document.      9 _____

**H.  Required Attachments and Signature**

If the employee contributes to the premiums, attach a copy of the enrollment form.

If salary is based on a W-2, K-1, 1099, or a similar document, attach a copy of the document.

If you have medical information from the employee's file relating to this disability, please attach copies.

If a workers' compensation claim is filed, send initial report of injury or illness and award notice.

Name of person completing this form (If this claim is approved for disability benefits, the benefit check will be sent to the employee with a carbon copy to you.)

X ___Judy Hampton___                    ___HR Supervisor___          ___11-15-13___
    Signature                             Title                         Date

## Long-Term Disability Claim Job Analysis

**To Be Completed By The Employee's Supervisor**

This claim is for (Employee's Name)
_JAMIE FLANAGAN_

Employee's Social Security Number ████████████                     | Date of Disability (Month, Day, Year)

**A. General information about the employee's job**

Job Title _NURSE PRACTIONER_                                       | Minimum education or training required

Does the employee perform supervisory functions?
☐ Yes   ☐ No   If yes, how many people are supervised? _____ Describe job duties.

Check the items below that relate to the employee's job. Use these definitions for the frequency of occurrence:
> **Occasionally** means the person does the activity up to 33% of the time.
> **Frequently** means the person does the activity 34% to 66% of the time.
> **Continuously** means the person does the activity 67% to 100% of the time.

_SEE JOB DESCRIPTION_

|                                | Occasionally | Frequently | Continuously |
|--------------------------------|:---:|:---:|:---:|
| Relate to others               | ☐ | ☐ | ☐ |
| Written and verbal communication | ☐ | ☐ | ☐ |
| Reasoning, math and language   | ☐ | ☐ | ☐ |
| Makes independent judgments    | ☐ | ☐ | ☐ |

Which of the following describe the employee's working environment? Check all that apply.
☐ Unprotected heights          ☐ Changes in temperature or humidity          ☐ Exposure to dust, fumes and gases
☐ Being near moving machinery  ☐ Driving automotive equipment                ☐ Other hazards

Is the employee required to travel?
☐ Yes   ☒ No   If yes, complete the following information:
How does the employee travel? (Automobile, plane, train, etc.)
Where does the employee travel?                                What percent of the time does the employee travel?

**B. Information about the physical aspects of the employee's job**

Check the items below that relate to the employee's job and complete the information requested. Use these definitions for the frequency of occurrence:
> **Occasionally** means the person does the activity up to 33% of the time.
> **Frequently** means the person does the activity 34% to 66% of the time.
> **Continuously** means the person does the activity 67% to 100% of the time.

_SEE JOB DESCRIPTION_

| Activity | Occasionally | Frequently | Continuously | Describe Activity | Weight |
|----------|:---:|:---:|:---:|---|---|
| ☐ Standing | ☐ | ☐ | ☐ | | |
| ☐ Walking | ☐ | ☐ | ☐ | | |
| ☐ Sitting | ☐ | ☐ | ☐ | | |
| ☐ Balancing | ☐ | ☐ | ☐ | | |
| ☐ Stooping | ☐ | ☐ | ☐ | | |
| ☐ Kneeling | ☐ | ☐ | ☐ | | |
| ☐ Crouching | ☐ | ☐ | ☐ | | |
| ☐ Crawling | ☐ | ☐ | ☐ | | |
| ☐ Reaching/working overhead | ☐ | ☐ | ☐ | | |
| ☐ Climbing: | ☐ | ☐ | ☐ | | |
| ☐ Stairs | ☐ | ☐ | ☐ | | |
| Number of stairs: _____ | | | | | |
| ☐ Ladders | ☐ | ☐ | ☐ | **Describe Activity** | **Weight** |
| Height of Ladder: _____ | | | | | |
| ☐ Pushing | ☐ | ☐ | ☐ | _____ | _____ lbs. |
| ☐ Pulling | ☐ | ☐ | ☐ | _____ | _____ lbs. |
| ☐ Lifting/carrying | ☐ | ☐ | ☐ | _____ | _____ lbs. |

(Continued on next page)

---

**Can the job be performed by alternating sitting and standing?**
☐ Yes   ☒ No

**Does the job require using the feet to operate foot controls?**
☐ Yes   ☒ No   If yes, on what type of equipment?

**How important is good vision in the job?**   *IMPORTANT*

| What are the major tasks requiring use of one or both hands? | One Hand | Both Hands |
|---|---|---|
| *SEE JOB DESCRIPTION* | ☐ | ☐ |
| | ☐ | ☐ |
| | ☐ | ☐ |
| | ☐ | ☐ |

---

**C.  Information about the job as it relates to the disability**

Can the job be modified to accommodate the disability either temporarily or permanently?
☐ Yes   ☐ No   If yes, explain


Is it possible to offer the employee assistance in doing the job (through use of technology or personal assistance for example)?
☐ Yes   ☐ No   If yes, explain


---

**D.  Attachments and Signature** (Attach a copy of the employee's job description)

Name of person completing this form

X _Judy Hampton_                           _HR Supervisor_          _11-15-13_
   Signature                                Title                    Date

                                           Telephone _417-335-7262_ Fax _417-348-8285_

Case 3:17-cv-05060-MDH    Document 33-4    Filed 05/15/18    Page 190 of 269   LIN00985

*SKAGGS Regional Medical Center*

# Job Description

## Job Title: Nurse Practitioner

Department:  Varies
Reports to:  Director of Physician Services
FLSA Status:  Exempt
Job Code: 7150
Effective Date: June 23, 2009

## SUMMARY:
Provides general medical care and treatment to patients in medical clinic(s), under direction of Physician, by performing the duties listed below.

## SUPERVISORY RESPONSIBILITIES:
This job has indirect supervisory responsibilities over clinical staff.

## ESSENTIAL DUTIES AND RESPONSIBILITIES:
- Provide exceptional service and/or care to all patients, customers and team members.
- Performs physical examinations and preventive health measures within prescribed guidelines and instructions of Physician.
- Orders, interprets, and evaluates diagnostic tests to identify and assess patient's clinical problems and health care needs. Recognizes need for further screening or referral to PT, Speech, OT, Dietician, etc.
- Records physical findings, and formulates plan and prognosis, based on patient's condition.
- Discusses case with Physician and other health professionals to prepare comprehensive patient care plan.
- Submits health care plan and goals of individual patients for periodic review and evaluation by Physician.
- Prescribes or recommends drugs or other forms of treatment such as physical therapy, inhalation therapy, or related therapeutic procedures.
- Refers patients to Physician for consultation or to specialized health resources for treatment.
- Adapts care to spiritual, psychosocial, and cultural needs of patients when appropriate.
- Reports suspected abuse using hospital procedure.
- Assesses the patient and family needs for teaching and identifies patient's learning level, needs, and barriers as well as ability to comprehend instructions.
- Provides education to meet the patient or support person's needs
- Collaborates with supervising physician in the treatment and plan of care of patients

LIN00986

**Nurse Practitioner**
**Page 2**

  according to parameters defined by the collaborating physician.
- Timely documents services provided to patients, signs and dates orders, use EMR efficiently, and maintain the patient's medical record accurately and timely.
- Assures that responses to patient are timely in reporting ancillary testing results and informing patient of further treatment regiments.
- Responds to physician needs for assistance as requested.
- Assists Office Manager by providing input when evaluating work performance of the clinical staff.
- Perform other duties as required.

## QUALIFICATION REQUIREMENTS:
To perform this job successfully, an individual must be able to perform each essential duty satisfactorily. The requirements listed below are representative of the knowledge, skills, and abilities required. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

**Education and/or Experience:**
- Master's Degree

**License(s), Certification(s), Registration(s), Accreditation(s)**
- Current Missouri RN License
- Current Missouri Nurse Practitioner License
- CPR

**Knowledge, Skills and Abilities:**
- Ability to communicate effectively.
- Ability to read, analyze, and interpret, professional journals, technical procedures, or governmental regulations.
- Ability to write reports.
- Ability to effectively present information and respond to questions from groups of managers, employees, patients, and the general public.
- Knowledge of Microsoft Office software products, primarily Excel and Word.
- Knowledge of Database software and EMR Word Processing Software.
- Skill in operation of tools, equipment, and materials listed below.

## PERFORMANCE REQUIREMENTS:
- Prompt and regular attendance according to policy
- Comply with dress code and appearance standards.
- Interact with patients, customers, the general public, management, and team members in a professional, courteous, and tactful manner.
- Work with integrity, uphold Skaggs' mission, values, and maintain confidentiality in all situations.

LIN00987

**Nurse Practitioner**
**Page 3**

- Follow safety & security policies & procedures, immediately report suspicious activities and unsafe conditions. Use equipment, tools & materials properly.
- Participate in all mandatory job training and meetings as directed which may include overnight travel and extended stays as applicable.
- Adhere to requirements, policies and procedures outlined in the Employee Handbook and/or other Hospital/Clinic practices.

## EQUIPMENT OPERATED:
- General office equipment
- Computer
- Diagnostic testing equipment
- Various types of medical instruments & equipment.

## PHYSICAL DEMANDS AND WORK ENVIRONMENT:
The physical demands and work environment characteristics described here are representative of those that must be met by an employee to successfully perform the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

- While performing the duties of this job, the employee is regularly required to stand; walk; use hands to finger, handle, or feel; reach with hands and arms and talk or hear. The employee is occasionally required to stoop and kneel. The employee must regularly lift and/or move 30 pounds, frequently lift and/or move 50 pounds and occasionally lift up to up to 100 pounds.

- Specific vision abilities required by this job include close vision, distance vision, color vision, peripheral vision, depth perception and ability to adjust focus.

- The noise level in the work environment is usually moderate.

- The employee is frequently exposed to blood borne pathogens, body fluids, contagious diseases, blood, and bio-hazard materials.

## SELECTION GUIDELINES:
*Formal application; verification of education, and experience; verification of license(s), certification(s), registration(s), accreditation(s) if applicable; oral interview, reference and background checks; job related tests may be required.*

**Nurse Practitioner**
**Page 4**

The duties listed above are intended only as illustrations of the various types of work that may be
performed.  The omission of specific statements of duties does not exclude them from the position.
The job description does not constitute an employment agreement between the Hospital/Clinic and the
employee.  The job description is subject to change as the needs of the Hospital/Clinic and requirements
of the job change.

**Employee Signature:**  I have read and agree that I can perform the essential functions of
this position.

_____        _____
Print Name                    Date        Signature


_____
HR Rep. Signature             Date

**Job Description Revision History:**
*List date(s) revised: 6/2009*

LIN00989

**Walton, Parnell D**

| | |
|---|---|
| **From:** | LFGAppeals |
| **Sent:** | Monday, June 09, 2014 11:04 AM |
| **To:** | ENTRPRSERIP |
| **Subject:** | FW: Jamie Flanagan 1130226196 Peer Review Report |
| **Attachments:** | Flanagan,_J-final[1].pdf |

_____

From: Penke, Allison
Sent: Monday, June 09, 2014 12:03:23 PM (UTC-05:00) Eastern Time (US &
Canada)
To: LFGAppeals
Cc: Hastings, Reid
Subject: Jamie Flanagan 1130226196 Peer Review Report


Please index as:


Business Area: GPRISKCLMS


Source Type as MEDRECSG


Source Identifier as MEDR - PEER REPORT

1

**Walton, Parnell D**

| | |
|---|---|
| **From:** | Disability Claims |
| **Sent:** | Monday, December 22, 2014 9:23 AM |
| **To:** | SA-EMLRIP112-P |
| **Subject:** | FW: 1130226196 JAMIE FLANAGAN |
| **Attachments:** | GetPDF.pdf |

_____

From: Young, Amy D. (Medical Review)
Sent: Monday, December 22, 2014 10:22:37 AM (UTC-05:00) Eastern Time (US & Canada)
To: Disability Claims
Subject: 1130226196 JAMIE FLANAGAN


Good morning!

Could you please upload the attached records.

Thank you

Amy

1

**Walton, Parnell D**

| | |
|---|---|
| **From:** | Disability Claims |
| **Sent:** | Thursday, March 05, 2015 8:01 AM |
| **To:** | SA-EMLRIP112-P |
| **Subject:** | FW: cl# 1130226196  Jamie Flanagan |

_____

From: Howe, Mary
Sent: Thursday, March 05, 2015 9:01:28 AM (UTC-05:00) Eastern Time (US & Canada)
To: Disability Claims
Cc: Elder, Theresa M.
Subject: cl# 1130226196 Jamie Flanagan

Mary Carmen Howe

The Lincoln National Life Insurance Company

Insurance Solutions-Group Protection

Medical Records Coordinator

8801 Indian Hills Drive

Omaha, NE 68114

(402)361-7540

Mary.Howe@lfg.com

Hello future.®

Insurance products are issued by the insurance company affiliates of Lincoln Financial Group: The Lincoln National Life Insurance Company and Lincoln Life & Annuity Company of New York. The Lincoln National Life Insurance Company is not authorized in the state of New York. Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

1

LIN00992

LIN00993

**Walton, Parnell D**

| | |
|---|---|
| **From:** | Disability Claims |
| **Sent:** | Monday, March 09, 2015 10:26 AM |
| **To:** | SA-EMLRIP112-P |
| **Subject:** | FW: Jamie Flanagan |
| **Attachments:** | GetPDF.pdf |

_____

From: Howe, Mary
Sent: Monday, March 09, 2015 11:26:10 AM (UTC-05:00) Eastern Time (US & Canada)
To: Disability Claims
Cc: Machian, Mike
Subject: Jamie Flanagan

These are the records that should have been sent to Intake Mike. I do not know why they didn't complete but I'll send them over again.

1

## Walton, Parnell D

| | |
|---|---|
| **From:** | Disability Claims |
| **Sent:** | Friday, April 17, 2015 12:33 PM |
| **To:** | SA-EMLRIP112-P |
| **Subject:** | FW: Disability paperwork Jamie Flanagan |
| **Attachments:** | New Doc 30.pdf |

_____

From: Machian, Mike
Sent: Friday, April 17, 2015 1:33:14 PM (UTC-05:00) Eastern Time (US &
Canada)
To: Disability Claims
Subject: FW: Disability paperwork Jamie Flanagan

From: Jamie Flanagan [mailto:jamieandjason0306@gmail.com]
Sent: Friday, April 17, 2015 12:27 PM
To: Machian, Mike
Subject: Disability paperwork Jamie Flanagan

Mike,

My doctor wanted to do the paperwork later as he was very busy the day I went to see him. I should have it within the week. Also, my printer is not working so all I could do was the scanner on my phone which you told me you hate, but I wanted to give you what I could today and get the correct most accurate address to send these to so I can get them to you as soon as possible. Please let me know today and I will drop them in the mail ASAP. Thank you so much,

Jamie

1

**Walton, Parnell D**

| | |
|---|---|
| **From:** | Disability Claims |
| **Sent:** | Wednesday, July 01, 2015 9:27 AM |
| **To:** | SA-EMLRIP112-P |
| **Subject:** | FW: 1130226196 jamie flanagan |
| **Attachments:** | GetPDF.pdf |

**From:** Young, Amy D. (Medical Review)
**Sent:** Wednesday, July 01, 2015 10:26:31 AM (UTC-05:00) Eastern Time (US & Canada)
**To:** Disability Claims
**Subject:** 1130226196 jamie flanagan

Please upload the attached records into AWD.
Thank you
Amy

1

## Walton, Parnell D

| | |
|---|---|
| **From:** | Disability Claims |
| **Sent:** | Wednesday, July 22, 2015 12:07 PM |
| **To:** | SA-EMLRIP112-P |
| **Subject:** | FW: Release of information - Dr. Hopewell |
| **Attachments:** | New Doc 34.pdf |

**From:** Machian, Mike
**Sent:** Wednesday, July 22, 2015 1:07:26 PM (UTC-05:00) Eastern Time (US & Canada)
**To:** Disability Claims
**Subject:** FW: Release of information - Dr. Hopewell

1130226196

**From:** Jamie Flanagan [mailto:jamieandjason0306@gmail.com]
**Sent:** Wednesday, July 22, 2015 12:05 PM
**To:** Machian, Mike
**Subject:** Release of information - Dr. Hopewell

Mr. Machian,

Can you please let me know you received this and that it is what you need? If it needs to be changed or something different, let me know.

Thank you,

Jamie Flanagan

1

**Walton, Parnell D**

| | |
|---|---|
| **From:** | Disability Claims |
| **Sent:** | Tuesday, August 25, 2015 11:21 AM |
| **To:** | SA-EMLRIP112-P |
| **Subject:** | FW: 1130226196 Jamie Flanagan |
| **Attachments:** | GetPDF.pdf |

**From:** Young, Amy D. (Medical Review)
**Sent:** Tuesday, August 25, 2015 12:20:42 PM (UTC-05:00) Eastern Time (US & Canada)
**To:** Disability Claims
**Subject:** 1130226196 Jamie Flanagan

Please upload the attached records into AWD
Thank you
Amy

**Walton, Parnell D**

| | |
|---|---|
| **From:** | Disability Claims |
| **Sent:** | Thursday, October 01, 2015 4:26 PM |
| **To:** | SA-EMLRIP112-P |
| **Subject:** | FW: (secure) |
| **Attachments:** | 443000719719.pdf |

**From:** Machian, Mike
**Sent:** Thursday, October 01, 2015 5:26:12 PM (UTC-05:00) Eastern Time (US & Canada)
**To:** Disability Claims
**Subject:** FW: (secure)

1130226196

**From:** Machian, Mike
**Sent:** Thursday, October 01, 2015 4:25 PM
**To:** 'Jamie Flanagan'
**Subject:** (secure)

**From:** Jamie Flanagan [mailto:jamieandjason0306@gmail.com]
**Sent:** Thursday, October 01, 2015 11:51 AM
**To:** Machian, Mike
**Subject:** Letter

Mike,

Can you please send me a copy of the letter they are mailing me via email?

Thanks

Jamie

**Walton, Parnell D**

| | |
|---|---|
| **From:** | LFGAppeals |
| **Sent:** | Thursday, March 10, 2016 2:25 PM |
| **To:** | SA-EMLRIP112-P |
| **Subject:** | FW: J FLANAGAN 1130226196 Final Review Report |
| **Attachments:** | Jamie Flanagan 1130226196.pdf |

**From:** Chappelear, Samantha
**Sent:** Thursday, March 10, 2016 3:24:32 PM (UTC-05:00) Eastern Time (US & Canada)
**To:** LFGAppeals
**Cc:** Rush, Virginia
**Subject:** J FLANAGAN 1130226196 Final Review Report

Please index as:

Business Area: GPRISKCLMS

Source Type as MEDRECSG

Source Identifier as MEDR - PEER REPORT

**Samantha Chappelear**
**Appeals, Support Coordinator**
**Group Protection Claims Solutions**
Lincoln Financial Group
8801 Indian Hills Dr.
Omaha, NE 68144
Toll Free: 1-800-423-2765
Phone: 402-361-2768
Fax: 402-951-0752
Email: Samantha.Chappelear@lfg.com

**You're In Charge**sm

Find us on facebook: www.facebook.com/LincolnFinancialGroup

Insurance products are issued by the insurance company affiliates of Lincoln Financial Group: The Lincoln National Life Insurance Company and Lincoln Life & Annuity Company of New York. The Lincoln National Life Insurance Company is not authorized in the state of New York. Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

1

LINC010000

## Walton, Parnell D

| | |
|---|---|
| **From:** | LFGAppeals |
| **Sent:** | Wednesday, August 17, 2016 9:03 AM |
| **To:** | SA-EMLRIP112-P |
| **Subject:** | FW: Jamie Flanagan |

---

**From:** Catrina Howard
**Sent:** Wednesday, August 17, 2016 10:02:57 AM (UTC-05:00) Eastern Time (US & Canada)
**To:** LFGAppeals
**Subject:** Jamie Flanagan

On May 8, 2016, I sent a letter to your company requesting a copy of my client's entire file and the curriculum vitae of experts utilized in denying Mrs. Flanagan's benefits. On June 6, 2016 I received the curriculum vitae for Joseph G. Thomas, M.D. and what is purported to be a curriculum vitae for Brandy Thomas, MA, CRC. In the June 6, 2016, with the curriculum vitae's letter you wrote "…a file copy is being created and will be sent to you once complete." To date I have received no file copy. Oddly, however, I have received a file copy c.d. with a person named Gibson on the c.d. I assume this is Gibson's records, but I cannot access the file because you utilize a password system of a Social Security number and Mrs. Flanagan's Social Security number does not open Gibson's file. I will assume the Gibson c.d. is for another case.

Our deadline to appeal the decision is October 23, 2016. To date you have not provided a copy of the entire file. I have the file from a prior request dated February 24, 2016, which consists of 612 pages. It would be very sufficient to simply provide us everything from the date of that c.d. forward. If I do not receive anything further evidencing the records from and after the date of that c.d. I am going to assume there are no further records after February 24, 2016 relevant to Mrs. Flanagan's claim and proceed to develop evidence. If later in a court action there are records from and after our appeal in February 2016 and the disc you sent on February 24, 2016, I will argue to the court your company intentionally refused to provide any further documentation used to deny Mrs. Flanagan's benefits.

Rick Vasquez

Cc: Jamie Flanagan
Cc: Reid Hastings

Catrina Howard
Law Offices of Rick Vasquez
1736 E Sunshine St. Ste 103
Springfield, Mo
65804

417-889-7735
www.rickvasquezlaw.com

LINC-1001

# GR LIFE CLAIM PROFILE

**Date:** 8/21/2017 **LFG** **Claim #:** 1140128972

---

**Insurer:** The Lincoln National Life Insurance Company **Posted:** 6/20/2014 **Location:** HOME
**Policy:** 00001015732500000 - **Status:** CLOSED **User ID:** HIELLEB
Lester E. Cox Medical Center **Business:** TRUE LIFE
**Close Date:** 9/3/2014 **Close Reason:** Not TD Any Occ

---

**Claimant Information**

**Name:** JAMIE FLANAGAN **Phone:** (417)459-5879 **DOB:** ▮▮▮
**SSN:** ▮▮▮ **Sex:** F **Hire:** 3/1/2010
**Address:** 1625 MUSKY DME DRIVE **Ins Eff:** 5/1/2013 **Class:** 3
CRANE MO 65633 USA **Occ:** Nurse Practi **DOT**
**Salary:** $90,043.20 **Period:** Monthly

---

**Claim Information**

**Special Provisions:** Optional coverage exists - see contract

**Age:** 33

**DLW:** 8/25/2013 **DOD:** 8/25/2013 **S/A:** S **W/R:** N

**Type:** WAIVER **Nature:** ILLNESS

**Diagnosis Pri:** 722.83 Postlaminectomy Syndrome Lumbar Region
**Sec:** 724.02 Spinal Stenosis Lumbar Region
**Recovery Date:** 4/3/2047

---

**Benefit Information**

**Date Ben Begin:** **Months Paid:** 0 **Actual Age:** 33
**Modal:** $0.00 **Reins:** **Reserve:**
**Waiver:** **Waiver Approved:** **Date Waiver Approved:**
**Face Bas:** **Face Sup:** **Face Vol:**
**Cur Bas:** **Cur Sup:** **Cur Vol:**

---

**Policy Information**

| | Basic | Supplemental | Voluntary |
|---|---|---|---|
| **Method:** | | | |
| **Min:** | | | |
| **Max:** | | | |
| **Add:** | | | |
| **Dis:** | | | |

---

**Offset Information**

| Type | Status | Awarded | Terminated | Mo Amount | Mo Used |
|---|---|---|---|---|---|
| LI | PROCESSED | | 4/3/2047 | $181,000.00 | |
| OLI | PROCESSED | | 4/3/2047 | $70,000.00 | |

---

**Dependent Information**

| Type | DOB | Name |
|---|---|---|

1

Case 3:17-cv-05060-MDH Document 33-4 Filed 05/15/18 Page 207 of 260 **LIN001002**

# GR LIFE CLAIM PROFILE

**Date:** 8/21/2017           **LFG**           **Claim #:** 1140128972

## Alert Information

| Status | Level | Description | Posted | Resolved |
|--------|-------|-------------|--------|----------|
| T | W | CHECK FOR CURRENT PREMIUM PAYMENT | 6/23/2014 | 8/4/2014 |
| T | W | VERIFY ELIM PERIOD MET, MED RECS REQUESTED & TE&E REQUESTED | 6/23/2014 | 8/4/2014 |
| T | W | CHECK WAIVER BEGN DATE | 6/23/2014 | 8/4/2014 |
| T | W | UPDATE LTD WITH AN ACTIVITIES CHECK | 6/23/2014 | 8/4/2014 |

## Action Plan

*** Nat'l Acct Grp: Per Grid: LI is ER pd, OLI/ODLI is EE pd, Josh Evans @ joshua.evans@coxhealth.com @ (417) 269-6528, initial calls are not req'd, can email GRP when/if doc is needed & determination of cl & Policy has 12 month own occ wording. ***

*** Clmt's Email: jamieandjason0306@gmail.com ***

*** TE&E in file & need beneficiary form as of 7/14 ***

****************************************************************************

7/17/14 - CRB & CPH - Management review: There is no direction rationale in the action plan explaining decision path, so HIE will need to summarize a direction rationale and refer back to management review. Referred back to HIE

7/14/14 HIE - Rec'd reply email from Grp on 7/10/14 adv'ing Jamie was class 3 for life coverage, she had grp life cov in the amot of $181K, she also had Optional life cov on herself in the amt of $70K, she pd $16.66 pr month for the opt. life coverage. Prior to approving cl, sent cl to be reviewed by ODR, will f/u w/ ODR on 7/16/14. Will f/u w/ clmt on 8/25/14 for contracting wording of 12 mons own occ for an updated of her dx & tx/updated APS/med recs from 7/1/14 to current, & possible RTW. Will send approval ltrs to both clmt & grp via email once the cl has been reviewed by ODR.

7/12/14 ACV for HIE - unable to check if HIE recvd email response back from ER regarding eligibility. will leave fu on 7/14/14 for HIE to check her email

7/10/14 HIE - I contacted the grp adm Josh, I explained the nature of my call in regards to confirming life elig for Mrs. Flanagan, he advd he understood, he stated he would like to reply via email as proof of confirmation, he stated he has rec'd my previous email on 6/26/14 & he will reply either 7/10 or 7/11 becasue he has to do some research, I advd I understood. I thanked him for his time & we both ended the call. Will f/u w/ Grp on 7/14/14.

7/8/14 HIE - I tried to reach the grp adm Josh, Heather advd he call in sick today but he should return on 7/9/14, I informed her that I had previously sent him an email in regards to confirming life elig for the clmt, she advd he will reply but he would be playing catch up on 7/9/14 upon his return, she advd to allow until 7/10/14 for Josh to reply in regards to elig via email. I thanked her for her time & we both ended the call. Will f/u w/ grp on 7/10/14.

7/2/14 HIE - Rec'd incoming v/m from Grp Adm Heather adv'ing she was returning my call in regards to Ms. Flanagan Life Waiver of prem cl, she stated to c/b @ 417 380 5040. She then disconnected the call. I returned the Grp Adm's call, I explained that I was verifying Ms. Flanagan's life coverage as of her dlw of 8/25/13, salary & life benefit amt, she advd Joshua would be the one whom would anser these questions, she is his back up, she's unable to get into their system, she stated Joshua would return to work on 7/8/14 due to holiday & vacation, she advd to plz c/b on Tuesday 7/8/14 & speak w/ Joshua, I advd that I would do so, I thanked her for her time & we both ended the call Will f/u w/ Grp on 7/8/14.

7/2/14 BRX mailed intro letter to ee for HIE

7/1/14 HIE - Rec'd incoming call from clmt, she advd she was sorry for missing my calls, I thanked her for returning my calls. I explained the nature of my call in regards to WOP-she advd she understood, I verified the clmt's ss#/add/dlw/er/occ/dob/doh/eff date of cov/dlw -she advd all is correct, she has 12th grade education & a masters degree in nursing, she advd she has trouble w/ sleeping which is one of her big issues along w/ muscle spasms/numbness & pain in her legs & feet, she has flare ups, she rec'd steroid (oral) a couple of months ago, she is seen every 3 mons, LOV was 2 mons ago, NOV is 7/29/14, she's able to drive for only 20 mins but mostly her spouse takes her where she needs to go, she doesn't need assistance w/ ADLs, she stated her dx is getting better, still has bad days, pain 9/10 sometimes or 2-3/10 is a good day, she only takes pain meds which affects her concentration & memory, she advd she does a lot of reading, watches TV, rest a lot thru out the day, not much of anything else, she just stays home, the meds she takes causes stomach issues also, & she also becomes disoriented, she

2

LIN0C1003

# GR LIFE CLAIM PROFILE

**Date:** 8/21/2017        **LFG**        **Claim #:** 1140128972

rest a lot w / a lot changes in positions, she also stated the meds affects her attention & alertness a lot. She can be reached via email @ jamieandjason0306@gmail.com. I explained to her this does not affect her LTD benefits, she stated she understood. I thanked her for her time & w e both ended the call.

7/1/14 HIE - Tried to reach the clmt, auto rec'd v/m, left message w / nature of my call in regards to WOP, her current status of her dx & tx, advd to plz return call to (402) 361-2991. Ended call. Tried to reach the grp adm Joshua, rec'd v/m of Heather Laskey, Left message w / nature of my call in regards to confirm life elig for Ms. Jamie Flanagan, advd I had issues an email to Joshua on 6/26/14 in regards to confirm ing Ms. Flanagan's life elig, no reply has been rec'd at this time, advd to return call to (402) 361-2991. Ended call. Since no reply rec'd from Grp Adm Joshue via email, w ill allow 1 more day for reply from grp since I w as able to leave a message w / Ms. Heather Laskey. Will f/u w / Grp on 7/2/14. If no reply from grp rec'd, then w ill send pend ltr to grp for elig.

6/26/14 HIE - Sent email to Grp Adm Joshua Evans to confirm life elig. for the clmt, w ill f/u w / Grp on 6/30/14. Tried to reach the clmt, phone rang & rang, no v/m picked up, unable to leave a message, disconnected call. Will f/u w / clmt on 6/30/14.

Jamie Flanagan Cl # 1140128972
PATH:6/26/14 HIE - Conduct initial call to clmt & send email to Grp to confirm life elig due to unable to locate clmt on any census(s) in AWD. Ck'd LTD cl, LTD cl w as overturned on 2nd appeal & cl w as approved & LTD has a f/u set for 9/19/14 w / the clmt.
ASSESSMENT:33 yr old Female, Nurse practitioner, DLW 8/25/13, Dx'd w / post laminectomy syndrome lumbar region & spinal stenosis lumber region. Approving cl due to contract w ording for ow n occ of 12 mons due to the clmt, & the clmt has failed conservative txs after sx w as performed on 4/11, her osw estry score w as 64%, her right less is w orse than left, she has numbness/burning dow n both legs, ache in her calves, feels w eakness, spasms in her back w / stabbing/aching, cannot put w eight on her right hip, pain in shoulder/elbow s/w rist, cannot drive more than 30 mins, & her pain progresses w / activity. spondylolisthesis w / failed fusion & nerve root scarring & failed spinal cord stimulator.
SUMMARY:33 yr old Female, Nurse practitioner, DOH 3/1/10, WP-0 days, the DOH/membership, Eff. 5/1/13, DLW 8/25/13, Dx'd w / post laminectomy syndrome lumbar region & spinal stenosis lumber region. She w as dx'd w / spondylolisthesis along w / failed fusion & nerve root scarring & failed spinal cord stimulator.
MEDICAL FINDINGS:Dx'd w / post laminectomy syndrome lumbar region & spinal stenosis lumber region.
AWD dated 11/15/13: ER's portion of cl: doh 3/1/10, insured 5/1/10, 40 hrs, nurse practitioner, dlw 8/23/13, pd $43.29 pr hr, pr Grp Adm Judy Hampton on 11/15/13. Auth form signed & dated by clmt on 11/10/13. EE's portion of cl: nurse practitioner, tx'ing Dr(s): Diane Cornelison (neuro/pain mgt), Charles Mace (neuro), Donald Hopew ell (neuro/pain mgt), Wayne Wallender (anestesiat/pain mgt), Knox (FP), I. Winkler (rheumatology), Glady Jacob (neuro), Thomas Woodw ard ( M), Barbara Podovoovich (pain/psych), hospitalized 4/1/11-4/4/11, pr clmt as of 11/10/13. APS-dx'd w / post lami syndrome lumber & spinal stenosis, & chronic pain. Low back pain w / pain spreads into low er extremities, normal physical exam/x-rays, CT/MRI, spondylolisthesis w / failed fusion & nerve root scarring. Symptoms have been constant since 8/10, 1st OV 10/6/10, pt unable to w ork 1/1/13, LOV 10/31/13, pt seen every 3 mons, failed lumbar fusion on 4/1/11, tx: epidurals/PT w / no benefit, spondylolisthesis w / failed fusion & nerve root scarring R&Ls: pain increased thru the day, w eak-unable to control w / pain meds, w ork is unlimited ability to rest/take breaks, this w ill progress overtime, pt has achieved max medical improvement, sit/stand/w alk-unqualifiable. Expect pt to return to prior level of functioning-never, recommend voc rehab yes, pr Dr. Donald Hopew ell (neuro/pain) on 11/17/13. Med recs dated 10/8/10 thru 10/31/13: 8/15/13 - pot seen for low back pain & evaluation for SCS as req'd by Dr. Cornelison, pain across low er lumbar spine w / radiation into bilateral hips, posterior & lateral extremities bilaterally, her sx have been present since 8/10 w / no know n accident or injury as cause, had previous lumbar fusion of L5_S1 by Dr. Mace in 4/11, she currently see's Dr. Hopew ell for pain mgt, how ever Dr. Cornelison has performed the injections. Pt has aching, throbbing, burning/hot, continuous numbness/tingling. FBSS-w / most of her pain in LE's, chronic pain syndrome, & spondylolithsis, pt is suffering from significant epidural fibrosis & is on high dose narcotics, despite her current conservative txs for this, she is in significant pain, recommended SCS, dual lead scs trial. 9/19/13 - pt seen for w eakness in legs, no true motor deficits, sensation not motor pnonomena?, pain w orse w / prolonged position in back, comfortable in chair, neuro exam show ed normal, f/u in 3 mons. 10/31/13 - lumbar spondylsois w / post lemi syndrome, pt req'd cord stimulator trial, no benefit from trial. Neurologic exam show ed normal, trial of methadone for morphine 10mg, f/u in 3 mons.
FCE w as performed on 4/22/14 - show ed upper extremity ROM & strength w as WNL/WFL & 5/5, w ork level less than sedentary, 7 lbs restriction, osw estry score w as 64%, this is a ?rippled perception of disability, right less is w orse than left, numbness/burning dow n both legs, ache in her calves, feels w eakness, spasms in her back w / stabbing/aching, pt feels as if her back is crushing if she stands, cannot put w eight on her right hip, pain in shoulder/elbow s/w rist, cannot drive more than 30 mins, her pain progresses w / activity.
Peer review performed on 6/9/14 by Dr. Meghana Karande indicated lumbar deg. Disease s/p lumbar fusion & chronic but stable pain, R&Ls w ould include: clmt may stand/w alk up to 2 hrs each out of 8 hrs w / normal breaks, sit up to 6 out of 8 hrs w / normal breaks, she w ould require position changes for 5 mins every hr, the clmt may lefit/carry/push & pull up to 20 lbs occasionally & 10 lbs freq, reach w ould not be restriced in alldirections, may climb stairs, kneed, bend, stoop, squat, crouch occasionally, climbing ropes, ladders & scaffolds & craw l w ould be never, handling/fingering/feeling w ould be unrestricted. The R&Ls w ould apply form 11/24/13 & onw ards these w ould likely be permanent.
EDUCATION/WORK EXPERIENCE:Nurse practitioner (med occ), college w / MA degree & NP.

3

# GR LIFE CLAIM PROFILE

**Date:** 8/21/2017        **LFG**        **Claim #:** 1140128972

---

BILLING/CENSUS (SELF BILLED ONLY):Self-billed Grp, Grp pd 3/1/14-3/31/14. Sold census is in AWD & Grp will be able to send in screen prints showing BAE, LI benefits & any OLI/ODLI proof. Unable to locate clmt on any 7 census(s) in AWD, will get confirmation from Grp.
BENEFIT:Class 3: 2 x BAE, rounded to the next higher $1,000; subject to a minimum of $10K & a max of $300K.
$90,043.20 x 2 = $180,086.40 rounded to the next higher $1,000 = $181,000.

OLI - pending to confirm if the clmt elected OLI coverage w/ Grp.
EOI NEEDED? No, not a late entrant.
AGE REDUCTIONS (IF NOT FOUND IN SYSTEM):Reduce by 35% @ 65 & 20% @ 70.
DEPENDENT VERIFICATION:        Spouse:Can waiver ODLI coverages, pending to confirm if the clmt elected ODLI coverages w/ Grp.
Child:
PERTINENT CONTRACT NFO:AWD, dated 7/1/13, pgs 1, 3-14, 24, 27-28, & 30-31 of 40.

TD before reaching age 60, for at least 6 mons in a row, & terms at age 67.

TD means an insured person is unable, due to sickness or injury, to perform the material & substantial duties of 1) the insured person's regular occ during the 1st 12 mons of disability; or 2) any occ for which the insured person is or becomes reasonably fitted by reason of training, education, experience, age & physical & mental capacity, after the 1st 12 mons of disability.

6/24/14 CPH - Reassigned claim from J9B to HIE.

4

LINC01005

# Chronological Activity List

| | | | | | |
|---|---|---|---|---|---|
| **Claimant:** | JAMIE FLANAGAN | | **Occupation:** | Nurse Practi | |
| **SSN:** | ▮▮▮▮ | **DOB:** ▮▮▮▮ | **Posted:** | 6/20/2014 | **Months Dis:** 47 |
| **Claim #:** | 1140128972 | **DOD:** 8/25/2013 | **Ben:** | | **Months Pd:** 0 |
| **Coverage:** | GR LIFE | **Status:** CLOSED | **Close Date:** | 9/3/2014 | **Assignee:** HIELLEB |
| **Policy Holder:** | Lester E. Cox Medical Center | | | | **Deceased:** |
| **Case Mgr. Status:** INV 7/23/2014 | | | **Close Code:** | Not TD Any Occ | |

| Posted Date | Category | Seq | Item | | Status | User |
|---|---|---|---|---|---|---|

Action Plan

*** Nat'l Acct Grp: Per Grid: LI is ER pd, OLI/ODLI is EE pd, Josh Evans @ joshua.evans@coxhealth.com @ (417) 269-6528, initial calls are not req'd, can email GRP when/if doc is needed & determination of cl & Policy has 12 month own occ wording. *** *** Clmt's Email: jamieandjason0306@gmail.com ****** TE&E in file & need beneficiary form as of 7/14 *************************************************************************7/17/14 - CRB & CPH - Management review : There is no direction rationale in the action plan explaining decision path, so HIE will need to summarize a direction rationale and refer back to management review . Referred back to HIE7/14/14 HIE - Rec'd reply email from Grp on 7/10/14 adv'ing Jamie was class 3 for life coverage, she had grp life cov in the amot of $181K, she also had Optional life cov on herself in the amt of $70K, she pd $16.66 pr month for the opt. life coverage. Prior to approving cl, sent cl to be reviewed by ODR, will f/u w/ ODR on 7/16/14. Will f/u w/ clmt on 8/25/14 for contracting wording of 12 mons own occ for an updated of her dx & tx/updated APS/med recs from 7/1/14 to current, & possible RTW. Will send approval ltrs to both clmt & grp via email once the cl has been reviewed by ODR.7/12/14 ACV for HIE - unable to check if HIE recvd email response back from ER regarding eligibility. will leave fu on 7/14/14 for HIE to check her email7/10/14 HIE - I contacted the grp adm Josh, I explained the nature of my call in regards to confirming life elig for Mrs. Flanagan, he advd he understood, he stated he would like to reply via email as proof of confirmation, he stated he has rec'd my previous email on 6/26/14 & he will reply either 7/10 or 7/11 becasue he has to do some research, I advd I understood. I thanked him for his time & we both ended the call. Will f/u w/ Grp on 7/14/14. 7/8/14 HIE - I tried to reach the grp adm Josh, Heather advd he call in sick today but he should return on 7/9/14, I informed her that I had previously sent him an email in regards to confirming life elig for the clmt, she advd he will reply but he would be playing catch up on 7/9/14 upon his return, she advd to allow until 7/10/14 for Josh to reply in regards to elig via email. I thanked her for her time & we both ended the call. Will f/u w/ grp on 7/10/14. 7/2/14 HIE - Rec'd incoming v/m from Grp Adm Heather adv'ing she was returning my call in regards to Ms. Flanagan Life Waiver of prem cl, she stated to c/b @ 417 380 5040. She then disconnected the call. I returned the Grp Adm's call, I explained that I was verifying Ms. Flanagan's life coverage as of her dlw of 8/25/13, salary & life benefit amt, she advd Joshua would be the one whom would anser these questions, she is his back up, she's unable to get into their system, she stated Joshua would return to work on 7/8/14 due to holiday & vacation, she advd to plz c/b on Tuesday 7/8/14 & speak w/ Joshua, I advd that I would do so, I thanked her for her time & we both ended the call Will f/u w/ Grp on 7/8/14. 7/2/14 BRX mailed intro letter to ee for HIE7/1/14 HIE - Rec'd incoming call from clmt, she advd she was sorry for missing my calls, I thanked her for returning my calls. I explained the nature of my call in regards to WOP-she advd she understood, I verified the clmt's ss#/add/dlw/er/occ/dob/doh/eff date of cov/dlw -she advd all is correct, she has 12th grade education & a masters degree in nursing, she advd she has trouble w/ sleeping which is one of her big issues along w/ muscle spasms/numbness & pain in her legs & feet, she has flare ups, she rec'd steroid (oral) a couple of months ago, she is seen every 3 mons, LOV was 2 mons ago, NOV is 7/29/14, she's able to drive for only 20 mins but mostly her spouse takes her where she needs to go, she doesn't need assistance w/ ADLs, she stated her dx is getting better, still has bad days, pain 9/10 sometimes or 2-3/10 is a good day, she only takes pain meds which affects her concentration & memory, she advd she does a lot of reading, watches TV, rest a lot thru out the day, not much of anything else, she just stays home, the meds she takes causes stomach issues also, & she also becomes disoriented, she rest a lot w/ a lot changes in positions, she also stated the meds affects her attention & alertness a lot. She can be reached via email @ jamieandjason0306@gmail.com. I explained to her this does not affect her LTD benefits, she stated she understood. I thanked her for her time & we both ended the call. 7/1/14 HIE - Tried to reach the clmt, auto rec'd v/m, left message w/ nature of my call in regards to WOP, her current status of her dx & tx, advd to plz return call to (402) 361-2991. Ended call. Tried to reach the grp adm Joshua, rec'd v/m of Heather Laskey, Left message w/ nature of my call in regards to confirm life elig for Ms. Jamie Flanagan, advd I had issues an email to Joshua on 6/26/14 in regards to confirming Ms. Flanagan's life elig, no reply has been rec'd at this time, advd to return call to (402) 361-2991. Ended call. Since no reply rec'd from Grp Adm Joshue via email, will allow 1 more day for reply from grp since I was able to leave a message w/ Ms. Heather Laskey. Will f/u w/ Grp on 7/2/14. If no reply from grp rec'd, then will send pend ltr to grp for elig. 6/26/14 HIE - Sent email to Grp Adm Joshua Evans to confirm life elig. for the clmt, will f/u w/ Grp on 6/30/14. Tried to reach the clmt, phone rang & rang, no v/m picked up, unable to leave a message, disconnected call. Will f/u w/ clmt on 6/30/14. Jamie Flanagan Cl # 1140128972PATH:6/26/14 HIE - Conduct initial call to clmt & send email to Grp to confirm life elig due to unable to locate clmt on any census(s) in AWD. Ck'd LTD cl, LTD cl was overturned on 2nd appeal & cl was approved & LTD has a f/u set for 9/19/14 w/ the clmt. ASSESSMENT:33 yr old Female, Nurse practitioner, DLW 8/25/13, Dx'd w/

post laminectomy syndrome lumbar region & spinal stenosis lumber region. Approving cl due to contract wording for own occ of 12 mons due to the clmt, & the clmt has failed conservative txs after sx was performed on 4/11, her oswestry score was 64%, her right less is worse than left, she has numbness/burning down both legs, ache in her calves, feels weakness, spasms in her back w/ stabbing/aching, cannot put weight on her right hip, pain in shoulder/elbows/wrist, cannot drive more than 30 mins, & her pain progresses w/ activity. spondylolisthesis w/ failed fusion & nerve root scarring & failed spinal cord stimulator.SUMMARY:33 yr old Female, Nurse practitioner, DOH 3/1/10, WP-0 days, the DOH/membership, Eff. 5/1/13, DLW 8/25/13, Dx'd w/ post laminectomy syndrome lumbar region & spinal stenosis lumber region. She was dx'd w/ spondylolisthesis along w/ failed fusion & nerve root scarring & failed spinal cord stimulator.  MEDICAL FNDNGS:Dx'd w/ post laminectomy syndrome lumbar region & spinal stenosis lumber region.AWD dated 11/15/13: ER's portion of cl: doh 3/1/10, insured 5/1/10, 40 hrs, nurse practitioner, dlw 8/23/13, pd $43.29 pr hr, pr Grp Adm Judy Hampton on 11/15/13. Auth form signed & dated by clmt on 11/10/13. EE's portion of cl: nurse practitioner, tx'ing Dr(s): Diane Cornelison (neuro/pain mgt), Charles Mace (neuro), Donald Hopewell (neuro/pain mgt), Wayne Wallender (anestesiat/pain mgt), Knox (FP), I. Winkler (rheumatology), Glady Jacob (neuro), Thomas Woodward ( M), Barbara Podovoovich (pain/psych), hospitalized 4/1/11-4/4/11, pr clmt as of 11/10/13. APS-dx'd w/ post lami syndrome lumber & spinal stenosis, & chronic pain. Low back pain w/ pain spreads into lower extremities, normal physical exam/x-rays, CT/MRI, spondylolisthesis w/ failed fusion & nerve root scarring. Symptoms have been constant since 8/10, 1st OV 10/6/10, pt unable to work 1/1/13, LOV 10/31/13, pt seen every 3 mons, failed lumbar fusion on 4/1/11, tx: epidurals/PT w/ no benefit, spondylolisthesis w/ failed fusion & nerve root scarring R&Ls: pain increased thru the day, weak-unable to control w/ pain meds, work is unlimited ability to rest/take breaks, this will progress overtime, pt has achieved max medical improvement, sit/stand/walk-unqualifiable. Expect pt to return to prior level of functioning-never, recommend voc rehab yes, pr Dr. Donald Hopewell (neuro/pain) on 11/17/13. Med recs dated 10/8/10 thru 10/31/13: 8/15/13 - pot seen for low back pain & evaluation for SCS as req'd by Dr. Cornelison, pain across lower lumbar spine w/ radiation into bilateral hips, posterior & lateral extremities bilaterally, her sx have been present since 8/10 w/ no known accident or injury as cause, had previous lumbar fusion of L5_S1 by Dr. Mace in 4/11, she currently see's Dr. Hopewell for pain mgt, however Dr. Cornelison has performed the injections. Pt has aching, throbbing, burning/hot, continuous numbness/tingling. FBSS-w/ most of her pain in LE's, chronic pain syndrome, & spondylolithsis, pt is suffering from significant epidural fibrosis & is on high dose narcotics, despite her current conservative txs for this, she is in significant pain, recommended SCS, dual lead scs trial. 9/19/13 - pt seen for weakness in legs, no true motor deficits, sensation not motor pnonomena?, pain worse w/ prolonged position in back, comfortable in chair, neuro exam showed normal, f/u in 3 mons. 10/31/13 - lumbar spondylsois w/ post lemi syndrome, pt req'd cord stimulator trial, no benefit from trial. Neurologic exam showed normal, trial of methadone for morphine 10mg, f/u in 3 mons.FCE was performed on 4/22/14 - showed upper extremity ROM & strength was WNL/WFL & 5/5, work level less than sedentary, 7 lbs restriction, oswestry score was 64%, this is a ?rippled perception of disability, right less is worse than left, numbness/burning down both legs, ache in her calves, feels weakness, spasms in her back w/ stabbing/aching, pt feels as if her back is crushing if she stands, cannot put weight on her right hip, pain in shoulder/elbows/wrist, cannot drive more than 30 mins, her pain progresses w/ activity. Peer review performed on 6/9/14 by Dr. Meghana Karande indicated lumbar deg. Disease s/p lumbar fusion & chronic but stable pain, R&Ls would include: clmt may stand/walk up to 2 hrs each out of 8 hrs w/ normal breaks, sit up to 6 out of 8 hrs w/ normal breaks, she would require position changes for 5 mins every hr, the clmt may lefit/carry/push & pull up to 20 lbs occasionally & 10 lbs freq, reach would not be restriced in alldirections, may climb stairs, kneed, bend, stoop, squat, crouch occasionally, climbing ropes, ladders & scaffolds & crawl would be never, handling/fingering/feeling would be unrestricted. The R&Ls would apply form 11/24/13 & onwards these would likely be permanent. EDUCATION/WORK EXPERIENCE:Nurse practitioner (med occ), college w/ MA degree & NP. BILLNG/CENSUS (SELF BILLED ONLY):Self-billed Grp, Grp pd 3/1/14-3/31/14. Sold census is in AWD & Grp will be able to send in screen prints showing BAE, LI benefits & any OLI/ODLI proof. Unable to locate clmt on any 7 census(s) in AWD, will get confirmation from Grp.  BENEFIT:Class 3: 2 x BAE, rounded to the next higher $1,000; subject to a minimum of $10K & a max of $300K.$90,043.20 x 2 = $180,086.40 rounded to the next higher $1,000 = $181,000. OLI - pending to confirm if the clmt elected OLI coverage w/ Grp. EOI NEEDED? No, not a late entrant. AGE REDUCTIONS (IF NOT FOUND IN SYSTEM):Reduce by 35% @ 65 & 20% @ 70. DEPENDENT VERIFICATION: Spouse:Can waiver ODLI coverages, pending to confirm if the clmt elected ODLI coverages w/ Grp. Child:PERTNENT CONTRACT INFO:AWD, dated 7/1/13, pgs 1, 3-14, 24, 27-28, & 30-31 of 40. TD before reaching age 60, for at least 6 mons in a row , & terms at age 67.TD means an insured person is unable, due to sickness or injury, to perform the material & substantial duties of 1) the insured person's regular occ during the 1st 12 mons of disability; or 2) any occ for which the insured person is or becomes reasonably fitted by reason of training, education, experience, age & physical & mental capacity, after the 1st 12 mons of disability.  6/24/14 CPH - Reassigned claim from J9B to HIE.

7/24/2014 12:46:17 PM    Referrals                 1        Senior Review                                        Initial           HIELLEB

Rec'd from ODR on 7/17/14 was advd to complete rationale explaining decision path: Summarized direction rationale: Approving cl due to contracting wording of 12 mons own occ & clmt is a 33 yr old female, Nurse practitioner, DLW 8/25/13, she was dx'd w/ post laminectomy syndrome lumbar region & spinal stenosis lumber region w/ failed

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

fusion, she has failed conservative txs after sx was performed on 4/11, her oswestry score was 64%, her right less is worse than her left, she has numbness & burning down both legs, aches in calves, weakness, spasms in back w/ stabbing/aching pains, she's not able to put weight on right hip, she also has pain in shoulder/elbows/wrist, unable to drive more than 30 mins, & her pain progresses w/ activity, failed spinal cord stimulator, she rec'd epidurals & PT w/ no benefits, & she has achieved max medical improvement, sit/stand/walk-unqualifiable, & she was recommend voc rehab.  - Senior Review - HIELLEB - Jul 24, 2014 12:49:27 pm

Reviewed file for Management Review. Referred fiel back to HIELLEB to set DAR with needed information including f/u path. Once completed review back to SR1 for additional review. - Senior Review - CXPHILL - Aug 06, 2014 02:38:13 pm
Made corrections, returned call back to ODR for further review, will f/u w/ ODR on 8/13/14.   - Senior Review - HIELLEB - Aug 11, 2014 04:42:46 pm
CXPHILL notes indicate to return to SR1 not CXPHILL, made correction  - Senior Review - HIELLEB - Aug 13, 2014 04:31:08 pm

Reviewed file for management review and recommend defined waiver approval based upon policy 12-month OO wording and r/l's provided. Refer to PEER Review in LTD claim showing the r/l's would not prevent clmt from working in some sedentary capacity. Referred back to HIELLEB for continued handling.  - Senior Review - CXPHILL - Aug 28, 2014 01:19:25 pm

| 9/3/2014 | Referrals | 1 | Senior Review | Completed | HIELLEB |

Rec'd from ODR on 7/17/14 was advd to complete rationale explaining decision path: Summarized direction rationale: Approving cl due to contracting wording of 12 mons own occ & clmt is a 33 yr old female, Nurse practitioner, DLW 8/25/13, she was dx'd w/ post laminectomy syndrome lumbar region & spinal stenosis lumber region w/ failed fusion, she has failed conservative txs after sx was performed on 4/11, her oswestry score was 64%, her right less is worse than her left, she has numbness & burning down both legs, aches in calves, weakness, spasms in back w/ stabbing/aching pains, she's not able to put weight on right hip, she also has pain in shoulder/elbows/wrist, unable to drive more than 30 mins, & her pain progresses w/ activity, failed spinal cord stimulator, she rec'd epidurals & PT w/ no benefits, & she has achieved max medical improvement, sit/stand/walk-unqualifiable, & she was recommend voc rehab.  - Senior Review - HIELLEB - Jul 24, 2014 12:49:27 pm

Reviewed file for Management Review. Referred fiel back to HIELLEB to set DAR with needed information including f/u path. Once completed review back to SR1 for additional review. - Senior Review - CXPHILL - Aug 06, 2014 02:38:13 pm
Made corrections, returned call back to ODR for further review, will f/u w/ ODR on 8/13/14.   - Senior Review - HIELLEB - Aug 11, 2014 04:42:46 pm
CXPHILL notes indicate to return to SR1 not CXPHILL, made correction  - Senior Review - HIELLEB - Aug 13, 2014 04:31:08 pm

Reviewed file for management review and recommend defined waiver approval based upon policy 12-month OO wording and r/l's provided. Refer to PEER Review in LTD claim showing the r/l's would not prevent clmt from working in some sedentary capacity. Referred back to HIELLEB for continued handling.  - Senior Review - CXPHILL - Aug 28, 2014 01:19:25 pm

| 8/11/2014 4:37:10 PM | Summary/Assessment/Path | 1 | 33 yr old female, Nurse practitioner, DLW 8/25/13, she was | Requested | HIELLEB |

Summary Notes
33 yr old female, Nurse practitioner, DLW 8/25/13, she was dx'd w/ post laminectomy syndrome lumbar region & spinal stenosis lumber region w/ failed fusion, she has failed conservative txs after sx was performed on 4/11 - HIELLEB - Aug 11, 2014 04:41:41 pm
Assessment Notes
the clmt was dx'd w/ post laminectomy syndrome lumbar region & spinal stenosis lumber region w/ failed fusion, she has failed conservative txs after sx was performed on 4/11, her oswestry score was 64%, her right less is worse than her left, she has numbness & burning down both legs, aches in calves, weakness, spasms in back w/ stabbing/aching pains, not able to put weight on right hip, has pain in shoulder/elbows/wrist, unable to drive more than 30 mins, & her pain progresses w/ activity, failed spinal cord stimulator, she has rec'd epidurals & PT w/ no benefits, & she has achieved max medical improvement, sit/stand/walk-unqualifiable, & she was recommend voc rehab.  - HIELLEB - Aug 11, 2014 04:41:41 pm
Path Notes
Approving cl due to contracting wording of 12 mons for own occ & the clmt was dx'd w/ post laminectomy syndrome lumbar region & spinal stenosis lumber region w/ failed fusion, she has failed conservative txs after sx

8/21/2017

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

w as performed, she failed spinal cord stimulator, she rec'd epidurals & PT w / no benefits, & she has achieved max medical improvement, R&Ls: sit/stand/w alk-unqualifiable, & she w as recommend voc rehab. Sent cl back to ODR for further review , will f/u w / ODR on 8/13/14.  - HIELLEB - Aug 11, 2014 04:41:41 pm

--ODR review is not yet complete, setting DAR out another 2 w eeks. - A1CAMPB - Aug 20, 2014 03:22:11 pm
Rec'd from ODR review was advd' to approve for defined w aiver due to contract w ording & peer review performed. Approving cl for defined w aiver from dlw to 12 month own occ w ording to 8/25/14, peer review performed doesn't support the clmt of being TDAO. Send defined w aiver approval ltr to clmt via regular mail & grp's defined w aiver via email.  - HIELLEB - Sep 03, 2014 03:34:44 pm

| 9/3/2014 | Summary/Assessment/Path | 1 | 33 yr old female, Nurse practitioner, DLW 8/25/13, she w as | Completed | HIELLEB |

Summary Notes
33 yr old female, Nurse practitioner, DLW 8/25/13, she w as dx'd w / post laminectomy syndrome lumbar region & spinal stenosis lumber region w / failed fusion, she has failed conservative txs after sx w as performed on 4/11 - HIELLEB - Aug 11, 2014 04:41:41 pm
Assessment Notes
the clmt w as dx'd w / post laminectomy syndrome lumbar region & spinal stenosis lumber region w / failed fusion, she has failed conservative txs after sx w as performed on 4/11, her osw estry score w as 64%, her right less is w orse than her left, she has numbness & burning dow n both legs, aches in calves, w eakness, spasms in back w / stabbing/aching pains, not able to put w eight on right hip, has pain in shoulder/elbow s/w rist, unable to drive more than 30 mins, & her pain progresses w / activity, failed spinal cord stimulator, she has rec'd epidurals & PT w / no benefits, & she has achieved max medical improvement, sit/stand/w alk-unqualifiable, & she w as recommend voc rehab.  - HIELLEB - Aug 11, 2014 04:41:41 pm
Path Notes
Approving cl due to contracting w ording of 12 mons for ow n occ & the clmt w as dx'd w / post laminectomy syndrome lumbar region & spinal stenosis lumber region w / failed fusion, she has failed conservative txs after sx w as performed, she failed spinal cord stimulator, she rec'd epidurals & PT w / no benefits, & she has achieved max medical improvement, R&Ls: sit/stand/w alk-unqualifiable, & she w as recommend voc rehab. Sent cl back to ODR for further review , will f/u w / ODR on 8/13/14.   - HIELLEB - Aug 11, 2014 04:41:41 pm

--ODR review is not yet complete, setting DAR out another 2 w eeks. - A1CAMPB - Aug 20, 2014 03:22:11 pm
Rec'd from ODR review was advd' to approve for defined w aiver due to contract w ording & peer review performed. Approving cl for defined w aiver from dlw to 12 month own occ w ording to 8/25/14, peer review performed doesn't support the clmt of being TDAO. Send defined w aiver approval ltr to clmt via regular mail & grp's defined w aiver via email.  - HIELLEB - Sep 03, 2014 03:34:44 pm

| 9/3/2014 | Documents/Mail | 2 | Waiver Defined Approval-Group | Completed | hielleb |

Waiver Defined Approval-Group

| 9/3/2014 | Documents/Mail | 1 | Waiver Defined Approval Claimant | Completed | hielleb |

Waiver Defined Approval Claimant

| 7/14/2014 | Claim Tasks | 6 | Terminate Claim / Coverage | Requested | HIELLEB |

LIFEDOCS Investigation Type: Term Date

Terms at age 67

Item Closed w ith Claim by System - HIELLEB - Sep 03, 2014 03:39:52 pm

| 9/3/2014 | Claim Tasks | 6 | Terminate Claim / Coverage | Completed | HIELLEB |

LIFEDOCS Investigation Type: Term Date

Terms at age 67

Item Closed w ith Claim by System - HIELLEB - Sep 03, 2014 03:39:52 pm

| 7/14/2014 | Claim Tasks | 4 | Review Claim | Requested | HIELLEB |

LIFEDOCS Investigation Type: Other

Source: HIE - ODR bas & oli = $251K

Date Requested: 14-JUL-14

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

7/14/14 HIE - sent cl to be reviewed by ODR, will f/u w/ ODR on 7/16/14.
Sent cl back to ODR w/ approval rationale, will f/u w/ ODR on 7/28/14. - HIELLEB - Jul 24, 2014 12:42:11 pm
Not rec'd at this time from ODR, will continue to f/u w/ ODR in 1 wk on 8/4/14. - HIELLEB - Jul 28, 2014 05:32:04 pm
cl still ODR review, will continue to f/u w/ ODR on 8/6/14. - HIELLEB - Aug 04, 2014 04:38:03 pm

Spoke w/ AEW, she advd if the clm is still in TE1 initials, yes, it is still being rev'd by ODR, will f/u w/ ODR in 1 wk on 8/13/14. - HIELLEB - Aug 06, 2014 12:48:33 pm
Sent cl to be rev'd by CXPHILL however it should have been placed into SR1 initials, will continue to f/u w/ ODR review on 8/15/14. - HIELLEB - Aug 13, 2014 04:31:50 pm
Cl is still in ODR review at this time, will continue to f/u w/ ODR on 8/20/14. - HIELLEB - Aug 18, 2014 01:47:56 pm

--Claim is still in ODR at this time, setting f/u out 1 week. - A1CAMPB - Aug 20, 2014 03:23:05 pm
The clm is still in ODR, will continue to f/u in 1 wk on 9/3/14. - HIELLEB - Aug 27, 2014 03:11:26 pm

Item Closed with Claim by System - HIELLEB - Sep 03, 2014 03:39:51 pm

| 9/3/2014 | Claim Tasks | 4 | Review Claim | Completed | HIELLEB |

LIFEDOCS Investigation Type: Other

Source: HIE - ODR bas & oli = $251K

Date Requested: 14-JUL-14

7/14/14 HIE - sent cl to be reviewed by ODR, will f/u w/ ODR on 7/16/14.
Sent cl back to ODR w/ approval rationale, will f/u w/ ODR on 7/28/14. - HIELLEB - Jul 24, 2014 12:42:11 pm
Not rec'd at this time from ODR, will continue to f/u w/ ODR in 1 wk on 8/4/14. - HIELLEB - Jul 28, 2014 05:32:04 pm
cl still ODR review, will continue to f/u w/ ODR on 8/6/14. - HIELLEB - Aug 04, 2014 04:38:03 pm

Spoke w/ AEW, she advd if the clm is still in TE1 initials, yes, it is still being rev'd by ODR, will f/u w/ ODR in 1 wk on 8/13/14. - HIELLEB - Aug 06, 2014 12:48:33 pm
Sent cl to be rev'd by CXPHILL however it should have been placed into SR1 initials, will continue to f/u w/ ODR review on 8/15/14. - HIELLEB - Aug 13, 2014 04:31:50 pm
Cl is still in ODR review at this time, will continue to f/u w/ ODR on 8/20/14. - HIELLEB - Aug 18, 2014 01:47:56 pm

--Claim is still in ODR at this time, setting f/u out 1 week. - A1CAMPB - Aug 20, 2014 03:23:05 pm
The clm is still in ODR, will continue to f/u in 1 wk on 9/3/14. - HIELLEB - Aug 27, 2014 03:11:26 pm

Item Closed with Claim by System - HIELLEB - Sep 03, 2014 03:39:51 pm

| 7/14/2014 | Claim Tasks | 5 | Open Review | Requested | HIELLEB |

LIFEDOCS Investigation Type: Clmt/Insured Contact

Source: 12 mons own occ

Date Requested: 14-JUL-14

7/14/14 HIE - F/u w/ clmt on 8/25/14 for contracting wording of 12 mons own occ for an updated of her dx & tx/updated APS/med recs from 7/1/14 to current, & possible RTW.

Item Closed with Claim by System - HIELLEB - Sep 03, 2014 03:39:52 pm

| 8/20/2014 | Claim Tasks | 5 | Open Review | Completed | HIELLEB |

LIFEDOCS Investigation Type: Clmt/Insured Contact

Source: 12 mons own occ

Date Requested: 14-JUL-14

7/14/14 HIE - F/u w/ clmt on 8/25/14 for contracting wording of 12 mons own occ for an updated of her dx & tx/updated APS/med recs from 7/1/14 to current, & possible RTW.

# Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

Item Closed with Claim by System - HIELLEB - Sep 03, 2014 03:39:52 pm

| 8/18/2014 8:15:53 PM | Claim Tasks | 7 | 45 Day.Need Decision/Extension | Requested | HIELLEB |

Item Closed with Claim by System - HIELLEB - Sep 03, 2014 03:39:52 pm

| 8/19/2014 | Claim Tasks | 7 | 45 Day.Need Decision/Extension | Completed | HIELLEB |

Item Closed with Claim by System - HIELLEB - Sep 03, 2014 03:39:52 pm

| 6/26/2014 | Claim Tasks | 3 | Call Employer | Requested | HIELLEB |

LIFEDOCS Investigation Type: Employer Contact

Date Requested: 26-JUN-14

7/14/14 HIE - Rec'd reply email from Grp on 7/10/14 adv'ing Jamie was class 3 for life coverage, she had grp life cov in the amot of $181K, she also had Optional life cov on herself in the amt of $70K, she pd $16.66 pr month for the opt. life coverage.

7/10/14 HIE - I contacted the grp adm Josh, I explained the nature of my call in regards to confirming life elig for Mrs. Flanagan, he advd he understood, he stated he would like to reply via email as proof of confirmation, he stated he has rec'd my previous email on 6/26/14 & he will reply either 7/10 or 7/11 becasue he has to do some research, I advd I understood. I thanked him for his time & we both ended the call.  Will f/u w / Grp on 7/14/14.

7/8/14 HIE - I tried to reach the grp adm Josh, Heather advd he call in sick today but he should return on 7/9/14, I informed her that I had previously sent him an email in regards to confirming life elig for the clmt, she advd he will reply but he would be playing catch up on 7/9/14 upon his return, she advd to allow  until 7/10/14 for Josh to reply in regards to elig via email. I thanked her for her time & we both ended the call. Will f/u w / grp on 7/10/14.

7/2/14 HIE - Rec'd incoming v/m from Grp Adm Heather adv'ing she was returning my call in regards to Ms. Flanagan Life Waiver of prem cl, she stated to c/b @ 417 380 5040. She then disconnected the call. I returned the Grp Adm's call, I explained that I was verifying Ms. Flanagan's life coverage as of her dlw of 8/25/13, salary & life benefit amt, she advd Joshua would be the one whom would answer these questions, she is his back up, she's unable to get into their system, she stated Joshua would return to work on 7/8/14 due to holiday & vacation, she advd to plz c/b on Tuesday 7/8/14 & speak w / Joshua, I advd that I would do so, I thanked her for her time & we both ended the call  Will f/u w / Grp on 7/8/14.

7/1/14 HIE - Tried to reach the grp adm Joshua, rec'd v/m of Heather Laskey, Left message w / nature of my call in regards to confirm life elig for Ms. Jamie Flanagan, advd I had issues an email to Joshua on 6/26/14 in regards to confirming Ms. Flanagan's life elig, no reply has been rec'd at this time, advd to return call to (402) 361-2991. Ended call. Since no reply rec'd from Grp Adm Joshue via email, will allow  1 more day for reply from grp since I was able to leave a message w / Ms. Heather Laskey. Will f/u w / Grp on 7/2/14.

6/26/14 HIE - Sent email to grp to confirm life elig for clmt for basic life & OLI coverages, will f/u w / Grp on 6/30/14.

Item Closed with Claim by System - HIELLEB - Sep 03, 2014 03:39:51 pm

| 7/14/2014 | Claim Tasks | 3 | Call Employer | Completed | HIELLEB |

LIFEDOCS Investigation Type: Employer Contact

Date Requested: 26-JUN-14

7/14/14 HIE - Rec'd reply email from Grp on 7/10/14 adv'ing Jamie was class 3 for life coverage, she had grp life cov in the amot of $181K, she also had Optional life cov on herself in the amt of $70K, she pd $16.66 pr month for the opt. life coverage.

7/10/14 HIE - I contacted the grp adm Josh, I explained the nature of my call in regards to confirming life elig for Mrs. Flanagan, he advd he understood, he stated he would like to reply via email as proof of confirmation, he stated he has rec'd my previous email on 6/26/14 & he will reply either 7/10 or 7/11 becasue he has to do some research, I advd I understood. I thanked him for his time & we both ended the call.  Will f/u w / Grp on 7/14/14.

7/8/14 HIE - I tried to reach the grp adm Josh, Heather advd he call in sick today but he should return on 7/9/14, I informed her that I had previously sent him an email in regards to confirming life elig for the clmt, she advd he will reply but he would be playing catch up on 7/9/14 upon his return, she advd to allow  until 7/10/14 for Josh to reply in

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

regards to elig via email. I thanked her for her time & we both ended the call. Will f/u w/ grp on 7/10/14.

7/2/14 HIE - Rec'd incoming v/m from Grp Adm Heather adv'ing she was returning my call in regards to Ms. Flanagan Life Waiver of prem cl, she stated to c/b @ 417 380 5040. She then disconnected the call. I returned the Grp Adm's call, I explained that I was verifying Ms. Flanagan's life coverage as of her dlw of 8/25/13, salary & life benefit amt, she advd Joshua would be the one whom would answer these questions, she is his back up, she's unable to get into their system, she stated Joshua would return to work on 7/8/14 due to holiday & vacation, she advd to plz c/b on Tuesday 7/8/14 & speak w/ Joshua, I advd that I would do so, I thanked her for her time & we both ended the call Will f/u w/ Grp on 7/8/14.

7/1/14 HIE - Tried to reach the grp adm Joshua, rec'd v/m of Heather Laskey, Left message w/ nature of my call in regards to confirm life elig for Ms. Jamie Flanagan, advd I had issues an email to Joshua on 6/26/14 in regards to confirming Ms. Flanagan's life elig, no reply has been rec'd at this time, advd to return call to (402) 361-2991. Ended call. Since no reply rec'd from Grp Adm Joshue via email, will allow 1 more day for reply from grp since I was able to leave a message w/ Ms. Heather Laskey. Will f/u w/ Grp on 7/2/14.

6/26/14 HIE - Sent email to grp to confirm life elig for clmt for basic life & OLI coverages, will f/u w/ Grp on 6/30/14.

Item Closed with Claim by System - HIELLEB - Sep 03, 2014 03:39:51 pm

| 7/10/2014 | Telephone (OUT) | 8 | Josh | Completed | HIELLEB |

I contacted the grp adm Josh, I explained the nature of my call in regards to confirming life elig for Mrs. Flanagan, he advd he understood, he stated he would like to reply via email as proof of confirmation, he stated he has rec'd my previous email on 6/26/14 & he will reply either 7/10 or 7/11 becasue he has to do some research, I advd I understood. I thanked him for his time & we both ended the call.

| 7/8/2014 | Telephone (OUT) | 7 | Heather | Completed | HIELLEB |

I tried to reach the grp adm Josh, Heather advd he call in sick today but he should return on 7/9/14, I informed her that I had previously sent him an email in regards to confirming life elig for the clmt, she advd he will reply but he would be playing catch up on 7/9/14 upon his return, she advd to allow until 7/10/14 for Josh to reply in regards to elig via email. I thanked her for her time & we both ended the call.

| 6/26/2014 | Claim Tasks | 1 | Open Review | Requested | BRXHA3 |

LIFEDOCS Investigation Type: Clmt/Insured Contact

Source: INTRO LTR

Date Requested: 26-JUN-14

6/26/14 HIE - Send intro ltr to clmt.

Item Closed with Claim by System - HIELLEB - Sep 03, 2014 03:39:50 pm

| 7/2/2014 | Claim Tasks | 1 | Open Review | Completed | BRXHA3 |

LIFEDOCS Investigation Type: Clmt/Insured Contact

Source: INTRO LTR

Date Requested: 26-JUN-14

6/26/14 HIE - Send intro ltr to clmt.

Item Closed with Claim by System - HIELLEB - Sep 03, 2014 03:39:50 pm

| 7/2/2014 | Telephone (OUT) | 6 | Heather | Completed | HIELLEB |

I returned the Grp Adm's call, I explained that I was verifying Ms. Flanagan's life coverage as of her dlw of 8/25/13, salary & life benefit amt, she advd Joshua would be the one whom would anser these questions, she is his back up, she's unable to get into their system, she stated Joshua would return to work on 7/8/14 due to holiday & vacation, she advd to plz c/b on Tuesday 7/8/14 & speak w/ Joshua, I advd that I would do so, I thanked her for her time & we both ended the call.

| 7/2/2014 | Telephone (IN) | 5 | Heather | Completed | HIELLEB |

Rec'd incoming v/m from Grp Adm Heather adv'ing she was returning my call in regards to Ms. Flanagan Life Waiver

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

of prem cl, she stated to c/b @ 417 380 5040. She then disconnected the call.

| 6/26/2014 | Claim Tasks | 2 | Open Review | Requested | HIELLEB |

LIFEDOCS Investigation Type: Clmt/Insured Contact

Date Requested: 26-JUN-14

7/1/14 HIE - Tried to reach the clmt, auto rec'd v/m, left message w / nature of my call in regards to WOP, her current status of her dx & tx, advd to plz return call to (402) 361-2991. Ended call.

6/26/14 HIE - Tried to reach the clmt, phone rang & rang, no v/m picked up, unable to leave a message, disconnected call. WIll f/u w / clmt on 6/30/14.

Item Closed w ith Claim by System - HIELLEB - Sep 03, 2014 03:39:51 pm

| 7/1/2014 | Claim Tasks | 2 | Open Review | Completed | HIELLEB |

LIFEDOCS Investigation Type: Clmt/Insured Contact

Date Requested: 26-JUN-14

7/1/14 HIE - Tried to reach the clmt, auto rec'd v/m, left message w / nature of my call in regards to WOP, her current status of her dx & tx, advd to plz return call to (402) 361-2991. Ended call.

6/26/14 HIE - Tried to reach the clmt, phone rang & rang, no v/m picked up, unable to leave a message, disconnected call. WIll f/u w / clmt on 6/30/14.

Item Closed w ith Claim by System - HIELLEB - Sep 03, 2014 03:39:51 pm

| 7/1/2014 | Telephone (IN) | 4 | JAMIE FLANAGAN | Completed | HIELLEB |

Rec'd incoming call from clmt, she advd she w as sorry for missing my calls, I thanked her for returning my calls. I explained the nature of my call in regards to WOP-she advd she understood, I verified the clmt's ss#/add/dlw /er/occ/dob/doh/eff date of cov/dlw -she advd all is correct, she has 12th grade education & a masters degree in nursing, she advd she has trouble w / sleeping w hich is one of her big issues along w / muscle spasms/numbness & pain in her legs & feet, he has flare ups, she rec'd steroid (oral) a couple of months ago, she is seen every 3 mons, LOV w as 2 mons ago, NOV is 7/29/14, she's able to drive for only 20 mins but mostly her spouse takes her w here she needs to go, she doesn't need assistance w / ADLs, she stated her dx is getting better, still has bad days, pain 9/10 somtimes or 2-3/10 is a good day, she only takes pain meds w hich affects her concentration & memory, she advd she does a lot of reading, w atches TV, rest a lot thru out the day, not much of anything else, she just stays home, the meds she takes causes stomach issues alsot, & she also becomes disoriented, she rest alot w / a lot changes in positions, she also stated the meds affects he attention & alertness alot. She can be reached via email @ jamieandjason0306@gmail.com. I explained to her this does not affect her LTD benefits, she stated she understood. I thanked her for her time & w e both ended the call.

| 7/1/2014 | Telephone (OUT) | 3 | Joshue/Heather Laskey | Completed | HIELLEB |

Tried to reach the grp adm Joshua, rec'd v/m of Heather Laskey, Left message w / nature of my call in regards to confirm life elig for Ms. Jamie Flanagan, advd I had issues an email to Joshua on 6/26/14 in regards to confirm ing Ms. Flanagan's life elig, no reply has been rec'd at this time, advd to return call to (402) 361-2991. Ended call.

| 7/1/2014 | Telephone (OUT) | 2 | JAMIE FLANAGAN | Completed | HIELLEB |

Tried to reach the clmt, auto rec'd v/m, left message w / nature of my call in regards to WOP, her current status of her dx & tx, advd to plz return call to (402) 361-2991. Ended call.

| 6/26/2014 | Telephone (OUT) | 1 | JAMIE FLANAGAN | Completed | HIELLEB |

Tried to reach the clmt, phone rang & rang, no v/m picked up, unable to leave a message, disconnected cal..

| 9/3/2014 3:39:43 PM | Status | | Not TD Any Occ | CLOSED | HIELLEB |



Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life Insurance Company**
8801 Indian Hills Drive
Omaha, NE 68114-4066
toll free (800) 423-2765
www.LFG.com

June 4, 2013

Andrew Hedgpeth
Lester E. Cox Medical Center
3801 S National Ave
Springfield, MO   65807

Re:   Policy No.  000010157325 – Life/AD&D and Optional Life
      Policy No.  000010157326 – Long Term Disability
      Group I.D.  LESTERECOX

Dear Mr. Hedgpeth:

Enclosed you will find amendments and revised policies for the above referenced policy numbers. As requested, we updated the rates as follows:

| | |
|---|---|
| ➢ Monthly Group Life Rate | $.060 per $1,000 of insurance |
| ➢ Monthly Basic AD&D Rate | $.020 per $1,000 of insurance |
| ➢ Long Term Disability | $.460% of Covered Payroll per Month |

These amendments are effective July 1, 2013.

It is very important that we receive a signed copy of the amendment for our records.  Please fax the signed copy to (877)573-6177.  **If we do not hear from you within 30 days, payment of the required premium will be considered acceptance of the amendment as issued.**

If you have any questions on this change, please feel free to contact your broker or Customer Service Professional at (800)423-2765, Option 2; or via e-mail at ClientServices@LFG.com.  Thank you for giving The Lincoln National Life Insurance Company an opportunity to serve you.

Sincerely,

The Lincoln National Life Insurance Company

Enclosures

LINC010014

AMENDMENT NO. 4

TO BE ATTACHED TO AND MADE PART OF GROUP POLICY NO.: 000010157325

ISSUED TO: Lester E. Cox Medical Center

It is agreed that the above policy be replaced with the attached Policy, which is revised and dated July 1, 2013.

The effective date of this amendment is July 1, 2013; but only with respect to losses incurred on or after that date. Nothing contained in this amendment shall change any of the terms and conditions of this Policy; except as stated above.

THE LINCOLN NATIONAL LIFE INSURANCE COMPANY

_____
Officer of the Company

Accepted by the Group Policyholder this _____ day of _____ 20_____

By _____ Title _____

GL1100 AMEND.

LINC01015

# The Lincoln National Life Insurance Company

A Stock Company    Home Office Location:  Fort Wayne, Indiana
Group Insurance Service Office:  8801 Indian Hills Drive, Omaha, NE 68114-4066 (402) 361-7300

Group Policyholder:

---

Lester E. Cox Medical Center

In Consideration of the Group Policyholder's application for this Policy and payment of all premiums when due, The Lincoln National Life Insurance Company agrees to make the payments provided in this Policy to the persons entitled to them.

The first premium for this Policy is due on its effective date.  Subsequent premiums are due on June 1, 2012, and on the same day of each month after that.  Policy anniversaries will be each January 1st; unless shown otherwise on the Premium Rate Schedule inside.

The provisions and conditions set forth on the following pages are a part of this Policy, as fully as if recited over the signatures below.

The Lincoln National Life Insurance Company has executed this Policy at its Group Insurance Service Office in Omaha, Nebraska.  The issue date of this Policy is May 1, 2012.

SECRETARY                                          PRESIDENT

**GROUP INSURANCE POLICY**
No. 000010157325
PROVIDING
LIFE INSURANCE
ACCIDENTAL DEATH AND DISMEMBERMENT INSURANCE
DEPENDENT LIFE INSURANCE

GL1101-TITLE PAGE                                          95
07/01/13

## TABLE OF CONTENTS

Schedule of Insurance…………………………………………………………3

Definitions …………………………………………………………………4

General Provisions ……………………………………………………………5

Provisions Applicable to Participating Employers……………………………6

Eligibility and Effective Dates for Personal Insurance………………………7

Individual Terminations ………………………………………………………8

Continuation of Coverage……………………………………………………9

Premiums and Premium Rates ………………………………………………10

Grace Period……………………………………………………………………12

Policy Termination ……………………………………………………………12

Beneficiary………………………………………………………………………13

Assignments ……………………………………………………………………14

Facility of Payment……………………………………………………………15

Death Benefit……………………………………………………………………15

Settlement Options ……………………………………………………………15

Extension of Death Benefit …………………………………………………16

Accelerated Death Benefit ……………………………………………………17

Conversion Privilege……………………………………………………………19

Dependents Life Insurance……………………………………………………20

Claims Procedures for Life or Accidental Death and Dismemberment Benefits …….22

Accidental Death and Dismemberment Insurance ……………………………25

Safe Driver Benefit……………………………………………………………26

Notice……………………………………………………………………………27

Prior Insurance Credit Provision ……………………………………………29

GL1101-1

07/01/13

LINCO10017

## SCHEDULE OF INSURANCE

The amount of an Insured Person's insurance is determined from the following table. The initial amount of coverage is the amount which applies to an Insured Person's Class on the date his or her coverage takes effect. An Insured Person may become eligible for increases in the amount of insurance in accord with the table. Any such increase will take effect on the latest of:

(1) the first day of the Insurance Month which coincides with or follows the date on which the Insured Person becomes eligible for the increase; provided he or she is Actively at Work on that day;

(2) the day the Insured Person resumes Active Work, if not Actively at Work on the day the increase would otherwise take effect; or

(3) the day any required evidence of insurability is approved by the Company.

Any decrease will take effect on the day of the change; whether or not the Insured Person is Actively at Work.

The amount of an Insured Person's Life Insurance shall be reduced by the amount of any Life Insurance in effect as a result of exercising the rights under the Conversion Privilege section of this Policy.

## CLASSIFICATION

| | |
|---|---|
| Class 1 | Executives and Physicians |
| Class 2 | All Full-Time Weekend Option Participants |
| Class 3 | All Other Full-Time Employees excluding Regular Part-Time Grandfathered Physicians |
| Class 4 | Regular Part-Time Grandfathered Physicians |
| Class 5 | Grandfathered Executives and Physicians of Skaggs Community Hospital Association d/b/a Cox Medical Center Branson |
| Class 6 | Regular Part-Time Grandfathered Executives and Physicians of Skaggs Community Hospital Association d/b/a Cox Medical Center Branson |

WAITING PERIOD (For date insurance begins, refer to "Effective Date" section)

For Classes 1, 4, 5 and 6:
    None

For Classes 2 and 3:
    One year of continuous Active Work

GL1101-2

07/01/13

## SCHEDULE OF INSURANCE (CONTINUED)

### B A S I C   I N S U R A N C E

### LIFE AND AD&D INSURANCE

| | Amount of Personal Life Insurance | AD&D Insurance Principal Sum |
|---|---|---|
| Class 1 | Two times Basic Annual Earnings, rounded to the next higher $1,000; subject to a minimum of $10,000 and a maximum of $300,000. | Two times Basic Annual Earnings, rounded to the next higher $1,000; subject to a minimum of $10,000 and a maximum of $300,000. |
| Class 2 | Two times Basic Annual Earnings, rounded to the next higher $1,000; subject to a minimum of $10,000 and a maximum of $300,000. | Two times Basic Annual Earnings, rounded to the next higher $1,000; subject to a minimum of $10,000 and a maximum of $300,000. |
| Class 3 | Two times Basic Annual Earnings, rounded to the next higher $1,000; subject to a minimum of $10,000 and a maximum of $300,000. | Two times Basic Annual Earnings, rounded to the next higher $1,000; subject to a minimum of $10,000 and a maximum of $300,000. |
| Class 4 | Two times Basic Annual Earnings, rounded to the next higher $1,000; subject to a minimum of $10,000 and a maximum of $300,000. | Two times Basic Annual Earnings, rounded to the next higher $1,000; subject to a minimum of $10,000 and a maximum of $300,000. |
| Class 5 | Two times Basic Annual Earnings, rounded to the next higher $1,000; subject to a minimum of $10,000 and a maximum of $500,000. | Two times Basic Annual Earnings, rounded to the next higher $1,000; subject to a minimum of $10,000 and a maximum of $500,000. |
| Class 6 | Two times Basic Annual Earnings, rounded to the next higher $1,000; subject to a minimum of $10,000 and a maximum of $300,000. | Two times Basic Annual Earnings, rounded to the next higher $1,000; subject to a minimum of $10,000 and a maximum of $300,000. |

Personal Life and AD&D Insurance will be reduced as follows:
- At age 65, benefits will reduce by 35% of the original amount;
- At age 70, benefits will reduce an additional 20% of the original amount.

Benefits will terminate when the Insured Person retires.

If the Insured Person first enrolls for Personal Life and AD&D Insurance at age 65 or older, the above age reductions will apply to:
- Any Guarantee Issue Amount available without evidence of insurability; and
- The maximum amount of insurance for which he or she is eligible.

GL1101-2

3-2

07/01/13

for Classes 1 and 5, **Basic Annual Earnings** means the Insured Person's annual contracted rate from the Group from the Group Policyholder before taxes on the Determination Date. The **"Determination Date"** is the last day worked just prior to the loss.

It also includes:
1. bonuses averaged over the 12 months just prior to the Determination Date; or over the actual period of employment with the Group Policyholder just prior to that date, if shorter.

It does **not** include commissions, overtime pay, or any other extra compensation. It does **not** include income from a source other than the Group Policyholder. It will not exceed the amount shown in the Group Policyholder's financial records or the amount for which premium has been paid; whichever is less.

For Classes 2 and 3, Bonus Eligible Employees, **Basic Annual Earnings** means the Insured Person's annual base salary or annualized hourly pay from the Group Policyholder before taxes on the Determination Date. The **"Determination Date"** is the last day worked just prior to the loss.

It also includes:
1. bonuses averaged over the 12 months just prior to the Determination Date; or over the actual period of employment with the Group Policyholder just prior to that date, if shorter. The Insured Person must be bonuses eligible, in an established bonus program.

It does **not** include commissions, tips and tokens, overtime pay, taxable fringe benefits, or any other extra compensation. It does **not** include income from a source other than the Group Policyholder. It will not exceed the amount shown in the Group Policyholder's financial records or the amount for which premium has been paid; whichever is less.

**for Classes 2 and 3, FOR PRODUCTION-BASED EMPLOYEES BASIC ANNUAL EARNINGS** means $1/12^{th}$ of the Insured Person's production earnings from the Group Policyholder for the 13 months prior to the Determination Date. If the Insured Person has not completed a full 13 months of service with the Group Policyholder, it is determined by annualizing the compensation over the actual period of employment with the Group Policyholder prior to the Determination Date; or

The **"Determination Date"** is last day worked just prior to the loss. It does **not** include commissions, tips and tokens, bonuses, overtime pay, taxable fringe benefits, or any other extra compensation. It does **not** include income from a source other than the Group Policyholder. It will **not** exceed the amount shown in the Group Policyholder's financial records or the amount for which premium has been paid, whichever is less.

**for Classes 4 and 6, Basic Annual Earnings** means the Insured Person's annual contracted rate from the Group from the Group Policyholder before taxes on the Determination Date. The **"Determination Date"** is the last day worked just prior to the loss.

It does **not** include commissions, bonuses, overtime pay, or any other extra compensation. It does **not** include income from a source other than the Group Policyholder. It will not exceed the amount shown in the Group Policyholder's financial records or the amount for which premium has been paid; whichever is less.

For Classes 1, 2, 3, 4 and 6, The combined amounts of Basic and Optional Life Insurance are subject to a maximum of $600,000 or Five Time Basic annual Earnings.

For Classes 5, The combined amounts of Basic and Optional Life Insurance are subject to a maximum of $800,000 or Five Time Basic annual Earnings.

Insured Persons are not required to make contributions for Basic Personal Life Insurance and AD&D Insurance.

GL1101-2

3-3

07/01/13

## SCHEDULE OF INSURANCE (CONTINUED)

### O P T I O N A L   I N S U R A N C E

### LIFE INSURANCE

Amount of Personal
Life Insurance

Class 1   A Person may elect Optional Life Insurance in any $10,000 increment; subject to a maximum of Three times Basic Annual Earnings (rounded to the next higher $10,000). Coverage is subject to a minimum of $10,000 and an overall maximum of $300,000.

Class 2   A Person may elect Optional Life Insurance in any $10,000 increment; subject to a maximum of Three times Basic Annual Earnings (rounded to the next higher $10,000). Coverage is subject to a minimum of $10,000 and an overall maximum of $300,000.

Class 3   A Person may elect Optional Life Insurance in any $10,000 increment; subject to a maximum of Three times Basic Annual Earnings (rounded to the next higher $10,000). Coverage is subject to a minimum of $10,000 and an overall maximum of $300,000.

Class 4   A Person may elect Optional Life Insurance in any $10,000 increment; subject to a maximum of Three times Basic Annual Earnings (rounded to the next higher $10,000). Coverage is subject to a minimum of $10,000 and an overall maximum of $300,000.

Class 5   The Approved Amount of Optional Personal Life Insurance under the Prior Carrier's Plan as of April 30, 2013

Class 6   A Person may elect Optional Life Insurance in any $10,000 increment; subject to a maximum of Three times Basic Annual Earnings (rounded to the next higher $10,000). Coverage is subject to a minimum of $10,000 and an overall maximum of $300,000.

Personal Life Insurance will be reduced as follows:
- At age 65, benefits will reduce by 35% of the original amount;
- At age 70, benefits will reduce an additional 20% of the original amount.
Benefits will terminate when the Insured Person retires.

If the Insured Person first enrolls for Personal Life Insurance at age 65 or older, the above age reductions will apply to:
- Any Guarantee Issue Amount available without evidence of insurability; and
- The maximum amount of insurance for which he or she is eligible.

GL1101-2

3-4

07/01/13

## SCHEDULE OF INSURANCE (CONTINUED)

for Classes 1 and 5, **Basic Annual Earnings** means the Insured Person's annual contracted rate from the Group from the Group Policyholder before taxes on the Determination Date. The **"Determination Date"** is the last day worked just prior to the loss.

It also includes:
1. bonuses averaged over the 12 months just prior to the Determination Date; or over the actual period of employment with the Group Policyholder just prior to that date, if shorter.

It does **not** include commissions, overtime pay, or any other extra compensation. It does **not** include income from a source other than the Group Policyholder. It will not exceed the amount shown in the Group Policyholder's financial records or the amount for which premium has been paid; whichever is less.

For Classes 2 and 3, Bonus Eligible Employees, **Basic Annual Earnings** means the Insured Person's annual base salary or annualized hourly pay from the Group Policyholder before taxes on the Determination Date. The **"Determination Date"** is the last day worked just prior to the loss.

It also includes:
1. bonuses averaged over the 12 months just prior to the Determination Date; or over the actual period of employment with the Group Policyholder just prior to that date, if shorter. The Insured Person must be bonuses eligible, in an established bonus program.

It does **not** include commissions, tips and tokens, overtime pay, taxable fringe benefits, or any other extra compensation. It does **not** include income from a source other than the Group Policyholder. It will not exceed the amount shown in the Group Policyholder's financial records or the amount for which premium has been paid; whichever is less.

**for Classes 2 and 3, FOR PRODUCTION-BASED EMPLOYEES BASIC ANNUAL EARNINGS** means $1/12^{th}$ of the Insured Person's production earnings from the Group Policyholder for the 13 months prior to the Determination Date. If the Insured Person has not completed a full 13 months of service with the Group Policyholder, it is determined by annualizing the compensation over the actual period of employment with the Group Policyholder prior to the Determination Date; or

The **"Determination Date"** is last day worked just prior to the loss. It does **not** include commissions, tips and tokens, bonuses, overtime pay, taxable fringe benefits, or any other extra compensation. It does **not** include income from a source other than the Group Policyholder. It will **not** exceed the amount shown in the Group Policyholder's financial records or the amount for which premium has been paid, whichever is less.

**for Classes 4 and 6, Basic Annual Earnings** means the Insured Person's annual contracted rate from the Group from the Group Policyholder before taxes on the Determination Date. The **"Determination Date"** is the last day worked just prior to the loss.

It does **not** include commissions, bonuses, overtime pay, or any other extra compensation. It does **not** include income from a source other than the Group Policyholder. It will not exceed the amount shown in the Group Policyholder's financial records or the amount for which premium has been paid; whichever is less.

GL1101-2

07/01/13

LINC01022

## SCHEDULE OF INSURANCE (CONTINUED)

For All Classes, Evidence of Insurability must be submitted to and approved by the Company when:
1. Optional Life Insurance amounts exceed the guarantee issue amount of $200,000 or 200% of salary, whichever is less, at initial enrollment;
2. the amount of Optional Life Insurance increases after the initial enrollment by more than $10,000 due to salary or benefit increases over a 12-month period based on the month of the policy anniversary;
3. an increased amount of Optional Life Insurance coverage is requested and any amount of coverage has been previously withdrawn or declined or is pending underwriting review; or
4. initial coverage is elected more than 31 days after first becoming eligible.

Refer to the Evidence of Insurability section for any additional requirements.

For Classes 1, 2, 3, 4 and 6, The combined amounts of Basic and Optional Life Insurance are subject to a maximum of $600,000 or Five Time Basic annual Earnings.

For Classes 5, The combined amounts of Basic and Optional Life Insurance are subject to a maximum of $800,000 or Five Time Basic annual Earnings.

An Insured Person may elect Optional Personal Life Insurance, provided such Insured Person is also enrolled in the Basic Insurance Program.

GL1101-2

3-6

07/01/13

## SCHEDULE OF INSURANCE (CONTINUED)

### DEPENDENTS INSURANCE
### (For Classes 1, 2, 3, 4, and 6)

| Dependent | Amount of Life Insurance |
|---|---|

Option 1

| Spouse | $5,000, subject to a maximum of 100% of the Insured Employee's Optional Life Insurance Benefit |
|---|---|

Option 2

| Spouse | $10,000, subject to a maximum of 100% of the Insured Employee's Optional Life Insurance Benefit |
|---|---|

Option 3

| Spouse | $20,000, subject to a maximum of 100% of the Insured Employee's Optional Life Insurance Benefit |
|---|---|

Option 4

| Spouse | $30,000, subject to a maximum of 100% of the Insured Employee's Optional Life Insurance Benefit |
|---|---|

Option 5

| Spouse | $40,000, subject to a maximum of 100% of the Insured Employee's Optional Life Insurance Benefit |
|---|---|

Option 6

| Spouse | $50,000, subject to a maximum of 100% of the Insured Employee's Optional Life Insurance Benefit |
|---|---|

Option 1

| Dependent Child (age 14 days to 6 months) | $100 |
|---|---|

GL1101-2

**SCHEDULE OF INSURANCE (CONTINUED)**

| | |
|---|---|
| Dependent Child<br>(age 6 months to 23 years,<br>23 years if a full-time student) | 2,500 |

Option 2

| | |
|---|---|
| Dependent Child<br>(age 14 days to 6 months) | 100 |

| | |
|---|---|
| Dependent Child<br>(age 6 months to 23 years,<br>23 years if a full-time student) | 5,000 |

Option 3

| | |
|---|---|
| Dependent Child<br>(age 14 days to 6 months) | 100 |

| | |
|---|---|
| Dependent Child<br>(age 6 months to 23 years,<br>23 years if a full-time student) | 7,500 |

Option 4

| | |
|---|---|
| Dependent Child<br>(age 14 days to 6 months) | 100 |

| | |
|---|---|
| Dependent Child<br>(age 6 months to 23 years,<br>23 years if a full-time student) | 10,000 |

Option 5

| | |
|---|---|
| Dependent Child<br>(age 14 days to 6 months) | 100 |

| | |
|---|---|
| Dependent Child<br>(age 6 months to 23 years,<br>23 years if a full-time student) | 12,500 |

GL1101-2

07/01/13

LINC01025

## SCHEDULE OF INSURANCE (CONTINUED)

Option 6

Dependent Child                                   100
    (age 14 days to 6 months)

Dependent Child                               15,000
    (age 6 months to 23 years,
     23 years if a full-time student)

Spouse Life Insurance will be reduced as follows:
- by 35% of the original amount when the Insured Employee attains age 65.

Spouse Insurance will terminate when the Insured Employee attains age 70 or retires, whichever occurs first.

Evidence of Insurability must be submitted to and approved by the Company when:
1. Optional Spouse Life Insurance amounts exceed the guarantee issue amount of $10,000 at initial enrollment;
2. the amount of Optional Spouse Life Insurance increases after the initial enrollment due to salary or benefit increases; or
3. initial coverage is elected more than 31 days after first becoming eligible.

Refer to the Evidence of Insurability section for any additional requirements.

GL1101-2

3-9

07/01/13

LINC-01026

## SCHEDULE OF INSURANCE (CONTINUED)

### DEPENDENTS INSURANCE
#### (For Class 5)

| Dependent | Amount of Life Insurance |
|---|---|
| Spouse | The Approved Amount of Spouse Life Insurance under the Prior Carrier's Plan as of April 30, 2013 |

Option 1

| | |
|---|---|
| Dependent Child (age 14 days to 6 months) | $100 |
| Dependent Child (age 6 months to 23 years, 23 years if a full-time student) | 4,000 |

Option 2

| | |
|---|---|
| Dependent Child (age 14 days to 6 months) | 100 |
| Dependent Child (age 6 months to 23 years, 23 years if a full-time student) | 6,000 |

Option 3

| | |
|---|---|
| Dependent Child (age 14 days to 6 months) | 100 |
| Dependent Child (age 6 months to 23 years, 23 years if a full-time student) | 8,000 |

Option 4

| | |
|---|---|
| Dependent Child (age 14 days to 6 months) | 100 |

GL1101-2

3-10

07/01/13

## SCHEDULE OF INSURANCE (CONTINUED)

Dependent Child                                              10,000
   (age 6 months to 23 years,
    23 years if a full-time student)

Spouse Life Insurance will be reduced as follows:
-   by 35% of the original amount when the Insured Employee attains age 65.

Spouse Insurance will terminate when the Insured Employee attains age 70 or retires, whichever occurs first.

Evidence of Insurability must be submitted to and approved by the Company when:
   1. Optional Spouse Life Insurance amounts exceed the guarantee issue amount of $10,000 at initial enrollment;
   2. the amount of Optional Spouse Life Insurance increases after the initial enrollment due to salary or benefit increases; or
   3. initial coverage is elected more than 31 days after first becoming eligible.
Refer to the Evidence of Insurability section for any additional requirements.

The following chart applies to the Extension of Death Benefit provision when benefits end upon attainment of the Social Security Normal Retirement Age:

| Year of Birth | Normal Retirement Age |
| --- | --- |
| 1937 and prior | 65 |
| 1938 | 65 and 2 months |
| 1939 | 65 and 4 months |
| 1940 | 65 and 6 months |
| 1941 | 65 and 8 months |
| 1942 | 65 and 10 months |
| 1943 - 54 | 66 |
| 1955 | 66 and 2 months |
| 1956 | 66 and 4 months |
| 1957 | 66 and 6 months |
| 1958 | 66 and 8 months |
| 1959 | 66 and 10 months |
| 1960 and later | 67 |

Note:  Persons born on January 1 of any year should refer to the Normal Retirement Age for the previous year.

Under the Continuation of Coverage provision, the word "retire" or "retirement" means an Insured Person's attainment of the Social Security Normal Retirement Age.  The use of the word "retire" or "retirement" elsewhere in this Policy means an Insured Person's retirement from employment with the Employer.

If any evidence of insurability is required, it will be provided at the Person's own expense.

GL1101-2

## SCHEDULE OF INSURANCE (CONTINUED)

**OPEN ENROLLMENT PERIOD** means a designated timeframe for eligible employees to elect coverage who did not enroll during their initial eligibility period or for employees with existing coverage under this Policy to elect additional benefit amounts. Evidence of insurability is not required during this period provided certain conditions are met as described in the Schedule of Insurance. Participation in an Open Enrollment Period does not change the Policy provisions related to Waiting Periods. Employees who have been previously declined for a benefit amount or increase are not eligible to participate in the Open Enrollment.

There will be an Open Enrollment Period beginning December 1st and ending December 31st for eligible Employees to enroll for or to increase their current benefit amounts.

Coverage elected during this period will be effective:
  (1) January 1st following the enrollment period, if Actively at Work on that day; or
  (2) The day the Insured Person resumes Active Work, if not Actively at Work on the day the elected coverage or increase would otherwise take effect.

GL1101-2

3-12                                                                 07/01/13

LINC-1029

## DEFINITIONS

ACTIVE WORK or ACTIVELY AT WORK means an employee's full-time performance of all customary duties of his or her occupation at:
(1) the GROUP POLICYHOLDER'S place of business; or
(2) any other business location where the employee is required to travel.

Unless disabled on the prior workday or on the day of absence, an employee will be considered Actively at Work on the following days:
(1) a Saturday, Sunday or holiday which is not a scheduled workday;
(2) a paid vacation day, or other scheduled or unscheduled non-workday; or
(3) an excused or emergency leave of absence (except a medical leave).

COMPANY means The Lincoln National Life Insurance Company, an Indiana corporation, whose Group Insurance Service Office address is 8801 Indian Hills Drive, Omaha, Nebraska 68114-4066.

DAY OR DATE means at 12:01 A.M., Standard Time, at the GROUP POLICYHOLDER'S place of business; when used with regard to eligibility dates and effective dates. It means 12:00 midnight, Standard Time, at the same place; when used with regard to termination dates.

FULL-TIME EMPLOYEE means an employee of the GROUP POLICYHOLDER:
(1) whose employment with the GROUP POLICYHOLDER is the employee's principal occupation;
(2) who is not a temporary or seasonal employee; and
(3) who is regularly scheduled to work at such occupation at least:
(a) for Classes 1, 3 and 5, 72 hours each pay period; and
(b) for Class 2, 48 hours each pay period.

GROUP POLICYHOLDER means the person, partnership, corporation, or trust as shown on the Title Page of this Policy.

INSURANCE MONTH means that period of time:
(1) beginning at 12:01 A.M. Standard Time, at the GROUP POLICYHOLDER'S place of business on the first day of any calendar month; and
(2) ending at 12:00 midnight on the last day of the same calendar month.

INSURED PERSON means a PERSON for whom the coverages provided by this Policy are in effect.

PERSON means a FULL-TIME EMPLOYEE or REGULAR PART-TIME EMPLOYEE of the GROUP POLICYHOLDER:
(1) who is a member of an employee class which is eligible for coverage under this Policy; and
(2) who has completed an enrollment form.

PERSONAL INSURANCE means the insurance provided by this Policy on Insured Persons.

PHYSICIAN means a licensed practitioner of the healing arts other than the Insured Person or a relative of the Insured Person.

POLICY means this Group Insurance Policy issued by the Company to the Group Policyholder.

REGULAR PART-TIME EMPLOYEE means an employee of the GROUP POLICYHOLDER who is regularly scheduled to work at least 20 hours each week or 40 hours each pay period.

## GENERAL PROVISIONS

ENTIRE CONTRACT.  The entire contract between the parties consists of:
(1)    this Policy and the Group Policyholder's application (a copy is attached);
(2)    the Participating Employer's participation agreement; and
(3)    the Insured Persons' enrollment cards, if any.

All statements made by the Group Policyholder and by Insured Persons are representations and not warranties.  No statement made by an Insured Person will be used to contest the coverage provided by this Policy; unless:
(1)    it is contained in a written statement signed by that Insured Person; and
(2)    a copy of the statement is furnished to the Insured Person or Beneficiary.

Only an Officer of the Company may change this Policy or extend the time for payment of any premium.  No change will be valid unless made in writing and signed by an Officer of the Company.  Any change so made will be binding on all persons referred to in this Policy.

INCONTESTABILITY.  Except for the non-payment of premiums, the Company may not contest the validity of this Policy as to any Insured Person after it has been in force for two years during his or her lifetime.  This clause will not affect the Company's right to contest claims made for disability, accidental death, or accidental dismemberment benefits.

NONPARTICIPATION.  This Policy will not be entitled to share in the surplus earnings of the Company.

BASIS OF RESERVE.  The reserve for this Policy will not be less than the reserve computed using:
(1)    the 1970 Intercompany Group Life Disability Valuation Table; and
(2)    interest at not less than three percent per annum.

INFORMATION TO BE FURNISHED.   The Group Policyholder and Participating Employers may be required to furnish any information needed to administer this Policy.   Clerical error by the Group Policyholder or Participating Employer will not:
(1)    affect the amount of insurance which otherwise would be in effect; or
(2)    continue insurance which otherwise would be terminated.

Once an error is discovered, an equitable adjustment in premium will be made.  If a premium adjustment involves the return of unearned premium, the amount of the return will be limited to the twelve month period which precedes the date the Company receives proof such an adjustment should be made.

The Company may inspect any of the Group Policyholder's records or Participating Employers' records which relate to this Policy.

MISSTATEMENT OF AGE.  If an Insured Person's age has been misstated, premiums will be subject to an equitable adjustment.  If the amount of benefit depends upon age; then the benefit will be that which would have been payable, based upon the person's correct age.

CERTIFICATES.  The Group Policyholder will be furnished with individual Certificates for delivery to each Insured Person.  These certificates summarize the benefits provided by this Policy.  If there is a conflict between the Policy and the Certificate, the Policy will control.

CONFORMITY WITH STATE STATUTES.  If any provision of this Policy conflicts with any applicable law, the provision will be deemed to conform to the minimum requirements of the law.

WORKER'S COMPENSATION.  This Policy is not to be construed to provide benefits required by Worker's Compensation laws.

GL1101-4.1 95                                                                                                      P.E.

## PROVISIONS APPLICABLE TO PARTICIPATING EMPLOYERS

A Participating Employer has no rights under this Policy except as provided in this Section. The Participating Employer will be responsible for all premiums payable with respect to any of its Employees who are Insured Persons under this Policy.

PARTICIPATING EMPLOYER means an employer who has been approved by the Company for participation in the coverage provided by this Policy. The following are Participating Employers:

<div align="center">

Skaggs Community Hospital Association d/b/a Cox Medical Center Branson
Cox Monnett

</div>

EFFECTIVE DATE. As it applies to any Participating Employer, the Effective Date of this Policy will be the later of:
- (a) the date this Policy is issued;
- (b) the first day of the Insurance Month following the Company's approval of the employer's Participation Agreement; or
- (c) a date agreed upon by the Company, the Participating Employer, and the Group Policyholder.

TERMINATION: A Participating Employer's participation under this Policy ends on the earliest of the following dates:
- (a) the date the employer no longer meets the definition of a Participating Employer;
- (b) the date the Participating Employer has fewer than 10 Insured Persons;
- (c) the date the Participating Employer suspends active business operations, is placed in bankruptcy or receivership, dissolves, merges or relocates;
- (d) the date the Participating Employer, without good cause, fails to:
  - (a) promptly furnish the Company any information it may reasonably require; or
  - (b) perform its duties pertaining to this Policy in good faith;
- (e) the last day of the Insurance Month for which premium is paid;
- (f) the last day of the Insurance Month in which the Company receives the Participating Employer's written request to cease participation; or
- (g) the date the Company terminates the coverage under this Policy for all Participating Employer's in this state.

On the day participation ends, Policy coverage will terminate for all the Participating Employer's employees and their Dependents. If an employer ceases to be a Participating Employer, it may not be a Participating Employer again; until the Company reapproves it as such.

GL1101-4a 04

## ELIGIBILITY AND EFFECTIVE DATES FOR PERSONAL INSURANCE

ELIGIBILITY.  A Person becomes eligible for the coverage provided by this Policy on the later of:
    (1)   the Policy's date of issue; or
    (2)   the date the Waiting Period is completed.

WAITING PERIOD.  (See Schedule of Insurance).

EFFECTIVE DATE.  Personal Insurance becomes effective on the latest of:
    (1)   (a)   for Classes 1, 4, 5 and 6, the date the Person becomes eligible for the coverage;
          (b)   for Classes 2 and 3, the first day of the Insurance Month coinciding with or next following the date the Person becomes eligible for the coverage;
    (2)   the date the Person resumes Active Work, if not Actively at Work on the day he or she becomes eligible;
    (3)   the date the Person makes written application for Personal Insurance; and signs:
          (a)   a payroll deduction order, if Insured Persons pay any part of the Policy premium; or
          (b)   an order to pay premiums from the Person's Section 125 Plan account, if Employer contributions are made through a Section 125 Plan; or
    (4)   the date the Company approves the Person's coverage, if evidence of insurability is required.

EVIDENCE OF INSURABILITY.  Evidence of insurability satisfactory to the Company must be submitted when:
    (1)   a Person makes written application for Personal Insurance more than 31 days after becoming eligible for the coverage; or
    (2)   a Person makes written application for Personal Insurance after he or she has requested:
          (a)   to cancel Personal Insurance;
          (b)   to stop payroll deductions for the coverage; or
          (c)   to stop premium payments from the Section 125 Plan account.

EXCEPTIONS.  If an Insured Person's coverage terminates due to an approved leave of absence or military leave, the Company will waive any Waiting Period or evidence of insurability requirement upon his or her return; provided:
    (1)   the Person returns within six months after the leave begins;
    (2)   the Person applies or is enrolled within 31 days after resuming Active Work; and
    (3)   the reinstated amount of insurance does not exceed the amount which terminated.

If an Insured Person's coverage terminates due to a lay-off, the Company will waive any Waiting Period or evidence of insurability requirement upon his or her return; provided:
    (1)   the Person returns within six months after the date the lay-off begins;
    (2)   the Person applies or is reenrolled within 31 days after resuming Active Work; and
    (3)   the reinstated amount of insurance does not exceed the amount which terminated.
Reinstatement will take effect on the date the Insured Person returns to Active Work.

If an Insured Person's coverage terminates because his or her employment ends, the Company will waive any Waiting Period or evidence of insurability requirement upon his or her return; provided:
    (1)   the Person is rehired within six months after employment terminated;
    (2)   the Person applies or is reenrolled within 31 days after resuming Active Work; and
    (3)   the reinstated amount of insurance does not exceed the amount which terminated.
Reinstatement will take effect on the date the Insured Person returns to Active Work.

GL1101-5 93 MO

(FMLA)

7

07/01/13

LINC01033

## INDIVIDUAL TERMINATIONS

An Insured Person's coverage will terminate on the earliest of:
(1)    the date this Policy terminates;
(2)    the last day of the Insurance Month in which the Insured Person requests termination;
(3)    the last day of the last Insurance Month for which premium payment is made on the Insured Person's behalf;
(4)    the date the Insured Person ceases to be in a class of employees which is eligible for coverage under this Policy;
(5)    with respect to any particular insurance benefit, the date the portion of the Policy providing that benefit terminates;
(6)    the date on which the Insured Person's employment with the Group Policyholder or Participating Employer terminates; or
(7)    the date the Insured Person enters the armed services of any state or country on active duty; except for duty of 30 days or less for training in the Reserves or National Guard.  (If the Insured Person sends proof of military service, the Company will refund any unearned premium.)

Ceasing Active Work results in termination of insurance; but coverage may be continued as follows:
(1)    If the Insured Person is disabled due to illness or injury, then coverage may be continued until the earlier of:
(a)    12 Insurance Months after the disability begins; or
(b)    the date the Person is no longer disabled;
provided premium payments are made on his or her behalf.

If the Insured Person is totally disabled due to illness or injury, and active employment is a condition of insurance; then Life Insurance may be continued until the earlier of:
(a)    the date the Insured Person is no longer totally disabled; or
(b)    the date the Insured Person qualifies for any Extension of Death Benefit under this Policy;
provided this Policy (or the Participating Employer's participation) remains in effect; and premium payments are made on the Insured Person's behalf.  For the first 6 months of continued Life Insurance, the Insured Person will be required to pay the Group Policyholder or Participating Employer only that part of the premium he or she would have been required to pay as an Active Employee.  "Total Disability" will be defined in the Extension of Death Benefit section of this Policy.
(2)    If the Insured Person ceases work due to a temporary lay off, an approved leave of absence, or a military leave; then coverage may be continued:
(a)    for three Insurance Months after the lay off or leave begins;
(b)    provided premium payments are made on his or her behalf.

GL1101-5 93 MO                                                                                                (FMLA)

## CONTINUATION OF COVERAGE

This section applies to any Basic or Optional Personal Life Insurance and Accidental Death and Dismemberment Insurance provided by this Policy. Such insurance may be continued until the Insured Person attains age 98, by paying the required premiums, when:

(1) an Insured Person's employment with the Employer ends for a reason other than sickness or injury or retirement; and

(2) the insurance has been in force for at least 12 months in a row just prior to the date employment ends.

Continuation of insurance under this provision will follow any state required continuation or other continuation allowed under the Ceasing Active Work section of this Policy.

To continue insurance, written application and the first premium payment must be made to the Company, within 31 days of the date insurance would otherwise end.

The Continuation of Coverage is not available when Policy coverage terminates solely because:

(1) an Insured Person's Employer ceases to be a Participating Employer; or

(2) this Policy terminates.

For life insurance that terminates under this Policy due to an Insured Person's termination of membership in an eligible class; see the Conversion Privilege section of this Policy.

AMOUNT OF COVERAGE. The amount of continued insurance may not exceed the amount in force when employment ends. During the continuation period the amount of insurance may not be increased. Continued insurance will be subject to any reduction on account of age, as shown in the Schedule of Insurance.

The Insured Person may decrease the amount of continued insurance at any time, by completing a request form supplied by the Company. The decrease will take effect on the first day of the Insurance Month after the Company receives the request.

PAYMENT OF PREMIUM. Timely payment of premium must be made directly to the Company, throughout the period of continued insurance. Premiums will be based on attained age as shown in the premium information provided with the application. A direct billing fee will be added to the premium based on the frequency chosen. The premium frequency may be changed by sending the Company advance written request on forms supplied by the Company. Such request may be sent at any time while continued insurance is in force, except during a Grace Period.

TERMINATION OF COVERAGE. Continued insurance will end on the earliest of:

(1) the date this Policy terminates;

(2) the last day of the Insurance Month in which termination is requested;

(3) the last day of the Insurance Month for which premium is paid;

(4) the date the Insured Person attains age 98, or dies;

(5) the date insurance would otherwise end had the Insured Person remained an Active Employee; or

(6) the date the Insured Person enters the armed forces of any state or country on active duty; except for duty of 30 days or less for training in the Reserves or National Guard. (If the Insured Person sends proof of military service, the Company will refund any unearned premium.)

When continued insurance ends, the Insured Person may be entitled to purchase an individual life policy, in accord with the Conversion Privilege section of this Policy.

Case 3:17-cv-05060-MDH    Document 33-4    Filed 05/15/18    Page 240 of 269    LINC01035

## PREMIUMS AND PREMIUM RATES

PAYMENT OF PREMIUMS.  No coverage provided by this Policy will be in effect until the first premium for such coverage is paid.  For coverage to remain in effect, each subsequent premium must be paid on or before its due date.  The Group Policyholder is responsible for paying all premiums as they become due.  Premiums are payable on or before their due dates at the Company's Group Insurance Service Office.  The premium must be paid in U.S. dollars.

PREMIUM RATE CHANGE.  The Company may change any premium rate on any of the following dates:
  (1)   the date this Policy's terms are changed;
  (2)   the date the Company's liability is changed due to a change in federal, state or local law;
  (3)   the date the Group Policyholder (or any covered division, subsidiary or affiliated company) relocates, dissolves or merges, or is added to or removed from this Policy;
  (4)   the date any coverage for one or more classes ceases to be provided under this Policy;
  (5)   the date the number of Insured Persons changes by 25% or more from the enrollment on the date this Policy took effect, or the most recent Rate Guarantee Date expired, if later; or
  (6)   on any premium due date on or after this Policy's first anniversary, or any later rate guarantee date agreed upon by the Company.

Unless the Company and the Group Policyholder agree otherwise, the Company will give at least 31 days' advance written notice of any increase in premium rates.

PREMIUM AMOUNT.  The amount of premium due on each due date will be the sum of the products obtained by multiplying each rate shown in the Premium Rate Schedule by the amount of insurance to which the rate applies.

Premium adjustments will not be pro-rated daily.  Instead, premium will be adjusted as follows.
  (1)   When an Insured Person's insurance or increase takes effect, premium will be charged from the monthly due date coinciding with or next following that change.
  (2)   When all or part of an Insured Person's insurance terminates, the applicable premium will cease on the monthly due date coinciding with or next following that termination.
  (3)   When premiums are paid other than monthly, increases or decreases will result in adjustment from the premium due date coinciding with or next following that change.

The above manner of charging premium is for accounting purposes only.  It will not extend coverage beyond a date it would have otherwise terminated.  Each premium payment will include any adjustments in past premiums, which are needed due to changes that have not yet been taken into account.  If a premium adjustment involves a return of unearned premium, the refund will be limited to the prior 12-month period.

### PREMIUM RATE SCHEDULE

Monthly Basic Group Life Rate                    $.06 per $1,000 of insurance

Monthly Basic AD&D Rate                          .02 per $1,000 of insurance

GL1101-6 04

## PREMIUMS AND PREMIUM RATES

Monthly Optional Group Life Rate

Classes 1, 2, 3, 4 and 6

| Insured Employee's Attained Age | Monthly Rate per $1,000 of insurance |
|---|---|
| Less than 25 | $.06 |
| 25 - 29 | .06 |
| 30 - 34 | .08 |
| 35 - 39 | .11 |
| 40 - 44 | .17 |
| 45 - 49 | .27 |
| 50 - 54 | .47 |
| 55 - 59 | .75 |
| 60 - 64 | .99 |
| 65 - 69 | 1.60 |
| 70 - 74 | 2.84 |
| 75 - 79 | 2.84 |
| 80 and over | 2.84 |

Monthly Optional Group Life and Optional Spouse Life Rate
Class 5                                         $.238 per $1,000 of insurance

Monthly Optional Spouse Life Rate

Classes 1, 2, 3, 4 and 6

| | |
|---|---|
| Option 1 | 1.00 per Insured Spouse |
| Option 2 | 2.00 per Insured Spouse |
| Option 3 | 4.00 per Insured Spouse |
| Option 4 | 6.00 per Insured Spouse |
| Option 5 | 8.00 per Insured Spouse |
| Option 6 | 10.00 per Insured Spouse |

Monthly Optional Child Life Rate

| | |
|---|---|
| Option 1 | 1.00 per Insured Child(ren) |
| Option 2 | 2.00 per Insured Child(ren) |
| Option 3 | 4.00 per Insured Child(ren) |
| Option 4 | 6.00 per Insured Child(ren) |
| Option 5 | 8.00 per Insured Child(ren) |
| Option 6 | 10.00 per Insured Child(ren) |

The above rates are guaranteed until January 1, 2016, unless an exception listed in the Premium Rate Change section applies.

After that, any premium rate change will be as shown in the renewal letter. The Company will send the Group Policyholder a renewal letter prior to each Policy Anniversary.

GL1101-6 04

Case 3:17-cv-05060-MDH   Document 33-4   Filed 05/15/18   Page 242 of 269   LINC01037

## GRACE PERIOD

A grace period of 60 days from the due date will be allowed for the payment of each premium after the first. This Policy will remain in effect during the grace period; unless the Group Policyholder gives the Company advance written notice of termination. The Group Policyholder will remain liable for payment of a pro rata premium for the time this Policy remained in force during the grace period.

## POLICY TERMINATION

TERMINATION BY THE COMPANY. To terminate this Policy, the Company must give the Group Policyholder at least 31 days' advance written notice of its intent to do so. The Company may terminate this Policy coverage on the due date of any premium; if:

(1) the total number of Insured Persons is less than ten;

(2) all of the premium is paid by the Group Policyholder and less than 100% of those eligible for coverage are insured;

(3) part of the premium is paid by Insured Persons and less than 75% of those eligible for coverage are insured (this part 3 will not apply to any voluntary, optional or supplemental insurance provided under this Policy);

(4) the Group Policyholder, without good cause, fails to:
    (a) promptly furnish any information the Company reasonably requires; or
    (b) perform its duties pertaining to this Policy in good faith;

(5) the Company terminates all other policies where permitted by their terms, which provide life insurance or weekly disability income insurance in the same state in which this Policy was issued; or

(6) state law otherwise requires this Policy to be terminated.

TERMINATION BY GROUP POLICYHOLDER. The Group Policyholder may terminate this Policy at any time, by giving the Company advance written notice. Coverage will then terminate:

(1) on the date the Company receives the notice; or

(2) any later date the Group Policyholder and the Company have agreed upon.

The Group Policyholder remains responsible for the payment of premiums to the date of termination.

AUTOMATIC TERMINATION. If any premium remains unpaid at the end of the Grace Period; then this Policy will automatically terminate, without any action on the Company's part, on the last day of the Grace Period. The Group Policyholder remains responsible for the payment of premiums to the date of termination.

EFFECT ON INCURRED CLAIMS. Termination of this Policy will not affect benefits otherwise payable for a claim incurred while this Policy is in force.

## BENEFICIARY

PAYMENTS TO BENEFICIARY.  At an Insured Person's death, the amount of his or her Personal Life Insurance will be paid to the surviving Beneficiary.  If the Insured Person has not named a Beneficiary, or if no named Beneficiary survives the Insured Person; then payment will be made to that Insured Person's:

    (1)    surviving spouse; or, if none
    (2)    surviving child or children in equal shares; or, if none
    (3)    surviving parent or parents in equal shares; or, if none
    (4)    surviving brothers and sisters in equal shares; or, if none
    (5)    estate, or in accord with the Facility of Payment section of this Policy.

The amount payable to anyone shown above will be reduced by any amount paid in accord with the Facility of Payment section.

In determining who is to receive payment, the Company may rely upon an affidavit by a member of the class of relatives to receive payment.  The Company will make payment based upon the affidavit it has; unless it receives notice of a valid claim by some other person, at its Group Insurance Service Office, before paying the proceeds.  Such payment will release the Company from any further obligation for the Insured Person's life insurance benefit.

If an Insured Person's named Beneficiary dies:
    (1)    within 15 days of the Insured Person's death; and
    (2)    before the Company receives satisfactory proof of the Insured Person's death;
then payment will be made as if the Insured Person had survived that Beneficiary; unless other provisions have been made.

NAMING THE BENEFICIARY.  An Insured Person's Beneficiary will be as shown on his or her enrollment card, unless changed.  This Policy may replace a group policy providing similar coverages.  In that event, the Beneficiary which the Insured Person named under the prior policy will be the Beneficiary under this Policy, until changed.

CHANGING THE BENEFICIARY.  Only the Insured Person, or his or her assignee, may change the Beneficiary.  A new Beneficiary may be named by filing a written notice of the change with the Company at its Group Insurance Service Office.  The change will be effective as of the date it was signed; subject to any action the Company takes before receiving notice of the change.

When applying for a conversion policy under the Conversion Privilege Section, an Insured Person must name a Beneficiary.  The Beneficiary named for the conversion policy may be someone other than the person named under this Policy.  In that event, the application for the conversion policy will be treated as a written notice of change of Beneficiary.

GL1101-7.1A 96

Pref. Bene.
07/01/13

13

LINC-001039

## ASSIGNMENTS

Personal Life Insurance and Accidental Death Insurance may be assigned. The assignments allowed under this Policy are absolute assignments and funeral assignments as described below.

No assignment will be binding on the Company unless and until:
(1) it is made on a form furnished by the Company;
(2) the original is completed and filed with the Company at its Group Insurance Service Office; and
(3) it is approved by the Company.

The Company and the Group Policyholder do not assume responsibility for the validity or effect of an assignment.

ABSOLUTE ASSIGNMENTS. An Insured Person may make an irrevocable assignment of his or her Personal Life Insurance and Accidental Death Insurance as a gift (with no consideration), providing he or she has the legal capacity and the mental capacity to do so. It may be made to a trust or to one or more of the Insured Person's relatives, their estates, or to a trustee of a trust under which one of the relatives is a beneficiary.

The term "relatives" includes, but is not limited to, an Insured Person's spouse, parents, grandparents, aunts, uncles, siblings, children, adopted children, stepchildren, and grandchildren.

In some states, community property is an established form of ownership that must be considered in making an assignment. If an Insured Person makes an absolute assignment to two or more assignees, such assignees will be joint owners with the right of survivorship between them. An Insured Person should consult with his or her own legal advisor before making an assignment.

Once the assignment has been recorded by the Company, the Insured Person can no longer change the beneficiary and cannot apply for conversion. Only the assignee can change the beneficiary designation if the previous designation is revocable. An assignment will have no effect on a prior irrevocable beneficiary designation. Only the assignee can apply for conversion but only when the Conversion Privilege provision would have been available to the Insured Person in the absence of the assignment under this Policy.

An absolute assignment cannot be used as a collateral assignment.

FUNERAL ASSIGNMENTS. Upon an Insured Person's death, the beneficiary may assign the Personal Life Insurance benefit and Accidental Death Insurance benefit to a funeral home for payment of burial expenses. After payment has been made for the burial expenses to the assigned funeral home, the remaining death benefit is then paid in accord with the Beneficiary and Settlement Options sections of this Policy.

GL1101-7.1C 01

07/01/13

LIN001040

## FACILITY OF PAYMENT

Policy benefits may become payable to an Insured Person's estate, to a minor, or to a person who the Company does not consider competent to give a valid release. In that event, the Company has the option to pay one or more of the following:

    (1)   a person who has assumed the care and support of the Insured Person or Beneficiary;

    (2)   a person who has incurred expense as a result of the Insured Person's last illness or death;

    (3)   the personal representative of the Insured Person's estate; or

    (4)   any person related by blood or marriage to the Insured Person.

No payment made under this section may exceed $2,000. Any payment made in good faith under this section will fully discharge the Company to the extent of the payment. Any remaining amount of benefit will be paid as shown in the Beneficiary section.

## DEATH BENEFIT

AMOUNT PAYABLE ON DEATH. Upon receipt of satisfactory proof of an Insured Person's death, the Company will pay a death benefit equal to the amount of Personal Life Insurance in effect on the date of death. This amount is shown in the Schedule of Insurance. The benefit will be paid as shown in the Beneficiary, Facility of Payment, and Settlement Options sections.

## SETTLEMENT OPTIONS

INSTALLMENTS. All or part of the death benefit may be received in installments, by making written election to the Company.

ELECTION. While living, an Insured Person may direct the Company to pay the death benefit in installments. If no such direction is in effect at the time of the Insured Person's death, the Beneficiary may make such an election.

CONDITIONS. Any election, whether by an Insured Person or a Beneficiary, must comply with the Company's practices at the time it is made. The amount applied under a settlement option must be at least $2,000. It must be sufficient to provide a payment of at least $20 per month.

GL1101-8 96

## EXTENSION OF DEATH BENEFIT

BENEFIT. Life insurance will be continued, **without payment of premiums**, for an Insured Person who:
(1) becomes Totally Disabled while insured under this policy and before reaching age 60;
(2) remains Totally Disabled for at least 6 months in a row; and
(3) submits satisfactory proof within the 7th through the 12th months of disability; or:
    (a) as soon as reasonably possible after that; but
    (b) not later than the 24th month of disability, unless he or she was legally incapacitated.

PREMIUM PAYMENT. Premium payments must continue until:
(1) the day the Insured Person is approved for this Extension of Death Benefit; or
(2) the day this Policy terminates (whichever occurs first).

Upon receipt of satisfactory proof, the Company will refund up to 12 months' premium paid for the Insured Person's life insurance, from the 1st day of Total Disability.

DEFINITION. For this benefit, Total Disability or Totally Disabled means an Insured Person is unable, due to sickness or injury, to perform the material and substantial duties of:
(1) the Insured Person's regular occupation during the first 12 months of disability; or
(2) any occupation for which the Insured Person is or becomes reasonably fitted by reason of training, education, experience, age and physical and mental capacity, after the first 12 months of disability.

AMOUNT CONTINUED. The life insurance continued by this section:
(1) will be the amount of Personal Life Insurance and any Dependent Life Insurance in effect on the day the Insured Person's Total Disability begins; and
(2) will be subject to the reductions and terminations in effect under this Policy on that day.

If the Insured Person receives an Accelerated Death Benefit, the amount will be reduced in accord with that provision. Any Accidental Death and Dismemberment Benefit will not be continued.

ADDITIONAL PROOF. At any time during this continuation, the Company may require the Insured Person:
(1) to submit further proof of his or her continued Total Disability; and
(2) to be examined by a Physician of the Company's choice, as often as reasonably necessary.

After the first two years of Total Disability, the Company will not request proof or an exam more than once a year. Proof will be at the Insured Person's expense; unless the Company requests an exam by a Physician of its choice.

When an Insured Person dies after submitting proof, further proof must be submitted to the Company showing that he or she remained continuously and Totally Disabled until death. When an Insured Person dies within 12 months after Total Disability begins, but before submitting proof; then his or her death benefit will still be paid under the terms of this Policy. But the Company must first receive satisfactory proof of his or her continuous Total Disability, from the last day of Active Work until the date of death.

TERMINATION. Any life insurance extended under this section will terminate automatically on:
(1) the day the Insured Person ceases to be Totally Disabled;
(2) the day the Insured Person fails to take a required medical examination;
(3) the 60th day after the Company mails a request for additional proof, if it is not given;
(4) the effective date of the Insured Person's individual conversion policy, with respect to any amount of life insurance converted in accord with the Conversion Privilege section; or
(5) the day the Insured Person reaches Social Security Normal Retirement Age (SSNRA), as shown in the Schedule of Insurance (whichever occurs first).

Discontinuance of this Policy will not terminate any life insurance extended under this section.

RIGHTS AFTER TERMINATION. If Total Disability ends, and the Insured Person **does not return** to a class eligible for Policy coverage; then he or she may exercise the Conversion Privilege. If Total Disability ends, and the Insured Person **does return** to an eligible class; then his or her Policy coverage will resume when premium payments are resumed, and any conversion policy is surrendered as provided below.

CONVERSION POLICIES. If the Insured Person has exercised the Conversion Privilege, and the benefits payable under this Policy and the conversion policy combined would exceed:
(1) the Insured Person's original amount of Policy coverage prior to the conversion; or
(2) the greater amount for which he or she later becomes insured under this Policy;

then benefits will be payable under the terms of this Policy. But the conversion policy must first be surrendered to the Company; and no claim may be made under the conversion policy, except for refund of premium less any dividends and policy loans.

GL1101-9 96 MO

Stand. Ext. - SSNRA

07/01/13

LIN0C1042

## ACCELERATED DEATH BENEFIT

BENEFIT. The Accelerated Death Benefit is an advance payment of part of the Insured Person's Personal Life Insurance. It may be paid to the Insured Person, in a lump sum, once during the Insured Person's lifetime.

To qualify, a Terminal Insured Person must:
(1) have satisfied the Active Work requirement under this Policy;
(2) have been insured under this Policy for at least 12 months; and
(3) have at least $2,000 of Personal Life Insurance under this Policy on the day before the Accelerated Death Benefit is paid.

Receiving the Accelerated Death Benefit will reduce the Remaining Life Insurance and the Death Benefit payable at death, as shown on the next page.

"Claimant," as used in this section, means the Terminal Insured Person for whom the Accelerated Death Benefit is requested.

"Terminal" means the Insured Person has a medical condition which is expected to result in death within 12 months, despite appropriate medical treatment.

APPLYING FOR THE BENEFIT. To withdraw the Accelerated Death Benefit, the Insured Person (or his or her legal representative) must send the Company:
(1) written election of the Accelerated Death Benefit, on forms supplied by the Company; and
(2) satisfactory proof that the Claimant is Terminal, including a Physician's written statement.

The Company reserves the right to decide whether such proof is satisfactory.

Before paying an Accelerated Death Benefit, the Company must also receive the written consent of any irrevocable beneficiary, assignee or bankruptcy court with an interest in the benefit. (See Limitations 3, 4, and 5.)

**NOTE: THIS IS NOT A LONG-TERM CARE POLICY. RECEIVING THIS ACCELERATED DEATH BENEFIT WILL REDUCE THE BENEFIT PAYABLE AT DEATH. ANY AMOUNT WITHDRAWN MAY BE TAXABLE INCOME, SO THE INSURED PERSON SHOULD CONSULT A TAX ADVISOR BEFORE APPLYING FOR THIS BENEFIT.**

AMOUNT OF THE BENEFIT. The Insured Person may elect to withdraw an Accelerated Death Benefit in any $1,000 increment; subject to:
(1) a minimum of $1,000 or 10% of the Claimant's amount of Life Insurance (whichever is greater); and
(2) a maximum of $250,000 or 75% of the Claimant's amount of Life Insurance (whichever is less).

To determine the Accelerated Death Benefit, the Company will use the lesser of A or B below:
A. the Claimant's amount of Life Insurance which is in force on the day before the Accelerated Death Benefit is paid; or
B. the Claimant's amount of Life Insurance which would be in force 12 months after that date; if the coverage is scheduled to reduce, due to age, within 12 months after the Accelerated Death Benefit is paid.

GL1101-9.8 01 MO

ADB-DEP.

07/01/13

ADMINISTRATIVE CHARGE:  NONE

WITHDRAWAL FEE:  NONE

EFFECT ON AMOUNT OF LIFE INSURANCE.  "Remaining Life Insurance" means the amount of Life Insurance which remains in force on the Claimant's life after an Accelerated Death Benefit is paid.  The Remaining Life Insurance will equal:

(1)  the Claimant's amount of Life Insurance which was used to determine the Accelerated Death Benefit (A or B above); minus

(2)  any percentage by which the Claimant's coverage is scheduled to reduce, due to age; if the reduction occurs more than 12 months after the Accelerated Death Benefit is paid, and while he or she is still living; minus

(3)  the amount of the Accelerated Death Benefit withdrawn.

PREMIUM:  There is no additional charge for this benefit.  Continuation of the Remaining Life Insurance will be subject to timely payment of the premium for the reduced amount; unless the Insured Person qualifies for waiver of premium under this Policy's Extension of Death Benefit provision, if included.

CONDITIONS.  If the Claimant exercises the Conversion Privilege after an Accelerated Death Benefit is paid, the amount of the conversion policy will not exceed the amount of his or her Remaining Life Insurance.  If the Claimant has Accidental Death and Dismemberment benefits under this Policy, the Principal Sum will not be affected by the payment of an Accelerated Death Benefit.

EFFECT ON DEATH BENEFIT.  When the Claimant dies after an Accelerated Death Benefit is paid, the amount of Remaining Life Insurance in force on the date of death will be paid as a Death Benefit.  The Insured Person's Death Benefit will be paid in accord with the Beneficiary section of this Policy.  If the Claimant dies after application for an Accelerated Death Benefit has been made, but before the Company has made payment; then the request will be void and no Accelerated Death Benefit will be paid.  The amount of Life Insurance in force on the date of death will be paid in accord with Policy provisions.

EFFECT ON TAXES AND GOVERNMENT BENEFITS.  Any Accelerated Death Benefit amount withdrawn may be taxable income to the Insured Person.  Receipt of the Accelerated Death Benefit may also affect the Claimant's eligibility for Medicaid, Supplemental Security Income and other government benefits.  The Claimant should consult his or her own tax and legal advisor before applying for an Accelerated Death Benefit.  The Company is not responsible for any tax owed or government benefit denied, as a result of the Accelerated Death Benefit payment.

LIMITATIONS.  No Accelerated Death Benefit will be paid:

(1)  if any required premium is due and unpaid;

(2)  on any conversion policy purchased in accord with the Conversion Privilege;

(3)  without the written approval of the bankruptcy court, if the Insured Person has filed for bankruptcy;

(4)  without the written consent of the beneficiary, if the Insured Person has named an irrevocable beneficiary;

(5)  without the written consent of the assignee, if the Insured Person has assigned his or her rights under this Policy;

(6)  if any part of the Life Insurance must be paid to the Insured Person's child, spouse or former spouse; pursuant to a legal separation agreement, divorce decree, child support order or other court order;

(7)  if the Claimant is Terminal due to a suicide attempt, while sane; or due to an intentionally self-inflicted injury;

(8)  if a government agency requires the Insured Person or the Claimant to use the Accelerated Death Benefit to apply for, receive or continue a government benefit or entitlement; or

(9)  if an Accelerated Death Benefit has been previously paid for the Claimant under this Policy.

GL1101-9.8 01 MO

ADB-DEP.

07/01/13

## CONVERSION PRIVILEGE - CONVERSION BENEFITS

GENERAL CONVERSION BENEFIT. An individual life policy (known as a conversion policy) may be purchased from the Company without evidence of insurability, if all or part of anyone's life insurance under this Policy terminates due to:

(1) termination of the Insured Person's employment or membership in an eligible class; or

(2) a dependent's ceasing to be an eligible family member due to the Insured Person's death or divorce, or a child's marriage or attainment of the limiting age.

To purchase a conversion policy, application and payment of the first premium must be made within 31 days after the life insurance is terminated. Any policy issued under the General Conversion Benefit will:

(1) be for an amount not to exceed the amount of the life insurance which was terminated; less the amount of any group life insurance for which the person becomes eligible within 31 days after insurance terminates;

(2) be on any form (except term) then issued by the Company at the age and amount for which application is made;

(3) be issued at the Insured Person's age at nearest birthday;

(4) be issued without disability or other supplemental benefits; and

(5) require premiums based on the class of risk to which the person then belongs.

CONVERSION BENEFIT-POLICY TERMINATION OR AMENDMENT. A conversion policy also may be purchased from the Company if:

(1) all or a part of anyone's insurance terminates due to amendment or termination of this Policy; and

(2) that person has been covered continuously under this Policy for at least five years.

Any conversion policy issued due to Policy termination or amendment will be subject to the same conditions as a policy issued under the General Conversion Benefit except its amount may not exceed the lesser of:

(1) $10,000; or

(2) the Amount of Life Insurance which terminates less the amount of any group life insurance for which the Insured Person becomes eligible within 31 days after the termination.

### PROVISIONS APPLICABLE TO ALL CONVERSION POLICIES

EFFECTIVE DATES. The coverage provided by a conversion policy issued under this Section will be effective on the later of:

(1) its date of issue; or

(2) 31 days after the date on which the person's life insurance terminated.

DEATH DURING CONVERSION PERIOD. The Company will pay a death benefit under this Policy equal to the amount of the life insurance which could have been converted, if the person:

(1) was entitled to purchase a conversion policy; and

(2) dies within the 31 day conversion period.

This death benefit will be paid even if no one applied for the conversion policy. If the first premium was paid for the conversion policy, the amount of the premium will be refunded and the conversion policy will be void.

NOTICE OF CONVERSION PRIVILEGES-INSURED PERSONS. When an Insured Person's Personal Insurance terminates, written notice of the right to convert will be:

(1) given personally to the Insured Person; or

(2) mailed to the Insured Person at his last known address.

An additional period in which to convert will be granted if this written notice is not given to the Insured Person at least 15 days before the end of the 31 day conversion period. Any such extension of the conversion period will expire on the earliest of:

(1) 15 days after the Insured Person is given the written notice; or

(2) 60 days after the end of the 31 day conversion period even if the Insured Person is never given the notice.

No death benefit will be payable under this Policy after the 31 day conversion period has expired even though the right to convert may be extended.

GL1101-10 MO

DEP.-$10,000

07/01/13

Case 3:17-cv-05060-MDH   Document 33-4   Filed 05/15/18   Page 250 of 269   LINOO21045

## DEPENDENTS LIFE INSURANCE

BENEFIT.  Upon receipt of satisfactory proof of a Dependent's death while insured under this Policy, the Company will pay the amount of the Dependents Life Insurance in effect on the date of such death.  This amount is shown in the Schedule of Insurance.  The death benefit will be paid:

    (1)    to the Insured Person; or

    (2)    if the Insured Person fails to survive the Dependent, to the Insured Person's Beneficiary or according to the Facility of Payment Section.

DEPENDENT.  A Dependent means a person who meets the definition of a dependent of the Insured Person under the provision of the U.S. Internal Revenue Code; and is an Insured Person's:

    (1)    spouse who is not legally separated from the Insured Person;

    (2)    unmarried child at least 14 days but less than 23 years of age;

    (3)    unmarried child less than 23 years of age, if attending an accredited educational institution for the minimum credit hours required to maintain full-time student status there; or

    (4)    unmarried child who is totally and permanently disabled and who became so disabled prior to reaching 23 years of age.

A legally adopted child is considered the Insured Person's child from the date of placement in the Insured Person's home for an agency adoption; or from the date the adoption petition is filed, if later, for a private adoption.

In addition to naturally born and legally adopted children, the word "child" includes an Insured Person's stepchild or foster child; provided the child resides in the Insured Person's household and is dependent on the Insured Person for principal support.

The term Dependent does not include anyone serving in the armed forces of any state or country; except for duty of 30 days or less for training in the Reserves or National Guard.

ELIGIBILITY.  An Insured Person becomes eligible for Dependents Life Insurance on the latest of:

    (1)    the date the Insured Person becomes eligible for Personal Insurance;

    (2)    the effective date of this Section; or

    (3)    the date the Insured Person first acquires a Dependent.

EFFECTIVE DATES.  An Insured Person's Dependents Life Insurance will become effective on the latest of the following dates:

    (1)    the date the Insured Person becomes eligible for Dependents Life Insurance;

    (2)    the date the Insured Person makes written application for Dependents Life Insurance and signs a payroll deduction order; and

    (3)    the date the Company approves any required evidence of insurability on all the Insured Person's Dependents.

If an Insured Person acquires a new Dependent while insured for Dependents Life Insurance, insurance for that Dependent will take effect on the date the Dependent is acquired.

If a Dependent is confined in a hospital on the date his or her Dependents Life Insurance would otherwise take effect, then Dependents Life Insurance for that Dependent will not take effect until ten days after final discharge from the hospital.

EVIDENCE OF INSURABILITY.  Each Insured Person's Dependent must submit evidence of insurability satisfactory to the Company if the Insured Person:
  (1)   makes application for Dependents Insurance more than 31 days after the date such Insured Person becomes eligible for Dependents Insurance; or
  (2)   elects to be insured for Dependents Insurance after such Insured Person had requested:
        (a)   termination of the Dependents Insurance; or
        (b)   cancellation of the payroll deduction order; or
  (3)   makes application for Dependents Insurance after it has automatically terminated, due to failure to pay premium by the end of the grace period.

INDIVIDUAL TERMINATION OF DEPENDENT INSURANCE.   An Insured Person's Dependents Insurance will cease for all of the Insured Person's Dependents on the earliest of:
  (1)   the date the Insured Person's Personal Insurance terminates;
  (2)   the date Dependent Insurance is discontinued under this Policy;
  (3)   the date the Insured Person ceases to be in a class of employees eligible for Dependent Insurance;
  (4)   the date the Insured Person requests that the Dependent Insurance be terminated; or
  (5)   the last day of the premium paying period for which the Insured Person has made any required contribution toward the cost of the Dependent Insurance.

Dependents Insurance on a particular Dependent will cease on the earliest of:
  (1)   the date he or she ceases to be a Dependent as defined in this Policy;
  (2)   the date he or she becomes covered under this Policy as an Insured Person; or
  (3)   the date he or she enters the armed forces of any state or country; except for duty of 30 days or less in the Reserves or National Guard.  (If the Insured Person sends proof of military service, the Company will refund any unearned premium.)

MISSTATEMENT OF AGE.  If the age of a Dependent has been misstated, premiums will be subject to an equitable adjustment.  If the amount of benefit is dependent upon age, the benefit will be that which would have been payable based upon the Dependent's correct age.

ASSIGNMENT.  Dependents Insurance may not be assigned.

INCONTESTABILITY.  Except for non-payment of premiums, the Company may not contest the validity of this Policy as to any Dependent, after it has been in force for two years during the lifetime of that Dependent. This clause will not affect the Company's right to contest claims made for accidental death, or dismemberment benefits.

GL1101-12 97

Case 3:17-cv-05060-MDH    Document 33-4    Filed 05/15/18    Page 252 of 269    LINC01047

## CLAIMS PROCEDURES
## FOR LIFE OR ACCIDENTAL DEATH AND DISMEMBERMENT BENEFITS

**NOTE:  This Policy may include an Extension of Death Benefit, an Accelerated Death Benefit or a Living Benefit.  If so, please refer to that section for special claim procedures.**

**NOTICE AND PROOF OF CLAIM**

**Notice of Claim**.  Written notice of an accidental death or dismemberment (AD&D) claim must be given within 20 days after the loss occurs; or as soon as reasonably possible after that.*  The notice must be sent to the Company's Group Insurance Service Office.  It should include the Insured Person's name, address and Policy number.

**Claim Forms**.  When notice of claim is received, the Company will send claim forms for filing the required proof.  If the Company does not send the forms within 15 days; then the Insured Person or Beneficiary (the claimant) may send the Company written proof of claim in a letter.  It should state the nature, date and cause of the loss.

**Proof of Claim**.  The Company must be given written proof of an AD&D claim within 90 days after the date of the loss; or as soon as reasonably possible after that.*  Proof of claim must be provided at the claimant's own expense.  It must show the nature, date and cause of the loss.  In addition to the information requested on the claim form, documentation must include:
  (1)    A certified copy of the death certificate, for proof of death.
  (2)    A copy of any police report, for proof of accidental death or dismemberment.
  (3)    A signed authorization for the Company to obtain more information.
  (4)    Any other items the Company may reasonably require in support of the claim.

**\* Exception:**  Failure to give notice or furnish proof of claim within the required time period will not invalidate or reduce the claim; if it is shown that it was done as soon as reasonably possible.  These time limits will not apply to a life insurance claim, or to any claim while the claimant lacks legal capacity.

**EXAM OR AUTOPSY**.  At anytime while a claim is pending, the Company may have the Insured Person examined:
  (1)    by a Physician of the Company's choice;
  (2)    as often as reasonably required.
If the Insured Person fails to cooperate with an examiner or fails to take an exam, without good cause; then the Company may deny benefits, until the exam is completed.  In case of death, the Company may also have an autopsy done, where it is not forbidden by law.  Any such exam or autopsy will be at the Company's expense.

**TIME OF PAYMENT OF CLAIMS**.  Any benefits payable under this Policy will be paid:
  (1)    immediately after the Company receives complete proof of claim and confirms liability; and
  (2)    in no event more than 30 days after the Company receives acceptable proof of claim.

**TO WHOM PAYABLE**

**Death**.  Any benefits payable for the Insured Person's death will be paid in accord with the Beneficiary, Facility of Payment, and Settlement Options sections of this Policy.  If this Policy includes Dependent Life Insurance; then any benefits payable for an insured Dependent's death will be paid to:
  (1)    the Insured Person, if he or she survives that Dependent; or
  (2)    the Insured Person's Beneficiary, or in accord with the Facility of Payment section; if the Insured Person does not survive that Dependent.

**Dismemberment.**  If this Policy includes Accidental Death and Dismemberment Benefits; then any benefit, other than the Insured Person's death benefit, will be paid to the Insured Person.

GL1101-13A 02 MO

L/ADD
07/01/13

LINC01048

## CLAIMS PROCEDURES
### (Continued)

**NOTICE OF CLAIM DECISION.** The Company will send the claimant a written notice of its claim decision. If the Company denies any part of the claim; then the written notice will explain:
    (1)    the reason for the denial, under the terms of this Policy and any internal guidelines;
    (2)    how the claimant may request a review of the Company's decision; and
    (3)    whether more information is needed to support the claim.

The Company will send this notice:
    (1)    within 15 days after resolving the claim;
    (2)    within 30 days after receiving acceptable proof of claim; and
    (3)    if reasonably possible, within:
        (a)    90 days after receiving the first proof of a death or dismemberment claim; or
        (b)    45 days after receiving the first proof of a claim for any Extension of Death Benefit, Living Benefit or Accelerated Death Benefit available under this Policy.

**Delay Notice.** If the Company needs more than 15 days to process a claim, in a special case; then an extension will be permitted. If needed, the Company will send the claimant a written delay notice:
    (1)    by the 15th day after receiving the first proof of claim; and
    (2)    every 30 days after that, until the claim is resolved.
The notice will explain the special circumstances which require the delay, and when a decision can be expected.

In any event, the Company must send written notice of its decision within:
    (1)    180 days after receiving the first proof of a death or dismemberment claim; or
    (2)    105 days after receiving the first proof of a claim for any Extension of Death Benefit, Living Benefit or Accelerated Death Benefit available under this Policy.
If the Company fails to do so; then there is a right to an immediate review, as if the claim was denied.

**Exception:** If the Company needs more information from the claimant to process a claim; then it must be supplied within 45 days after the Company requests it. The resulting delay will not count towards the above time limits for claim processing.

**REVIEW PROCEDURE.** The claimant may request a claim review, within:
    (1)    60 days after receiving a denial notice of a death or dismemberment claim; or
    (2)    180 days after receiving a denial notice of a claim for any Extension of Death Benefit, Living Benefit or Accelerated Death Benefit available under this Policy.

To request a review, the claimant must send the Company a written request, and any written comments or other items to support the claim. The claimant may review certain non-privileged information relating to the request for review.

**Notice of Decision.** The Company will review the claim and send the claimant a written notice of its decision. The notice will explain the reasons for the Company's decision, under the terms of this Policy and any internal guidelines. If the Company upholds the denial of all or part of the claim; then the notice will also describe:
    (1)    any further appeal procedures available under this Policy;
    (2)    the right to access relevant claim information; and
    (3)    the right to request a state insurance department review, or to bring legal action.

For a death or dismemberment claim, the notice will be sent within 60 days after the Company receives the request for review; or within 120 days, if a special case requires more time. For a claim for any Extension of Death Benefit, Living Benefit or Accelerated Death Benefit available under this Policy, the notice will be sent within 45 days after the Company receives the request for review; or within 90 days, if a special case requires more time.

GL1101-13A 02 MO

Case 3:17-cv-05060-MDH   Document 33-4   Filed 05/15/18   Page 254 of 269   LINC010049

## CLAIMS PROCEDURES
### (Continued)

**Delay Notice.** If the Company needs more time to process an appeal, in a special case; then it will send the Insured Person a written delay notice, by the 30th day after receiving the request for review. The notice will explain:
    (1)    the special circumstances which require the delay;
    (2)    whether more information is needed to review the claim; and
    (3)    when a decision can be expected.

**Exception:** If the Company needs more information from the claimant to process an appeal; then it must be supplied within 45 days after the Company requests it. The resulting delay will not count towards the above time limits for appeal processing.

**Claims Subject to ERISA** (Employee Retirement Income Security Act of 1974). Before bringing a civil legal action under the federal labor law known as ERISA, an employee benefit plan participant or beneficiary must exhaust available administrative remedies. Under this Policy, the claimant must first seek two administrative reviews of the adverse claim decision, in accord with this section. If an ERISA claimant brings legal action under Section 502(a) of ERISA after the required reviews; then the Company will waive any right to assert that he or she failed to exhaust administrative remedies.

**RIGHT OF RECOVERY**. If benefits have been overpaid on any claim; then full reimbursement to the Company is required within 60 days. If reimbursement is not made; then the Company has the right to:
    (1)    reduce future benefits until full reimbursement is made; and
    (2)    recover such overpayments from the Insured Person, or from his or her Beneficiary or estate.
Such reimbursement is required whether the overpayment is due to fraud, the Company's error in processing a claim, or any other reason.

**LEGAL ACTIONS**. No legal action to recover any AD&D benefits may be brought until 60 days after the required written proof of claim has been given. No such legal action may be brought more than three years after the date written proof of claim is required. These time limits will not apply to a life insurance claim, however.

GL1101-13A 02 MO                                 L/ADD

07/01/13

LINO-01050

# ACCIDENTAL DEATH AND DISMEMBERMENT INSURANCE

BENEFIT.  If an Insured Person sustains an accidental bodily injury, and the injury directly causes one of the following losses within 365 days of the date of that injury; then the Company will pay the benefit listed:

| LOSS | BENEFIT |
|---|---|
| Loss of one hand by severance at or above the wrist | One-half the Principal Sum |
| Loss of one foot by severance at or above the ankle | One-half the Principal Sum |
| Irrecoverable loss of the sight in one eye | One-half the Principal Sum |
| Any combination of two or more of the losses listed above | Principal Sum |
| Loss of life | Principal Sum |

The total benefit for all losses resulting from the same accident may not exceed the Principal Sum.  The Principal Sum for the Insured Person's classification is shown in the Schedule of Insurance.

TO WHOM PAYABLE.  Benefits for loss of life will be paid in accord with the Beneficiary Section.  All other benefits will be paid to the Insured Person.

LIMITATIONS.  Benefits are not payable for any loss to which a contributing cause is:
  (1) intentional self-inflicted injury or self-destruction while sane;
  (2) disease, bodily or mental infirmity, or medical or surgical treatment of these;
  (3) the Insured Person's participation in a riot;
  (4) duty as a member of any military, naval or air force;
  (5) war or any act of war, declared or undeclared;
  (6) the Insured Person's participation in the commission of a felony;
  (7) use of drugs; except when prescribed by a Physician;
  (8) voluntary inhalation of gas, including carbon monoxide;
  (9) travel or flight in any aircraft, including balloons and gliders; except as a fare paying passenger on a regularly scheduled flight; or
  (10) the Insured Person's driving a vehicle while having an alcohol concentration of .10 grams of alcohol or more per 100 milliliters of blood.

## SAFE DRIVER BENEFIT

BENEFIT.  If an Insured Person dies as a direct result of a covered auto accident, for which Accidental Death and Dismemberment Benefits are payable; then:
    (1)    an additional Seat Belt Benefit will be payable, if the Insured Person was wearing a properly fastened seat belt at the time of the accident; and
    (2)    an additional Air Bag Benefit will be payable, if the auto was equipped with air bag(s).

The Seat Belt Benefit equals $10,000 or 10% of the Principal Sum, whichever is less; and the Air Bag Benefit equals $10,000 or 10% of the Principal Sum, whichever is less.  The Seat Belt Benefit and the Air Bag Benefit will not be less than $1,000 per Insured Person.  The Principal Sum is the amount payable because of the Insured Person's accidental death.

A copy of the police report must be submitted with the claim.  The position of the seat belt or presence of an air bag must be certified by:
    (1)    the official accident report; or
    (2)    the coroner, traffic officer or other investigating officer.
Upon receipt of satisfactory written proof, the additional benefit will be paid in accord with the Beneficiary section.

DEFINITIONS.  As used in this provision:

"Auto" means a 4-wheel passenger car, station wagon, jeep, pick-up truck or van-type car.  It must be licensed for use on public highways.  It includes a car owned or leased by the Group Policyholder.

"Intoxicated," "Impaired," or "Under the Influence of Drugs" shall be defined as by the jurisdiction where the accident occurs.

"Seat Belt" means a properly installed:
    (1)    seat belt or lap and shoulder restraint; or
    (2)    other restraint approved by the National Highway Traffic Safety Administration.

LIMITATIONS.  Safe Driver Benefits will not be paid if:
    (1)    the Accidental Death and Dismemberment Benefit is not paid under this Policy for the Insured Person's death; or
    (2)    at the time of the accident, the Insured Person or any other person who was driving the auto in which the Insured Person was traveling:
        (a)    was driving without a valid drivers' license;
        (b)    was driving in excess of the legal speed limit; or
        (c)    was driving while intoxicated, impaired, or under the influence of drugs (except for drugs taken as prescribed by a Physician for the driver's use).
    The above limitations will apply, whether or not the driver is convicted.

GL1101-14.15A

Seat Belt & Air Bag
07/01/13

LINC01052

## NOTICE CONCERNING COVERAGE
## LIMITATIONS AND EXCLUSIONS UNDER THE LIFE AND
## HEALTH INSURANCE GUARANTY ASSOCIATION ACT

Residents of Missouri who purchase life insurance, annuities or health insurance should know that the insurance companies licensed in this state, to write these types of insurance are members of the Missouri Life and Health Insurance Guaranty Association. The purpose of this association is to assure that policyholders will be protected, within limits, in the unlikely event that a member insurer becomes financially unable to meet its obligations. If this should happen, the guaranty association will assess its other member insurance companies for the money to pay the claims of insured persons who live in this state and, in some cases to keep coverage in force. The valuable extra protection provided by these insurers through the guaranty association is not unlimited, however. And as noted below this protection is not a substitute for consumers' care in selecting companies that are well-managed and financially stable.

The Missouri Life and Health Insurance Guaranty Association may not provide coverage for this policy. If coverage is provided, it may be subject to substantial limitations or exclusions, and require continued residency in Missouri. You should not rely on coverage by the Missouri Life and Health Insurance Guaranty Association in selecting an insurance company or in selecting an insurance policy. Coverage is NOT provided for your policy or any portion of it that is not guaranteed by the insurer or for which you have assumed the risk, such as a variable contract sold by prospectus. Insurance companies or their agents are required by law to give or send you this notice. However, insurance companies and their agents are prohibited by law from using the existence of the guaranty association to induce you to purchase any kind of insurance policy. YOU MAY CONTACT EITHER THE ASSOCIATION OR THE MISSOURI DEPARTMENT OF INSURANCE AT THE FOLLOWING ADDRESSES SHOULD YOU HAVE ANY QUESTIONS REGARDING THIS NOTICE.

The Missouri Life and Health Insurance Guaranty Association
994 Diamond Ridge, Suite 102
Jefferson City, MO 65109

Missouri Division of Insurance
P.O. Box 690
Jefferson City, MO 65102-0690

The state law that provides for this safety-net coverage is called the Missouri Life and Health Insurance Guaranty Association Act. Included is a brief summary of this law's coverages, exclusions and limits. This summary does not cover all provisions of the law; nor does it in any way change anyone's rights or obligations under the act or the rights or obligations of the guaranty association.

MO NOTICE A 06

07/01/13

LINO041053

Generally, persons will be protected by the Life and Health Insurance Guaranty Association if they live in this state, and hold a life or health insurance contract, or an annuity, or a certificate under a group policy or contract.  However, not all individuals with a right to recover under life or health insurance policies or annuities are protected by the Act.  A person is not protected when:

1.  The person is eligible for protection under the laws of another state;
2.  The person purchased the insurance from a company that was not authorized to do business in this state;
3.  The policy is issued by an organization which is not a member insurer of the association; or
4.  The person does not live in this state, except under limited circumstances.

Additionally, the Association may not provide coverage for the entire amount a person expects to receive from the policy.  The Association does not provide coverage for any portion of the policy where the person has assumed the risk, for any policy of reinsurance (unless an assumption certificate was issued), for interest rates that exceed a specified average rate, for employers' plans that are self-funded, for parts of plans that provide dividends or credits in connection with the administration of policy, or for unallocated annuity contracts (which are generally issued to pension plan trustees).

The Act also limits the amount the Association is obligated to pay persons on various policies.  The Association does not pay more than the contractual obligation of the insurance company.  The Association does not have to pay more than three hundred thousand dollars ($300,000) in death benefits for any one life regardless of the number of policies that insure that life.  The Association does not have to pay amounts over one hundred thousand dollars ($100,000) in cash surrender or withdrawal benefits on one life regardless of the number of policies insuring that individual.  For health insurance benefits, the Association is not obligated to pay over one hundred thousand dollars ($100,000) including net cash surrender and withdrawal benefits.  On an annuity contract, the Association is not liable for over one hundred thousand dollars ($100,000) in present value.  Finally, the Association is never obligated to pay more than a total of three hundred thousand dollars ($300,000) for any one insured for any combination of insurance benefits.

MO NOTICE A 06

AMENDMENT TO BE ATTACHED TO AND MADE PART OF GROUP POLICY NO.: 000010157325

ISSUED TO: Lester E. Cox Medical Center

The Policy is amended by the addition of the following provisions.

### PRIOR INSURANCE CREDIT UPON TRANSFER OF LIFE INSURANCE CARRIERS

This provision prevents loss of life insurance coverage for an Insured Person, which could otherwise occur solely because of a transfer of insurance carriers. This Policy will provide the following Prior Insurance Credit, when it replaces a prior plan.

"Prior Plan" means a prior carrier's group life insurance policy, which this Policy replaced within 1 day of the prior plan's termination date.

FAILURE TO SATISFY ACTIVE WORK RULE. Subject to payment of premiums, this Policy will provide life coverage for a Person who:
   (1)   was insured under the prior plan on its termination date;
   (2)   was otherwise eligible under this Policy; but was not Actively-At-Work due to Injury or Sickness on its Effective Date;
   (3)   is not entitled to any extension of life insurance under the prior plan; and
   (4)   is not Totally Disabled (as defined in the Extension of Death Benefit section of this Policy) on the date this Policy takes effect.

AMOUNT OF LIFE INSURANCE. Until the Person satisfies this Policy's Active Work rule, the amount of his or her group life insurance under this Policy will not exceed the amount for which the Person was insured under the prior plan on its termination date.

This Amendment takes effect on the effective date of coverage under this Policy. In all other respects, this Policy remains the same.

**THE LINCOLN NATIONAL LIFE INSURANCE COMPANY**

_Charls A. Brantley_
Officer of the Company

GL1101-AMEND. PC1

Prior Ins. Cred. - Life
07/01/13

29

# Chronological Activity List

| | | | | | | |
|---|---|---|---|---|---|---|
| **Claimant:** | JAMIE FLANAGAN | | | **Occupation:** | Nurse Practi | |
| **SSN:** | ▮▮▮▮▮▮ | **DOB:** | ▮▮▮▮▮▮ | **Posted:** | 6/20/2014 | **Months Dis:** 47 |
| **Claim #:** | 1140128972 | **DOD:** | 8/25/2013 | **Ben:** | | **Months Pd:** 0 |
| **Coverage:** | GR LIFE | **Status:** | CLOSED | **Close Date:** | 9/3/2014 | **Assignee:** HIELLEB |
| **Policy Holder:** | Lester E. Cox Medical Center | | | **Deceased:** | | |
| **Case Mgr. Status:** | INV 7/23/2014 | | | **Close Code:** | Not TD Any Occ | |

LIN001056



Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

Packet 1409792621146

**The Lincoln National Life Insurance Company**
Service Office:
8801 Indian Hills Drive
Omaha, NE 68114-4066
toll free (800) 423-2765
www.Lincoln4benefits.com

September 3, 2014

JAMIE  FLANAGAN
986 S. HEDGE DR
NIXA, MO 65714

Re:    Policyholder:  LESTER E COX MEDICAL CENTER
       Policy Number: 00001015732500000
       Claim Number: 1140128972
       Claimant:  Jamie Flanagan

Dear Mrs. Flanagan:

In order to provide the highest quality of customer service, The Lincoln National Life Insurance Company has implemented an integrated process that provides a prompt assessment of the Extension of Death Benefit provided by your Group Life Policy.  Eligibility for this benefit does not have to be initiated by you or your employer.  We conduct this assessment to determine whether your group life insurance coverage can remain in force without payment of premiums as defined in the Extension of Death Benefit provision.

For the life insurance coverage to be continued without payment of premiums, you must remain Totally Disabled per your policy provision.  Based on information gathered in connection with your claim, waiver of your life insurance premiums has been approved for the period of 08/25/2013 to 08/25/2014 for the following:

- Employee Life coverage in the amount of $181,000.00
- Optional Employee Life coverage in the amount of $70,000.00

To be eligible for continued benefits under the policy issued to Lester E Cox Medical Center by The Lincoln National Life Insurance Company it must be established that you remain continuously Totally Disabled from any occupation.  The policy definition of Totally Disabled as specified in the Extension of Death Benefit provision is as follows:

An Insured Person (1) is unable, due to sickness or injury, to engage in any employment or occupation for which such Insured Person is or becomes qualified by reason of education, training or experience; and (2) is not engaging in any gainful employment or occupation.

©2014  Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

LINC01057

Our records show that you last worked on August 25, 2013, due to lumbar post laminectomy syndrome, spinal stenosis, and chronic pain. The Attending Physician's Statement dated November 17, 2013, by Dr. Donald Hopewell indicated you had reported to have symptoms of low back pain with pain spreading into your lower extremities, your examination showed normal, and spondylolisthesis with a failed fusion and nerve root scarring. You had failed a post lumber fusion spinal cord stimulator trial. Your pain was reported to increase throughout the day and it was unable to be controlled with medications. Also, Dr. Hopewell was unable to quantify restrictions for sit, stand, walk, manipulation, and postural limitations, and you were recommended vocational rehabilitation. Notes dated September 19, 2013, indicated you complained of weakness in the legs, your examination showed normal, and there were no motor deficits. Notes dated October 31, 2013, indicated the spinal cord stimulator trial had failed and you were prescribed Methadone. You had a Functional Capacity Evaluation performed on April 23, 2014 by occupational therapy which indicated the Isometric strength testing was not performed due to therapist discretions, secondary to multiple diagnosis and lifting restrictions. Reaching was not restricted, squatting was recommended very occasional to not recommended, bending was not recommended, sitting was occasional (20 minute duration), standing was occasional to very occasional (10 minutes duration), walking was to be occasional, and stair climb was determined to be very occasional. Balancing was only recommended at protective heights and crawling was very occasional to not recommended, you were able to occasionally lift up to 7 pounds, your velocity was good, and crepitus was not noted. Your movement pattern did not indicate pain but suggested some quadriceps weakness. You demonstrated the ability to crawl on a carpeted surface without complaints of pain or discomfort, you had slow transition from standing to floor, gait decreased pelvic rotation, and increased right leg length with test progression with walking.

A Peer review was performed by Dr. Meghana Karande (Board Certified in Physical Medicine and Rehabilitation) on June 9, 2014 optined "Thus, on the basis on lumbar degenerative disease status post lumbar fusion and chronic but stable pain, restrictions and limitations would include: The claimant may stand/walk up to two hours each out of eight hours with normal breaks. The claimant may sit up to 6 out of 8 hours with normal breaks. She would require position changes for five minutes every hour. The claimant may lift, carry, push, and pull up to 20 pounds occasionally and 10 pounds frequently. Reach would not be restricted in all directions. The claimant may climb stairs, kneel, bend, stoop, squat, and crouch occasionally. Climbing ropes, ladders and scaffolds and scrawl would be never. Handling, fingering, and feeling would be unrestricted. "

Therefore, we cannot waive your group life insurance premiums under the Extension of Death Benefit provision of this policy after 08/25/2014.

A separate letter that does not include your confidential information has been mailed to Lester E Cox Medical Center advising of our decision.

We will also be refunding Lester E Cox Medical Center for all the premiums paid to us for your group life insurance for the period of 08/25/2013 to 08/25/2014. Please contact Lester E Cox Medical Center directly to obtain a refund for these premiums paid.

Additionally, you may have the right to convert your group life insurance to an individual life insurance policy. Please contact Lester E Cox Medical Center within 15 days from the date of this letter regarding your eligibility for the conversion privilege.

REF #262867

**Appeal Rights**

You, your attorney or a person legally authorized as your representative may appeal the denial by requesting a review of your denied claim. To initiate this process, submit your written request for review to us at the following address within 180 days after you receive this denial notice.

Claims Shared Services
The Lincoln National Life Insurance Company
PO Box 2337
Omaha, NE 68103
Fax: 800-922-3503

Please include the following with your appeal:

1. The policy and claim number;
2. Your reason(s) for appealing; and
3. If applicable, any additional documentation to support the appeal, such as medical treatment records, laboratory results, x-rays or other testing results.

Following receipt of your appeal, we will review the claim and provide you with a full written explanation of the decision within 45 days. If you wish, you may also request copies of the pertinent documents related to the claim.

If your plan is subject to ERISA, you may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor Office or your state insurance regulatory agency. In addition, once all required reviews of your claim have been completed, you have the right to bring a civil action under applicable law.

Please contact our office with any questions you may have at the number listed above or email us at nationalaccountclaims@lfg.com. You can also register for our website at www.Lincoln4Benefits.com to view your benefits and claim status online 24 hours a day.

Sincerely,

Hazel Ellebb
Life Waiver Benefit Specialist
The Lincoln National Life Insurance Company



Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

Packet 1409792625025

**The Lincoln National Life
Insurance Company**
Service Office:

8801 Indian Hills Drive
Omaha, NE 68114-4066
toll free (800) 423-2765
www.Lincoln4benefits.com

September 3, 2014

LESTER E COX MEDICAL CENTER
ATTN JOSHUA EVANS
3801 S NATIONAL AVE
SPRINGFIELD, MO 65807

Re:     Extension of Death Benefit
        Insured:  Jamie Flanagan
        Policy Number: 00001015732500000
        Claim Number: 1140128972

Dear Mr. Evans:

In order to provide the highest quality of customer service, The Lincoln National Life Insurance Company has implemented an integrated process that provides a prompt assessment of the Extension of Death Benefit provided by your Group Life Policy.  Eligibility for this benefit does not have to be initiated by the employer or the insured.  We conduct this assessment to determine whether the group life insurance coverage can remain in force without payment of premiums as defined in the Extension of Death Benefit provision.

For the life insurance coverage to be continued without payment of premiums, Jamie Flanagan must remain Totally Disabled per the policy provision.  Based on information that we've gathered in connection with Jamie Flanagan's claim, waiver of the life insurance premiums has been approved for the period of 08/25/2013 to 08/25/2014 for the following:

- Employee Life coverage in the amount of $181,000.00
- Optional Employee Life coverage in the amount of $70,000.00

Information submitted in the claim does not support that Mrs. Flanagan remained continuously totally disabled after 08/25/2014.  A separate letter has been mailed to Jamie Flanagan advising of our decision and providing appeal rights.

Any premium that had been paid on Mrs. Flanagan's behalf for the period of 08/25/2013 to 08/25/2014 should be taken on your next billing statement as a credit.

There may be two options available in order for Jamie Flanagan's life insurance coverage to remain in force.  One option is to continue to pay premiums on Mrs. Flanagan's behalf. Another option is to exercise the right to convert the life insurance policy. Mrs. Flanagan has

©2014  Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

REF #262994

been advised to contact Lester E Cox Medical Center regarding eligibility for the conversion privilege.

**This decision does not affect your claim for Long Term Disability Benefits.**

Please contact our office with any questions you may have at the number listed above or email us at nationalaccountclaims@lfg.com.  You can also register for our website at www.Lincoln4Benefits.com to view your benefits and claim status online 24 hours a day.

Sincerely,

Hazel Ellebb
Life Waiver Benefit Specialist
The Lincoln National Life Insurance Company

## Ellebb, Hazel

| | |
|---|---|
| **From:** | joshua.evans@coxhealth.com |
| **Sent:** | Thursday, July 10, 2014 3:29 PM |
| **To:** | Ellebb, Hazel |
| **Subject:** | RE: (secure) Jamie Flanagan |

Jamie was in Class 3.  She had group life coverage in the amount of $181,000.00.  She also had optional coverage on herself in the amount of $70,000.00.  She paid $16.66 per month for the optional coverage.  Please let me know if you have any other questions.

Thanks,

Josh


------------Original Message:

  FROM: Hazel.Ellebb@lfg.com
   TO: "joshua.evans@coxhealth.com"
<joshua.evans@coxhealth.com>
  DATE: June 26, 2014 1:09:23 PM EDT
SUBJECT: (secure) Jamie Flanagan

Hello Mr. Evans,

I am currently reviewing a Life Waiver of Premium (Extension of Death
Benefit) claim # 1140128972 for Ms. Jamie Flanagan. I need to confirm
her life eligibility as of her day last worked of 8/25/13. What class #
would Ms. Flanagan should be listed as for her life coverage, did she
elect Optional life coverage for herself and/or any dependents? If so,
Please confirm the amount of life coverages and the amount of premiums
paid for her life coverages. If you should have any additional questions
or concerns, please feel free to contact me directly at (402) 361-2991.
Thank you in advance for your assistance, it is greatly appreciated.

Sincerely,

LIN0041062

Mrs. Hazel Ellebb
Claim Solutions - Group Protection
Lincoln Financial Group
8801 Indian Hills Drive
Omaha, NE 68114

Toll Free Phone: 800.423.2765
Phone: 402.361.2991
Fax: 402.361.1689
Email: hazel.ellebb@LFG.com (link:
mailto:hazel.ellebb@LFG.com)
You're In Charge®
Find us on facebook: www.facebook.com/LincolnFinancialGroup


Notice of Confidentiality: **This E-mail and any of its attachments may contain Lincoln National Corporation proprietary information, which is privileged, confidential, or subject to copyright belonging to the Lincoln National Corporation family of companies. This E-mail is intended solely for the use of the individual or entity to which it is addressed. If you are not the intended recipient of this E-mail, you are hereby notified that any dissemination, distribution, copying, or action taken in relation to the contents of and attachments to this E-mail is strictly prohibited and may be unlawful. If you have received this E-mail in error, please notify the sender immediately and permanently delete the original and any copy of this E-mail and any printout. Thank You.**



Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

July 2, 2014

**The Lincoln National Life
Insurance Company**
Service Office:

8801 Indian Hills Drive
Omaha, NE 68114-4066
toll free (800) 423-2765
www.LFG.com

JAMIE FLANAGAN
986 S. HEDGE DR
NIXA MO 65714

Re:  Extension of Death Benefit
      Policy Holder:  LESTER E. COX MEDICAL CENTER
      Policy Number:  00001015732500000
      Claim Number:  1140128972

Dear Mrs. Flanagan:

In order to provide the highest quality of customer service, The Lincoln National Life Insurance Company has implemented an integrated process that allows us to take a proactive approach in reviewing all disability related benefits you may be eligible for without you or your employer having to initiate the process.

The Lincoln National Life Insurance Company is currently reviewing your eligibility for the Extension of Death Benefit under your group life insurance policy with LESTER E. COX MEDICAL CENTER.  Should you qualify for this benefit, your life insurance would remain in force without payment of premiums.

Currently we are reviewing the documentation provided for your Long Term Disability claim in order to make a determination regarding your Extension of Death Benefit under the group life insurance policy.  We will contact you if additional information is needed or when a claim decision has been reached.  Failure to provide requested documentation for your Long Term Disability claim may result in the termination of benefits under both policies.

Please contact our office with any questions you may have 1-800-423-2765 or email us at Claims@LFG.com.  You can also register at our employee website at www.Lincoln4Benefits.com and view your benefits and claim status online 24 hours a day.

Sincerely,

Brandi Hawkins on behalf of Hazel Ellebb
Life Waiver Benefit Specialist
The Lincoln National Life Insurance Company