IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| JAMIE S. FLANAGAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:17-cv-05060-MDH |
| | ) | |
| THE LINCOLN NATIONAL LIFE | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>DEFENDANT'S SUGGESTIONS OPPOSING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................ii

INTRODUCTION ............................................................................................................... 1

DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT  OF MATERIAL
FACTS ............................................................................................................................ 3

ARGUMENT ................................................................................................................... 26

      I.      Lincoln Correctly Determined that Plaintiff Failed to Prove
              Disability........................................................................................... 26

      II.     Plaintiff's Reliance On A Disputed 7 Pound Lifting Restriction
              To Prove Disability From Any Occupation Is Misplaced And
              Actually Supports Lincoln's Determination. ................................... 29

      III.    Plaintiff's Critiques of Lincoln's Vocational Consultants Are
              Meritless and Irrelevant. ................................................................ 31

CONCLUSION.................................................................................................................. 36

Case 3:17-cv-05060-MDH    Document 38    Filed 06/20/18    Page 2 of 42

TABLE OF AUTHORITIES

**Cases**

*Acord v. Metro. Life Ins. Co.*,
2006 WL 2433432 (W.D. Mo. Aug. 21, 2006)........................................................................ 31

*Barker v. Retirement Plan of Intern. Paper Co.*,
804 F. Supp. 2d 501 (D.S.C. 2011)..................................................................................... 32

*Black & Decker v. Nord,*
538 U.S. 822 (2003)............................................................................................................. 7

*Boardman v. Prudential Ins. Co. of Am.*,
337 F.3d 9 (1st Cir. 2003)................................................................................................... 27

*Cook v. Heckler*,
739 F.2d 396 (8th Cir. 1984) ............................................................................................. 33

*Farfalla v. Mutual of Omaha Ins. Co.*,
324 F.3d 971 (8th Cir. 2003) ............................................................................................... 8

*Farley v. Benefit Trust Life Ins. Co.*,
979 F.2d 653 (8th Cir. 1992) ............................................................................................. 26

*Ferrari v. Teachers Ins. & Annuity Ass'n*,
278 F.3d 801 (8th Cir. 2002) ............................................................................................... 7

*Fisher v. Barnhart*,
181 F. App'x 359 (4th Cir. 2006) ...................................................................................... 33

*Gerhardt v. Liberty Life Assur. Co. of Boston*,
736 F.3d 777 (8th Cir. 2013) ....................................................................................... 22, 32

*Glover v. Jefferson Pilot Fin. Ins. Co.*,
2007 WL 552114 (E.D. Ark. Feb. 21, 2007) ..................................................................... 26

*Gonda v. Permanente Medical Group, Inc.*,
300 F.R.D. 609 (N.D. Cal. 2014)....................................................................................... 34

*Henningsen v. Astrue*,
2013 WL 791771 (D. Minn. Feb. 13, 2013) ...................................................................... 33

*In re Vorpahl*,
695 F.2d 318 (8th Cir. 1982) ............................................................................................... 3

Case 3:17-cv-05060-MDH    Document 38    Filed 06/20/18    Page 3 of 42

*King v. Hartford Life & Accident Ins. Co.*,
414 F.3d 994 (8th Cir. 2005) .............................................................................. 3, 36

*Knepper v. Astrue*,
2012 WL 4470773 (N.D. Iowa Sept. 27, 2012)....................................................... 34

*Leahy v. Raytheon Co.*,
315 F.3d 11 (1st Cir. 2002) ..................................................................................... 3

*Martin v. Harris*,
666 F.2d 1153 (8th Cir. 1981) ................................................................................ 33

*Menz v. Procter & Gamble Health Care Plan*,
520 F.3d 865 (8th Cir. 2008) ................................................................................... 3

*Metropolitan Life Ins. Co. v. Glenn*,
554 U.S. 105 (2008).............................................................................................. 34

*Owens v. Colvin*,
727 F.3d 850 (8th Cir. 2013) ........................................................................... 20, 30

*Pearson v. Metro. Life Ins. Co.*,
2009 WL 35339 (N.D. Iowa Jan. 6, 2009)................................................................ 3

*Petrauskas v. Commissioner Social Sec. Admin.*,
414 Fed. Appx. 7 (9th Cir. 2010)........................................................................... 33

*Pralutsky v. Metro. Life Ins. Co.*,
435 F.3d 833 (8th Cir. 2006) ................................................................................. 27

*Price v. Hartford Life & Accident Ins. Co.*,
746 F. Supp. 2d 860 (E.D. Mich. 2010).................................................................. 34

*Riedle v. General Am. Life Ins. Co.*,
248 F.3d 753 (8th Cir. 2001) ................................................................................... 7

*Robinson v. Colvin*,
2014 WL 347401 (E.D.N.C. Jan. 30, 2014) ........................................................... 33

*Sahulka v. Lucent Techs., Inc.*,
206 F.3d 763 (8th Cir. 2000) ................................................................................... 7

*Sample v. Schweiker*,
694 F.2d 639 (9th Cir. 1982) ................................................................................. 33

*Schultz v. 3M Company*,
  2016 WL 3620738 (D. Minn. June 29, 2016) ........................................................................... 27

*Torres v. UNUM Life Ins. Co. of Am.*,
  405 F.3d 670 (8th Cir. 2005) ................................................................................................ 26

*Weidauer v. Broadspire Servs., Inc.*,
  2008 WL 4758691 (S.D. Ohio Oct. 27, 2008) ....................................................................... 34

**Statutes**

20 C.F.R. § 404.1567 ........................................................................................................... 20, 30

**Other Authorities**

Dictionary Occupational Title analyses of Call Center Nurse and Nurse Consultant .................... 2

DOT Code 075.127-014 ............................................................................................................. 18

eDOT Code 075.374-916 ........................................................................................................... 18

<u>**INTRODUCTION**</u>

The core question presented in this case is whether, based on the administrative record assembled during the claims process, Lincoln correctly determined that Plaintiff did not meet her burden of proving that she is totally disabled from ***any*** occupation per the terms of the Group Policy. Review of that record compels an affirmative answer to the question.

The medical evidence in the administrative record is undisputed that as of November 24, 2015 and thereafter, Plaintiff had the ability to sit, stand, and walk long enough to work a full-time sedentary occupation. The medical evidence is also undisputed that Plaintiff has the cognitive abilities, as well as the manual dexterity to handle, finger, feel, and grasp items necessary to work a fulltime sedentary occupation. There is likewise no dispute in the record that Plaintiff has the transferable skills necessary to perform several sedentary, gainful occupations consistent with "her training, education or experience." (AR at 128).[1]

In fact, the only point on which the medical professionals differed at all, was exactly how much weight Plaintiff could lift. She lifted 7 pounds during a FCE, but the FCE was incomplete and not an accurate assessment of her capabilities. Among other issues, the FCE practitioner did not even test Plaintiff's lifting capacity above 7 pounds, but rather simply accepted Plaintiff's statement that her limit was 7 pounds. Two medical reviewers found her capable of lifting between 10 and 20 pounds occasionally. A third reviewer simply deferred to the FCE. And one treating doctor checked a box indicating no lifting capacity at all, but not even Plaintiff claims that assessment was accurate. While one would not expect complete unanimity on the issue, the point is that there was *no credible evidence* that as of November 24, 2015, Plaintiff could not lift

---

[1] Lincoln cites exclusively to the Administrative Record ("AR"), attached as Exhibit A to its Motion for Summary Judgment, and replaced bates stamp prefix "LIN" with prefix "AR."

at least enough weight to work in a sedentary occupation. Plaintiff claims to the contrary by conceding that she can lift at least 7 pounds occasionally, but arguing that such capacity, by definition, precludes her from sedentary work. She is wrong.

The occupations Lincoln's vocational consultants identified are sedentary and require exerting up to 10 pounds of force occasionally *or* a negligible amount frequently. *See the Dictionary Occupational Title analyses of Call Center Nurse and Nurse Consultant attached to Lincoln's Motion as Exhibit B.* The great weight of evidence in the administrative record demonstrates that Plaintiff satisfies either, or both of those requirements. Indeed, there is not one stich of credible evidence that Plaintiff cannot move a negligible amount of force frequently. To the contrary, she admits the ability to do ADL's that require at least such lifting capacity. As such, and as two separate vocational professionals found, based on a lifting capacity that Plaintiff admits that she has, she can perform the main duties of several gainful sedentary occupations and is therefore not "disabled" within the meaning of the Group Policy.

In the face of an administrative record that overwhelmingly fails to support disability, Plaintiff resorts to scattershot attacks on Lincoln that demonstrate her failure to comprehend that she, not Lincoln, bore the burden of proof. Plaintiff accuses one of the independent medical reviewers of fabricating a comment by Plaintiff's treating physician, Dr. Hopewell, wherein Dr. Hopewell said that he checked boxes on forms based on what Plaintiff told him. This critique is curious because that is clearly what Dr. Hopewell did, because Dr. Hopewell had every opportunity to deny the comment and never did, and because by the end of the administrative process, not even Dr. Hopewell supported Plaintiff's disability claim.

Plaintiff also criticizes Lincoln for seeking advice from Lincoln's vocational consultants, and for not asking the vocational consultants to make medical determinations. These critiques

are ironic in light of the fact that Plaintiff's vocational evidence constituted a report from an "expert" hired by her counsel, who improperly purported to reach medical conclusions regarding Plaintiff's functionality, but failed to provide any actual vocational analysis.

At bottom, Plaintiff's meritless critiques not only misplace the burden, but constitute a misguided effort to distract the Court from the virtually undisputed medical and vocational evidence in the record, which simply does not support disability from any occupation. Lincoln reached the only conclusion it could have based on that record. Lincoln's determination was correct and it is entitled to judgment.

**DEFENDANT'S RESPONSE TO
PLAINTIFF'S STATEMENT OF MATERIAL FACTS**

Lincoln submits the following Response to Plaintiff's Statement of Material Facts (Dkt. No. 35) pursuant to Local Rule 56.1:[2]

**1. Plaintiff was employed by Lester E. Cox Medical Center as a nurse practitioner for a period of 3 years and 8 months ending on August 25, 2013. Plaintiff's employment began on March 1, 2010. (Exhibit A. page LIN00982)**

1. Admitted.

---

[2] Although the Western District of Missouri uses Rule 56 as a vehicle to tender the issues in an ERISA benefits case, the normal summary judgment rules do not apply to such cases. Rather, the Court is called upon to review Lincoln's administrative decision based on a fixed administrative record — the record that was before Lincoln when it made its decision. The Court "sits more as an appellate tribunal than as a trial court." *Leahy v. Raytheon Co.*, 315 F.3d 11, 18 (1st Cir. 2002). The Court's review is undertaken by examining the evidence that was before Lincoln when it made its decision. The court does not take evidence, but, rather, "'must focus on the evidence available to the administrators at the time of [its] decision [i.e. the administrative record]." *Pearson v. Metro. Life Ins. Co.*, 2009 WL 35339, at *5 (N.D. Iowa Jan. 6, 2009) (quoting *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 999 (8th Cir. 2005)). There is no jury trial in ERISA actions. *In re Vorpahl*, 695 F.2d 318, 322 (8th Cir. 1982). Rather, ERISA cases are resolved on cross dispositive motions. *Menz v. Procter & Gamble Health Care Plan*, 520 F.3d 865, 871 (8th Cir. 2008). As such, the Rule 56.1 statement is simply a vehicle to direct the Court to the relevant portions of the record to aid its "appellate" review.

3

**2.     Plaintiff was insured under a policy of insurance for long term disability through her employment. (Ex. A p. 114-203)**

2.     Lincoln admits that pages 114-203 of the record constitute the group policy of long-term disability insurance (the "Group Policy") that Lincoln issued to Plaintiff's former employer to insure, in part, its employee welfare benefits plan, which Plaintiff was at one point insured under.

**3.     Plaintiff underwent a lumbar fusion on April 1, 2011, which her physician, Donald Hopewell, M.D. a neurologist, described as a "failed lumbar fusion." (Ex. A p. 923)**

3.     Lincoln admits that page 923 of the record constitutes a portion of a Long-Term Disability Claim Physician's Statement that Dr. Hopewell completed on November 17, 2013. Lincoln further notes that page 923 of the record includes a note from Dr. Hopewell under "Objective Findings" that states, "Normal physical exam, X-rays, CT myelogram & MRI" (sic).

**4.     Initial post-operative films showed hardware was intact with no instability on October 19, 2011. (Ex. A. p. 956) X-ray's reconfirmed this on December 16, 2011. (Id.) However, a CT Scan of the same date showed "Grade 2 subluxation L5 on SI with internal fixation and an L4-L5 disc bulge that may affect the exiting L4 nerve root. (Id.)**

4.     Lincoln admits that page 956 of the record constitutes a summary of numerous diagnostic reports including normal lumbar spine X-rays on October 19, 2011 and December 16, 2011. Lincoln denies that Plaintiff has fully set forth the findings of the December 16, 2011 CT scan, which noted that the findings compared with the previous examination and "clinical correlation was recommended." (AR at 956).

4

**5.** **A report of Dr. Hopewell's dated January 24, 2013, indicated an MRI showed nerve root scarring and plans to do a cord stimulator trial, with nonsignificant cervical pathology. (Ex. A p. 961).**

5. Lincoln admits that page 961 of the record constitutes a visitation summary of Dr. Hopewell dated January 24, 2013 in which he also noted that Plaintiff had a normal neurologic exam.

**6.** **A September 12, 2012 MRI showed epidural soft tissue which appeared to compromise the thecal sac. By December 28, 2012 postsurgical changes showed spondylolisthesis with extensive evidence of fibrosis and extending into the nerve root. (Id.)**

6. The first sentence of Paragraph 6 does not contain a citation to the record, and thus, it is denied. Lincoln denies the second sentence of Paragraph 6, because it cites to a visitation summary of Dr. Hopewell dated January 24, 2013 that does not mention any postsurgical changes other than that her neurological examination was normal.

**7.** **Plaintiff left work in August 2013 and applied for long term disability benefits through Defendant (Ex. A p. 1004) Defendant acknowledged Plaintiff's diagnosis of "spondylolisthesis along with failed fusion and nerve root scarring and failed spinal cord stimulator, in receiving the application for benefits. (Id.)**

7. Lincoln admits only that Plaintiff stopped working on or about August 25, 2013 and applied for LTD benefits, but denies that it "acknowledged" any diagnosis.

**8.** **As part of her application Plaintiff furnished an employee statement dated November 10, 2013 which indicated she could not work. (Ex. A p. 915)**

8. Lincoln admits that the cited portion of the record constitutes a portion of the Long-Term Disability Claim Employee's Statement that Plaintiff submitted to Lincoln in

5

connection with her LTD application setting forth her subjective self-assessment. Lincoln denies that her statements were supported in the contemporaneous medical records and denies that Plaintiff met her burden of proving disability under the Group Policy (AR at 114-203).

**9.      As part of Plaintiff's application Dr. Hopewell submitted a physician statement on November 17, 2013. (Exhibit A. page 923-925) Dr. Hopewell's primary diagnoses was post-laminectomy syndrome lumbar, spinal stenosis and chronic pain. (Id 923.) Objective findings were described as "normal physical exam. X-rays, CT myelogram MRI-Spondylolthisthasis due to failed fusion and nerve root scarring." (Id. at 923). Dr. Hopewell noted the spinal cord stimulator failed. (Id.) Dr. Hopewell noted restrictions in response to the question "What the patient should not do" and replied "Work due to unlimited ability to rest/take breaks." Dr. Hopewell indicated Plaintiff's condition was at maximum improvement and she would never return to her prior level of function. Dr. Hopewell said sitting, standing, walking, etc. limits were "Unquantifiable." (Id. 924)**

9.      Lincoln admits that the cited portions of the record constitute the Long-Term Disability Claim Physician's Statement that Dr. Hopewell filled out on November 17, 2013, but failed to complete in its entirety as he did not indicate Plaintiff's capabilities to perform ADLs, nor her physical restrictions and limitations.

**10.      During the first 2 years of disability Plaintiff must only prove she cannot perform her "own occupation" to be eligible. (Ex. A p. 841) On December 4, 2013, Defendant determined Plaintiff did not meet this standard and denied her benefits. (Ex. A p. 841-847)**

10.      Lincoln denies the first sentence of Paragraph 10 as stated and admits only that the Group Policy defines the own occupation period as "a period beginning at the end of the

Elimination Period and ending 24 months later for Insured Employees." (AR at 118). Lincoln denies the second sentence of Paragraph 10 as stated, but admits that via letter dated December 4, 2013, it informed Plaintiff that she had not met her burden of proving entitlement to LTD benefits (AR at 841-847).

**11. On April 12, 2014, Plaintiff was found permanently and totally disabled and eligible for Social Security disability benefits. (Ex. A p. 805) Social Security found Plaintiff disabled as of August 22, 2013 when she left employment.**

11. Lincoln admits that page 805 of the record constitutes the first page of the Social Security Administration's Notice of Award. Lincoln further states that via letter dated April 23, 2014, Plaintiff's counsel notified Lincoln that Plaintiff had been approved for Social Security Disability ("SSDI") benefits. (AR at 813-819.) The letter did not indicate what condition(s) the SSA found disabling or the SSA's rationale. (*Id.*) Flanagan provided no other information to Lincoln pertaining to her SSDI award. (*Id.*) Additionally, Flanagan's receipt of SSDI is not binding on Lincoln. As the Supreme Court held in *Black & Decker*, ERISA claims administrators are not bound by a SSDI determination because of the vast differences in the two different types of benefits programs, including the SSA's requirement to defer to treating physicians. 538 U.S. 822, 823 (2003); *see also Riedle v. General Am. Life Ins. Co.*, 248 F.3d 753, 759 (8th Cir. 2001) ("the Social Security Administration's determination is not binding" on ERISA administrators). Moreover, because Plaintiff did not submit the entire SSDI file to Lincoln, the basis for the SSA's determination is unclear. *See Sahulka v. Lucent Techs., Inc.*, 206 F.3d 763, 768 (8th Cir. 2000) (claimant bears burden of substantiating claim); *Ferrari v. Teachers Ins. & Annuity Ass'n*, 278 F.3d 801, 806 (8th Cir. 2002) (fault for claimant's failure to submit documentation that might have affected the administrator's decision lies with claimant himself). What is clear,

7

however, is that the SSA made its decision at a different time, and based on different evidence, as the SSA undisputedly did not review the two independent record reviews obtained by Lincoln. *See Farfalla v. Mutual of Omaha Ins. Co.*, 324 F.3d 971, 975 (8th Cir. 2003) (explaining that an administrator is not bound by a SSDI determination based on different evidence and occurring at a different time).

**12.     Plaintiff underwent a functional capacity evaluation on April 22, 2014, which tested her abilities to perform work performed by Nancy Dickey Beisswenger, OTR/L. (Ex. A p. 786-804) This report concluded Plaintiff could sit for 20 minutes at a time, stand for 10 minutes and walk occasionally. (Id. 804) Plaintiff was found to be able to lift 7 pounds occasionally, with no frequent lifting. (Id.) Plaintiff was found to be able to do less than sedentary work. (Id.)**

12.     Lincoln admits that Plaintiff underwent a Functional Capacity Evaluation ("FCE") and that the cited pages reference a report authored by Ms. Beisswenger on April 22, 2014, at the request of Plaintiff's attorney. Lincoln otherwise denies the statement as not supported in the record.  As Dr. Karande explained the FCE was "incomplete as isometric strength testing was not performed due to therapist discretion, secondary to multiple diagnoses and lifting restrictions.  Furthermore, there is no quantification of muscle strength or range of motion. Thus, this test would have to be interpreted with caution."  (AR at 748)  Moreover, the FCE did not even test Plaintiff's ability to lift more than 7 pounds or to handle material frequently, because Plaintiff told Ms. Beisswenger that "she has a 7 lb. weight restrictions after her back surgery.  She states it has not been removed and she adheres to it."  (AR at 791).  No such 7 pound weight restriction appears anywhere else in the administrative record.

8

**13.** On May 6, 2014 Plaintiff, through counsel, appealed to Defendant the denial of December 13, 2013, submitting only Ms. Beiswenger's report and the Social Security Decision. (Ex. A. p. 785)

13. Admitted.

**14.** Defendant submitted the file to Meghana C. Karande, M.D. who found Plaintiff could stand or walk 2 hours in an 8-hour day, sit up to 6 hours, and requires a 5 minute position change every hour. (Ex. A p. 749)

14. Lincoln admits that page 749 of the record is the final page of a June 9, 2014 report authored by Meghana Karande, M.D., board certified in physical medicine and rehabilitation, after reviewing the entirety of Plaintiff's medical file. (AR at 741-749). Lincoln further states that as part of Dr. Karande's review, she contacted Dr. Hopewell, who admitted that the only basis for his opinions was acceptance of what Plaintiff told him. (*Id.* at 743.) According to Dr. Karande, "[Dr. Hopewell] informed me that the restrictions and limitations he had established were based on 'what the patient told him.'" (*Id.*) Dr. Karande also reviewed the FCE and remarked that it was "incomplete as isometric strength testing was not performed due to therapist discretion, secondary to multiple diagnoses and lifting restrictions. Furthermore, there is no quantification of muscle strength or range of motion. Thus, this test would have to be interpreted with caution." (*Id.* at 748). After examining Plaintiff's medical records and diagnostic studies, Dr. Karande concluded that Plaintiff's pain was stable and should not preclude occupational functioning. Dr. Karande stated that Plaintiff could sit up to 6 hours per day, stand/walk up to two hours per day, and occasionally lift up to 20 pounds. (*Id.* At 749).

**15.** On June 16, Defendant issued a favorable decision with no explanation. (Ex. A p. 738-739)

9

15.     Lincoln admits only that pages 738-739 of the record constitute a June 16, 2014 letter in which Lincoln approved Plaintiff's claim for LTD benefits during the own occupation period.

**16.     On November 24, 2014 Defendant notified Plaintiff it needed proof of continued disability and began requesting medical records and forms. (Ex. A p. 729)**

16.     Lincoln admits only that page 729 of the record constitutes the first page of a letter dated November 24, 2014 in which Senior Claims Examiner Theresa Elder reminded Plaintiff that she had the continuing burden of proving disability.  Lincoln denies that this was the first time it "began" requesting medical records from Plaintiff.

**17.     On March 2, 2015 Defendant began investigating whether Plaintiff could meet the standard for disability after 2 years which means the "main duties of any gainful occupation." (Ex.A p. 662) (Please note this "investigation began more than 8 months prior to Plaintiff reaching the 2 year period). Moreover, on April 1, 2015 defendant wrote Plaintiff stating they must have a treating medical professional form for the 6 months prior to November 24, 2015. (Id.) Defendant asked for the form back prior to April 16, 2015, despite the fact that by its own terms it could not be completed until May 24, 2015. (Ex. A p. 662-663).**

17.     In response to the first sentence of Paragraph 17, Lincoln admits only that page 662 of the record constitutes the first page of a letter dated April 1, 2015 in which Senior Claims Examiner Mike Machian requested, for a second time, that Plaintiff complete an Insured Supplemental Form, a Treating Medical Professionals Form, Education Background Form, Abilities Form, and an authorization permitting Lincoln to obtain medical records to enable Lincoln to determine whether she met her burden of proving disability from any occupation.

Lincoln further denies Plaintiff's implication that beginning the any occupation investigation in advance of the change in definition date is in any way improper. In response to the second and third sentences of Paragraph 17, Lincoln admits only that the cited pages of the record constitute a letter dated April 1, 2015 in which Mr. Machian requested that Plaintiff complete various forms in connection with her LTD claim. Lincoln further denies the implication that asking Plaintiff to identify all of her treating professionals during the entire relevant time period, including both the own occupation period and the any occupation period, was somehow improper. The Group Policy requires that Plaintiff prove disability and regular care of a physician, for any period of time in which she claimed to be disabled. (AR at 131). Plaintiff's implication that Lincoln should have simply ignored the time period leading up to November, 2015, is contrary to the Group Policy terms and to common sense.

**18.    On April 21, 2015, Dr. Hopewell completed the very form requested and indicated Plaintiff could never lift nor carry any weight, could sit a third of an 8-hour work day, but only for a 20 minute duration, and stand and walk occasionally. (Ex. A p. 637) (Please note Defendant paginated this document only upside down) By this point Dr. Hopewell was diagnosing Plaintiff with the same conditions but also a mixed connective tissue autoimmune disease. (Ex. A p. 575-579)**

18.    Lincoln admits that page 637 of the record is an Abilities Form dated April 16, 2015 completed by Dr. Hopewell in which he states that Plaintiff can frequently sit, finger, handle, and reach above the shoulder; occasionally sit, stand, and drive; but that Plaintiff cannot lift any weight whatsoever; a finding that is inconsistent with all of the evidence in the record, including the FCE and Plaintiff's own admitted abilities to cook, drive, text on her cellphone, run errands, and use the computer (AR at 71, 792). In response to the second sentence of Paragraph

18, Lincoln admits only that pages 575-579 of the record are Physician Progress Notes by Dr. Hopewell dated April 16, 2015 to July 15, 2015. In each of these notes, Dr. Hopewell states that Plaintiff had normal neurologic examinations. (*Id.*)

**19.     The Defendant procured a vocational report from Stacey Nidositko, MS, CRC, a Vocational Rehabilitation Counselor dated September 23, 2015. (Ex. A p. 568) The report from Ms. Nidositko indicates she reviewed a form completed by Plaintiff and the only medical evidence or opinion reviewed that she noted was Dr. Karande's report of June 9, 2014, which indicated Plaintiff could perform sedentary work. (Id.) There is no evidence Ms. Nidositko reviewed any treating reports nor opinions from Dr. Hopewell nor the functional capacity evaluation. (Id.) Premised upon solely Dr. Karande's opinion Ms. Nidositko opined Plaintiff could perform sedentary skilled work. (Id.)**

19.     Lincoln admits that page 568 of the record is a Transferable Skills Analysis ("TSA") completed by Vocational Rehabilitation Counselor Stacey Nidositko, MS, CRC on September 23, 2015.  Lincoln denies the second, third, and fourth sentences of Paragraph 19, because these statements misconstrue the nature of the TSA and improperly mix medical and vocational issues. The purpose of the TSA is to apply an assumed set of medical restrictions and limitations (here, the reasonable restrictions and limitations set forth by Dr. Karande), to Plaintiff's transferable work skills and wage requirements, in order to determine whether Plaintiff can perform any gainful occupations in the national economy.  That is exactly what Ms. Nidositko did.  Ms. Nidositko listed Plaintiff's education and training, including that Plaintiff had a Master's of Science in Nursing and had taken several courses toward a Doctorate in Nursing Practices.  (*Id.*).  She detailed the relevant medical restrictions and limitations as set forth by Dr. Karande including frequent sitting with the ability to take normal breaks, occasional

standing and walking with the ability to take breaks, and the ability to lift and carry up to 20 pounds occasionally and 10 pounds frequently. (*Id.*). Ms. Nidositko also listed Plaintiff's transferable skills including "[a]pplying technical knowledge, common sense, and special medical skills to care for or treat sick or handicapped people; using eyes, hands, and fingers skillfully; adapting quickly to emergency situations; instructing, planning, and directing work of others; keeping accurate records; and distinguishing shapes, forms, and colors," as well as the wage requirement. (*Id.*) Ms. Nidositko then identified several sedentary occupations that Plaintiff could perform, including nurse consultant and call center nurse given her skills, educational background, experience, wage requirement, and physical limitations. (*Id.*)

**20.     Six days after Ms. Nidositko's report Defendant issued a September 29, 2015, letter denying Plaintiffs receipt of benefits after November 24, 2015. (Ex. A p. 560-563) The denial makes no mention of Ms. Nidositko's report but incorporates the findings verbatim. (Ex. A p. 562) The denial states it considered all of the medical and opinions that Defendant did not provide Ms. Nidositko. (Id. at 561) Ultimately, the denial utilized Dr. Karande's opinion of June 9, 2014 (Id.) The defendant claims in its denial Dr. Karande contacted Dr. Hopewell who told him that Dr. Hopewell's restrictions and limitations given on his form were "...based off what the claimant had told him." (Id.)**

20.     Lincoln admits only that the pages of the record cited in Paragraph 20 constitute a letter from Mr. Machian dated September 28, 2015 in which he notified Plaintiff that no LTD benefits were payable beyond November 24, 2015 — the date that the Own Occupation Period changed to Any Occupation. Mr. Machian further detailed Flanagan's repeated normal examinations with Dr. Hopewell, Dr. Karande's findings and conversation with Dr. Hopewell, Ms. Nidositko's analysis, and the lack of objective proof as to why Lincoln correctly determined

13

that Flanagan had failed to meet her burden of proving disability from any occupation. (*Id.*) Lincoln denies Plaintiff's implication that there was anything lacking in the determination letter or the evidence discussed therein. Plaintiff continuously confuses the proper roles of the various professionals involved in a disability determinations. Contrary to Plaintiff's apparent view, medical professionals provide advice regarding medical restrictions and limitations, vocational professionals provide advice regarding the availability of gainful occupations that are consistent with those medical restrictions and limitations as well as the claimant's transferable skills, and claims handlers weigh all of the evidence in the file and make the final determination that applies the facts to the Group Policy provisions and requirements, with the assistance of the advice provided by the medical and vocational professionals. (AR at 48-50, 564-567).

**21.     Dr. Karande completed her report on June 9, 2014 some 10 months prior to Dr. Hopewell's providing specific restrictions on April 21, 2015. (Id.) Thus, to the extent the conversation between Dr. Karande and Dr. Hopewell transpired it would have had to have concerned the opinion of Dr. Hopewell from November 17, 2013, wherein he opined her limitations were "unquantifiable" and that she could not work. On December 9, 2015, Dr. Hopewell stated he had no recollection of any conversation with the patients insurance company regarding any aspect of her care including disability. (Ex. A p. 536) Plaintiff's counsel requested defendant provide all pertinent documents including a transcript of Dr. Karande's conversation with Dr. Hopewell and Dr. Karande's notes from the conversation. (Ex. A p. 541) On February, 10, 2016. Defendant replied while providing a copy of the claim file but stating "However, we are not including a transcript or notes from the conversation between Dr. Meghana Karande and Dr. Hopewell. Due to Dr. Karande's review taking place in June 2014, those notes are no longer available." (Ex. A. p. 534)**

21.     The first sentence of Paragraph 21 does not provide a specific citation to the record, and thus, it is denied. Lincoln further admits only that Dr. Karande completed her peer review report on June 9, 2014 (AR at 741-749) and Dr. Hopewell completed an Abilities Form on April 21, 2015. (AR at 637).  Lincoln denies the second sentence of Paragraph 21.  By way of further response, Plaintiff seems to misconstrue Dr. Hopewell's opinion.  Dr. Hopewell consistently, although in direct contravention to his own contemporaneous medical records, claimed that Plaintiff is impaired from even sedentary work.  However, he admitted to Dr. Karande that this opinion, and all of his findings, are based solely on Plaintiff's subjective complaints, rather than any objective evidence.  Specifically, Dr. Hopewell stated that his opinions were based on "what [Plaintiff] told him." (*Id.* At 743).  In response to the third sentence of Paragraph 21, Lincoln admits that page 536 of the record is a letter from Dr. Hopewell dated December 9, 2015 stating that he had "no recollection of any conversation with the patients insurance company regarding any aspect of her care including disability" (sic).  This is true. Dr. Hopewell has no recollection of speaking with an insurance company (presumably Lincoln), because Lincoln never communicated with him on the telephone.  Dr. Karande is not an employee of an insurance company and does not work for Lincoln.  Dr. Karande is an independent physician retained by a third-party medical vendor, University Disability Consortium ("UDC").  (AR at 741). Notably, Dr. Hopewell never denied speaking with Dr. Karande, nor did he deny that his opinions regarding impairment were based on what Plaintiff told him. In response to the fourth sentence of Paragraph 21, Lincoln admits that page 541 of the record is a letter dated January 25, 2016 from Plaintiff's counsel to Lincoln requesting numerous documents and materials.  In response to the fifth sentence of Paragraph 21, Lincoln admits that page 534 of the record is the second page of a letter dated February 10, 2016 in which Senior

15

Claims Examiner Reid Hastings explained that there are no transcripts or notes of Dr. Karande's conversation with Dr. Hopewell from nearly two years prior despite efforts to recover them. In fact, on February 10, 2016, Mr. Hastings contacted UDC to request Dr. Karande's notes. (AR at 34). But UDC responded that "Unfortunately with this review being conducted almost two years ago, Dr. Karande would have destroyed any notes she might have had. . . Sorry I couldn't dig up more on this!" (*Id.*)

**22.      On December 9, 2015, Plaintiff met with Dr. Hopewell who noted ongoing problems with Plaintiff's long term disability. (Ex. A p. 553) Plaintiff expressed to Dr. Hopewell the problems center around the fact that her physical examination was normal and that her pain levels fluctuate. (Id.) Dr. Hopewell indicated this was normal for all patients with chronic medical problems and that normal physical exams are common in patients with spine based pain issues. (Id.) Dr. Hopewell stated I do not believe there is anything I can do to sway the opinion of her insurance carrier. (Id.) Dr. Hopewell also noted overall her pain is doing well on her current regimen without complications.**

22.      Lincoln admits that page 553 of the record is a progress note from Dr. Hopewell dated December 9, 2015 in which he explained that "normal physical exams are common in patients with spine based pain issues." Dr. Hopewell also concluded that "[o]verall [Plaintiff's] pain is doing reasonably well on her current regimen without complications." (Id.)

**23.      On January 25, 2016, Plaintiff appealed the September 28, 2015 denial of ongoing benefits. (Ex. A p. 548)**

23.      Admitted.

**24.      On March 9, 2016, Defendant obtained a "Peer File Review" from an occupational medicine doctor Joseph G. Thomas, M.D. (Ex. A p. 526) Dr. Thomas reviewed**

16

**the report of Dr. Hopewell, the functional capacity evaluation and the report of Dr. Karande and stated "I am in agreement with the Abilities Form provided by Dr. Hopewell on 4/21/15 with the exception of lifting. Per the FCE, the claimant could lift up to 7 pounds occasionally." (Ex. A p. 524) Dr. Thomas indicates claimant can perform frequent sitting up to 20 minutes at a time and occasional standing and walking up to 10 minutes at a time. (Id.) Dr. Thomas noted the validity of the FCE and that the limitations are consistent with the diagnosis of post laminectomy syndrome and chronic pain syndrome. (Ex A p. 525) Dr. Thomas states "The most objective testing for functional ability that was available was a Functional Capacity Evaluation and this was performed on 4/24/14. Her function was determined to be less than sedentary work based on her lifting limitations. It was determined to be a valid test. There was no medical evaluation contrary to this conclusion. (Ex. A p. 526) Dr. Thomas goes on to note "from 11/25/2015, the claimant would have decreased capacity for prolonged sitting, prolonged standing, lifting, bending, stooping and balancing.....I am in agreement with the Abilities Form provided by Dr. Hopewell on 4/21/15 with the exception of the lifting noted above." (Id.)**

24. Lincoln admits that pages 523-528 is a report by Joseph Thomas, M.D., board certified in occupational medicine, dated March 9, 2016. Lincoln also admits that Dr. Thomas highlighted his disagreement with the box Dr. Hopewell checked indicating a lifting capacity of zero, and that he deferred to the prior FCE where Plaintiff lifted 7 pounds, but additional lifting capacity was not tested. Lincoln further states that Dr. Thomas noted that the FCE revealed near normal range of motion and strength with respect to Plaintiff's lumbar spine. (AR at 524). He also noted Dr. Hopewell's essentially sedentary restrictions but for the zero lifting restrictions and Dr. Hopewell's belief that depression was affecting Plaintiff's pain. (Id.)

17

**25.     Defendant then procured a second vocational report dated March 21, 2016, from Brandy Thomas, M.A., CRC. (Ex. A p 520-521) This vocational evaluator reviewed only the prior report of Stacey Nidositko, MS, CRC and Dr. Thomas' report of March 9, 2016. (Id.) It is important to note Dr. Thomas' agreement with most of Dr. Hopewell's report and his affirmation of the FCE and contrast that these documents were not provided to Brandy Thomas. (Id.) Brandy Thomas mirrors Stacey Nidositko's analysis as to claimant's ability to perform sedentary skilled work. (Id.)**

25.     Lincoln admits that pages 520-521 of the record constitute a Transferable Skills Analysis ("TSA") completed by Vocational Rehabilitation Counselor Brandy Thomas, MA, CRC on March 21, 2016.  Lincoln denies the second and third sentences of Paragraph 29, because these statements misconstrue the nature of the TSA and improperly mix medical and vocational issues.  The purpose of the TSA is to determine whether any of the reasonable restrictions and limitations as set forth by Dr. Thomas, would render Plaintiff unable to perform any occupation in the national economy given Plaintiff's transferable work skills and wage requirements.  That is exactly what Ms. Thomas did.  Ms. Thomas listed Plaintiff's education and training and detailed the relevant medical restrictions and limitations as set forth by Dr. Thomas — the same as the FCE.  Ms. Thomas identified several gainful occupations (nurse consultant (DOT Code 075.127-014) and call center nurse (eDOT Code 075.374-916)), consistent with Dr. Thomas's restrictions and limitations and Plaintiff's transferable skills.  (*Id.*) Ms. Thomas stated that both occupations require frequent sitting with the ability to change positions (consistent with Dr. Thomas' sitting restrictions), occasional standing and walking with the ability to change positions (consistent with Dr. Thomas' standing and walking restrictions) and the ability either to lift ten pounds occasionally (i.e. up to 1/3 of the time) or a negligible

18

amount of weight frequently (i.e. from 1/3 to 2/3 of the time) (consistent with Dr. Thomas' lifting restriction of 7 pounds occasionally).  (*Id.* at 520). *See also Ex. B to Lincoln's Motion.* Lincoln further denies Plaintiff's continued implication that Ms. Thomas should have actually analyzed and weighed the medical evidence and determined for herself, despite not being a medical professional, what Plaintiff's medical restrictions and limitations were.  Lincoln further denies any implication that had Ms. Thomas done so, it would have mattered in any relevant way, since Ms. Thomas was asked to assume the restrictions and limitations set forth by Dr. Thomas who deferred to the previous FCE, despite its shortcomings. These restrictions and limitations were slightly more conservative than the restrictions and limitations Ms. Nidositko was asked to assume, based on Dr. Karande's opinion.  (AR at 568).  Nonetheless, Ms. Thomas correctly concluded that the same occupations Ms. Nidositko identified, were consistent with Plaintiff's transferable skills, with Dr. Thomas's slightly more conservative restrictions and limitations, and offered a gainful wage.  (AR at 520-521).  In response to the fourth sentence of Paragraph 25, Lincoln admits only that both Ms. Thomas and Ms. Nidositko independently determined that the sedentary occupations of nurse consultant and call center nurse were consistent with Plaintiff's transferable skills and with the medical restrictions and limitations set forth by both Dr. Karande and Dr. Thomas.

**26.     On April 26, 2016, Defendant issues a denial of Plaintiff's appeal reciting portions of Dr. Hopewell's report and Dr. Thomas' report which support its denial, but wholly leaving out other portions of the report (Ex. A p. 515-519) In making its assessment Defendant relies on Brandy Thomas' vocational report to identify that Plaintiff can perform sedentary work. (Ex. A p. 517) However, Defendant correctly notes that sedentary work is defined as involving lifting up to 10 pounds of force occasionally, wholly ignoring**

**that its own reviewing medical expert Dr. Thomas, and the valid FCE on which he relied limited Plaintiff to 7 pounds or less than sedentary work. (Id.)**

26. Denied as stated. Lincoln admits only that pages 515-519 of the record constitutes an April 26, 2016 letter from Mr. Hastings to Plaintiff notifying her that Lincoln was upholding its prior, correct decision that she failed to meet her burden of proving disability from any occupation beyond November 24, 2015. This letter explains in detail the reasoning for Lincoln's determination. Lincoln further denies the statement that it ignored anything or, more importantly, that the ability to lift at least 7 pounds occasionally is inconsistent with the requirements of the sedentary occupations Ms. Nidositko and Ms. Thomas identified. As both TSA's set forth, the two identified occupations (call center nurse and nurse consultant) required "[e]xerting up to 10 pounds of force occasionally or a negligible amount of force frequently." *See Ex. B to Lincoln's Motion for Summary Judgment*. "Occasionally" means an "activity or condition [that] exists up to 1/3 of the time." *Owens v. Colvin*, 727 F.3d 850, 851-52 (8th Cir. 2013). "Frequently" means an "activity or condition [that] exists from 1/3 to 2/3 of the time." *Id.* at 851. Here, both of the identified occupations – call center nurse and nurse consultant – require "[e]xerting up to 10 pounds of force occasionally **or** a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects." *See Ex. B to Lincoln's Motion for Summary Judgment* (emphasis added). Except for Dr. Hopewell's unsupported opinion that Plaintiff cannot lift a pencil, there is no dispute that Plaintiff can lift at least 7 pounds occasionally (Dr. Thomas and the FCE), if not at least ten pounds occasionally (Nurse Mills), or twenty pounds occasionally (Dr. Karande). As defined above, Flanagan's ability to lift at least 7 pounds occasionally represents lifting or carrying a negligible amount of force at least 1/3 of the time, thus meeting the defined sedentary physical demand strength level. *See* 20 C.F.R. § 404.1567. In reviewing the essential duties of

20

each occupation, Ms. Thomas and Ms. Nidositko correctly determined that these tasks would require lifting negligible amounts frequently. (AR at 520-521, 568.) This is also consistent with Flanagan's undisputed ability to perform ADL's including bathing, dressing, and cooking. (AR at 71.) Plaintiff's lifting restriction would not preclude her from working either of the occupations identified in the TSAs as she is more than capable of lifting a pen, piece of paper, stapler, or telephone.

**27. On May 18, 2016, Plaintiff's counsel requested a copy of the curriculum vitae of both Dr. Joseph Thomas and Brandy Thomas. (Ex. A p. 514) On June 6, 2016, Defendant provided a copy of both to counsel, but neither was made a part of the record herein. (Ex. A p. 512) Counsel files herewith Exhibit B which is purported to be the curriculum vitae of Brandy Thomas. (Exhibit B)**

27. In response to the first sentence of Paragraph 27, Lincoln admits that page 514 of the record constitutes a letter dated May 18, 2016 from Plaintiff's counsel seeking copies of the curriculum vitae of "every expert utilized." In response to the second sentence of Paragraph 27, Lincoln admits that page 512 of the record is a letter dated June 6, 2016 from Mr. Hastings enclosing the requested CVs, which Lincoln has no objection to this Court considering in connection with its review of Lincoln's determination.

**28. Exhibit B the purported curriculum vitae of Brandy Thomas, indicates that she has a bachelors and master's degree, but does not state from where nor when. Moreover, the document indicates her only work since February 2014 has been for the Defendant. (Exhibit B)**

28. Lincoln admits that Exhibit B of Plaintiff's Motion is a CV of Ms. Thomas but denies that the CV is lacking in any way. If Plaintiff's counsel desired more information about

Ms. Thomas's background, he could have asked Lincoln for it, but he did not. Lincoln fails to comprehend what point Plaintiff attempts to make by virtue of the fact that Ms. Thomas has been employed by Lincoln since 2014. Cases upholding disability determinations based, in part, on vocational advice rendered by company employees are legion and Plaintiff does not state or even imply that Ms. Thomas's employment in any way improperly influenced her vocational work on this claim. *See e.g., Gerhardt v. Liberty Life Assur. Co. of Boston*, 736 F.3d 777, 781-782 (8th Cir. 2013) (finding it reasonable for Liberty to rely on a TSA by an in-house vocational consultant as opposed to the findings of plaintiff's rehabilitation counselor). Indeed, in conducting her TSA, Ms. Thomas assumed the restrictions and limitations that Plaintiff advocates.

**29.      On November 29, 2016, Plaintiff through counsel filed a final appeal to Defendant of the denial of benefits. (Ex. A. p 350-351)**

29.      Admitted.

**30.      Included with the appeal of November 29, 2016 was a vocational rehabilitation evaluation undertaken by Phil Eldred, M.S. C.R.C. dated October 5, 2016. (Ex. A p. 441¬505). Defendant's entire file and all medical opinions were provided to Mr. Eldred. (Ex. A p. 441-442) Mr. Eldred opined that the report of Nancy Beisswenger, the FCE, gave restrictions at less than sedentary work. (Id. at 455) The report of Dr. Karande was noted to be at the sedentary work level. (Id. at 457) Conversely, Mr. Eldred concluded the report of Dr. Hopewell was for less than sedentary work. (Id. at 458) Finally, Mr. Eldred found the report of the final peer review upon which Defendant relied in denying benefits Dr. Thomas, gave restrictions at less than sedentary work, which Mr. Eldred stated "... Means she is unemployable and unable to work in any occupation." (Id. at 459)**

**Mr. Eldred concluded Plaintiff is unemployable at the sedentary or any work level. (Id. at p. 462-464)**

30.     Lincoln admits only that the cited pages of the record constitutes a vocational evaluation by Phillip Eldred, MS, CRC dated October 5, 2016 completed at Flanagan's counsel's request.  As explained further in Lincoln's Suggestions in Support of its Motion for Summary Judgment at Section III(B), Mr. Eldred's vocational review improperly reached medical conclusions and provided no basis upon which to disagree with Lincoln's TSAs.

**31.     At Defendant's request additional medical were obtained and submitted (Ex. A p. 352-393, and 269-345) to bring the record current. Defendant noted the following new medical evidence (including but not limited to) in its February 6, 2017 denial:**

**a.     On October 22, 2014 Dr. Hopewell diagnosed Plaintiff with lumbar spondy-losis, post laminectomy lumbar syndrome and lumbar spondylolisthesis all occurring in the setting of mixed connective tissue disease. (Ex. A p 225)**

**b.     On December 7, 2015, Dr. Mace, a neurosurgeon, noted a good fusion but some progression of degeneration at L4-5 and left foraminal stenosis but no need for surgery. (Id)**

**c.     On June 16, 2016, Anne Winkler, M.D., a rheumatologist, noted undifferentiated connective tissue disease (UCTD). On September 1, 2016 Dr. Winkler noted some success from a steroid injection which lasted 1-2 months, but that at times "she (sic) was hurting all over with swelling of hand/finger that reportedly would occur about twice per month....and was not sleeping well due to pain radiating to right thigh." (Ex. A p. 226)**

23

**d.       Pain management records from Dr. Kokoszka and Dr. Tonkin indicated problems with performance of driving, shopping for groceries, preparing meals, performing housework, climbing a flight of stairs and sexual functions. (Id.) The exam noted no deformities, edema, cyanosis, atrophy of upper or lower extremities and normal reflexes. (Id.)**

31.     Lincoln admits that via letter dated October 28, 2016, Lincoln wrote to Plaintiff's counsel seeking any new medical evidence to provide a full and fair review of Plaintiff's claim. (AR at 394-395).  In response, Plaintiff's counsel submitted several additional medical records which Paragraph 31 cites to.

　　　　a.       Admitted.

　　　　b.       Admitted.

　　　　c.       Denied as stated. Lincoln admits only that Plaintiff saw Dr. Winkler on June 16, 2016 and stated that she "was ok for some time." (AR at 281). The following week, Plaintiff took a vacation to Florida (*Id.* at 278). Upon return from her vacation, Plaintiff had a normal physical examination with Dr. Winkler. (*Id.* at 284).

　　　　d.       Denied. Plaintiff's October 5, 2016 visit to Dr. Kokoszka noted normal physical and neurological examinations. (AR at 358).  Further, Dr. Kokoszka did not at any time provide Lincoln with any opinions supporting disability or occupational restrictions.  Plaintiff next saw Dr. Tonkin on October 12, 2016 and reported 60% pain relief. (AR at 367).  Dr. Tonkin also did not at any time provide Lincoln with any opinions supporting disability or occupational restrictions.  Additionally, Plaintiff told Lincoln that she could complete ADLs on

24

her own including bathing, showering, dressing, and cooking. (AR at 71). Lincoln further notes that not one of these additional treating physicians provided any opinions to the effect that Plaintiff is in any way impaired from sedentary work. Nor did any of these additional treating physicians provide any information to Lincoln, supportive of Plaintiff's disability claim.

**32. On February 6, 2017, Defendant denied Plaintiff's claim for benefits for the final time. (Ex.A p. 223-227) In denying Plaintiff Defendant recited Plaintiff's treatment records but relies on Dr. Karande's opinion as the premise of the initial denial finding Plaintiff could perform sedentary work. (Id. at 224) Defendant noted that at the first level of Appeal Dr. Thomas found Plaintiff was capable of sedentary work. (Id.) However, at the second level, the February 6, 2017, denial Defendant merely recites that it consulted with an unnamed health care consultant and that it did not support that Plaintiff was disabled beyond November 24, 2015. (Id. at 226) Defendant stated "We found no clinical findings noted in the file demonstrating any functional limitation that would support your client was unable to perform duties of any sedentary occupation. (Id. at 226).**

32. Lincoln admits only that the pages cited in the record constitute a February 6, 2017 letter from Senior Claims Examiner Joseph Jackson notifying Plaintiff that Lincoln correctly upheld its initial determination that she had not met her burden of proving that she was totally disabled from any occupation. Mr. Jackson explained that Lincoln based its decision on Plaintiff's medical records, the reports of two board certified physicians and a registered nurse, as well as two TSAs identifying sedentary occupations Plaintiff can perform. Plaintiff's claim file, which Lincoln produced to her counsel on request, clearly identifies Nurse Mills as providing additional medical advice on second appeal. (AR at 205-209).

25

**33. Plaintiff filed the lawsuit herein.**

33.     Admitted.

**ARGUMENT**

I.      <u>Lincoln Correctly Determined that Plaintiff Failed to Prove Disability</u>.

Plaintiff's Motion seems to wholly forget that the Group Policy firmly places the burden of providing "proof" of total disability on her. (AR at 131).  Lincoln had no burden to disprove Plaintiff's claim. *See Torres v. UNUM Life Ins. Co. of Am.*, 405 F.3d 670, 678 (8th Cir. 2005) ("Unum was not required to articulate a theory for [plaintiff's] inability to perform his job, but rather was to consider the evidence [he] submitted to determine whether it proved him disabled."); *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992) (it is plaintiff's burden of proving covered benefits); *Glover v. Jefferson Pilot Fin. Ins. Co.*, 2007 WL 552114, at *2 (E.D. Ark. Feb. 21, 2007) ("claimant for disability benefits must submit proof to show that she is disabled in the first instance").

That failure is not surprising given that during the administrative process, Plaintiff produced no actual proof of disability from any occupation, but for her own subjective say so. Plaintiff argues to the contrary pointing to two MRIs from September and December of 2012 — nearly a year prior to when Plaintiff stopped working fulltime as a nurse practitioner in August of 2013 and almost three years before Lincoln determined that Plaintiff was not disabled from any occupation.  (Dkt. No. 35 at p. 16).[3] The staleness of this evidence alone is telling.  Indeed, Plaintiff points to no subsequent tests closer to the relevant time period, and ignores the numerous normal tests around the time of the MRIs, including a normal lumbar myelogram in

---

[3] The page Plaintiff cited in her Motion, page 961 of the record, is a January 24, 2013 Followup Work-sheet from Dr. Hopewell, (AR at 961) not the MRIs.

26

November of 2012 (AR at 940), a normal thoracic spine MRI in December of 2012 (AR at 933), a normal lumbar X-ray in January of 2013 (AR at 930), and a normal lumbar spine CT scan in October of 2015 (AR at 551).

Even more importantly, while a MRI may constitute objective evidence that Plaintiff, like many working people, has degenerative disc disease and post-surgical changes, it provides no proof whatsoever that she is unable to work in a sedentary capacity. In this regard, Plaintiff confuses proof of a diagnosis with proof of disability. *See Pralutsky v. Metro. Life Ins. Co.*, 435 F.3d 833, 840-41 (8th Cir. 2006) (explaining that claims administrator accepted the diagnosis, but correctly required objective proof of disability as a result of that diagnosis); *see also Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d 9, 16 (1st Cir. 2003) (detailing that proof of diagnosis is different from proving how that diagnosed illness rendered the plaintiff unable to work); *Schultz v. 3M Company*, 2016 WL 3620738, at *3-4 (D. Minn. June 29, 2016) (finding that it was proper for an insurer to require objective evidence that a diagnosed illness rendered plaintiff unable to work).

As Lincoln's opening Motion demonstrates, from the date of the 2012 MRIs upon which she relies, to Lincoln's final determination in February of 2017, Plaintiff had more than a dozen normal examinations with neurologist Dr. Hopewell (See Dkt. No. 33 at pp. 36-38); a normal examination with neurologist Dr. Mace in 2015 (AR at 286); a normal examination with rheumatologist Dr. Winkler in 2016 (AR at 284); and a normal examination with spinal surgeon Dr. Kokoszka in 2016 (AR at 358).

Lacking any support in the imaging tests and physical examinations, Plaintiff turns to the forms Dr. Hopewell filled out on her behalf. But as also explained in Lincoln's opening motion, Dr. Hopewell himself, in his November 17, 2013 Physician's Statement, (i.e. two years before

27

Lincoln's determination that is at issue here) declined to provide any specific restrictions and limitations, but did note, under "objective findings", that Plaintiff had "normal physical exam, X-rays, CT myelogram and MRI." (AR at 923). And Dr. Hopewell admitted to Dr. Karande several months later, in June 2014, that the reason he wrote that Plaintiff could not work on the November 17, 2013 form, is because that is "what the patient told him." (AR at 743).

Despite the fact that Dr. Karande specifically documented this phone call in his report as taking place on June 2, 2014 at 4:13 p.m., Plaintiff's Motion calls it a "phantom phone call" and implies that Dr. Karande fabricated Dr. Hopewell's statement. (Dkt. No. 35 at p. 16). As support for this alleged malfeasance, Plaintiff points to a letter Dr. Hopewell wrote eighteen months later, in connection with Plaintiff's first appeal of Lincoln's determination, on December 9, 2015. In the letter, Dr. Hopewell stated that he had "no recollection of any conversation with the patients insurance company regarding any aspect of her care including disability" (sic) (AR at 536). This statement is not surprising, since Dr. Hopewell did not speak with Plaintiff's insurance company; he spoke with Dr. Karande, a consulting physician for a third-party vendor, University Disability Consortium.

The letter is relevant, however, in terms of what it *did not say*. In his letter, Dr. Hopewell did not deny basing his previous no work statement on what Plaintiff told him.[4] Nor did the letter provide any further evidence or opinions as to Plaintiff's functionality or alleged

---

[4] The same is obviously true of the Abilities Form Dr. Hopewell completed on April 21, 2015, which was entirely consistent with sedentary work but for his lifting restriction of zero. (AR at 637). As Lincoln explained in its opening Motion, this opinion, that Plaintiff could not lift even a piece of paper, was contrary to, literally, all the evidence in the contemporaneous medical records at the time, including Plaintiff's own admissions and acknowledged activities. (AR at 71). Clearly, rather than engage in any actual analysis or objective evaluation, Dr. Hopewell simply checked a box in an effort to assist Plaintiff's disability claim. *See Lincoln's Motion at III(A).*

28

impairment. These omissions are telling since Plaintiff submitted the letter in support of her appeal of Lincoln's benefits termination. Certainly, if Dr. Hopewell held any opinions at the time that were supportive of Plaintiff's disability claim, he would have said so. The fact that he did not, further supports what the evidence in the administrative record shows, i.e. that Plaintiff had improved by that time (AR at 230-231, 553, 577), all examinations were normal (AR at 574-576, 688, 926-927, 953-954, 959-969), and even Plaintiff admitted an ability to perform ADLs (AR at 71, 792), travel (AR at 83, 278), and that her pain was under control and "doing reasonably well." (AR at 553).

In short, as of November 24, 2015, Plaintiff clearly possessed the ability to work in a sedentary capacity, and the administrative record contains no credible evidence to the contrary.

II. Plaintiff's Reliance On A Disputed 7 Pound Lifting Restriction To Prove Disability From Any Occupation Is Misplaced And Actually Supports Lincoln's Determination.

Since nearly all of Plaintiff's in-person examinations with her treating physicians were normal and since the majority of her diagnostic studies were unremarkable, Plaintiff pins her entire claim on a narrow disagreement over precisely how much weight she can lift. The evidence forces Plaintiff down this narrow pathway because there is no disagreement whatsoever about her capacity to work a fulltime sedentary occupation in terms of sitting, standing, walking, grasping, handling, and cognitive ability. Plaintiff has also admitted that she has the physical abilities to travel from rural Missouri to Texas (AR at 83) and Florida (AR at 278). And in terms of lifting, even Plaintiff herself seems to admit that Dr. Hopewell's April 16, 2015 lifting restriction of zero was not accurate, as she concedes she can lift at least 7 pounds occasionally. (Dkt. No. 35 at p. 12).

With virtually no room to maneuver, Plaintiff places all of her eggs in the basket of a claim to the effect that that the difference between being able to lift 7 pounds occasionally versus 10 pounds occasionally, by definition, renders her totally disabled from *any* occupation. Unfortunately for Plaintiff, she is simply wrong.

From the standpoint of lifting, the gainful occupations that Lincoln's vocational consultants identified, require "[e]xerting up to 10 pounds of force occasionally **or** a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including the human body." (emphasis added) See *Exhibit B to Lincoln's Motion*; *see also* 20 C.F.R. § 404.1567 (explaining that sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."). "Occasionally" means an "activity or condition [that] exists up to 1/3 of the time." *Owens v. Colvin*, 727 F.3d 850, 851-52 (8th Cir. 2013). "Frequently" means an "activity or condition [that] exists from 1/3 to 2/3 of the time." *Id.* at 851.

As concerns the sedentary occupations Lincoln's vocational consultants identified, the difference between being able to lift 7 pounds and 10 pounds does not matter since they require the ability to lift "no more than" 10 pounds occasionally or a negligible amount of weight frequently and Plaintiff can undisputedly do that, at the very least. Indeed, Dr. Karande determined that Plaintiff could lift up to 10 pounds frequently and up to 20 pounds occasionally (AR at 748-749); Nurse Mills concluded that Plaintiff could lift up to 10 pounds occasionally (AR at 209);[5] and Dr. Thomas, deferring to the FCE despite its staleness and its shortcomings as

---

[5] Plaintiff's Motion refers to Nurse Mills as "an unnamed health care consultant." This is yet another curious critique. Nurse Mills is openly identified, along with all of her findings, in the administrative record that Lincoln produced to Plaintiff's counsel on multiple occasions. (AR at 205-209; 219).

identified by Dr. Karande,[6] found that Plaintiff could lift up to 7 pounds occasionally (AR at 523-528, 786). Plaintiff herself concedes the ability to perform ADL's including bathing, dressing, and cooking (AR at 71); all of which require the ability to perform at least negligible lifting.[7]

Thus, even if one were to accept a lifting restriction of slightly less than 10 pounds, it is simply not correct that such capacity automatically precludes sedentary functioning. Again, there is no bright line requirement of 10 pounds exactly. The requirement for sedentary work is "no more than" 10 pounds occasionally or a negligible amount frequently and Plaintiff clearly satisfies either or both requirements.[8]

> III. Plaintiff's Critiques of Lincoln's Vocational Consultants Are Meritless and Irrelevant.

As explained in Lincoln's Motion, Lincoln obtained not one but two Transferable Skills Analyses (TSA's) by two separate vocational consultants. The first, by Ms. Nidositko (AR at

---

[6] As Dr. Karande explained, the 2014 FCE was incomplete in several respects and therefore not an accurate assessment of Plaintiff's full functional capacity. *See* AR at 748 (explaining that the FCE was "incomplete as isometric strength testing was not performed due to therapist discretion, secondary to multiple diagnoses and lifting restrictions. Furthermore, there is no quantification of muscle strength or range of motion. Thus, this test would have to be interpreted with caution"). Indeed, the FCE practitioner did not even test Plaintiff's ability to lift more than 7 pounds or to handle material frequently, due to the fact that Plaintiff told Ms. Beisswenger that she had "permanent lifting restrictions" of lifting no more than 7 pounds following her back surgery, which took place three years earlier. (AR at 791, 804) (noting that Plaintiff "states that [the alleged lifting restriction] has not been removed and she adheres to it.") *Id.* Of course, no such "permanent lifting restriction" appears anywhere else in the administrative record.

[7] The ability to perform ADLs is an indicator of a claimant's capacity to work in a sedentary position. *See Acord v. Metro. Life Ins. Co.*, 2006 WL 2433432, at \*5 (W.D. Mo. Aug. 21, 2006) (granting defendant's motion for summary judgment on a claim for STD benefits because, in part, "[f]ile lacks mention of specific ADL impairment by her healthcare provider or need for home health aide that would support an impairment from a sedentary position").

[8] Plaintiff relies on the opinion of Mr. Eldred for the proposition that she is unable to lift enough weight to perform a sedentary occupation. But Mr. Eldred cites to no support for this conclusion and did not even purport to analyze the specific requirements of the occupations that Lincoln's vocational consultants identified.

31

568), found several gainful occupations consistent with Plaintiff's training, education and experience, that Plaintiff can perform within the restrictions and limitations set by Dr. Karande in her June 9, 2014 report. (AR at 741-749). The second, by Ms. Thomas, confirmed that Plaintiff can still perform those gainful occupations, even if one assumes the slightly more conservative restrictions and limitations set by Dr. Thomas in his March 9, 2016 report. (AR at 523-528).

Ms. Thomas and Ms. Nidositko performed their analyses exactly as vocational professionals should; they applied an assumed set of medical restrictions and limitations to the record evidence regarding Plaintiff's training, education and experience, and then searched the relevant vocational texts and sources for occupations in the national economy consistent with both, that also provide a gainful wage (i.e. at least 60% of Plaintiff's pre-disability income). (AR at 520-21, 568). Cases upholding determinations based in part on TSA's conducted in a similar manner, are legion. *See e.g.*, *Gerhardt v. Liberty Life Assur. Co. of Boston*, 736 F.3d 777, 781-782 (8th Cir. 2013) (finding it reasonable for Liberty to rely on its TSA as opposed to the findings of plaintiff's rehabilitation counselor as the TSA properly considered plaintiff's "medical status, functional capacity, education history, work history, and vocational status in determining the occupations for which [plaintiff] was reasonably fitted").

The evaluative aspect of a TSA involves the comparison of transferable skills to the requirements of the occupations in question. *See Barker v. Retirement Plan of Intern. Paper Co.*, 804 F. Supp. 2d 501, 502 (D.S.C. 2011) ("purpose of the TSA was to identify occupations, if any, that [plaintiff] could perform within any identified medical restrictions or limitations"). Thus, a plaintiff wishing to challenge a TSA might argue that she does not possess the transferable skills to perform the occupations in question. But Plaintiff makes no such argument here. Instead, she makes the novel claim that Lincoln should have provided the vocational

consultants with all of the medical evidence and let them decide for themselves what Plaintiff's medical restrictions and limitations are. Perhaps Plaintiff makes this argument because the vocational "expert" her lawyer hired, did in fact purport to weigh the medical evidence and render conclusions with respect thereto. (AR at 441-464). Unfortunately for Plaintiff, however, she provides no authority for the notion that vocational consultants should also assume the role of doctors and reach medical conclusions. That is because there is none.

As Lincoln explained in its Motion, vocational reviewers are not physicians and thus cannot opine on medical issues such as appropriate medical restrictions and limitations. *See e.g.*, *Martin v. Harris*, 666 F.2d 1153, 1155 (8th Cir. 1981) (explaining that the basic purpose of vocational experts is to "assess whether jobs exist for a person with the claimant's precise disabilities"); *Cook v. Heckler*, 739 F.2d 396, 399 (8th Cir. 1984) ("vocational experts are not consulted for their medical expertise"); *Robinson v. Colvin*, 2014 WL 347401, at \*3 (E.D.N.C. Jan. 30, 2014) *citing Fisher v. Barnhart*, 181 F. App'x 359, 365 (4th Cir. 2006) ("vocational experts are not experts in [medicine] who are qualified to render opinions on how the claimant's ailments might be reflected in his capabilities; rather, they are employment experts who know the mental and physical demands of different types of work"); *Henningsen v. Astrue*, 2013 WL 791771, at \*6 (D. Minn. Feb. 13, 2013) (non-physicians are not qualified to render a medical opinion on a plaintiff's physical impairments); *Sample v. Schweiker*, 694 F.2d 639, 643–44 and n.6 (9th Cir. 1982) (noting that a vocational expert has neither the role nor qualifications "to determine the validity of the medical opinion offered"); *Petrauskas v. Commissioner Social Sec. Admin.*, 414 Fed. Appx. 7, 9 (9th Cir. 2010) (finding that vocational experts "did not have the expertise to provide a medical opinion as to the severity of [claimant's] impairments"); *Knepper*

*v. Astrue*, 2012 WL 4470773, at \*8 (N.D. Iowa Sept. 27, 2012) ("a doctor should not be forced into the role of a vocational expert").

Notwithstanding this mountain of authority, Plaintiff persists in criticizing the vocational consultants for not conducting some type of analysis regarding the FCE and Dr. Hopewell's Abilities Form.[9] While, contrary to Plaintiff's implication, the entire claims file is available to vocational consultants for review, it is entirely unclear what analysis Plaintiff thinks the vocational consultants should have performed and what conclusions she thinks they should have reached. Again, to the extent Plaintiff claims that they should have weighed the medical evidence as set forth in these documents and rendered their own opinions with respect thereto, any such claim impermissibly mixes vocational with medical expertise and is simply wrong.

Moreover, the entire point is a red herring because the medical restrictions the second vocational consultant, Ms. Thomas, was asked to assume were the ones set forth by Dr. Thomas, who deferred to the FCE. (AR at 520-521). And, again, not even Plaintiff contends that Dr.

---

[9] Plaintiff devotes a significant portion of her Motion to the standard of review and an alleged conflict of interest presented by Lincoln determining and paying claims. None of these issues are particularly relevant here because Lincoln has conceded that the *de novo* standard of review applies. Conflict is irrelevant under *de novo* review because the court is not deferring to Lincoln's determination. *See e.g.*, *Gonda v. Permanente Medical Group, Inc.*, 300 F.R.D. 609, 616 (N.D. Cal. 2014) (holding that bias and conflict of interest are "irrelevant" under *de novo* review); *Price v. Hartford Life & Accident Ins. Co.*, 746 F. Supp. 2d 860, 866 (E.D. Mich. 2010) ("If the standard of review is de novo, then the significance of the administrator's conflict of interest evaporates."); *Weidauer v. Broadspire Servs., Inc.*, 2008 WL 4758691, at \*10 (S.D. Ohio Oct. 27, 2008) ("However, since a plan administrator's decision is accorded no deference or presumption of correctness when conducting a de novo review, whether there is a conflict of interest in this case is irrelevant."). Even if conflict was relevant, it is not important because, as Plaintiff admits, there is no evidence that financial considerations influenced the determination. And Lincoln took active steps to promote accuracy including paying the claim for two years, retaining separate third party vendors to refer independent physicians, seeking advice from separate vocational consultants, and providing two levels of independent appellate review by separate employees who were not involved in the initial determination. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 126 (2008) (importance of conflict reduces "to the vanishing point" when administrator takes active steps to promote accuracy).

34

Hopewell's Abilities Form was accurate. So query what effect Plaintiff thinks Ms. Thomas improperly assuming the role of a doctor, would have had on her vocational analyses?[10]

In sum, Plaintiff's erroneous critiques of Lincoln's reviewers, simply expose why her own vocational "expert's" opinion deserved no weight. Mr. Eldred purported to assume the role of vocational expert, physician, and claims professional all in one. He claimed that Plaintiff is allegedly impaired due to side effects from her medication negatively impacting her memory, concentration, and digestive system. (AR at 399.) But allegedly impairing side effects from medications are not mentioned anywhere in the contemporaneous medical records and no physician ever found, or even implied, that Plaintiff is cognitively impaired. Indeed, what the medical records do show, and what Mr. Eldred never mentioned, is that Plaintiff continued to work full time on the exact same pain medication for more than two years after her surgery, without complaining of side effects.

Mr. Eldred went on to incorrectly claim that Plaintiff had less than sedentary work capacity while failing to analyze the two positions that Ms. Thomas and Ms. Nidositko identified — nurse consultant and call center nurse. He never even attempted to review, let alone analyze, the specific requirements of either position as compared to Plaintiff's medical restrictions and limitations. In other words, he failed to do the one thing that vocational consultants are supposed to do. Instead, Mr. Eldred opined, as Plaintiff does in her Motion, with no support whatsoever, that simply because lifting 7 pounds is slightly less than 10 pounds, Plaintiff is not capable of

---

[10] Plaintiff also criticizes Ms. Thomas' qualifications, stating, without support, that her CV is devoid of relevant training and experience. (Dkt. No. 35 at p. 18). Yet Ms. Thomas has a bachelor's degree in Rehabilitation Services and a Master's degree in Rehabilitation Counseling. *Ex. B. to Plaintiff's Motion*. It is hard to fathom more relevant training. By contrast, Plaintiff's "expert," Mr. Eldred, has an undergraduate degree in secondary education and a master's in Guidance and Counseling (AR at 478) — neither of which pertain to vocational rehabilitation.

working a sedentary position. But such a conclusion ignores the contemporaneous medical records and the definition of sedentary work.

In sum, the record before this Court is clear that Plaintiff failed to meet her burden of proving disability from *any* occupation and Lincoln's determination would survive any standard of review.

## CONCLUSION

For the reasons detailed above, the Court should grant Lincoln's Motion for Summary Judgment and deny Plaintiff's Motion.[11]

Respectfully submitted,

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

/s/ AnnRene S. Braun
AnnRene S. Braun, MO #67962
4520 Main Street
Suite 400
Kansas City, MO 64111
Telephone: 816-471-1301
annrene.braun@ogletree.com

Byrne J. Decker (pro hac vice)
Steven J. Silver (pro hac vice)
477 Congress Street
5th Floor
Portland, ME 04101
Telephone: 207-387-2962
Fax: 207-387-2986
byrne.decker@ogletree.com
steven.silver@ogletree.com

*Attorneys for The Lincoln National Life Insurance Company*

---

[11] If the Court somehow does not affirm Lincoln's determination, the only appropriate remedy is a remand back to Lincoln for reconsideration. *See King v. Hartford Life and Acc. Ins. Co.*, 414 F.3d 994, 1006 (8th Cir. 2005).

36

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 20th day of June, 2018, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Rick S. Vasquez     MO #41317
LAW OFFICES OF RICK S. VASQUEZ
1736 E. Sunshine Street, Suite 103
Springfield, MO 65804
(417) 889-7735
(417) 889-7096 (Facsimile)
vasquezlaw@sbcglobal.net

**ATTORNEY FOR PLAINTIFF**

/s/ AnnRene S. Braun
Attorneys for The Lincoln National Life
Insurance Company